**IN THE UNITED STATES
DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2:20-cv-21
2020 FEB 26  AM 8:41

CLERK

BY____ GW_____

Civil Docket No.:

1.  **Darryl Schneider,**
2.  **Sandra Kimball,**

Plaintiffs

**vs.**

1.  **ABC, Inc. (ABC)**, monetary damages,
2.  **CNA Insurance Company (CNA)**, monetary damages,
3.  **Axis Insurance (AI)**, monetary damages,
4.  **Florida Lawyers Mutual Insurance Company (FLMIC)**, monetary damages,
5.  **Chart Industries Inc. (CI)**, monetary damages,
6.  **Free Methodist Church of North America (FMCNA)**, monetary damages,
7.  **Agency for Community Treatment Services (ACTS)**, monetary damages,
8.  **Florida Department of State and Legislative Affairs (FDS & LA)**, non-monetary damages, Title 42, Chapter 21, Section 1988,
9.  **Stephen Muldrow**, working for the Department of Justice **(DOJ)**, non-monetary damages, Title 18, Chapter 216, Section 3333,
10. **Clarence Thomas**, Working for the U.S. Supreme Court **(USSC)**, non-monetary damages, Title 18, Chapter 1, U.S. Code § 4 and Title 18, Chapter 216, Section 3333,
11. **David Bowdich**, Deputy Director of the Federal Bureau of Investigation **(FBI)**, non-monetary damages, Title 18, Chapter 216, Section 3333,
12. **Kellyanne Conway**, Working as Senior Attorney for the Trump Administration **(TA)**, non-monetary damages, Title 18, Chapter 216, Section 3333,

Defendants

**Trial by Common Law Jury (U.S. amend. VII) Demanded with a Trial Date Set in Stone.**

**COMPLAINT PURSUANT TO RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT AND OTHER CAUSES OF ACTION**

**RICO Case Statement:**

When the powerfully corrupted take control over citizens' inalienable rights for increased wealth and power by using the corruptible, racketeering occurs.

During the beginning of 2012, the Plaintiff's mother, Gloria Schneider, referred to in this complaint as the decedent, was abused, neglected, exploited and murdered by her three (3) caretakers. On 6-29-12, the caretakers coerced the decedent into signing two (2) false inheritance instruments that probate attorney Robert Welker had finished drafting for them back in 3/2012 by way of a forged retainer agreement between himself and the decedent. This allowed Robert Welker to probate the decedent's estate for more blood money after her death on 7-1-12. This was illegal enough, but the Hillsborough County Sheriff's Office (HCSO) in Florida implemented an ongoing vendetta against the Plaintiff, starting in 3/2012 by Colonel James Previtera. After the Florida Department of Law Enforcement (FDLE) had investigated the death threat allegations made by the Plaintiff against HCSO, James Previtera was terminated from both his detention position and HCSO. And his friends at HCSO in turn refused to investigate and charge the

2

decedent's caretakers for her murder as a form of payback to the Plaintiff, costing him his inheritance under Florida Slayer Statute 732.802. By beyond reasonable doubt evidence, HCSO had the 13th Judicial Circuit in Tampa, Florida implement their revenge against the Plaintiff by costing him any court awarded money from any lawsuit that he was party to in Hillsborough County, Florida. Thus far, 29 local judges at both the 13th Judicial Circuit and the Second District Court of Appeals (2DCA) in Florida have defrauded the Plaintiff out of $1,081,720 as part of a corrupt enterprise under the Civil RICO Act as a favor to HCSO. Without HCSO having denied requests from both state and federal government agencies to investigate the decedent's murder, this complaint would not have been filed.

What the naive Plaintiff discovered while attempting to obtain justice for himself and the decedent these last seven (7) long years, is that all American government agencies are geared towards covering up any type of crime, even murders, from its local state levels to the Trump Administration, simply by ignoring their employment requirements to enforce the penalties. Whenever a cover-up is wanted by a well-connected, corrupted official in charge of a state agency, even one just for spite, it is not only approved by the highest ranking elected state official, but there is absolutely no interference from any federal government agency or their corrupt allies, the media.

3

If a murder takes place and a high ranking government official is involved, the enterprising media is obligated not to report it without prior government approval as part of their allegiance to the powers that be. And if any long term assistance is needed from any government agency in continuing to whitewash illegal acts committed, they are efficiently and effectively given out like clockwork along with a smile and a back on the back as proud and loyal government protected confederates who operate above the law.

The problem with obtaining justice in in America today is that government involvement in corruption is so vast and inclusive, that exposing even one low ranking government employee involved in a petty crime, has the likelihood of also exposing the entire government and its high ranking affiliates of having done worse. The implementation of a totalitarian world order in America is complete. When fair and equitable laws for citizens are turned into meaningless and irrelevant garbage by judicial servants everywhere at the request of their superiors, or lose their job assignments and pay raises, it is time to flee that country to one having less dictators to please in acquiring the freedoms needed to survive.

The purpose of the continual RICO predicate acts that were committed by the four (4) corrupt enterprises cited in this complaint were: **1)** to continue monetarily injuring the

4

Plaintiff's business and property interests everywhere they had the ability to defraud the Plaintiff as bullies participating in HCSO's vendetta for either profit or gain (something of value). And **2)** to cover-up the six (6) or more types of prior racketeering activities committed under Title 18, chapter 96, Section 1961(1), by implementing and/or assisting in (even by turning a blind eye to) under Title 18, U.S. Code § 3, but not limited to **A)** murder under Title 18, Section § 1959 (committed by the primary enterprise), **B)** extortion under Title 18, Section § 880 (committed by the primary enterprise), **C)** extortionate credit transactions under Title 18, Sections § 891-894 (committed by the primary enterprise), **D)** influencing the operations of an employee benefit plan under Title 18, Section § 1954 (committed by the secondary, third and fourth enterprises, **E)** money laundering under Title 18, Section § 1956 (participated in by all four (4) enterprises) and **F)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 (committed by all four (4) enterprises).

The RICO predicate acts committed by Florida's state judicial enterprise (secondary enterprise) resulted in the Plaintiff's court cases not legally going to trial where evidence could have been brought to light before a neutral and unbiased jury for awarded monetary compensation to the Plaintiff and justice for the murdered decedent.

The local trial and appellate court judges have been the driving force in orchestrating and implementing the federal Racketeer Influenced and Corrupt Organizations Act (RICO) on the Plaintiffs and decedent. Consequently, the necessity for this complaint to be heard out of state for a chance at justice prevailing, is due to members of the Florida judicial branch of government having participated in the racketeering activities committed, thus the judicial accomplices have affected interstate commerce.

Fed. R. Civ. P. 8 requires the complaint to contain "a short and plain statement of the claim," but RICO claims that are based on mail or wire fraud (Title 18, Chapter 63, U.S. Codes § 1341 & 1343), must also satisfy Fed. R. Civ. P. 9(b) by stating the circumstances constituting fraud with particularity by identifying the time, place, and content of the fraudulent actions, as well as the parties to the actions. The heightened pleading standards under *Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqba,* are particularly important in RICO cases to protect defendants against baseless charges of racketeering. Consequently, this complaint is long, but clear and concisely written. Thus, the Plaintiff not only included the applicable RICO statutes and case laws to keep the honest judge hearing this case innocent of committing any errors, but as a reference aid available to everyone in the world. All the statements made

6

by the Plaintiff in this complaint were based only on the facts, most of which are documented in the Plaintiff's court case files.    The Plaintiff never filed one complaint in which actionable claims were not cited in support of the counts upon which damages should have been awarded.    And Rule 11(b)(3), which allows pleadings to be based on evidence that a party reasonably anticipates will surface following further discovery, always applies.

Finally, when opposing parties from the Plaintiff's court cases cited in this complaint decided not to come to court and settle their debts owed with honor and integrity because they knew that the presiding judges were out to defraud the Plaintiff, they made up their minds to come to court to defraud.    To the corrupted lawyer accomplices and their malpractice insurance carriers who participated in over forty (40) violations of Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346, without any moral conscience, smiling in the Plaintiff's face while shaking hands with one another after each illegal win, winning unfairly without honor and integrity meant everything to them.    Now it is high time for them to finally lose with some!

"Never doubt that a small group of committed people can change the world.    Indeed, it is the only thing that ever has." Margaret Mead.

7

**Some Applicable Rules for Suing the Defendants in this Complaint:**

In this complaint, it is important to note that **1)** if a defendant was the owner of a company whose **company or himself** benefited from his having participated in a RICO predicate act, the owner is in violation of Title 18, Chapter 96, Section 1962(a) and his company can be sued for vicarious liability under the Respondeat Superior Doctrine. *Petro-Tech, Inc.*, 824 F. 2d at 1359 n. 11. **2)** If a defendant was a manager of a company who benefited the **company or owner** by permitting an employee or agent of the company during the scope of their employment to have participated in a RICO predicate act which benefited the **company or owner**, the manager is in violation of Title 18, Chapter 96, Section 1962(b) and the company can be sued for vicarious liability under the Respondeat Superior Doctrine. *Quick v. Peoples Bank of Cullman Cnty.*, 993 F.2d 793, 797 (11th Cir. 1993). **3)** 1) if a defendant was an employee or agent of the company who benefited the **company or owner** from his having participated in a RICO predicate act, the defendant is in violation of Title 18, Chapter 96, Section 1962(c) and the company can be sued for vicarious liability under the Respondeat Superior Doctrine. *Davis v. Mutual Life Ins. Co. of New York*, 6 F. 3d 367, 378-80 (6th Cir. 1993). **4A)** If a defendant as an employee or agent of a company, directly commits a RICO

8

predicate act as one of the principles that benefits a **company or owner**, or **4B)** if a defendant had a fiduciary duty (legal or ethical) to act appropriately once notified of a racketeering operation within a **company or agency** that was within their employment requirements to stop, with foreseeable racketeering activity **continuing** into the future, if they did not take the appropriate action, the defendant is in violation of Title 18, Chapter 96, Section 1962(c). Brady v. Dairy Fresh Products Co., 974 F. 2d 1149, 1155 (9th Cir. 1992). **5A)** If a defendant as an owner (Section § 1962(a), manager (Section § 1962(b), employee or agent (Section § 1962(c) with a fiduciary duty (legal or ethical) to act appropriately, by not violating Title 18, Chapter 96, Section 1962(d) (Pinkerton Doctrine), who had **beforehand knowledge** of what the RICO plan was that would continue to be implemented into the future, or **5B)** had a fiduciary duty (legal or ethical) to act appropriately **once notified** of a racketeering operation at an agency or company that was within their employment requirements to stop, with foreseeable racketeering activity continuing into the future, if the appropriate action was not taken, **but without any future racketeering activities occurring**, only a Title 18, Chapter 96, Section 1962(d) violation was committed, but you cannot sue a co-conspirator under the RICO Act without a future violation occurring under Title 18, Chapter 96, Section 1962(c).

9

**All of the Defendants and their co-conspirators (accomplices) in this complaint are in violation of Title 18, Section 1962(a and/or b and/or c) which makes all of them also liable for damages under Section § 1962(d) because they knew what the RICO plan was before participating in it, but the Plaintiffs are not suing all of the accomplices in this matter.**

Under Federal Rule 19, the Plaintiffs **can** choose which accomplices they sue for the full triple remedial damage amount, when together all of them unfairly and unethically exploited the Plaintiffs, illegally interfering with their property and business interests, affecting both intrastate and interstate commerce.

**Racketeering is a form of antitrust committed (unfair trade and competition for acquiring either products, or more importantly in this matter, services), when statewide judicial employees (both state and federal) in their individual capacities, allow members of an association (opposing parties) to monopolize a publicly used state court system to defraud an adverse party, who exchanged currency for honest services to be rendered (commerce), they have deprived the citizen of any value in what he or she paid for (honest services fraud)**. Call it the **Schneider Antitrust Act**. Consequently the Plaintiffs chose to sue only the Defendants cited, not their co-conspirators (accomplices), allowing the Defendants to decide if they want

10

to, or not, legally sort out their respective proportions of liability and payment with their fellow joint tortfeasors. Under Federal Rules 19(a)(1)(B)(i) and (a)(1)(B)(ii), there must either be a possibility that disposing of the action in the person's absence will "as a practical matter impair or impede the person's ability to **protect the interest**," or a possibility that doing so will **"leave an existing party subject to a substantial risk of incurring double, multiple,** or otherwise inconsistent **obligations because of the interest." Neither of these conditions are applicable in this matter because 1) the co-conspirators (accomplices) have no interests other than a financial obligation to pay the Defendants their share of the moneys owed to the Plaintiffs, 2) the damage amounts are remedial, so either the Defendants owe the total damage amount or they do not owe anything. And 3) the evidence for awarding damages by this court is at the beyond reasonable doubt evidence level of what illegal acts were committed, and by whom. Although both judicial and attorney participation <u>(actions taken)</u> in this matter were required as a <u>team effort</u> to achieve the enterprises' goals, their attendance in this lawsuit under Rule 19(a)(1)(A) does not change the: 1) money amount owed, 2) evidence substantiating the counts and claims or 3) <u>the co-conspirators all declaring bankruptcy as a means not to pay the Plaintiffs a penny after fraudulently dragging out each and</u>**

**every court proceeding as they have done in the past. Consequently, criminal court is the only viable venue for punishing the co-conspirators!**

As with any **Rule 19(a)(1)(B)** case, deciding whether an absent **joint tortfeasor** is a required party **requires identifying the specific interest the absent party claims** and determining **whether the party's ability to protect that interest may be impaired despite the fact that it has not been named as a party in the action.** Compare Wilbur, 423 F. 3d at 1111-14. **Whether the judicial and attorney accomplices are required as parties in this matter depends on whether their interests qualify for protection under Rule 19(a)(1)(B)(i), even if 1) it is alleged to have played a central role in the conspiracy, and 2) even if resolution of the action will require the court to evaluate the absent party's conduct.** *Ward v. Apple, Inc.* 2015

We observed that **"[j]oinder is 'contingent . . .** upon an initial requirement that **the absent party claim a legally protected interest relating to the subject matter of the action,"** id. at 689 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F. 2d 1030, 1043 (9th Cir.1983)).

We have clarified that **"the interest at stake need not be 'property in the sense of the due process clause.'"** *Cachil Dehe Band*, 547 F. 3d at 970 (quoting *Am. Greyhound Racing*, 305 F. 3d at 1023). And we have required that **the interest "be more than**

12

**a financial stake**, and **more than speculation about a future event (bad publicity or future litigation and/or prosecution)**." Id. (internal quotation marks omitted). "Within the wide boundaries set by these general principles, **we have emphasized the 'practical' and 'fact-specific' nature of the inquiry**." Id. *Ward v. Apple, Inc.* (2015). It is **not practical** to allow 78 additional co-conspirators to be party to this case, nor is it going to change the case related **ultimate facts** which have been documented.

"It has long been the rule that it is **not** necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990) (percuriam); see also Fed. R. Civ. P. 19 advisory committee's note to 1966 amend. (noting that **"a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like liability"**). **Antitrust conspirators are liable for the acts of their co-conspirators.** *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150,253-54 (1940); *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F. 2d 1360, 1367 (9th Cir.1980). **It therefore follows that a plaintiff is "not required to sue all of the alleged conspirators in as much as antitrust co-conspirators are jointly and severally liable for all damages caused by the conspiracy**." *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*,

668 F. 2d 1014, 1053 (9th Cir. 1982); see also *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 330(1955) **(holding that joinder of alleged antitrust co-conspirators was not mandatory "since as joint tort-feasors they were not indispensable parties")**; *Georgia v. Penn. R. R.*, 324 U.S. 439, 463 (1945) ("In a suit to enjoin a conspiracy <u>not</u> all the conspirators are necessary parties . . . ."). For this reason, an absent **antitrust co-conspirator generally will not be a required party under Rule 19(a)(1)(A), which applies only when a party's absence prevents the court from "accord[ing] complete relief among existing parties**."

This case, for example, illustrates why according complete relief will usually be possible without joining an absent co-conspirator like ATTM. If the Plaintiffs prevail, they will be able to recover all of their damages from Apple alone, *see Socony-Vacuum*, 310 U.S. at 253-54, without naming ATTM as a party. Accordingly, ATTM is not a required party under Rule 19(a)(1)(A). Ward v. Apple, Inc., (2015).

**When state and federal judges control an entire statewide court system as members of an enterprise, deliberately making it legal for those who have acquired stolen property in the amount of a felony ($300 in Florida), to keep the property for whatever reason, they have committed money laundering under Title 18, Chapter 95, Section 1956.**

Under Federal Rule 19 and the RICO Act, as a result of a **non-courtroom defrauding**, the victim or victims can file a RICO lawsuit against any co-conspirators who participated at least once, directly or indirectly in the RICO plan with an enterprise or association that committed at least two (2) RICO predicate acts on them under Section § 1961(1), resulting in at least one (1) injury to a property or business interest, **but the acts must "amount to or pose a threat of continued criminal activity."** **H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 238-39 (1989).**

**Within the American court system, is the largest enterprise there ever was, and ever will be, in the history of planet Earth!** **Their members form government cooperative cabals operating within every state judicial circuit and district, who aid each other in violating the RICO Act whenever desired, with managing members in key appointed and elected positions, in violation of Title 18, Chapter 96, Section 1962(b), by giving their approval to trial and appellate court judges to defraud either plaintiffs or defendants.**

**The Plaintiff recently talked with a couple inactive attorneys who stated that after experiencing how utterly shameful and dirty they felt while being part of the American kangaroo court system of justice, they refused to practice law ever again and wish they could have thrown their bar licenses into the garbage**

**out of embarrassment for having become attorneys, but could only inactivate them and find honest work elsewhere. These were truly honorable men!**

The American court system is chuck-full of crooked and arrogant racketeering judges and attorneys, continuously looking to defraud the public at the drop of a hat for nothing more than shear satisfaction and increased self-esteem. So to say that a defrauded party in a court case should have known that their judge was a member of an enterprise, is a very false statement because **they already knew! The question to be asked first of a diligent person conducting an investigation into who was behind their being defrauded in a court case should be: Can you prove by clear and convincing evidence (substantially more probable to being true than not) that your judge's judicial enterprise committed two (2) clear abuse of discretions that injured you during your court case in violation of the RICO Act?**

Under Federal Rule 19 and the RICO Act, but as a result of a **courtroom injury** implemented by a state judicial enterprise having defrauded a party or parties with **1)** an illegal dismissal pleading granted or **2)** an illegal permanent suspension of discovery due to a false pleading granted or **3)** any obvious illegal judicial order that benefits an opposing party that either filed a false pleading, or just subsequently acquiesced in the illegal benefit, that results in a permanent injury to a

16

property or business interest, if further legal recourse is not taken by the victim or victims, after the state judicial enterprise commits two (2) clear abuse of discretions, which under the RICO Act, amounts to two (2) RICO predicate acts committed under Section § 1961(1), by either the same judge, or a different judge, from the same state judicial enterprise, on at least one (1) of the same injured parties involved, during either **1)** a rehearing, **2)** an appeal or **3)** a new case, for the same or a different (any) property or business interest, with either different or the same opposing party or parties having participated or subsequently acquiesced in a second beneficial RICO predicate act committed, the victimized party or parties can sue any one of his or her judges and/or their co-conspirators under the RICO Act for the entire damage amount owed in any court case that resulted in his or her injury.

**In other words, any two (2) racketeering actions under Section § 1961(1), that were clearly committed by a state judicial enterprise through a judge or judges, resulting in at least one (1) permanent injury to a victim or victims' property or business interest, in any court case, without taking further legal recourse to correct the injury, is actionable under the RICO Act and the victim or victims can sue any of their judges and/or their co-conspirators for damages sustained in any court case where the injury took place.**

**Most of the time, wire and mail frauds committed results in an immediate injuries, but blatantly false pleadings filed as direct wire or mail fraud solicitations to judges by opposing parties to defraud intended court case victim or victims <u>do not</u>. Consequently, the one who commits a clear abuse of discretion (honest services fraud) resulting in an injury during a court case is the judge, not an opposing party. <u>All of the state judicial enterprise managers were notified by the Plaintiff, seeking their assistance after most of the illegal acts were committed on him by his judges, but each one of these managers subsequently acquiesced in (turned a blind eye) to seeing that the injuries sustained by the Plaintiff were reversed</u>. The managers of the state judicial enterprise contacted by the Plaintiff were: Rick Scott, Jorge Labarga, Pamela Bondi, Manuel Menendez, Ronald Ficarrotta and Edward LaRose, with notification dates documented throughout this complaint.**

In a courtroom setting, the one (1) RICO predicate act with an injury committed by the **state judicial enterprise** through one of its judges, needs to pose a threat of continued criminal activity (two (2) or more) under Section § 1961(1). Consequently two (2) RICO predicate acts committed by the **state judicial enterprise, <u>defrauding any one of the same victims either in 1) the same, 2) related or 3) unrelated court case</u>**, are needed to show that a **RICO pattern** under Section § 1961(5)

of defrauding the same party or parties under Section § 1961(1) has been established before the state judicial enterprise and/or their co-conspirators can be sued for racketeering.

**Under the RICO Act, any enterprise is deemed to have racketeered if it commits two (2) RICO predicate acts on anyone. The problem with suing your judge for doing so is that 1) he or she can declare bankruptcy and not pay you a penny. And 2) it is difficult to find documented court cases where any judge from the same state judicial enterprise has clearly been guilty of having racketeered even once. Under the *Rotella* case ruling, publicizing this information would allow victims to easily sue their judges as acting members in their state judicial enterprise along with their co-conspirators only after one (1) judicially implemented RICO predicate act is committed with an injury during one court case.**

A **co-conspirator** in a courtroom setting is an opposing party or parties who benefited by **1)** having filed a false pleading that was ruled favorably on or **2)** subsequently acquiesced in a false ruling, violations of the RICO Act.

**When parties to a court cases file blatantly false pleadings in order to win, the wire and/or mail fraud they commit, is an indirect future defrauding, known as a fraud on the court, on an intended victim or victims directed at the judge (solicitation) for his or her participation in committing honest services fraud**

(abuse of discretion).  So if the judge reads clearly false allegations made in a pleading and <u>agrees</u> with the proposed wire or mail fraud scheme by intending to involve his or her enterprise in defrauding an intended victim, at least two (2) times, instead of ruling in favor of the intended victim or victims winning the court case due to the <u>blatant attempt by an opposing party or parties to commit a fraud on the court by wire and/or mail fraud with the aid of the state judicial enterprise</u>, then all association or enterprise members who intend to participate, are immediately in violation of Title 18, Chapter 96, Section 1962(d).  Since it is the state judicial enterprise, with the approval of its management under Title 18, Chapter 96, Section 1962(b), that commits the RICO injury on the intended victim or victims, not an association of racketeers that includes opposing parties and the judge, the state judicial enterprise as a separate entity has to commit the two (2) RICO predicate acts (a pattern) as stated under Section § 1961(5), through a judge or judges.

<u>One common law fraud (wire and/or mail fraud) devised as a scheme (Title 18, Chapter 96, Section 1962(d)) to solicit a judge into injuring an intended court case victim or victims, in and of itself, is not actionable under the RICO Act, unless 1) the pleading clearly does not apply the correct laws based on the merits of the case that the judge has ruled favorably on</u>

**resulting in an injury sustained by the victim or victims and 2) one (1) more RICO predicate act is committed by the state judicial enterprise under Section 1961(1) on the same victim or victims, making it two (2) violation committed under Title 18, Chapter 96, Section 1962(c), if only by a judge wrongly affirming a prior RICO predicate act with an injury committed by another judge.**

There is only one way for a party or parties to a court case to have known there was racketeering committed on them by an enterprise during their court case without being told in order to take legal action against the enterprise and/or their co-conspirators for their sustained injury or injuries, and that is by clear and convincing evidence level amounts of racketeering (a pattern of two (2) or more RICO predicate acts committed) shown as proof that a conspiracy to defraud was acted on (committed) by a state judicial enterprise, and that is by it having implemented at least two (2) RICO predicate act through the same or another judge, during any court case on a the same victim or victims seeking compensation on either the same or a different (any) property or business interest, initiated by a clearly false pleading filed by any opposing party or parties as either an association **(false joinders),** or as individual participants **(false pleadings).** **Consequently, after two RICO predicate acts; two (2) violations of honest services fraud; two**

21

**(2) abuse of discretions; two (2) substantive due process right violations,** any victim can sue any judge and/or co-conspirator who participated directly or indirectly, in at least one (1) RICO predicate act committed against them, resulting in an injury, for the full compensation owed to them from that court case.

**So a second (2) RICO predicate act committed by the same or a different judge working for the same state judicial enterprise, defrauding the same party or parties in _any_ court case, injuring them at least once in _any_ property or business interest, resulting in a total of two (2) abuse of discretions that were clearly erroneous, respectively _Rabkin v. Oregon Health Sciences Univ._, 350 F. 3d 967, 977 (9th Cir. 2003) and Fed. R. Civ. P. 52(a)(6); _United States v. Cazares_, 121 F. 3d 1241, 1245 (9th Cir. 1997), are needed to rule out a onetime judicial error, or a onetime personnel defrauding of a disliked party by one (1) judge due to spite, before any co-conspirator with deep pockets who participated directly under Section § 1962(c) or indirectly under Section § 1962(d) (Pinkerton Liability Doctrine) in either court case, can be sued in federal court under the RICO Act for triple the entire compensation owed. The key word here is onetime. Multiple times (two (2) or more) with at least one (1) injury means that racketeering has occurred under the RICO Act, enacted by a judge or judges, who either requested or had**

**standing permission given to them by their management team within their state judicial enterprise to do so.** Until an injury happens, all participants can only be in violation of Title 18, Chapter 96, Section 1962(d).

A judge having committed one (1) abuse of discretion (Envtl. Def. Ctr., Inc. v. EPA, 344 F. 3d 832, 858 n.36 (9th Cir. 2003) is just as illegal as their having committed one (1) arbitrary, pretextual or capricious ruling, also known as a fraud on the court, or one (1) state and federal substantive due process right (civil rights) violation, all being causes of action in suing either a judge and/or his or her co-conspirators under Title 42, Chapter 21, Section 1983, **but when two (2) abuse of discretions have been committed on the same party or parties where both rulings were clearly false, you can sue that judge who made the ruling and/or their co-conspirators (opposing parties or the second judge) under the RICO Act for any damages sustained.**

When the word Plaintiff is used in this complaint, it is referring to Mr. Schneider. And when the word Plaintiffs is used in this complaint, it is referring to Mr. Schneider and Ms. Kimball.

Substantive due process right violations in the **courtroom setting** are evidentiary and ultimate facts that are illegally dismissed as irrelevant **first,** due to a clear abuse of

discretions that **secondarily** cause sustained, illegal procedural right violations.

Finally, the word "enterprise" used in this complaint only means an association of bad actors who participated in racketeering (RICO predicate acts committed), no matter where they were operating out of when they committed them.


**Defendant Specific Federal Count Violations, Based on What the Defendants' and Accomplices' Positions Were at the Time They Participated in Multiple Corrupt Enterprises, with Actionable Claims added to them at this Time to Begin Clearly and Concisely Identifying What Caused the Plaintiff's Damages under the Applicable Laws:**


**Section 1.** All state and federal judicial accomplices (secondary enterprise), either past or present employees of the government, can be sued for violations under **1) (Title 18, Chapter 96, Codes § 1961-1968), 2) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 3) (Title 18, U.S. Code § 3), 4) (Title 42, Chapter 21, Section 1983), 5) Title 18, Chapter 13, U.S. Codes § 241 & 242, 6) Title 18, Chapter 95, Section 1956 and 7) Fraud on the Court.** Remedial triple damage amounts and attorney's fees with a lodestar multiplier could be demanded, but under Section § 1983, regular damages along with punitive

amounts and attorney's fees could be asked for instead, when in their individual capacities, during the course of their official capacities, they directly implemented and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, the racketeering activities listed under **(Title 18, U.S. Code § 1961(1))**, but not limited to **1)** murder (Title 18, Section § 1959), **2)** extortion (Title 18, Section § 880), **3)** extortionate credit transactions (Title 18, Sections § 891-894), **4)** influencing the operations of an employee benefit plan (Title 18, Section § 1954), **5)** money laundering under (Title 18, Section § 1956), first committed by Robert Foster when he illegally dismissed a lis pendens knowing that the $65,000 less than the fair market value proceed amount of $165,000 from the sale of the murdered decedent's home, was going to her murderers who forged her signature on the sales contract before her death and **6)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 for the purposes of defrauding the Plaintiffs and decedent out of their state and federal substantive due process rights (civil rights) when they were required by law to act appropriately.  The accomplices cited in this Section participated under either **(Title 18, Chapter 96, Section 1962(b)** as managing partners within the secondary enterprise, and/or under **(Title 18, Chapter 96, Section 1962(c)** as principals in the secondary enterprise's

numerous RICO predicate acts committed for the purposes of **A)** monetarily damaging the Plaintiffs' business and/or property interests by laundering money owed to them under Title 18, Chapter 95, Section 1956 and **B)** covering up the prior racketeering activities of the three (3) local enterprises. The accomplices are: **Jorge Labarga, Manuel Menendez & Ronald Ficarrotta (primary upper management under Sections § 1962(b & c) within the secondary enterprise and given constructive notice of the frauds committed on the Plaintiffs with a reasonable amount of time to take the appropriate action), Bernard Silver, William Levens, Clarence Thomas (given constructive notice and a reasonable amount of time to take the appropriate action), Robert Foster, Mark Wolfe, Richard Nielsen, Paul Huey, Elizabeth Rice, Robert Foster, Catherine Catlin, Robert Bauman, Joelle Ober, Chet Tharpe, Claudia Isom, Jack St. Arnold, Morris Silberman, Charlene Honeywell, Morris Silberman, John Badalamenti, Marva Crenshaw, Edward LaRose (secondary upper management under Sections § 1962(b & c)) within the secondary enterprise and given constructive notice and a reasonable amount of time to take the appropriate action), Patricia Kelly, Matthew Lucas, Robert Morris, Susan Rothstein-Youakim, Samuel Salario, Daniel Sleet, Anthony Black, Craig Villanti, Stevan Northcutt and Nelly Khouzam.**

**Further Analysis of the Ultimate Facts and Applicable Laws Supporting the Counts of Section 1:**

The judicial accomplices **have no absolute immunity from suit** when they participated in the secondary enterprise (state judicial enterprise) that orchestrated, committed and covered up under Title 18, U.S. Code § 3, RICO predicate acts for the purposes of **1)** monetarily damaging the Plaintiffs' business and/or property interests by laundering money owed to them under Title 18, Chapter 95, Section 1956 and **2)** to cover-up the prior racketeering activities of the three (3) local enterprises, all while sitting on the bench protecting their assigned positions, future pay raises and retirement benefits. The problem with a large and powerful gang is that when a **team member** is called upon to perform a task as part of a **team plan**, their participation had better be effectively given, or else they risk either being **1)** punished with a demotion (the demotion of both Mark Wolfe and Elizabeth Rice to criminal court for not being effective enough), or **2)** terminated from the gang, as in a career change for the worst.

**The civil rights violations (torts) that were repeatedly committed by the judicial accomplices as a team effort, formed a pattern of racketeering activity that contravened the Plaintiffs' 5th and 14th amendment rights as an enterprise, not as**

individuals acting in their individual capacities while sitting on the bench.

It is a private, non-judicial and illegal action for any judge to go outside the jurisdiction and scope of their job duties and participate with an enterprise for the purpose of defrauding a citizen out of their state and federal substantive due process rights while sitting on the bench. Consequently, the judicial accomplices do not have immunity from suit for causing damages to the Plaintiffs when they participated in racketeering activities, no matter where they were sitting at the time! See *Committee to Protect our Agricultural Water v. Occidental oil,* 235 F. Supp. 3d 1132, Id at paragraph 55.

Judicial immunity ends when a judge forms the requisite criminal intent under Section § 1962(d) to purposely violate the RICO statutes and then participates with an enterprise under Section § 1962(c) in facilitating racketeering activities, monetarily damaging the Plaintiffs' business and/or property interests by laundering money owed to them under Title 18, Chapter 95, Section 1956 for any contrived reason while in their official capacity when he or she was really working for an enterprise.

As employees within a government agency, the judicial accomplices had a government imposed fiduciary duty to uphold the laws of the U.S. constitution for its citizens (the Plaintiffs and decedent). By the judicial accomplices having

**known what the basics of the RICO plan were, and then having participated in, or managed, the plan during its unfolding as approving partners within multiple enterprises, they committed violations under both Title 18 U.S. Section 1962(b and/or c). Consequently, they can be sued for damages under the RICO Act for not having acted appropriately while sitting on the bench.**

The defendant must be aware of the enterprise's conduct and play some role on behalf of the enterprise. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120-21 (2d Cir. 2013). **This may be shown, for example, if a group bands together (judges and lawyers) to commit a pattern of racketeering that they could not accomplish on their own.** *In re Ins. Brokerage Antitrust Litigation*, 618 F. 3d 300, 378 (3d Cir. 2010).

**In order for the judicial accomplices (referees) to have pulled off defrauding the Plaintiffs out of any money owed, they needed the lawyer accomplices to provide the government function of electronically filing, and mailing in clearly false pleadings to the court for it to falsely rule on, filing false orders with the clerk of the court, violations under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1343. A fraud on the court committed by officers of the court, that also satisfies all of the requirements under the RICO Act, is considered racketeering by officers of the court.**

What is **not** racketeering under the RICO Act is when a judge either errors when making a ruling, **or who on their own accord, personally and deliberately makes a false ruling during the course of their judicial capacity for whatever reason with the help of an attorney who filed a false pleading in order to benefit himself or his client**. An isolated false ruling intentionally made by a judge to defraud a party, is nothing more than **a fraud on the court** that an appeal should be able to reversed, but this was not the case in this matter. **A fraud on the court is not, in and of itself, racketeering because the act of committing a fraud on the court is not racketeering by an enterprise under the Civil RICO Act. An enterprise has to have (1) a common or shared purpose among its members; (2) some continuity of structure and personnel and (3) an ascertainable structure distinct from that inherent in the pattern of racketeering, in order to exist**. Even an association in fact type of enterprise has all of these requirements. **Numerous frauds upon the court committed by multiple enterprises, monopolizing a public court system (commerce) that implements blatant honest services fraud (antitrust) over and over and over again to accommodate all participating enterprises until they have defrauded a party right out of court, injuring their business and/or property interests, is most definitely racketeering under the Civil RICO Act**. The structure of the

Florida's state judicial enterprise needs to be taken apart for having been nothing but a burden and an embarrassment to the American legal system, but perhaps this is what it was always meant to be.

**THERE WERE AT LEAST FORTY (40) COUNTS OF RICO PREDICATE ACTS COMMITTED BY FLORIDA'S STATE JUDICIAL ENTERPRISE, SPECIFICALLY UNDER TITLE 18, CHAPTER 63, SECTIONS 1341, 1343 & 1346 IN THE FORM OF FALSE PLEADING AND ORDERS DOCUMENTED IN THE CASE FILES OF THE PLAINTIFF'S ELEVEN (11) TRIAL, ONE (1) FEDERAL AND OVER A DOZEN (14) APPELLATE COURT CASES.  FALSE ORDERS WERE INTENTIONALLY MADE BY THIRTY (30) LOCAL DISTRICT JUDGES (LOWER, FEDERAL AND APPELLATE DIVISION).  ALL OF THE LAWYERS WHO WERE PARTY TO THE PLAINTIFF'S CASES KNEW TO PERFORM THE SAME GOVERNMENT FUNCTION OF FILING THE SAME TYPES OF UNEQUIVOCALLY FALSE PLEADINGS THAT JUDGE BERNARD SILVER GRANTED IN THE PLAINTIFF'S TORTIOUS INTERFERENCE COURT CASE (RESPECTIVELY 14-CA-10278, ON 2-6-15) TO ILLEGALLY END THE REST OF THE PLAINTIFF'S CASES WITH.  THIS ILLEGAL OPERATION OF CLEARLY DENYING THE PLAINTIFF HIS CIVIL RIGHTS WAS CONTRIVED USING A CORRUPT LEGAL SYSTEM ALREADY IN PLACE THAT MONETARILY DAMAGED HIM WITH AN OBVIOUS PATTERN AND PURPOSE.  THERE WAS ONLY ONE RATIONAL EXPLANATION FOR WHY SO MANY JUDGES HAD GIVEN SO MANY BLATANTLY FALSE RULINGS IN THE SAME DISTRICT.  THE JUDICIAL ACCOMPLICES WERE ABSOLUTELY, POSITIVELY, BY BEYOND REASONABLE**

DOUBT EVIDENCE, PART OF THE SECONDARY ENTERPRISE FORMED IN THIS MATTER BY HCSO AND THE CHIEF JUDGE'S OFFICE WITHIN THE 13TH JUDICIAL CIRCUIT, WITH THE SOLE PURPOSE OF DEFRAUDING AND DEPRIVING THE PLAINTIFF OUT OF ANY COURT AWARDED MONEY!

Judicial immunity is overcome in only two sets of circumstances: 1) A judge is not immune from liability for non-judicial actions, i.e., **actions not taken in a judge's judicial capacity, (but actions taken while off the clock that violate civil rights as a member of an enterprise)**, and 2) a judge is not immune for **actions**, though judicial in nature, **taken in complete absence of all jurisdiction as a judge (actions taken while on the clock that violate civil rights as a member of an enterprise)**. *Mireles v. Waco,* 502 U.S. 9 (1991), 112, S. Ct. 286, 116 L. Ed. 2d. 9, 60 USLW 3304 & 3307.

**Any participation in furthering RICO predicate acts to be committed by an enterprise, either while off or on the clock, is racketeering under the RICO Act.** And it is unconstitutional for anyone who damages a citizen by participating in racketeering activities, to be allowed immunity from having to pay for damages that they helped cause. **This would mean that in America, some corrupted public servants are considered a higher class of human being by their government while working on the clock and are therefore allowed a license to defraud the lower classes**. This fallacy is seen as creative art imitating a

Hollywood pipedream from those who authored the fiction series stories *James Bond,* where the main character had a license to kill given to him by his government because he was considered a higher class of human being while working as a government spy. **Unconstitutional malarkey!** And the official response as to why judges have immunity **(not including the RICO Act and Section §  1983 federal statute violations)** from suit for deliberately defrauding citizens in court, is the oxymoron reason that judges would be too restricted to make unbiased and correct rulings. **Sheer fraud!  The correct answer is:  Judges would have to be impartial and unbiased on the job no matter what their personal motives really were at work, if they knew they would be personally sued for damages for making even one deliberate mistake.  And any frivolous lawsuits against a judge would be dismissed on motions to dismiss and affirmed on appeal.**

**<u>Replace state judges with computers that are programed with state and federal statutes and common laws, programed by magistrates, and every state court ruling given, no matter which court a party is in, will be consistently fair and correct because the rulings will be based only on relevant laws and actionable claims, not on biased and arrogant tyrants in positions of power.  And together all state governments will save billions of dollars on both trial and appellate court judicial salaries.</u>**

33

In all of the Plaintiff's many court cases, the seemingly inept presiding judges did <u>not</u> perform their duties as required as judges when they applied irrelevant case laws and inapplicable statutes when making their rulings, <u>even when a few of them who had smiled at the Plaintiff just before making one last false ruling, were given the ultimatum by the Plaintiff of either not to do so, or be sued under the Civil RICO Act</u>! No judge acting on his own would have dared erred by dismissing a murder case (12-CP-1669) with prejudice and cost an unknown party (Plaintiff) a million dollars, unless he or she was told to do so by their superior and knew for sure they would not be penalized for any illegal acts committed because their gang was untouchable! This deliberate failure of all the judicial accomplices <u>not</u> performing their judicial functions correctly as judges, <u>but successfully as functioning members of an extremely large and well organized enterprise on a mission to implemented the same pattern of racketeering activities used to defraud the same party for the same purpose of sustaining the same types of damages in ten (10) court cases, allows them to be sued by this same party for monetary compensation as active participants under the Civil RICO Act</u>!

If a judge (government employee in an action of law) is in violation of Title 18, Chapter 96, Codes § 1961-1968) while sitting on the bench in the course of his official capacity, he

**or she along with any non-government co-conspirators who aided and abetted, are also in violation of Title 42, Chapter 21, Section 1983, but the reverse is not true.**

**In Determining Whether a Judge is Shielded from Liability under § 1983 by Absolute Immunity:**

The approach looks to the nature (purpose) of the function performed, not the identity of the actor (judge) who performed it. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). And also stated in this case: Certain immunities were so well established when § 1983 was enacted that this Court presumes that Congress would have specifically so provided had it wished to abolish them. Most public officials are entitled only to qualified immunity (discretionary actions performed within their official capacity, unless their actions violated "clearly established" federal law or constitutional rights). However, sometimes their actions fit within a common-law tradition of absolute immunity. **Whether they do is determined by the nature of the function performed, not the identity of the actor who performed it.**

A state court judge does not have absolute immunity from a damages suit under § 1983 for his decisions to demote and dismiss a court employee. *Forrester v. White*, 484 U.S. 223-230 (1988). Accordingly, the Court has applied a "functional"

approach under which the nature of the functions entrusted to particular officials is examined in order to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions.   Even with respect to constitutional immunities granted for certain functions of Congress and the President, the Court has been careful not to extend the scope of protection further than its purposes require.   Pp. 484 U. S. 223-225.   Truly judicial acts, however, must be distinguished from the administrative, legislative, or executive functions that judges may occasionally be assigned by law to perform.   **It is the nature of the function performed -- adjudication (a formal judgment made only on the merits of a disputed matter) -- rather than the identity of the actor.**   Page 484 U. S. 220.   And 792 F. 2d 647, reversed and remanded.   O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, WHITE, MARSHALL, STEVENS, and SCALIA, JJ., joined, and in all but Part II of which BLACKMUN, J., joined.

**When a judge participates in a non-judicial type capacity under either Code § 1983 or Codes § 1962(b or c) while sitting on the bench in their official capacities, they are liable for actual damages that they cause, but under the RICO Act, the damage amounts are triple remedial.**

**Section 2.** The CNA, FLMIC, AI, CI, FMCNA and ACTS company owners (Section § (1962(a)), their managers (Section § (1962(b)) and their employees and agents (facilitators under Section § (1962(c)) (third enterprise), **who benefited their companies from the ongoing RICO predicate acts committed on the Plaintiff or Plaintiffs under either Title 18, Chapter 96, Sections 1962(a, b or c),** when they illegally either protected their companies, their affiliates, their insured lawyers, the law firms of their insured lawyers, their insured lawyer's professional associations or corporations, from having to pay a court imposed monetary debt payable to the Plaintiff or Plaintiffs, **made their companies vicariously liable under the Respondeat Superior Doctrine, in conjunction with Section 1962(a, b or c) violations for the Plaintiff's or Plaintiffs' damages.** All of the third enterprise Defendants cited in this Section are as guilty as the principles (employees or agents) who committed the RICO predicate acts under **(Title 18, Chapter 96, Section 1962(c))** when they **1)** monetarily damaging the Plaintiffs' business and/or property interests by soliciting the court or courts to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section 1956 and **2)** covered up the prior racketeering activities of either the primary, secondary or their own third enterprise under **(Title 18, U.S. Code § 3)**.

Under the Pinkerton Liability Doctrine used in Title 18, Chapter 96, Section 1962(d), the third enterprise Defendants cited in this Section (no distinction requirement under RICO between an owner and a company, *Petro-Tech, Inc.*, 824 F. 2d at 1361), were principals in the wrong committed on the Plaintiffs just by having consciously shared in the RICO plan, whether or not they directly participated in any of the RICO predicate acts committed. Supreme Court of the United States in *Pinkerton v. United States,* 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). This also means that 1) when RICO predicate acts are committed in furtherance of a conspiracy under Title 18, Chapter 96, Section § 1962(d), anyone within an enterprise who consciously shared in the RICO plan is liable for damages equal to the principal, or principals, who committed the damages and can be held liable themselves for damages under Title 18, Chapter 96, Section § 1962(a, b or c), depending on what their positions were within each enterprise that they participated with.

More importantly, 2) when a company or company owner benefits (not necessarily by money) from any one of their employees having committed a RICO predicate act under Title 18, Chapter 96, Section 1962(c), the company itself can be sued for vicariously liable under the Respondeat Superior Doctrine in conjunction with a Section 1962(a, b or c) violation, if the

**employee was working within the scope of their employment, even if the employee acted with an improper purpose and ultimately cheated the company, and/or one of the owners and the third person.** *Harrison v. Dean Witter Reynolds, Inc.*, 715 F. Supp. 1425 (N.D. Ill. 1989).

The racketeering activities under Title 18, Chapter 96, Section 1961(1) that were directly implemented and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, by the third enterprise Defendants in this matter are applicable to at least numbers 4, 5 and 6 of the following: **1)** murder (Title 18, Section § 1959), just FLMIC, CNA and AI; **2)** extortion (Title 18, Section § 880), just FLMIC, CNA and AI; **3)** extortionate credit transactions (Title 18, Sections § 891-894), just FLMIC, CNA and AI; **4)** influencing the operations of an employee benefit plan (Title 18, Section § 1954); **5)** money laundering under (Title 18, Section § 1956), first committed in this matter by Robert Foster when he illegally dismissed a lis pendens knowing that the $65,000 less than fair market value proceed of $165,000, from the sale of the murdered decedent's home was going to her murderers who forged her signature on the sales contract before her death and **6)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 for the purposes of **A)** monetarily damaging the Plaintiffs' business

and/or property interests by soliciting the court to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section 1956, **B)** covering up the prior racketeering activities of any and all of the three (3) local enterprises. And most definitely for **C) benefiting from the RICO predicate acts committed by not having to pay a penny as a monetary award to the Plaintiff or Plaintiffs when they were required by law to act appropriately during the following court cases:**

**(1) Florida Lawyers Mutual Insurance Company (FLMIC)**, in cases 14-CA-12257, 2D18-694, 17-CA-4051, 2D18-1889, and 2D19-1384, from 2014 to present, **for injury to a property interest in the amount of $1,060,000.; (2) CNA Insurance Company (CNA)**, in cases 14-CA-10278, where the RICO plan caused case 8-17-CV-219-7-36MAP to be illegally dismissed, 16-CA-4693, 2D17-2243, Florida SC18-590, U.S. SC17-9268, 17-CA-4051 and 2D19-1384, from 2014 to present, **for injury to a property interest in the amount of $1,060,000.; (3) Chart Industries, Inc. (CI)**, in cases 17-CC-403, 18-CA-1537 and 2D18-4761 (acting as their own insurance company), from 2017 to present, **for injury to a business interest in the amount of $15,000.; (4) Axis Insurance (AI)**, in case 17-CA-4051 and 2D19-1384, from 2017 to present, **for injury to a property interest in the amount of $1,060,000.; (5) Free Methodist Church of North America (FMCNA**), in case 17-CA-6219,

acting as their own insurance company, starting on 12-06-18, liable from 2-4-17 to present, **for injury to** Mr. **Schneider for stolen property in the amount of $720.   And FMCNA, also liable From 2-4-17 to 6-17-21 to Ms. Kimball, when she would have been released from TN-24's, or another residential aftercare program.** Ms. Kimball was wrongly expelled from her aftercare program by **TN-24** on 2-4-17, a sister company, sponsored, funded and technically owned by FMCNA.   Consequently, FMCNA currently owes Ms. Kimball for her time spent in prison for the remainder of her 18 month prison sentence, starting around 3-02-17 and ending around 1-01-18, because FMCNA was responsible for TN-24 having violated Ms. Kimball's community control (house arrest) that was to end on 6-16-17.  And FMCNA also owes Ms. Kimball for 123 days in jail, from 10-12-18 to 10-28-18 (Hillsborough County), from 5-7-19 to 7-22-19 (Hillsborough County), from 9-13-19 to 10-10-19 (Pinellas County) and from 11-24-19 to 11-26-19 (Hillsborough County).   **At a $300 per day imprisonment rate.   Around $117,900 total damage amount is currently owed to Ms. Kimball by FMCNA.** Florida Department of Corrections (DOC) had instructed TN-24, **as part of Ms. Kimball's judgment and sentence,** to protect her 24/7 from any further injury from vagrants or law enforcement until both her community care and aftercare had finished on respectively 6-16-17 and 6-16-21.   **Ms. Kimball had been a good girl and done everything required to accommodate this protection**

**from TN-24!** Since Ms. Kimball's **1)** community control, **2)** aftercare and **3)** court ordered judgment and sentence were wrongly and abruptly terminated by TN-24, a deliberate breach of fiduciary duty to Ms. Kimball in order to injure her with malice, **FMCNA, as the owner of TN-24, was and is, liable to Ms. Kimball for any future incarceration from 2-4-17 until 6-17-21**. **(6) Agency for Community Treatment Services (ACTS)**, in case 17-CA-6219, acting as their own insurance company, starting on 11-20-18, is liable from 10-12-15 to present, **for stolen apartment furnishings (property) at 13145 20th St. N., Apt. 209, Tampa, FL 33612, owned by Mr. Schneider, in the current amount of $6,000;** and to Ms. Kimball in the current amount of **$1,824** for stolen SSI money. And for $300 per day for every day Ms. Kimball was falsely imprisoned with an illegal Hillsborough County Detention Center hold on her (false imprisonment), from 10-12-15 up until 5-31-16, which is approximately **$66,600** for about 7.4 months. And ACTS also owes Ms. Kimball for 6 months incarceration in an **inappropriate** jail diversion program (abuse of process) from 6-29-16 to 1-29-17. So the approximate amount of **$54,000** for 6 months incarceration added to the bill is approximately **$122,424 for a total @ $300 per day, for about 13.4 months, plus the $1,824, excluding damages for emotional distress.**

**Together, all six (6) Defendants cited in Section 2 (third enterprise) knowingly and deliberately filed false pleadings and/or joinders before each court hearing, either themselves or through their insured clients, employees or agents, that provided the government function for the state judicial enterprise accomplices to have defrauded the Plaintiffs and decedent out of their state and federal substantive due process rights (civil rights), when they violated 1) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 2) (Title 18, Chapter 96, Codes § 1961-1968), 3) (Title 42, Chapter 21, Section 1983), 4) (Title 18, Chapter 13, U.S. Codes § 241 & 242), 5) (Fraud on the Court), 6) (Title 18, U.S. Code § 3) and 7) (Respondeat Superior Doctrine).** Triple remedial damage amounts and attorney's fees with a lodestar multiplier are demanded, but under Section § 1983, regular damages along with punitive amounts and attorney's fees could also be asked for instead. Together the activities of the third enterprise Defendants in Section 2 were not passive to the racketeering scheme after having knowledge of the current and ongoing plan by Florida judges to defraud the Plaintiffs in their property and/or business interests when they committed the following: **1)** covered up the prior racketeering activities committed on the Plaintiffs and decedent, **2)** permitted their employees or agents to participate in assisting the local judges and/or other accomplices under (Title 18, Chapter 96, Section

1962(d & c)) in clearly soliciting the judges to denying honest services (abuse of discretion) for their benefit, when they intended to, and submitted, mail and/or wire fraud solicitations for the judges to rule favorably on, illegally injuring the Plaintiffs' cases, violations under (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346) **(no distinction requirement under RICO between an owner and a company, Petro-Tech, Inc., 824 F. 2d at 1361).** And **3)** had their managers (1962(b) permit the RICO predicate acts committed, violations under **(Title 18, Chapter 96, Section 1962(b))**, by having **created subsidiary insured/agent positions** (just CNA, FLMIC & AI) to carry out the racketeering activity under Section § 1962(c).   *District 1199P Health & Welfare Plan v. Janssen, L.P*, No. 06-CV-3044, 2008 WL 5413105, at *15 (D.N.J. Dec. 23, 2008).

The Defendants, employees, insured agents, agents and accomplices are: **1) Florida Lawyers Mutual Insurance Company** in cases 14-CA-12257, 2D18-694, 17-CA-4051, 2D18-1889, and 2D19-1384, implemented by agent Lee Pearlman the insured, in cases 14-CA-12257, 17-CA-4051 and 2D19-1384, **with judicial accomplices** William Levens in case 14-CA-12257, Mark Wolfe in case 14-CA-12257, Robert Nielsen in case 14-CA-12257, Elizabeth Rice in case 17-CA-4051, Patricia Kelly in case 2D18-694, Matthew Lucas in case 2D18-694, Samuel Salario in case 2D18-694, respondeat superior Edward LaRose to 2DCA judges in cases 2D18-694 and

44

2D18-1889, Morris Silberman in case 2D18-1889, Robert Morris in case 2D18-1889 and John Badalamenti in case 2D18-1889; **2) CNA Insurance Company** in cases 14-CA-12257 (on 9-5-17) wire fraud without damages, 14-CA-10278, 16-CA-4693, 2D17-2243, Florida SC18-590, U.S. SC17-9268, 17-CA-4051 and 2D19-1384, implemented by employees Robin Black in case 2D17-2243 and Bowen Brown in cases 17-CA-4051 and SC18-590 and for CNA hiring Eccleston and Wolf, a Washington D.C. law firm that intelligently filed a waver in response to case U.S. SC17-9268 knowing that no U.S. Supreme Court judge, handpicked by the crookest crooks in the American government, would agree to hear a multi-level government corruption case against their own. And for CNA also hiring the law firm Grower, Ketcham, Eide, Telan & Meltz, P.A., in case 2D19-1384, the insured's friend, agent Thomas Rydberg, in cases 14-CA-10278 and 16-CA-4693, **with judicial accomplices** Bernard Silver in case 14-CA-10278, Charlene Honeywell who helped CNA Insurance Company from case 14-CA-10278, in case 8-17-CV-219-7-36MAP, Paul Huey in cases 16-CA-4693 and 14-CA-10278, Elizabeth Rice in case 17-CA-4051, Morris Silberman in case 2D17-2243, Daniel Sleet in case 2D17-2243, Matthew Lucas in case 2D17-2243, Clarence Thomas in case U.S. SC17-9268 and Florida Department of State and Legislative Affairs in case SC18-590; **3) Chart Industries, Inc.** in cases 17-CC-403, 18-CA-1537 and 2D18-4761 (implemented by agents Janice Pickett in case

45

17-CC-403, Michael D'Lugo in cases 18-CA-1537 and 2D18-4761, Wicker, Smith, O'Hara, McCoy & Ford, P.A. in cases 17-CC-403, 18-CA-1537 and 2D18-4761, **with judicial accomplices** Joelle Ober in case 17-CC-403, Chet Tharpe in case 18-CA-1537, Craig Villanti in case 2D18-4761, Daniel Sleet in case 2D18-4761, Anthony Black in case 2D18-4761 and respondeat superior Edward LaRose in case 2D18-4761; **4) Axis Insurance** in cases 14-CA-12257 (on 9-1-17 and 9-6-17) wire fraud without damages, 17-CA-4051 and 2D19-1384, implemented by agents Spector Gadon & Rosen, P.C., Michael McGirney and Thomas Rydberg the insured, **with judicial accomplices,** Elizabeth Rice in case 17-CA-4051 and Nelly Khouzam the new chief judge of the 2DCA as of mid. 2019 and respondeat superior to her cooperative three judge panel of jackals, Robert Morris in case 2D19-1384, Edward LaRose in case 2D19-1384 and Stevan Northcutt in case 2D19-1384 and **5) Free Methodist Church or North America** in case 17-CA-6219, implemented by agents Butler, Weihmuller, Katz and Craig LLP, William Linero Jr. and Abraham Shakfeh, **with judicial accomplice** Elizabeth Rice and **6) Agency for Community Treatment Services** in case 17-CA-6219, implemented by agents Boyd, Richards, Parker and Colonnelli P.L., Joseph Riopelle and Jessica Welsh, **with Judicial Accomplice** Elizabeth Rice.    **Including the following managing co-conspirators:** Manuel Menendez 2012 to 2015, Ronald Ficarrotta 2015 to present, Ricky Polston from 2012 to 2014,

Jorge Labarga from 2014 to 2018, Charles Canady from 2018 to present, Rick Scott from 2012 to 2019, Pamela Bondi from 2012 to 2019, Ashley Moody from 2019 to present and Ron DeSantis from 2019 to present. **EVIDENCE OF OVER EIGHTY (80) WIRE AND MAIL FRAUDS UNDER TITLE 18, CHAPTER 63, U.S. CODES § 1341, 1343 & 1346 COMMITTED BY THIRD ENTERPRISE DEFENDANTS AND THEIR JUDICIAL ACCOMPLICES DURING RACKETEERING SCHEMES AGAINST THE PLAINTIFFS RESULTING IN INJURIES TO THEIR PROPERTY AND BUSINESS INTERESTS, ARE IN THE APPENDICES AND CASE FILES.**

**Further Analysis of the Ultimate Facts and Applicable Laws Supporting the Counts of Section 2:**

Racketeering Activity—Issues Relating to Mail and Wire Fraud (Mail fraud (18 U.S.C.A. § 1341) and Wire fraud (18 U.S.C.A. § 1343)) are included as racketeering activities and are alleged as predicate acts in a **"high percentage"** of civil RICO claims. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997). Criminal mail fraud involves **(1)** a scheme based on intent to defraud; and **(2)** the use of the mails to further that scheme. *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 455 (S.D.N.Y. 1998). A scheme to defraud encompasses **"acts of artifice or deceit which are intended to deprive an owner of his property or money."** *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, No. 92-CV-2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993), judgment aff'd, 20 F. 3d 771 (7th

Cir. 1994). The elements of mail or wire fraud have been identified as:

(1) A plan or scheme to defraud;

(2) Intent to defraud;

(3) Reasonable foreseeability that the mail or wires will be used; and

(4) Actual use of the mail or wires to further the scheme. See *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F. 3d 402 (8th Cir. 1999). See also *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 455 (S.D.N.Y. 1998) (noting that elements of mail fraud are **more broadly defined** than elements of common law fraud).

The six (6) Defendants cited in Section 2 are liable for damages owed to the Plaintiff or Plaintiffs under the Civil RICO Act because **they benefited while committing RICO predicate acts during court cases that they were party to when they either 1)** received fees paid into them by their clients (accomplices) during litigation, and/or **2)** felt satisfaction in having benefited their insured by defrauding either of the Plaintiffs. **This is the corrupt gang mentality which immediately manifests in a weak and spineless person's mind as soon as he or she becomes part of a large, secret and powerful enterprise that can injure a lower class person at will like they were nothing but an insignificant ant. Worms! And 3) benefited their companies**

in not having had to pay a penny of the money owed to either of the Plaintiffs. The Fifth Circuit has found **no barrier** to vicarious liability under § 1962(a) or (b), **when the principal (owner or company) has derived some benefit (profit or acquired right or privilege) from their agent's wrongful acts.** Crowe v. Henry, 43 F. 3d 198, 206 (5th Cir. 1995). **The privilege of not having had to pay either of the Plaintiffs a penny in award money was the most valued benefit.** A subsequent district court decision sought to reconcile the two decisions by construing *Schwartz* as a narrow holding limited to cases in which the corporation was unaware of its employees' misconduct, **as opposed to *Liquid Air*, in which the corporation stood by silently and benefited from the wrongdoing.** *Harrison v. Dean Witter Reynolds, Inc.*, 695 F. Supp. 959, 962 (N.D. Ill. 1988); see also *Dynabest Inc. v. Yao*, 760 F. Supp. 704, 711-712 (N.D. Ill. 1991) **(allowing Section § 1962(a and b) claims against employer based on vicarious liability where the employer benefited from the RICO violation).**

The Ninth Circuit has adopted the reasoning of *Petro-Tech* and *Liquid Air*, holding that liability may arise under § 1962(a) under respondeat superior principles **"when the individual (owner) or entity (company) is benefited by its employee or agent's RICO violations."** *Brady v. Dairy Fresh Products Co.*, 974 F. 2d 1149, 1155 (9th Cir. 1992). The Eleventh Circuit has

held that **respondeat superior liability may be imposed under §
1962(b), but only on those enterprises that derive some benefit
from the RICO violation**.   *Quick v. Peoples Bank of Cullman
Cnty.*, 993 F. 2d 793, 797 (11th Cir. 1993).   The Third Circuit
held that **an enterprise (company) may be held vicariously liable
for a violation of Section § 1962(a) because that subsection of
RICO does not require a distinction between the person (owner)
and the enterprise (company)**.   *Petro-Tech, Inc.*, 824 F. 2d at
1361.    The  Fifth  Circuit  has  found  **no  barrier  to  vicarious
liability under § 1962(a or b) when the person (owner) or entity
(company)  has  derived  some  benefit  from  the  agent's  wrongful
acts**.   *Crowe  v.  Henry*,  43  F.  3d  198,  206  (5th  Cir.  1995).
DeFalco v. Bernas, 244 F. 3d 286, 307, 309 (2d Cir. 2001) **(town
could be an enterprise)**; United States v. Warner, 498 F. 3d 666,
695-96  (7th  Cir.  2007)  **(recognizing  that  a  state  could  be
considered a RICO enterprise, if only because the state is often
a  victim  of  RICO  schemes)**;  United  States  v.  Freeman,  6  F.  3d
586, 596-97 (9th Cir. 1993).   **Unfortunately, all of the states
in America have judicial enterprises in operation**.


**Employers Permit Their Lawyers to Mislead as a Form of Defense:**
In criminal law, lawyers who represent the guilty, and who are
not witnesses to the crimes committed, have to believe the facts
presented to them by their clients, even if they believe they

may have been lied to. Consequently, criminal lawyers deliberately misrepresent to jurors what they should believe as relevant in establishing a reasonable doubt defense. This is acceptable lawyer conduct when no one really knows what happened but the client. On the other hand, when a lawyer deliberately and blatantly lies about what applicable laws a judge should use in deciding a case, the lawyer has intentionally attempted to commit a fraud on the court with the judge's help. **It takes at least two (2) officers of the court, a lawyer and a judge, to commit a clear and blatant fraud on the court in which even the judge knows he or she has participated in honest services fraud (abuse of discretion).** At this point, the lawyer would be in violation of both the bar rules under the attorney code of conduct and the federal mail and/or wire fraud statutes, **even if no injury occurred. When a judge as part of an enterprise electronically files a clearly false order with the clerk of the court used as a means to officially and immediately defraud a party or parties, they have also commit wire fraud.**

When a fraud on the court has been committed by both an attorney and a judge resulting in injury, both the wrongdoers are in violation of Title 42, Chapter 21, Section 1983. And if two (2) RICO predicate acts were committed by the judge or judges as members of the state judicial enterprise, **all participants** are in violation under the RICO Act.

51

Finally, lawyers are <u>absolutely permitted all year round</u> by their employers to provide judges with their desired legal or illegal pleadings to rule favorably on for the employers' benefit. <u>Any greedy employer could care less if they benefited from racketeering, as long as the wrong committed by their company was seemingly passed off to the judge when he or she signed the false final order</u>! Right? <u>Wrong</u>! Imputation and subsequently acquiescing in by not implementing the appropriate corrective measures after having wrongly benefited by the fraud, keeps all wrong doers on the hook for damages.

**To Prevail on a Claim under Respondeat Superior:**

The plaintiff must establish "both that **(1)** an employer-employee relationship existed and **(2)** the alleged tortious conduct fell within the scope of employment." *Doe v. Medeiros*, 266 F. Supp. 3d 479, 484 (D. Mass. 2017) (citing *Dias*, 780 N. E. 2d at 450-51). **An employer's liability via respondeat superior "arises simply by the <u>operation of law</u> and is only derivative of the wrongful act of the employee."** *Merrimack Coll. v. KPMG LLP*, 480 Mass. 614, 108 N. E. 3d 430, 438 (2018) (quoting *Elias v. Unisys Corp.*, 410 Mass. 479, 573 N.E.2d 946, 948 (1991)). **An employer itself need not act wrongfully to be held liable for the tort of an employee committed within the scope of employment.** See id.

*Ebbe v. Concorde Investment Services, LLC*, 392 F. Supp. 3d 228 (2019).

**Imputation:**

**The law of agency establishes a set of rules for determining when, in relation to third parties, an agent's conduct or knowledge should be imputed to his or her principal.** See Restatement (Third) of Agency §§ 2.01 - 2.04, 5.03 (2006). For example, **in transactions with third parties, an agent's conduct will be imputed to the principal, if the agent acted with actual or apparent authority (attorney/client relationship), or if the principal ratified the agent's conduct.** See *Fergus v. Ross*, 477 Mass. 563, 566-568, 79 N. E. 3d 421 (2017). See also Restatement (Third) of Agency, supra at §§ 2.01 - 2.03, 4.02. **In the realm of torts, the tortious conduct committed by an agent in the scope of his or her agency will be imputed to the principal under a theory of respondeat superior.** See *Lev v. Beverly Enters.-Mass., Inc.*, 457 Mass. 234, 238, 929 N. E. 2d 303 (2010). See also Restatement (Third) of Agency, supra at § 2.04. **Knowledge that an agent acquires in the scope of his or her employment can also be imputed to the principal.** See *Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66-67, 679 N. E. 2d 540 (1997). See also Restatement (Third) of Agency, supra at §

5.03. *Merrimack Coll. v. KPMG LLP*, 480 Mass. 614, 108 N. E. 3d 430, 438 (2018)

**The result of imputation is that the principal bears the legal consequences of the agent's conduct**. Thus, if an agent with actual or apparent authority enters into a contract with a third party, the principal will be bound by that contract. See, e.g., *Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 4, 17, 679 N. E. 2d 191, cert. denied, 522 U.S. 1015, 118 S. Ct. 599, 139 L. Ed. 2d 488 (1997) (university bound by agreement signed by vice-president where vice-president had apparent authority). **And if an agent negligently injures a third party while acting within the scope of the agency, the principal (employer) will be held vicariously liable for that negligence**. See, e.g., *Dias v. Brigham Med. Assocs., Inc.*, 438 Mass. 317, 323, 780 N. E. 2d 447 (2002) (corporation could be held vicariously liable for alleged medical malpractice of its physician-employee). *Merrimack Coll. v. KPMG LLP*, 480 Mass. 614, 108 N. E. 3d 430, 438 (2018)

**Imputation serves various functions.  It creates incentives for principals to choose their agents wisely**. See Restatement (Third) of Agency, supra at § 5.03 comment b, at 360. **It also encourages principals to supervise their agents** and to share information with them. Id. **The ultimate purpose behind these rules of imputation, however, is to fairly allocate risks**

**between principals and innocent third parties.**  As we explained in *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 664-665, 659 N. E. 2d 731 (1996).

***Kansallis*:**

"Standing behind [the] diverse concepts of vicarious liability is a principle that helps to rationalize them.  This is the principle that as between two innocent parties -- the principal-master and the third party -- **the principal-master who for his own purposes, places another in a position to do harm to a third party should bear the loss.  A principal who requires an agent to transact his business, and can only get that business done if third parties deal with the agent as if with the principal, cannot complain if the innocent third party suffers loss by reason of the agent's act.  Similarly, the master who must put an instrument into his servant's hands in order to get his business done ... must also bear the loss, if the servant causes harm to a stranger in the use of that instrument as the business is transacted." (Citations omitted.)**  *Merrimack Coll. v. KPMG LLP*, 480 Mass. 614, 108 N. E. 3d 430, 438 (2018).

**Vicarious Liability under the Respondeat Superior Doctrine:**
A wrongdoing is never really within the scope of an employee's employment:  If a wrongdoing were, then the employer's liability

would be direct, not vicarious.   See Restatement (Second) of
Agency, § 212 Comment a; cf. *Pomer v. Deere Co.*, 875 F. 2d 1262,
1266 (7th Cir. 1989).   **In determining whether an employer is
liable for the wrongdoing of an employee, the analysis becomes
one of degree:   Just how related must the wrongdoing be to the
nature of the employee's work before the wrongdoing itself falls
within the scope of the employment?**
**The general rule is that an employee acts within the scope of
his employment for respondeat superior purposes when his conduct
"(a)** . . . **is of the kind he is employed to perform; (b)** . . .
**occurs substantially within the authorized time and space
limits;** [and] **(c)** . . . is actuated, at least in part, **by a
purpose to serve the master.** . . ." Restatement (Second) of
Agency, § 228; Prosser on Torts, supra, § 70 at 502.
§ 229 of the Restatement provides that **an act is of the kind an
employee was hired to perform, if the act is similar to those he
was authorized (permitted within the scope of employment) to do
and inter alia (out of many other acts), <u>if the employer "has
reason to expect that such an act will be done</u>."** Restatement
(Second) of Agency, § 229(f); see *Rosenthal Co. v. Commodity
Futures Trading Commission*, 802 F. 2d at 968-69.   **Thus, an act
may be within the scope of employment even if it was
specifically prohibited by the employer.** Restatement (Second)
of Agency, § 230 **("An act, although forbidden, or done in a**

forbidden manner, **may be within the scope of employment.");** see *Marbury Management, Inc. v. Kohn*, 629 F. 2d 705, 716 (2d Cir. 1980). *Harrison v. Dean Witter Reynolds, Inc.*, 695 F. Supp. 959, 962 (N. D. Ill. 1988).

Under settled principles (agreement in principle) of respondeat superior, **an employee who does what he is authorized (permitted within the scope of employment) to do, binds his employer even if the employee acts with an improper purpose and ultimately cheats both his employer and the third person.** Restatement (Second) of Agency § 165, Comment e; id. at § 257, Comments a, d; see Congregation of the Passion, *Holy Cross v. Kidder Peabody Co., Inc.*, 800 F. 2d 177, 184 (7th Cir. 1986). *Harrison v. Dean Witter Reynolds, Inc.*, 695 F. Supp. 959, 962.


**Subsequently Acquiesced in by an Employer after an Injury has Occurred:**

**A lawyer (officer of the court) is in the purview of his authority to provide the government function of submitting knowingly false pleadings that the court wants and needs to illegally rule on in furtherance of their employer's interests. Even if the employee's acts result in racketeering and are not immediately foreseeable to the employer, they will be after the fraud has been committed and an injury has resulted. The employer will receive the blatantly false final order by**

imputation, but in turning a blind eye to the injury caused by their employee's fraud, they have permitted the fraud to stand. This wrongful conduct by an employer after the fact makes them guilty under vicarious liability for injuries sustained as if they had permitted the fraud beforehand.

A fraud permitted to stand by an employer after it has knowingly benefited by the fraud, is just as much wrong as an employer permitting a fraud to be committed by an employee before being benefited.

Consequently, all third enterprise employees' fraudulent actions were <u>subsequently acquiesced in</u> by their employers (Defendants) making them liable for their employees' wrongful acts. *Quick v. Peoples Bank of Cullman Cnty.*, 993 F. 2d 793, 797 (11th Cir. 1993).

Under general agency rules, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees or agents when the acts are: (1) related to, and committed within, the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) <u>authorized either before, or subsequently acquiesced in after, an injury by the corporation</u>. Id. at 1306, citing 10 W. Flectcher, Cyclopedia of the Law of Private Corporations § 4942, at 664 (1986).

In *Quick v. Peoples Bank of Cullman Cnty.*, 993 F. 2d 793, 797 (11th Cir. 1993), these three elements bring us to the Bank's

second argument on appeal. The Bank argues that even if respondeat superior is applicable, *Buckelew* was not acting within the scope of his employment, but instead was acting for personal motives contrary to the Bank's interest; therefore, the Bank is not subject to liability. This argument amounts to a challenge to the sufficiency of the evidence supporting the jury's verdict regarding vicarious liability. When reviewing such a challenge, "[t]he question is whether or not reasonable jurors could have concluded as this jury did based upon the evidence presented." *Griffin v. Swim-Tech Corp.*, 722 F. 2d 677, 679 n. 1 (11th Cir. 1984). We conclude that the jury's findings here meet this standard. The *Quicks* presented evidence that *Buckelew's* activities were incident to his assigned duties and took place at the Bank during business hours. This evidence establishes the <u>first element — that *Buckelew's* activities were related to and committed within the course of his employment</u>. As to the <u>second element, *Buckelew* had been assigned the function of making loans, and his activities did further that aspect of the Bank's business</u>. To counter this assertion, the Bank argued that *Buckelew* engaged in these activities in violation of the Bank's conflict-of-interest policy. The *Quicks*, however, presented convincing evidence that the policy was unwritten, that it had not been enforced in the past and that *Buckelew* was unaware of it. We thus conclude that there

was sufficient evidence to support a finding that *Buckelew's* activities were committed in furtherance of the Bank's business. Regarding the <u>third element, the Bank did not expressly authorize Buckelew's activities, but there is evidence of acquiescence</u>. Though there is conflicting testimony on the point, the jury was entitled to infer that the Bank acquiesced in *Buckelew's* activities by requesting that the *Quicks*: (1) sign a consolidation note that included amounts fraudulently taken by *Buckelew*, (2) sell their inventory to reduce that indebtedness, (3) not say anything to anyone about *Buckelew's* activities, and (4) not deal with anyone besides Cummings and Nails. <u>Thus, there was sufficient evidence (knowledge of the fraud after the fact) for a reasonable jury to find that *Buckelew's* activities were subsequently acquiesced in by the Bank</u>. *Quick v. Peoples Bank of Cullman Cnty.*, 993 F. 2d 793, 797 (11th Cir. 1993). Hindsight is always 20/20. Any agent who supposedly did not understand parts of the Plaintiff's or Plaintiffs' complaints should have simply asked for clarification on the subject, but all of the employees and agents working for the Defendants in Section 2 only solicited the judge or judges for the illegal dismissal of the case or cases with prejudice, using blatantly obvious inapplicable statutes and case laws for doing so in order to wrongly benefit! <u>Blatant solicitations to racketeer</u>!

**Section 3.** All state **entities** (municipalities) named in this Section can be **sued either in state court** for any one of their employees having committed a negligent or intentionally tort while acting within the scope of his or her employment which **1)** breached a state government policy.  Or they can be **sued in federal court** for having **2)** implemented a state government policy in violation of their duty to the public under the U.S. Constitution.  Using the second one of these two (2) methods for receiving compensation for damages, there were violations of the following federal statutes:    **1. (Title 18, Chapter 13, U.S. Codes § 241 & 242)** and **2. (Title 42, Chapter 21, Section 1983)**. **A municipality is a proper defendant under Title 42, Chapter 21, Section 1983, where the conduct complained of relates to an official municipal policy, custom, or practice causing the U.S. constitutional tort.** *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018 (1972).  **This is excluding a victim having been injured in an action at law (a court case). Punitive damages and attorney's fees are owed for common law frauds and breaches of fiduciary duties to the public by municipalities. "A public official, acts as trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty to them."** *United States v. Kincaid-Chauncey*, 556 F. 3d 923, 939 (9th Cir. 2009) (quoting *United States v. Silvano*, 812 F. 2d 754, 759 (1st Cir.

1987) and *United States v. Mandel*, 591 F. 2d 1347, 1363 (4th Cir. 1979) (internal quotation marks omitted)). **Although the Plaintiff cannot sue the municipalities in this Section under the RICO Act, but only in federal court under Section § 1983**, in general, a breach of fiduciary duty is not considered a necessary element for a mail or wire fraud conviction **proceeding on an honest services theory, but their intent as a participant does under the Pinkerton Liability Doctrine used in Section § 1962(d)**. See *United States v. Ervasti*, 201 F. 3d 1029, 1036 (8th Cir. 2000). In Bridge v. Phoenix Bond & Indemnity Co., the Supreme Court held that where the alleged mail or wire fraud scheme is not based on misrepresentations or omissions in particular mailings or wirings, the plaintiff need not show that it relied on the mailings or wirings asserted as predicate acts. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659-61 (2008). **One court has held that while innocent mailings may be used to further a mail fraud scheme, they might not count as predicate acts toward establishing a pattern of racketeering unless they contain misrepresentations**. See *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F. 3d 402, 407 (8th Cir. 1999).

Monetary compensation with punitive damages were owed to the Plaintiff by the municipality accomplices cited below when they violated both the Plaintiff's and decedent's state and federal

substantive due process rights with injuries.    Thus these four (4) municipalities, through their employees, illegally and deliberately cost the Plaintiff his owed money under the Florida Slayer Statute 732.802 and the legal right to make claim to his gift deed, both property interests. **The four (4) municipalities below are not being sued in this Section for any actions taken by their employees that were part of a corrupt enterprise's plan to commit or cover-up racketeering activities that damaged the Plaintiff and decedent while at work being paid by their employer.**

As for individuals in violation of government policy, where there are operational decisions made as to how policies will be implemented, there is **no** state governmental sovereign immunity from suit.    Only basic state government policy decisions are immune from suit.    A state government that has discretionary policy decisions in place pertaining to a matter, has immunity from suit that pertains to that matter **(if not in violation of federal constitutional rights)**, but subsequent actions undertaken to implement basic policy decisions are considered ministerial acts for which liability attaches.    **There are no discretionary state policy decisions in place that allows any government agency to violate U.S. statutes or common laws in order to violate its citizen's rights that are not void of the authority to do so, just illegal made up policies by crooked**

government employees.  <u>And the federal statute of limitations in a circuit may be tolled permanently on acts to defraud and deprive a plaintiff of his civil rights done in conjunction with committing a fraud on the court or being an accessory after the fact in a murder under Title 18, U.S. Code § 3</u>.

The municipalities/accomplices are: **1) Florida Governor's Office, for Rick Scott <u>making it the policy of the governor's office not to investigating a murder, from 2016 to present</u>, at least for the Plaintiff and decedent <u>(punitive damages are allowed under Section § 1983)</u>; 2) Hillsborough County Sheriff's Office (HCSO), for David Gee, Chad Chronister, Jason Gordillo & Christopher Brown <u>making it the policy of HCSO not to investigating a murder, unless the county coroner's office states that one has been committed, from 2016 to present</u>, at least for the Plaintiff and decedent <u>(punitive damages are allowed under Section § 1983)</u>; 3) Hillsborough County Coroner's Office, <u>an accomplice</u> to HCSO, for deliberately stating an inaccurate reason for the decedent's cause of death, allowing HCSO to <u>impose their fraudulent policy</u> of not being required to investigate the decedent's murder (compliments of Mary Mainland, from 2016 to present with punitive damages allowed); 4) Florida Attorney General's Office, for Pamela Bondi from 4/2015 to 2019, Chesterfield Smith from 2017 to present and Jack Hagadorn from 4/2015 to present, <u>making it the policy of the attorney</u>**

general's office not to investigate a murder or refer one to another government agency, at least for the Plaintiff and decedent (punitive damages are allowed under Section § 1983).

Florida's 13th Judicial Circuit can continue to be sued by the Plaintiff in state court for breaching a state government policy pertaining to slandering a party per quod when its employees tortiously interfered (inducement) in the Plaintiff court case 14-CA-10278 (intentional tort lawsuit), on 1-6-15, by committing a fraud on the court, to stop a judicial investigating by Bernard Silver into the decedent's murder while becoming accessories after the fact to it, to succeed in monetarily damaging the Plaintiff (compliments of Manuel Menendez and Kimberly Cash). Punitive damages are allowed.

Manuel Menendez and Kimberly Cash, former or current 13th Judicial Circuit's employees and officers of the court, can be sued in federal court for racketeering under Title 18, Chapter 96, Codes § 1961-1968) done in conjunction with having committing a 1) fraud on the court while violating Title 18, U.S. Code § 3 in conjunction with a 2) murder under Section § 1959. Both of which have no statute of limitations.


Fraud on the Court:

Under FRCP Rule 60(b), a final judgment may be set aside based on the fraud or misrepresentation of an adverse party.

Ordinarily, a Rule 60(b) motion must be brought within one year of judgment. One exception is the more serious 'fraud on the court,' which has no statute of limitations. "Fraud upon the court" has been defined by the 7th Circuit Court of Appeals to "embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Kenner v. C.I.R.*, 387 F. 3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23.

In *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted." Common law dictates there is no distinction between state and federal courts during the commission of a fraud on the court.

Fraud on the court occurs when an officer of the court is involved in the perpetration of a fraud or makes material misrepresentations to the court. Fraud upon the court makes void the orders and judgments of that court. When an officer of

the court is found to have fraudulently presented facts to impair the court's impartial performance of its legal task, the act (known as fraud upon the court) **is not subject to a statute of limitation**.


**Further Analysis of the Statute of Limitations under Title 42, Chapter 21, Section 1983 or the RICO Act:**

There is no statute of limitations contained within the language of 42 USC § 1983. The United States Supreme Court has directed that 42 USC § 1983 "requires courts to borrow and apply to all § 1983 claims the one most analogous state statute of limitations." *Owens v Okure*, 488 US 235, 240 (1989). Federal courts adjudicating civil rights claims under 42 U.S.C. § 1983 **must borrow the state statute of limitations applicable to personal injury actions under the law of the forum state (state where the lawsuit is brought)**. *United States Supreme Court, Wilson v. Garcia* (1985), No. 83-2146.

**Thus, in Burlington, Vermont, Section 1983 actions must be brought within three (3) years from the date the cause of action accrued, unless tolled due to 1) concealment fraud, 2) having been misled (deception), 3) Continuing Violation or Last Predicate Act Rules, 4) fraud on the court (misrepresentation) or 5) a murder. Both of the two (2) last reasons have no statute of limitations in any U.S. forum.** Fraudulent

concealment occurs when a defendant engages in a misleading, deceptive or contrived action in an attempt to conceal a plaintiff's recognizing a possible cause of action. In any case: **All Title 42, Chapter 21, Section § 1983 actions by the municipality accomplices started to accrue around mid. 2015.**

## The 13th Judicial Circuit:

The 13th Judicial Circuit committed a fraud on one of its own courts through Kimberly Cash **(an officer of the court)** around 1-6-15, to mislead the Plaintiff into believing that Manuel Menendez and herself were **not** part of Bernard Silver's gang out to deprive him of his civil rights under the RICO Act. David McClain stated in court on 7-14-17, during his motion to dismiss case 17-CA-902, filed on 2-28-17 with Kimberly Cash's affidavit, that Kimberly Cash was just **concerned for Bernard Silver's wellbeing (within the scope of employment), which prompted her to slander the Plaintiff with Bernard Silver.** This stopped the Plaintiff from knowing that the real reason for the deliberate judicial defrauding rendered (2-6-15) on him by Bernard Silver (illegal final order), was for racketeering purposes confirmed by the Plaintiff on 5-18-16. On 2-6-15 is when the statute of limitations started to accrue for suing the 13th Judicial Circuit for its employees deliberately slandering the Plaintiff per quod, in breach of state government policies, without it having

68

committed a **1) fraud on the court while violating Sections §**
**1983, 1962(c), 241 & 242, with the intent of 2) covering up the**
**decedent's murder under Code § 3.** Consequently, because the
final ruling during case 14-CA-10278 should be null and void
(set aside) due to a fraud on the court, the Plaintiff could try
to have this done either at the local state appellate court or
the local federal court under Section § 1983. But the Plaintiff
cannot in good conscious sue the 13th Judicial Circuit again for
simply breaching state policy during the scope of their
employment for slander per quod in state court when Kimberly
Cash and Manuel Menendez were not acting within the scope of
their employment when they were actually racketeering. **They can**
**on the other hand be sued in this court for violating either**
**federal (excess of $75,000) tortious inference laws, the RICO**
**Act or Section § 1983 when they went** outside **the scope of their**
**employment as officers of the court to deliberately defraud and**
**deprive the Plaintiff and decedent out of their state and**
**federal civil rights in this matter.**

**The Hillsborough County Coroner's Office:**

The Plaintiff contacted the local coroner's office on 4-24-15
and spoke with the coroner, Mary Mainland, explaining to her
that the decedent died from sever sepsis and/or septic shock per
Florida Hospital in Tampa, Florida, which was due to abuse and

neglect, not from natural causes.  Mary Mainland stated that she did not know this and was going to order and review all of the decedent's medical records from her doctor's office visits leading up to her death **(there were none)** and change her cause of death with this agency to undeterminable.  This never happened with spoliation of the decedent's medical evidence. And HCSO continued to refuse to investigate the decedent's death unless **their coroner** stated that the decedent's cause of death was not from natural causes.  Unknown to the Plaintiff until about 1-1-16, HCSO had asked the coroner not to change the decedent's cause of death.  Consequently, the Plaintiff was deliberately lied to (misled) and the decedent's civil rights were deprived from her under Title 42, Chapter 21, Section 1983 by Mary Mainland around 1-1-16.  This is when the statute of limitations started to accrue for suing Hillsborough County Coroner's Office under Section § 1983 **for complying with HCSO's illegal policy as their accessory** without using a fraud on the court or a murder cover-up to toll the statute of limitations.


**As for the Florida Governor's Office, Hillsborough County Sheriff's Office and the Florida Attorney General's Office:**
All three (3) of these agencies (secondary enterprise) have their own **made up** policy of violating their fiduciary duty to

its citizens by **implementing their own state government policies**
in violation of their fiduciary duty to the public under the
U.S. Constitution **whenever desired!**

These illegal actions by Florida agencies are **ongoing** violations
of Title 42, Chapter 21, Section 1983.   1-1-2016 is when the
statute of limitations started to accrue for the Plaintiff suing
these government agencies under Section § 1983, without using a
fraud on the court or a murder cover-up to toll the statute of
limitations, committed in conjunction with violating their duty
to the public under the U.S. Constitution.


**Section 4.**   All state and federal employees (secondary
enterprise), either past or present employees of the government,
other than officers of the court, in their individual capacities
during the course of their official capacities, can be sued
under the Civil RICO Act for having participated in violation of
**1) (Title 18, Chapter 96, Codes § 1961-1968), 2) (Title 18, U.S.
Code § 3), 3) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 &
1346), 4) (Title 42, Chapter 21, Section 1983), 5) (Title 18,
Chapter 13, U.S. Codes § 241 & 242) and 6) (Respondeat Superior
Doctrine) in which together these state and federal government
actors deprived the Plaintiffs and decedent of their civil
rights.**

Substantive exceptions do exist to hold supervisory authority liable for the torts of their employees. The first such exception arises when the supervisory authority is **acting negligently in the hiring and/or appointment of an employee.** (*Baisely v. Henry* (1921) 55 Cal. App. 760, 763-764.) This negligence would subject a supervisor to **personal liability** (non-company lawsuit) for their actions. This situation commonly arises when a supervisor has some connection, involvement, or knowledge of the wrongful acts of the employee. **The authority of a supervisor may be so expansive, that their actions align more similarly with that of a principal, thus subjecting them to liability.** Thus, a supervisor that has **prior knowledge** of certain propensities of an employee who **authorizes, ratifies, or cooperates** in such conduct may be personally liable for his own wrongful actions.

Triple remedial damage amounts and attorney's fees with a lodestar multiplier could be demanded, but under Section § 1983, regular damages along with punitive amounts and attorney's fees could be asked for instead, when the accomplices in this section either directly implemented and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, the racketeering activities of the three (3) local enterprises under **(Title 18, U.S. Code § 1961(1))**, but not limited to **1)** murder (Title 18, Section § 1959), **2)** extortion (Title 18, Section § 880), **3)**

extortionate credit transactions (Title 18, Sections § 891-894), **4)** influencing the operations of an employee benefit plan (Title 18, Section § 1954), **5)** money laundering under (Title 18, Section § 1956), first committed by Robert Foster when he illegally dismissed a lis pendens knowing that the $65,000 less than the fair market value proceed amount of $165,000 from the sale of the murdered decedent's home, was going to her murderers who forged her signature on the sales contract before her death and **6)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 for the purposes of defrauding the Plaintiffs and decedent out of their state and federal substantive due process rights (civil rights) when they were required by law to act appropriately, but instead managed and controlled the RICO predicate acts committed under **(Title 18, Chapter 96, Section 1962(b))**, and/or participated in the RICO predicate acts under **(Title 18, Chapter 96, Section 1962(c))**, for the purposes of **A)** monetarily damaging the Plaintiffs' business and/or property interests by having directly, or indirectly, participated in the solicitation of the courts to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section 1956 and to **B)** cover-up the prior racketeering activities committed by the three (3) local enterprises. These accomplices are: **1) Rick Scott under Section § 1962(b) by having a fiduciary duty to act**

73

appropriately when given constructive notice of a murder by USPS certified mail, 70182290000075887042; 2) Chad Chronister under Section § 1962(b) by having a fiduciary duty to act appropriately when given constructive notice of a murder by the contents of two (2) subpoenas served on him in 2018; 3) Christopher Brown and 4) Jason Gordillo in 2018, under Section § 1962(c) by having had a fiduciary duty to act appropriately when given constructive notice of a murder; 5) James Previtera during 3/2012, under Section § 1962(b & c), <u>who benefited from satisfaction in having caused all of the illegal court case racketeering activities on the Plaintiffs and decedent</u>; 6) David Gee from 2/2012 to 9/2017 under Section § 1962(b), Respondeat Superior to James Previtera, for knowingly participating in James Previtera's illegal racketeering activities on the Plaintiff and decedent with a fiduciary duty to act appropriately; 7) Mary Mainland under Section § 1962(c), with a fiduciary duty to act appropriately when given constructive notice of a murder by phone on 4-24-15; 8) Stephen Muldrow under Section § 1962(b), with a fiduciary duty to act appropriately when given constructive notice in 6/2017 of a murder cover-up by HCSO, Defendant; 9) Pamela Bondi under Section § 1962(b) by having a fiduciary duty to act appropriately when given constructive notice of both a murder by USPS certified mail 7017-3380-0000-5200-3137 and the defrauding of Ms. Kimball by

USPS Certified mail 7018-1130-0001-3829-4635; 10) David Bowdich under Section § 1962(c), with a fiduciary duty to act appropriately when given constructive notice of a murder, Defendant; 11) Christopher Wray under Section § 1962(c), for being liable under the Respondeat Superior Doctrine, is responsible for David Bowdich's failure to act appropriately after given constructive notice of U.S. civil rights violations by USPS priority mail, 9505515441348205297578 and USPS certified mail, 70183090000099211471 in that, by beyond reasonable doubt evidence, Christopher Wray was informed by imputation from David Bowdich of the Plaintiff's matter and his anticipating the appropriate action to be taken by the Federal Bureau of Investigation (FBI); 12) Kellyanne Conway under Section § 1962(c), with a fiduciary duty to act appropriately when given constructive notice by email and USPS certified mail, 70173380000052003847 of a murder, Defendant; 13) Donald Trump under Section § 1962(c), with a fiduciary duty to act appropriately when given constructive notice by email and USPS certified mail, 70183090000025296800 of a murder and for being liable under the Respondeat Superior Doctrine for at least Kellyanne Conway's failure to act appropriately after she was constructively notified of numerous U.S. civil rights violations. By beyond reasonable doubt evidence, Donald Trump was informed by imputation from kellyanne Conway and the five

(5) other Trump executives that the Plaintiff contacted, anticipating an appropriate action to be taken in this matter by the Trump Administration abiding by Section 3 of Article 2, of the U.S. Constitution (Take Care Clause) in a reasonable amount of time. Undoubtedly Donald Trump authorized Kellyanne Conway and his other executives who were all constructively notified of the decedent's murder cover-up by the Plaintiff, to turn a blind eye to the incident <u>as a benefit in not having to embarrass and punish any of his affiliates and allies in government positions, supporting and covering for Donald Trump's administration when needed</u>, or the Plaintiff would have been notified of the Trump Administration's willingness to comply with the Plaintiff's many constructive notices given to White House executives within 30 days (reasonable amount of time). Since Donald Trump and his team of crooked government employees (Trump Administration), subsequently acquiesced in righting the wrong (fraud) committed on the Plaintiff and decedent by his affiliates within local government agencies, he is now liable, along with the 12 cited Defendants, for triple remedial damages owed in this matter, under the Civil RICO Act, for being just another dirty accomplice.


Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 4:

**In Section 3 of Article 2 of the Constitution is the <u>Take Care</u> <u>Clause</u> that requires the U.S. president and his <u>administration</u> to obey and enforce all laws of the land,** though they retain some discretion in interpreting the laws and determining how to enforce them, **but not by turning a blind eye and ignoring the**m! *Ex parte Young* exception to Eleventh Amendment immunity applies to suing government participants under the RICO Act for damages when they violated a U.S. constitutional law.   In general, a participant under this exception is someone who **1)** was informed of the illegal act either because their job duties and position required him or her to have this knowledge, **or 2) were given either constructive or actual notice of the violation.**   And who also **3)** had a fiduciary duty as a government employee to take the appropriate actions towards enforcement of the penalties in a U.S. civil rights violation committed on one of his or her citizens, but deliberately turned a blind eye to the crimes under Title 18, U.S. Code § 3, making him or her liable under both Title 18, Chapter 96, Section 1962(d & c).   A violation of Section § 1962(d) for having known of the act that was committed, and a violation of Section § 1962(c) when the same act had foreseeably occurred **again in the future** by the same, or an affiliated party or parties.   **<u>This means that the accomplices</u> <u>cited in Section 4 were all part of future RICO predicate act</u> <u>committed simply by knowing what the basics of the RICO plan</u>**

**were that had been implemented and then turning a blind eye to it, aiding and abetting this plan to continue to defraud and deprive the Plaintiff and decedent out of their civil rights with business and/or property damages.**

For a § 1962(d) conspiracy claim based on an agreement to violate § 1962(c), the defendant need not agree to operate or manage the enterprise. See *Salinas v. United States*, 522 U.S. 52, 63 (1997) **(holding that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."). Rather, the defendant may be liable, if it (he or she) knowingly agrees to facilitate others who operate or manage the enterprise.** For example, in *Brouwer v. Raffensperger*, Hughes & Co., 199 F. 3d 961 (7th Cir. 2000). See also *MCM Partners, Inc.*, 62 F. 3d 967; *United States v. Quintanilla*, 2 F. 3d 1469, 1485 (7th Cir. 1993); *United States v. Starrett*, 55 F. 3d 1525, 1547-48 (11th Cir. 1995); *Tonnemacher v. Sasak*, 859 F. Supp. 1273, 1277-78 (D. Ariz. 1994); *Fid. Fed. Sav. & Loan Ass'n*, 830 F. Supp. at 261 and *Jones v. Meridian Towers Apartments, Inc.*, 816 F. Supp. 762, 772-73 (D.D.C. 1993). The Seventh Circuit reconciled a perceived conflict between the Supreme Court's opinions in *Salinas and Reves* by holding that to be actionable, the agreement need **not** be to manage the enterprise, **but to "facilitate the activities of those who do."** *Brouwer*, 199 F. 3d

at 967.  The Third Circuit has similarly held that a **"defendant may be held liable for conspiracy to violate § 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."** *Smith v. Berg*, 247 F. 3d 532, 538 (3d Cir. 2001).  Under *Brouwer v. Raffensperger, Hughes & Co.*, 199 F. 3d 961, 967 (7th Cir. 2000).  All of the Defendants listed in Section 4, **1)** participated in the RICO predicate acts committed by at least not having taken any action to stop the foreseeable acts from continuing in the future with a fiduciary duty to stop and enforce the penalties of the acts and **2)** who knew what the nature (purpose) of the RICO plan was.  **The court emphasized that "one who opts into or participates in a conspiracy is liable for the acts of his [or her] co-conspirators which violate [S]ection 1962(c),** <u>**even if the defendant did not personally agree to do, or to conspire with respect to, any particular element."**</u> *Smith v. Berg*, 247 F. 3d 532, 534 (3d Cir. 2001), Id. at 537, see also *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 257 F. App'x 49 (9th Cir. 2007).  **The Second Circuit, also looking to Salinas, concluded that** <u>**proof that an enterprise was actually established is not necessary for a conspiracy**</u>. *United States v. Applins*, 637 F. 3d 59, 75 (2d Cir. 2011).  According to the Fourth and Fifth Circuits, **the plaintiff must prove only that the "defendant** <u>**participated in the conspiracy with knowledge of**</u>

**the essential nature of the plan**." *United States. v. Tillett*, 763 F. 2d 628, 632 (4th Cir. 1985); *United States v. Elliott*, 571 F. 2d 880, 903-04 (5th Cir. 1978). **It is "not necessary to prove that the defendant knew all of the details of the unlawful enterprise or the number or identities of all the co-conspirators**." *Dale v. Frankel*, 131 F. Supp. 2d 852, 860 (S.D. Miss. 2001) (quoting *United States v. Posada-Rios*, 158 F. 3d 832, 858 (5th Cir. 1998)).

The *Bloch* court relied upon a footnote from *Petro-Tech* which stated that **"there could be circumstances in which the common law of respondeat superior would hold an employer (company) liable even when the employer did not benefit from the employee's conduct**." (owners benefiting not the company). Bloch v. Prudential-Bache Securities, 707 F. Supp. at 193, quoting Petro-Tech, Inc., 824 F. 2d at 1359 n. 11. **Not punishing affiliate enterprise members on government payrolls, who keep your secrets safe while they violate your citizens' rights for profit or gain, is one crooked president going along, to get along!**

**Section 5.** All private party accomplices which include attorneys and non-officers of the court, law firms, P.A.s and P.C.s, as participants of the primary, secondary and third enterprises, participated in violation of **(Title 18, Chapter 96,**

**Codes § 1961-1968), (Title 42, Chapter 21, Section 1983), (Title 18, Chapter 13, U.S. Codes § 241 & 242), (Title 18, U.S. Code § 3) and (Fraud on the Court) by providing the government function of filing knowingly false pleadings, even as joinders, for courthouse judges to illegally grant, for the purpose of defrauding and depriving the Plaintiffs and decedent under (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346).** Triple remedial damage amounts and attorney's fees with a lodestar multiplier could be demanded, but under Section § 1983, regular damages along with punitive amounts and attorney's fees could be asked for instead, when the accomplices in this Section either directly implemented, and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, the racketeering activities of the three (3) local enterprises under **(Title 18, U.S. Code § 1961(1)),** but not limited to **1)** murder (Title 18, Section § 1959), **2)** extortion (Title 18, Section § 880), **3)** extortionate credit transactions (Title 18, Sections § 891-894), **4)** influencing the operations of an employee benefit plan (Title 18, Section § 1954), **5)** money laundering under (Title 18, Section § 1956), first committed by Robert Foster when he illegally dismissed a lis pendens knowing that the $65,000 less than the fair market value proceed amount of $165,000 from the sale of the murdered decedent's home was going to her murderers who forged her signature on the sales contract before her death

81

and **6)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 for the purposes of defrauding the Plaintiffs and decedent out of their U.S. civil rights when they were required by law to act appropriately, but participated under **(Title 18, Chapter 96, Section 1962(c))**, for the purposes of the following: **A)** covering up the prior racketeering activities that were committed by the three (3) local enterprises and **B)** monetarily damaging the Plaintiffs' business and/or property interests by soliciting the judges to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section § 1956. Together, all of the accomplices cited in this Section are guilty of having taken measures to facilitate continued RICO predicate act violations on the Plaintiffs' and decedent's, violations of their state and federal substantive due process rights (civil rights), when they were legally required by law, some as officers of the court, to act appropriately, but by beyond reasonable doubt evidence, **1)** knew that the nature of the RICO plan was to illegally end the Plaintiffs' cases, monetarily damaging them and **2)** participated in the illegal RICO plan by filing knowingly false pleadings, even as joinders, that allowed the judges the opportunity to implement their RICO plan, illegally ending the Plaintiffs' cases. The filing of knowingly false pleadings by licensed attorneys is also a violation under the Florida Bar's Code of

Conduct.    In  Supreme  Court  of  Florida,  *The  Florida  Bar  v.
Whitney*,  132  So.  3d  1095,  No.  SC11-1135  (2013)  cites  The  Florida
Bar  Rules:    4-3.3(a)  (**"A  lawyer  shall  not  knowingly:  <u>4-3.3(a)</u>
<u>(2)  fail  to  disclose  a  material  fact  to  a  tribunal  when</u>
<u>disclosure  is  necessary  to  avoid  assisting  a  criminal  or</u>
<u>fraudulent  act  by  the  client,  or  other  party  to  the  case;</u>**  4-
3.4(c)  **(a  lawyer  shall  not  knowingly  disobey  an  obligation  under
the  rules  of  a  tribunal)  (if  not  fraudulently  illegal);**  (4)
**permit  any  witness,  including  a  criminal  defendant,  to  offer
testimony  or  other  evidence  that  the  lawyer  knows  to  be  false.
<u>4-8.4(c)  (a  lawyer  shall  not  engage  in  conduct  involving</u>
<u>dishonesty,  fraud,  deceit,  or  misrepresentation);</u>**  and  **<u>4-8.4(d)</u>
<u>(a  lawyer  shall  not  engage  in  conduct  in  connection  with  the</u>
<u>practice  of  law  that  is  prejudicial  to  the  administration  of</u>
<u>justice</u>).**    Together  the  lawyer  accomplices  in  this  Section
violated  **all**  of  the  underlined  Florida  Bar  Rules  cited.    The
accomplices  are:  **Robert  Welker  (in  cases  12-CP-1669,  14-CA-
10278,  16-CA-4693,  2D17-2243,  Florida  SC18-590,  U.S.  SC17-9268
and  17-CA-4051),  Steven  Hearn  (in  cases  12-CP-1669,  2D17-2725,
17-CA-4051,  2D18-1538,  2D18-1889  and  2D19-1384,  Frederick  Hearn
(in  case  17-CA-4051  and  2D19-1384),  Steven  Hearn  P.A.,  (in  cases
2D17-2725,  17-CA-4051,  2D18-1538,  2D18-1889  and  2D19-1384,  Bowen
Brown  (in  cases  Florida  SC18-590,  17-CA-4051,  U.S.  SC17-9268  and
2D19-1384),  Robin  Black  (in  case  2D17-2243),  Janice  Pickett  (in**

case 17-CC-403) Michael D'Lugo (in cases 18-CA-1537 and 2D18-4761), Wicker, Smith, O'Hara, McCoy & Ford, P.A.; respondeat superior to Janice Pickett and Michael D'Lugo (in cases 17-CC-403, 18-CA-1537 and 2D18-4761), Lee Pearlman (in cases 12-CP-1669, 2D13-4571, 14-CA-12257, 2D18-694, 17-CA-4051 and 2D19-1384), Andrew Mallory (in case 17-CA-4051 and 2D18-1889), Denmon & Pearlman, P.A.; respondeat superior to Lee Pearlman and Andrew Mallory (in cases 17-CA-4051 and 2D18-1889), Thomas Rydberg (in cases 12-CP-1669, 2D13-4571, 14-CA-10278, 14-CA-12257, 16-CA-4693, 2D17-2243, 17-CA-4051 and 2D19-1384), Thomas Rydberg P.A.; respondeat superior to Thomas Rydberg (in case 12-CP-1669, 2D13-4571, 14-CA-10278, 14-CA-12257, 16-CA-4693, 2D17-2243, 17-CA-4051 and 2D19-1384), Michael McGirney (in cases 14-CA-12257, 17-CA-4051 and 2D19-1384), Spector Gadon & Rosen, P.C.; respondeat superior to Michael McGirney (in cases 14-CA-12257, 17-CA-4051 and 2D19-1384), Sybil Murphy (in cases 12-CP-1669, 2D13-4571, 14-CA-10278, 2D17-2725, 17-CA-4051, 2D18-1889 and 2D19-1384), Abraham Shakfeh and William Linero Jr. (in case 17-CA-6219), Butler, Weihmuller, Katz and Craig LLP; respondeat superior to Abraham Shakfeh and William Linero Jr. (in case 17-CA-6219), Joseph Riopelle and Jessica Welsh (in case 17-CA-6219 and Boyd, Richards, Parker and Colonnelli P.L.; respondeat superior to Joseph Riopelle and Jessica Welsh (in case 17-CA-6219), for the above reasons.

**Section 6.** Defendant **ABC, Inc., along with accomplices Willow Bay, Tanya Menton, Charlene Honeywell and Bernard Silver** (fourth and secondary enterprises) **violated the Plaintiff's 1ˢᵗ U.S. constitutional amendment right to free speech)** when **1)** Charlene Honeywell illegally defrauded the Plaintiff out of being able to file an appeal by requiring him to pay an illegal $500 filing fee, documented in the final order from case 8-17-CV-219-7-36MAP, on 5-9-17.   **2)** when Bernard Silver illegally gave the Plaintiff a contempt of court ultimatum, stopping him from speaking with any courthouse employee at his judicial office on business, documented in case 14-CA-10278, on 12-18-14.   And when **3)** ABC, Inc. gave the Plaintiff a do not contact Willow Bay at unaffiliated USC ultimatum by letter on 6-21-18.   All of these civil rights violations were done to help **1)** cover-up the prior racketeering activities committed under Title 18, U.S. Code § 3 by the three (3) local enterprises and to **2)** cost the Plaintiff his business and property interests that are still being implemented by Florida's state judicial enterprise.

**Section 7. Sybil Murphy, Marcy McDermott and Cyrie Schneider (decedent's caretakers) can be sued under (Title 18, Chapter 96, Sections 1962(b & c))**, along with **Richard Smith and Richard Murphy** under **(Title 18, Chapter 96, Section 1962(c))** for

committing a **3) (Fraud on the Court)** during cases 12-CP-1669, 13-CA-10278, 17-CA-4051, 2D18-1889 and 2D19-1384, all of whom formed the **primary enterprise** under **1) (Title 18, Chapter 96, Codes § 1961-1968)**, when they violated **2) (Title 18, Chapter 95, Section 1959)** – relating to a murder by having planned and implemented the killing of the decedent under Florida's aggravated manslaughter statute 782.07; **4) (Title 18, Chapter 41, Section 880)** – relating to receiving the proceeds of extortion, when the three (3) caretakers made the decedent sign two (2) false inheritance instruments which were a will and a gift deed. The gift deed was a **ruse** to be given to the Plaintiff by Robert Welker after the decedent was dead, so that the Plaintiff would believe that he owned the gifted property, when he in fact does not due to the deed not having been properly served to him by the decedent while she was alive. Consequently, the ownership rights to this deeded property can be exercised at any time by either the caretakers or their heirs after the Plaintiff's death, since he currently only has squatter's rights from having both lived on the property and paid the taxes associated with it for over seven years. The death of a squatter terminates the squatter's rights to the property. **5) (Title 18, Chapter 42, Sections 891–894)** - relating to **extortionate credit transaction (SunTrust Bank on 6-12-12 account number 0049011229398)**. Among other properties of the decedent's stolen before her death, was

an illegal transfer of $20,000 (hush money) made to Marcy McDermott on 6-12-12, 19 days before the decedent death on 7-1-12, by Cyrie Schneider and documented in the appendices); **(Title 18, Chapter 95, Section 1959)** – relating to the three (3) caretakers' **planed series of related illegal acts** leading up to the malicious manslaughter of the decedent by having committed the following: **1)** procuring false inheritance instruments by forging the decedent's signature on Robert Welker's retainer agreement, **6) (a federal class D felony)**, **2)** substituting the decedent's pneumonia medication for an antifungal, a violation under **(Florida Statute 825.102, 732.802 and Title 18, Chapter 95, Section 1959)**, **3)** denying the decedent medical attention, a violation under **(Florida Statute 825.102, 732.802 and Title 18, Chapter 95, Section 1959)**, **4)** giving the decedent critical amounts of heart stopping potassium, a violation under **(Florida Statute 825.102, 732.802 and Title 18, Chapter 95, Section 1959)**, and **5)** moving the decedent's body to the nearest toilet to falsely have paramedics believe that she was ambulatory right before her death, and that her death occurred while she was ambulatory in the bathroom instead of laying on the sofa almost dead for days while her caretaker watched her die, a violation under **7) (25 CFR § 11.440)**. All of these illegal acts were aided and abetted by all five (5) primary enterprise members under **8) (Title 18, U.S. Code § 2)**.

Richard Smith, once a career gentleman suitor, who is believed to have only married Cyrie Schneider for her illegally planned and unfettered rights to all of the decedent's property, **was a witness to the decedent signing false inheritance instruments on 6-29-12, that by marriage, allowed him to finagle some of the decedent's loot.  Cyrie Schneider had asked Richard Smith to attend the signing of the false inheritance instruments at the decedent's house on 6-29-12 to add his name to both the false will and deed instruments as a credible witness to the decedent being competent when she signed them.  He was also present to put pressure on the decedent to sign the inheritance instruments.**

And Richard Murphy, husband to Sybil Murphy, a stranger to the estranged Plaintiff and decedent, considered the source from whom he had already stolen property from through his wife and **willingly funded the solicitation of multiple judges to defraud the Plaintiff and decedent under (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), out of their civil rights, violations by all five (5) primary enterprise members under the following:  9) (Title 18, Chapter 13, U.S. Codes § 241 & 242), (Title 18, Chapter 96, Section 1962(d)), (Title 18, Chapter 96, Section 1962(c)), 10) (Title 18, U.S. Code § 3) and 11) (Title 42, Chapter 21, Section 1983)**.

Both the related only by marriage, money hungry, thieving husbands cited in this Section are just as guilty as the principles in this matter because they were both primary enterprise members by having known what the RICO plan was **(Pinkerton Liability Doctrine)** long before the decedent was abused, neglected, exploited and murdered.  The accomplices are: **Sybil Murphy, Marcy McDermott, Cyrie Schneider, Richard Smith and Richard Murphy** for the above reasons.  **All of the Section 7 accomplices can and should be prosecuted for murder**!

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 7, with an Added Count:**

Extortion is the violation of the free will of an individual. It is the verbal or written instillation of fear that something will happen to the victim if they do not comply with the extortionist's will (coercion).

There is also the matter of about $350,000 from around $700,000 of the decedent's cash property that the Plaintiff cannot account for.  The Plaintiff believes that the decedent's social security money (federal government welfare money) was slowly transferred directly or indirectly for decades by the decedent's degreed accountant, Cyrie Schneider, to Sybil Murphy, where it was illegally invested into her husband's, pension funds at both

the McDonnell Douglas and Lockheed Martin companies before retiring from these two companies. These were companies that offered fantastic retirement plans, matching funds deposited and giving high rates of interest on deposited money that was never to be shared with the decedent, and was never to be accounted for in her estate. Thus, the primary enterprise committed **money laundering** under **(Title 18, Chapter 95, Section 1956(a))** and **theft and conversion** under **(Florida Statute 772.11)**. And if any of the decedent's **stolen** money was mailed or wired by a primary enterprise member, then the primary enterprise also committed violations under **(Title 18, Chapter 63, U.S. Codes § 1341 & 1343), in relation to money laundering and theft and conversion**. By the evidence gathered during Sybil murphy's deposition taken on 4-19-13, next to Thomas Rydberg's law firm, in the Verizon Building, Suite 1775, 201 N. Franklin Street, Tampa, FL 33602, in case 12-CP-1669, Sybil Murphy had her name on a bank account with around $160,000 in it that was the property of the decedent's when she was **1)** not trusted to hold any of the decedent's money, **2)** did not live with the decedent and **3)** did not pay any of the decedent's bills. **It is true that the decedent did not herself choose to set up any banking account where the deposits upon her death were to be paid to the joint holder. In Florida, it is a known automatic banking procedure stated on most banking registration forms that all Florida**

banks, unless stipulated to them beforehand in writing, will pay the deposits of any joint account upon death to the surviving account holder, period.  And the decedent was legally blind due to cataracts.  <u>This is why the caretakers needed their will instrument signed so badly by the decedent, making 1) who really owned the decedent's banking money before and after her death and 2) the fact that the decedent did not herself choose for her banking deposits to be paid to the joint account holders upon her death as an inheritance, irrelevant</u>.

Joint accounts with right of survivorship have been a frequent source of litigation in Florida.

In *Spark v. Canny*, 88 So. 2d 307 (Fla. 1956), this Court held that where a joint bank account with right of survivorship was established with the funds of one person, a gift of the funds remaining in the account at the death of the creator of the joint account was presumed, but that such presumption was rebuttable and could be overcome by clear and convincing evidence to the contrary.  In a subsequent case, **the Court held that the presumption had been rebutted by a showing that the sole intent of the person who created the joint account was to make a gift effective upon her death.**  *Chase Fed. Sav. & Loan Ass'n v. Sullivan*, 127 So. 2d 112 (Fla. 1960).  <u>We reasoned that establishment of the joint account under these circumstances was an ineffectual attempt to do that which could only be</u>

accomplished by a last will and testament.   In order for the survivor to prevail, it had to be shown that the creator intended a gift inter vivos at the time the account was opened! *In Re Estate of Combee*, 601 So. 2d 1165 (1992).

In the state of Florida, if clear and convincing evidence cannot be shown by opposing parties after the burden of proof shifts to the estate under Florida Statutes sections 658.56 and 90.304 (1987) to show that the decedent did wish for banking proceeds to go to the joint holder at the time the account was opened, then the proceeds do not pass to the joint holder upon death and are made part of the decedent's estate property to be probated. Cited in *Caputo v. Nouskhajian*, 871 So. 2d 266 (2004).   Id.   At 1167 n. 2. In *Combee*.   This fact was never legally allowed to be proven in case 12-CP-1669 by Robert Foster after the Plaintiff had stated it in his complaint and then mentioned it to him on 9-24-12 at the very first hearing in this court case with a court reporter present.   Either there was something in the water Robert Foster was drinking, or he was a practicing member of the secondary enterprise on a mission to deprive the decedent out of her state and federal civil rights to have her stolen money looked into.

The Supreme Court of Florida, *In re Estate of Combee*, 601 So. 2d 1165 (Fla. 1992), held that, in such disputes over the inclusion

of bank accounts in a probate estate, **parol evidence** is admissible to prove the decedent's intent.

It was a well-known fact that for decades the decedent was under the assumption that if she died without anyone else's name on her bank accounts, the banks would keep her money, or there would at least be a surcharge (inheritance tax) on the balance of her bank accounts.  A half a century ago, the decedent liked the high rate of interest on her money given to her by the banks, but feared them stealing her money, if given an opportunity to do so.  The Plaintiff was a child at the time and did not know much about this banking rule, but it did seem possible, and what is relevant is, the decedent believed it was likely to happen.

The problem with the decedent's ignorance of the Florida banking laws meant that she then had to trust the ones whose names were on her bank accounts and certificates of deposits (CD) to **distribute the balance of each equally amongst her heirs** because 1) she never wanted a will and 2) was too incompetent to know she was being murdered by the ones named on her bank accounts!

The decedent's social security deposits were made into one (1) of her checking accounts for Cyrie Schneider, who was the decedent's trusted, degreed accountant (bookkeeper) and live in caretaker, to pay her bills with.

The $160,000 balance in one of the decedent's bank accounts that Sybil Murphy jointly owned, as stated on 4-19-13, was never disclosed to the court in case 12-CP-1669. What this money was used for while in the hands of Sybil Murphy, was known only by the primary enterprise members with copies of the bank account number only given to Thomas Rydberg, Robert Welker and Lee Pearlman. All of these accomplices kept the decedent's banking information hidden so **any illegal activities involving this bank account, could not be discovered and disclosed during any court case having to do with the decedent's property by the Plaintiff.** Under RICO, by assisting the client in preparing its own books and records, Justice Souter wrote, the auditor "step[ped] out of its auditing shoes and into those of management." (a violation under RICO) *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993), Id. at 190-91. **The primary enterprise cannot be sued at this time for decedent's missing $350,000 under the money laundering statute with any related mail and wire fraud claims for lack of the spoliated evidence due to Lee Pearlman, Robert Welker and Thomas Rydberg having refused to provide the referenced $160,000 banking account information to the court during cases 12-CP-1669, 14-CA-10278, 14-CA-12257, 17-CA-4051, or to the Plaintiff, but their insurance companies can and are being sued for this money, damn it to Hell!**

The insurance companies in Section 2 are being sued by the Plaintiff for their agents deliberate **spoliation** of the decedent's banking information, stopping the Plaintiff from proving where the rest of the decedent's money went! $23,000. deposited each year, at 10% interest, for 15 years, **is a lot more than $350,000!** The Defendants are: **Florida Lawyers Mutual Insurance Company (Section § 1962(b & c))**, **CNA Insurance Company (Section § 1962(b & c))**, and **Axis Insurance (Section § 1962(b & c))**. All three (3) of these companies were co-conspirators in the above referenced court cases, that either stopped these cases from going into the discovery phase, court case 14-CA-10278 (CNA), or illegally stopped the discovery of the decedent's $160,000 and her murder related information, court cases 14-CA-12257 and 17-CA-4051 (CNA, AI and FLMIC).

**Section 8.** **Edward LaRose** (Section § 1962(b)), respondeat superior to **Robert Morris, John Badalamenti and Morris Silberman** (secondary enterprise), are all in violation of **(Title 18, Chapter 96, Codes § 1961-1968)**, **(Title 18, Chapter 13, U.S. Codes § 241 & 242)**, **(Fraud on the Court)** and **(Title 18, U.S. Code § 3)**, for participating under **(Title 18, Chapter 96, Section 1962(b or c))** when they tampered with the witness Marcy McDermott giving her testimony under **(Title 18, Chapter 73, Section 1512)** by deliberately failing to reverse **Elizabeth**

**Rice's false order** that dismissed the Plaintiff's sanction and certified questions deposition motion in case 17-CA-4051, case 2D18-1889, on 5-31-18, that asked for: **1)** sanctions against **Andrew Mallory, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, Steven Hearn and Steven Hearn P.A.,** when they stopped Marcy McDermott's from answering probate related question and walking out of her deposition with Marcy McDermott on 12-05-17 at the James J. Lunsford Law Library, 701 E. Twiggs Street, Tampa, Florida 33602, **in violation of both FRCP Rules 1.310(c) and 30(c).** And **2)** for not reversing Elizabeth Rice's order dismissing the Plaintiff's motion for Marcy McDermott to be asked certified questions in her court under **Fed. R. Civ. P. Rule 32(a)(8) and 804(b)(1) of the Federal Rules of Evidence.** The accomplices are: **Edward LaRose (Section § 1962(b)), Robert Morris, John Badalamenti, Morris Silberman, Andrew Mallory, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, Steven Hearn, Steven Hearn P.A., Elizabeth Rice, Sybil Murphy (Section § 1962(b)), Marcy McDermott, Lee Pearlman and Defendant Florida Lawyers Mutual Insurance Company for vicarious liability under Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations,** for the above reasons.

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 8:**

Rule [30(c) of the Federal Rules of Civil Procedure] itself says **"Evidence objected to shall be <u>taken</u> subject to the objections,"** and Professor *Wright* says it means what it says, citing *Shapiro v. Freeman , D.C.N.Y.*, 1965, 38 F.R.D. 308, for the doctrine: **"Counsel for party had no right to impose silence or instruct witnesses not to answer, and if he believed questions to be without scope of orders, he should have done <u>nothing more than state his objections</u>."** *Wright & Miller*, Federal Practice and Procedure: Civil 52113 at 419, n. 22 (1970). **We agree.** If plaintiff's counsel had any objection to the questions under Rule 30(c), **he should have placed it on the record and <u>the evidence</u> would have been taken (by the court) subject to such objection.** *Ralston Purina Co. v. McFarland*, 550 F. 2d at 973 (4th Cir. 1977). Consequently, **all of the accomplices and the Defendant cited in Section 8 also committed spoliation of <u>evidence</u>** that was not able to be obtained on 12-05-17, in case 14-CA-12257. Certified questions needed to be asked of Marcy McDermott **with Elizabeth Rice present** in case 17-CA-4051, but Elizabeth Rice illegally objected in court to continuing Marcy McDermott's deposition on 4-24-18.

**A Deposition Taken in an Earlier Action:**

97

A deposition lawfully taken and, if required, filed in any federal or **state court action** may be used in a later action involving the **1) same subject matter (same issues) between the 2) same parties, or** their **representatives or successors in interest,** to **the 3) same extent as if taken in the later action.** A deposition previously taken (in any court) may also be used as allowed by the Federal Rules of Evidence.   Fed. R. Evid. 804(b)(1).   A party does **not** have to satisfy both Rule 32 and Rule 804; **a party only needs to satisfy either Rule 32 or Rule 804**.   *Coffee*, supra at 160.   The provisions of Rule 32 and Rule 804 are cumulative.   Id.


**Section 9.   Elizabeth Rice** (secondary enterprise) can be sued under **(Title 18, Chapter 96, Codes § 1961-1968), (Title 18, Chapter 13, U.S. Codes § 241 & 242), (Title 42, Chapter 21, Section 1983), (Fraud on the Court)** and **(Title 18, U.S. Code § 3)**, for being a participant under **(Title 18, Chapter 96, Section 1962(c))** when she tampered with witness Marcy McDermott giving her testimony in her court, a violation of **(Title 18, Chapter 73, Section 1512),** by illegally denying the Plaintiff's sanction/deposition motion stated in Section 8, on 04-25-18, heard in her court on 4-24-18 while presiding on case 17-CA-4051.   The accomplice is: **Elizabeth Rice** for the above reasons.

Section 10.   **Andrew Mallory** and **Steven Hearn** as well as their **affiliated entities** associated with illegally stopping Marcy McDermott's deposition on 12-5-17, which resulted in honest services fraud by **Richard Nielsen, Elizabeth Rice, Edward LaRose** (Section § 1962(b)), respondeat superior to **Robert Morris, John Badalamenti and Morris Silberman**, can be sued for violation of **(Title 18, Chapter 96, Codes § 1961-1968), (Title 18, Chapter 13, U.S. Codes § 241 & 242), (Title 18, U.S. Code § 3)** and **(Fraud on the Court),** for participating under **(Title 18, Chapter 96, Section 1962(c))** when they continued the RICO pattern of defrauding the Plaintiff in this matter by violating **(Title 18, Chapter 73, Section 1512)** - relating to tampering with a **witness,** victim, or an informant, on 12-05-17, 4-25-18 and 5-31-18, that started at the James J. Lunsford Law Library, 701 E. Twiggs St., Tampa, Florida 33602.   The accomplices are:   **Lee Pearlman, an insured/agent of Florida Mutual Insurance Company** (Section § 1962(b)), **Andrew Mallory (Section § 1962(c)), Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, Steven Hearn (Section § 1962(c)), Steven Hearn P.A.** (Sections § 1962(a, b & c)), **respondeat superior to Steven Hearn, Florida Lawyers Mutual Insurance Company** in conjunction with Section § 1962(b & c) violations, **Defendant and Sybil Murphy** (Section § 1962(b), **respondeat superior to Steven Hearn and Steven Hearn P.A.,** for the above reasons.

**Section 11.** **Bernard Silver** (secondary enterprise) reversely discriminated against the Plaintiff under **(Title 42, Chapter 21, Section 1985(3))**, in case 14-CA-10278.  See U.S. Supreme Court's 1976 *McDonald vs. Santa Fe Trail Transport Co.*  Bigoted Bernard Silver, a minority accomplice, had the **nerve** to treat the Plaintiff as though he were a bigot, due to false information provided to him by the chief judge's office at the 13th Judicial Circuit.   The Plaintiff was slandered per quod with Bernard Silver, by beyond reasonable doubt evidence as to Manuel Menendez authorizing his secretary, Kimberly Cash, to illegally and purposely tell Bernard Silver, as stated in her affidavit filed in case 17-CA-902, that the Plaintiff called Bernard Silver and Thomas Rydberg (not Jewish) "Jew buddies" and that "they probably attended the same synagogue", along with perhaps some real defamatory comments towards Bernard Silver not stated in her affidavit.  By beyond reasonable doubt evidence, Manuel Menendez had everything to do with these false statements made, so that Bernard Silver would be upset enough to scold the Plaintiff in his court on 1-6-15 as a **ruse** to give Manuel Menendez a **cover** when he planned the illegal dismissal of case 14-CA-10278 in violation of the Civil RICO Act.  Manuel Menendez implemented this plan to aid and abet HCSO in keeping the Plaintiff from obtaining property owed to him from probate case

12-CP-1669 and any other court awarded property that Florida's state judicial enterprise could illegally influence. On 5-18-16 the Plaintiff believed that Bernard Silver knew what the basics of the RICO plan were from both Robert Foster and Manuel Menendez and complied with the plan to fool the Plaintiff, **but Bernard Silver, of Judah dissent, had to have harbored ill feelings (bigotry) towards the Plaintiff and Manuel Menendez for being the barer of bad news.** The accomplice is: **Bernard Silver** for the above reasons.

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 11:**

The statute of limitations under Title 42, Chapter 21, Section 1985(3) is tolled in conjunction with the following: Under the equitable tolling doctrine due to Charlene Honeywell, on 5-9-17, **1)** having mislead the Plaintiff during case 8-17-CV-219-7-36MAP as to case 14-CA-10278 having been dismissed due to an error made by Bernard Silver. But the Plaintiff knew on 2-3-17 that the illegal dismissal of case 14-CA-10278 was due to Manuel Menendez's RICO plan, so he withdrew his FRCP 1.540(b)(1) motion during this case and ended it permanently. Section § 1985(3) is tolled indefinitely because it was committed in conjunction with Bernard Silver having committed a **2)** fraud on the court and having **3)** acted as an accomplice after the fact in the

decedent's murder by covering it up in violation of Title 18, U.S. Code § 3.

**Section 12.**   The **Florida Department of State and Legislative Affairs** are being sued by the Plaintiff for a **(permanent injunction under Title 42, Chapter 21, Section 1988)** to correct two (2) Florida laws that were used against the Plaintiff, in violation of his state and federal substantive due process rights during the course of this matter.   Florida cases:   SC18-590 from 2DCA case 2D17-2243, and case 17-CA-4051 from the 13th Judicial Circuit.   **1)** In case SC18-590, the State of Florida implemented an illegal change in the Florida state constitution that currently **limits the Florida Supreme Court to review under Article V, Section 3(b)3 to just elaborated per curiam decisions.**   This illegally denies some **chosen losers** their appellate rights in the Florida Supreme Court anytime a Florida district court of appeal has an illegal political agenda for denying a party their state and federal civil rights, all they have to do is **not** give an opinion as to why an order was affirmed.   **This is a fraudulent violation under (Title 18, Chapter 96, Codes § 1961-1968)**, **(Title 18, Chapter 13, U.S. Codes § 241 & 242)**, **(Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346)**, **(Title 18, Chapter 96 Section 1962(b)**, **(Title 42, Chapter 21, Section 1983)** and **(Fraud on the Court)**.   **And it**

started out as a conspiracy under **(Title 18, Chapter 96, Section 1962(d))** that was concocted by organizers Jorge Labarga (Chief Judge of the Florida Supreme Court), Pamela Bondi (attorney general at the time), Rick Scott (governor at the time) and state district chief judges (management), to deny citizens their right to appeal false DCA rulings to the Florida Supreme Court, as a ruse to abide with state trial judges' illegal agendas, making the state and federal civil right violations also violations under the Civil RICO Act. See *Wells v. State*, 132 So. 3d 1110 (Fla. 2014). **Under the RICO Act, there is no absolute legislative immunity from suit for damages caused.** See *Committee to Protect our Agricultural Water v. Occidental oil*, 235 F. Supp. 3d 1132, id at paragraph 54.

The Florida Supreme Court may review by conflict certiorari, a per curiam judgment of affirmance without an opinion, if an appellate court ruling creates a conflict with a decision of the Florida Supreme Court, or another Florida District Court of Appeal. Foley v. Weaver Drugs, Inc., Florida Supreme Court No. 32357, (1965). **A violation of state law by the Florida Supreme Court.**

And **2)** in case 17-CA-4051 for the Florida Legislature having enacted Florida Statute 68.093(2)(d)1 (vexatious litigant statute) that basically says: A person as defined in s. 1.01(3) who, in the immediately preceding 5-year period, has commenced,

prosecuted, or maintained, **pro se,** five or more civil actions in any court in this state, except an action governed by the Florida Small Claims Rules, **which actions have been finally and adversely determined against such person or entity, has to post a security bond to litigate any more cases in a Florida state court.** This goes without saying that the five (5) determinations were legal and correct without any of them having been the result of judges and attorneys defrauding a party out of their state or federal civil rights by dismissing their cases illegally as members of the state judicial enterprise.

**Florida Statute 68.093(2)(d)1 is in violation of federal civil rights for three (3) reasons: 1)** it illegally treats pro-se litigants differently than attorneys, in that if an attorney lost 5 circuit civil court cases in favor of opposing counsel, he or she would **not** be deemed as a vexatious litigant and have to post a security deposit during his or her next circuit civil court case. Or have to obtain leave of the administrative judge of that circuit to continue the case under Florida Statute 68.093(4). **2)** Florida Statute 68.093(2)(d)1 fails to take into consideration the reasons for losing the court cases which may **not** have been due to the merits. And **3)** Florida Statute 68.093(3)(c) is in violation of a litigant being declared indigent by the clerk of the court under Florida Statutes 57.081(1) by requiring them to post a bond in order to litigate

104

another circuit civil case. **For these three (3) reasons the current Florida's vexatious litigant statute should not continue to allowed officers of the court to deny pro se litigants their civil right to file suit for damages.**

Florida Statute 68.093 also violates the judgment made in a Florida 3DCA case that "pro se litigants are **not** held to 'a lesser standard than a reasonably competent attorney (RI. 72, 275)." *Silveira v. Quiroga*, So. 3d, 40 Fla. L. Weekly D287 (Fla. 3d DCA January 28, 2015).

Florida Statute 68.093(2)(d)1 pertains to litigants who were given fair and just opportunities to be compensated for damages according to state and federal laws, and due to the facts in their complaints not stating a claim that supported a cause of action upon which damages could have been awarded (a frivolous lawsuit), their cases were correctly dismissed. Contrary to this, the Plaintiff had clear and concise actionable claims that supported counts upon which damages should have been awarded in case 17-CA-4051, but Elizabeth Rice **intended** under **(Title 18, Chapter 96, Section 1962(d))** to defraud (cheat) the Plaintiff out of the opportunity to ever make it to trial in any future court case when she agreed to declare the Plaintiff a vexatious litigant as a favor to opposing parties in case 17-CA-4051, on 2-27-19 and filed her **intent** to do so in the case file as a memorandum on 2-28-19, but after the Plaintiff told her in a

case filed email on 3-6-19 that **he would be suing her under the Civil RICO Act, she declined to do so on 3-19-19.**

**The Supremacy Clause** of the United States Constitution (Article VI, Clause 2) establishes that the Constitution, federal laws made pursuant to it, and treaties made under its authority, constitute the **supreme law of the land. ... This makes the Supremacy Clause the cornerstone of the whole (entire) American political structure. <u>Under the Supremacy Clause, federal law is the supreme law of the land, and state courts must enforce it in absence of valid excuse</u>.** *Mims v. Arrow Financial Services, LLC*, U.S. 2012, 132 S. Ct. 740, 565 U.S. 368, 181 L. Ed. 2d 881, on remand 468 Fed. Appx. 936, 2012 WL 1382531.

**Preemption doctrine, flowing from Supremacy Clause** which "**<u>invalidates state laws</u>** that interfere with, or are contrary to, federal law." Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 414-15 (2d Cir.2002). The doctrine is inapplicable to potential (likely) conflict between two federal statutes. *Tufariello v. Long Island R. Co.*, C.A. 2 (N.Y.) 2006, 458 F. 3d 80.

**Federal law may preempt state law under theories of either express, field, or conflict preemption.** *National City Bank of Indiana v. Turnbaugh, D. Md.* 2005, 367 F. Supp. 2d 805, affirmed 463 F. 3d 325, certiorari denied 127 S. Ct. 2096, 550 U.S. 913, 167 L. d. 2d 831.

Section 1964(a) of the RICO Act provides that federal district courts may issue orders to "prevent and restrain" violations of Section 1962.   Section 1964(b) authorizes the U.S. Attorney General to institute proceedings "under this section."   **A permanent injunction is all that the Plaintiff is asking for in this Section**.   The Defendants are:   **The Florida Department of State and Legislative Affairs** for the above reasons.

Section 13.   **All government and corporate employee accomplices**, past and present, are in violation of **(Title 18, chapter 95, U.S. Code § 1954)**, offer, acceptance, **or solicitation to influence operations of employee benefit plan.   A benefit plan in which government, or corporate, employees continue working in their assigned positions with perks and pay raises while being in good standing with their enterprise, is a highly valued benefit plan!   It is not the duty or policy of reputable government agencies or corporations to have their employees commit RICO predicate acts as tasks to be performed on the job for their salaries or department budget allotments, some of which always seems to turn into perk money to influence others into getting dirty jobs completed that defraud others out of their state and federal civil rights!**   The accomplices are: **Rick Scott, Stephen Muldrow, Pamela Bondi, David Bowdich, Kellyanne Conway, Donald Trump, Tanya Menton and Rick Scott,**

Chad Chronister from 9/2017 to present, David Gee from 3/2012 to 9/2017, James Previtera during the month of 3/2012, Claudia Isom, Mary Mainland, Manuel Menendez, Ronald Ficarrotta, Bernard Silver, William Levens, Robert Foster, Mark Wolfe, Richard Nielsen, Paul Huey, Elizabeth Rice, Robert Foster, Catherine Catlin, Robert Bauman, Joelle Ober, Chet Tharpe, Jack St. Arnold, Jorge Labarga, Morris Silberman, Charlene Honeywell, Morris Silberman, John Badalamenti, Marva Crenshaw, Edward LaRose, Patricia Kelly, Matthew Lucas, Robert Morris, Susan Rothstein-Youakim, Samuel Salario, Daniel Sleet, Anthony Black, Craig Villanti, Nelly Khouzam, David McClain, Christopher Brown, Jason Gordillo, Mary Mainland, Andrew Mallory, Bowen Brown, Robin Black, Michael McGirney, Clarence Thomas, Claudia Isom, Janice Pickett, Michael McGirney, Andrew Mallory,  Robin Black, Michael D'Lugo, Joseph Riopelle, Jessica Welsh, Abraham Shakfeh, William Linero Jr., Charles Canady, Ashley Moody, Ron DeSantis, Ricky Polston and Stevan Northcutt.


**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 13:**

Section § 1954 (4) a **person** who, or an **officer, counsel, agent,** or **employee** of an **organization** which, provides benefit plan services to such plan receives **or agrees to receive** or **solicits**

any fee, kickback, commission, gift, loan, **money, or something of value** **(the benefit plan of keeping one's paid position and being in good standing with the enterprise due to continued acts of loyalty to it)** because of or with intent **to be influenced with respect to, any of the actions, decisions, or other duties** relating to any question or matter concerning such plan or any person who directly or indirectly gives or **offers**, or promises to give or offer, any fee, kickback, commission, gift, loan, **money, or something of value** **(the benefit plan of keeping one's paid position and being in good standing with the enterprise due to continued acts of loyalty to it)** which is prohibited by this section, shall be fined under this title or imprisoned not more than three years, or both:   Provided, That **this section shall not prohibit the payment** to or acceptance by any person **of bona fide salary,** compensation, or other payments made for goods or facilities actually furnished or **for services (honest services) actually performed in the regular course of his duties** **(not salaries paid out by companies or government agencies to their employees for breaching federal laws that violate civil rights (RICO Act))** as such person, administrator, **officer,** trustee, custodian, **counsel, agent, or employee** of such plan, **employer,** employee organization, **or organization providing benefit plan services to such plan.**

Unfortunately <u>none</u> of the employees or agents in this Section can be sued by their employers for breaching a fiduciary duty to them when they committed mail and/or wire fraud solicitations to their co-conspirator judges, who were in violation of Title 18, Chapter 63, Sections 1341 and/or 1343, when they committed honest services fraud under Title 18, Chapter 63, U.S. Codes § 1346 on the Plaintiffs and decedent.  When this happened, these RICO predicate acts committed by the judges made all of the employers vicariously liable under the Respondeat Superior Doctrine for damages because <u>the employers knew and authorizing all of the mail and wire frauds either before, or subsequently acquiescing in after, the injuries were sustained by the victims</u>.  Consequently, the employers in this matter have no legal recourse against their co-conspiring employees.

**Section 14.   Clarence Thomas is in violation of <u>(Title 18, Chapter 1, U.S. Code § 4)</u> - Misprision of felony:**

Whoever having knowledge of the actual commission of a felony cognizable by a **court of the United States** (an identifiable federal violation), conceals and does not as soon as possible make known the same to some judge or other person in civil (the Department of justice (DOJ)) or military authority under the **United States,** shall be fined under this title or imprisoned not more than three years, or both.  (June 25, 1948, Ch. 645, 62

110

Stat. 684; Pub. L. 103-322, title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147).

Acting in good faith, the Plaintiff says:  **1)** if Clarence Thomas had knowledge of the decedent's murder from having knowledge of the merits of case U.S. SC17-9268, but decided to deliberately ignore his U.S. statutory duty under Title 18, Chapter 1, U.S. Code § 4 to forward the decedent's murder information to the DOJ for an investigation to be conducted, actively concealing the murder information that was before him in case U.S. 17-9268 by not officially hearing this case as a means of not having to inform anyone of the decedent's murder, just like Robert Foster did by dismissing case 12-CP-1669 illegally with prejudice before discovery had really started, **the Plaintiff asks this U.S. district court to <u>make</u> Clarence Thomas comply with (Title 28, U.S.C. § 1361)!**  And **2)** if Clarence Thomas for some grossly negligent reason, did not know the basics what case U.S. SC17-9268 was about as the presiding judge, **he needs to retire after he hears case U.S. SC17-9268, and again forwards the contents of it to the DOJ!**  The Defendant is:  **Clarence Thomas**, for the above reasons.


**Section 15.  Clarence Thomas, Stephen Muldrow, Kellyanne Conway and David Bowdich are being <u>sued</u> for violating <u>(Title 18, Chapter 216, Section 3333) — for Non-criminal Misconduct</u>:**

Misconduct is wrongful, improper, or unlawful conduct **motivated by premeditated or intentional purpose or by obstinate indifference to the consequences of one's acts**. **Misconduct can be considered an unacceptable or improper behavior**. Generally, a **civil defendant** will be liable for non-criminal misconduct, if the defendant **owed a duty of care as a fiduciary would towards the plaintiff, and the defendant breached that duty of care by knowingly allowing the same foreseeable harm to be committed into the future, resulting in future harm to the plaintiff**. In tort law, **a duty of care** is a legal obligation which is imposed on an individual requiring **adherence to a standard of reasonable care**. **Unreasonable care, would be behavior that knowingly fosters future harm that is foreseeable and results in harm to others**. Once the four (4) high ranking U.S. government Defendants cited in this Section were constructively notified of the decedent's murder being covered up and the Plaintiff being defrauded in his property and/or business by racketeers working in state government agencies, they had a fiduciary duty to him to act appropriately, but deliberately failed to do so to avoid having to expose, humiliate and punish their affiliates who committed the illegal RICO acts, with their blessings! The idiom that comes to the Plaintiff's mind is "**do not have romantic relationships with any co-workers**." **And within the**

**crooked, American government, everyone is in bed with each other**!

**Since this is a RICO Act (criminal and/or business and/or personal tort) violation complaint, all that the Plaintiff is asking for in this Section is for this court to enact a Title 18 U.S. Code § 3333 Report to see how many more murders have been covered up by these four (4) Defendants and their respective agencies (U.S. Supreme Court, DOJ, Trump Administration and FBI), all working together as a large team of racketeers within the same U.S. government based enterprise (Trump Administration), in violation of Title 18, Chapter 96, Sections 1962(b & c)**.

**Under an 18 U.S. Code § 3333 Report:**

(a) A special grand jury impaneled by **any district court**, with the concurrence of a **majority of its members, may, upon completion of its original term, or each extension thereof, submit to the court a report—**

(1) concerning **a) noncriminal misconduct,** b) malfeasance, **or c) misfeasance in office involving organized criminal activity by an appointed public officer or employee, as the basis for a recommendation of removal or disciplinary action**; or

**(2) regarding organized crime conditions in the district.**

Both Kellyanne Conway and Donald Trump were given an **offal lot of constructive notice** of this matter by the Plaintiff either directly or through Trump Administration executives under them, but both Kellyanne Conway and Donald Trump failed to act appropriately.   All four (4) defendants in this Section violated:   **1)** The Respondeat Superior Doctrine as negligent **supervisors** knowingly hiring weak minded, corruptible employees and then illegally instructing them on what employment requirements not to perform.  **2)** Title 18, Chapter 96, Sections 1961-1968 (specifically Sections § 1962(b & c)), **3)** Title 18, Chapter 13, U.S. Codes § 241 & 242 and **4)** Title 42, Chapter 21, Section 1983 (co-conspirators in an action at law).  **No hard feelings, but the four (4) crooked government employees cited in this Section owe the Plaintiffs and other victims for damages! Six months from around 9-15-17, when Senator Marco Rubio's office still could not get a written response from the FBI or the DOJ because the decedent's murder fell on deaf ears, it was safe to say that the Trump Administration permanently halting prosecutorial investigations for racketeering by state agencies through federal investigative agencies, is what they do the best for government employed Americans!**  Both Donald Trump and Kellyanne Conway hired naive subordinate Trump Administration employees, paid them well, and then instructed them to do nothing to help citizens when complaints came in about local

government corruption.   **Demoralizingly sickening**!   Kellyanne Conway ran Donald Trump's 2017 election campaign on the promise of getting rid of corrupt career politicians in congress as well as jailing a few, but had White House staff pass consumer complaints to her where she turn a blind eye to them.   If Donald Trump could not fulfill his employment requirements because he was worried about the repercussions from making enemies in high places, he should have never run for office.   Consequently, both Donald Trump and Kellyanne Conway most definitely acted outside the scope of their employment requirements, in violations of **Section 3 of Article 2, of the U.S. Constitution, the Take Care Clause.**   So they are personally responsible for damages that the Trump Administration caused the Plaintiff.   The Defendants are: **Clarence Thomas, Stephen Muldrow, Kellyanne Conway and David Bowdich,** for the above reasons.

**Section 16.**   **ABC, Inc.,** (forth enterprise) defrauded and deprived both the Plaintiff and decedent of their state and federal substantive due process rights (civil rights) under the Civil RICO Act on 6-21-18 when they illegally stopped the Plaintiff's expectancy with USC as a participant in violation of **1)(Title 18, Chapter 96, Codes § 1961-1968), 2)(Title 18, U.S. Code § 3), 3) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 4) (Title 42, Chapter 21, Section 1983), 5) (Title 18,**

**Chapter 13, U.S. Codes § 241 & 242), 6) (vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(a, b & c) violations, 7) (Fraud on the Court) and 8) (California Duty to Act law).** On 6-12-18, Willow Bay was working in her individual capacity at the State of California owned University of Southern California (USC), during the course of her official capacity at ABC, Inc. as part owner of ABC, Inc. by marriage rights, when she instructed and authorized under **(Title 18, Chapter 96, Sections 1962(a & b)),** Tanya Menton, under **(Title 18, Chapter 96, Section 1962(c))** to, A) cover-up the prior racketeering activities committed under Title 18, Chapter 96, Section 1961(1) by the three (3) local Florida enterprises, which were: **1)** murder (Title 18, Section § 1959), **2)** extortion (Title 18, Section § 880), **3)** extortionate credit transactions (Title 18, Sections § 891-894), **4)** influencing the operations of an employee benefit plan (Title 18, Section § 1954), **5)** money laundering (Title 18, Section § 1956) and **6)** wire and/or mail fraud used to implement honest services fraud under Title 18, Sections § 1341, 1343 & 1346 for the purposes of defrauding both the Plaintiff and decedent out of their state and federal substantive due process rights (civil rights). And ABC, Inc. monetarily injure the Plaintiff in his property and business interests by maliciously breaching the Plaintiff's expectancy with USC under **9) (tortious interference with**

**expectancy)**, when **Willow Bay**, **through Tanya Menton, told the Plaintiff in a letter dated 6-21-18, not to contact Dean Willow Bay at USC or else suffer the consequences at the hands of ABC, Inc. security, 10) (violation of 1st amendment rights under the U.S. Constitution)**. See *Garret v Taylor*, 79 Eng. Rep. 485 (K.B. 1620); *Tarleton v McGawley*, 170 Eng. Rep. 153 (K.B. 1793) and *Keeble v Hickeringill*, (1707) 103 Eng. Rep. 1127.

**Tortious interference claims can be heard in federal court provided they meet the requirements under Title 28 U.S.C. § 1332(a):** Jurisdiction to matters that involve **complete diversity** of citizenship between the parties **must involve an amount in controversy that exceeds at least $75,000.** The ABC, Inc. headquarters are located at 77 West 66th Street Fifth Floor, New York, NY 10023. And the Plaintiffs are located in Tampa, Florida, 33612.

Triple remedial RICO damage amounts exceeding **3.9 million dollars U.S. currency at a nominal rate of interest are demanded, not including attorney's fees with a lodestar multiplier that will be owed**, but under both Section § 1983 (for having helped Florida's state judicial enterprise defraud the Plaintiff and decedent) and the tortious interference (violation of expectancy with USC) laws, regular damages along with punitive amounts and attorney's fees could be asked for instead. Together, Willow Bay and Tanya Menton participated under **(Title**

**18, Chapter 96, Sections (a, b & c))**, by tortiously interfering with the Plaintiff posting a journalism job at USC, specifically at the College of Journalism, seeking to employ a student, or other USC patron, to write and publish a story about the decedent's fate and the fleecing of the elderly in America to aid and abet **1)** Florida's state judicial enterprise and **2)** Trump Administration and their affiliates, all of whom racketeered. This would have **definitely and absolutely** exposed what was happening to at least the Plaintiff and decedent (possibly others) by the three (3) local enterprises. **And as a result of public exposure to this matter, the local Defendants and accomplices would have definitely and absolutely stopped defrauding the Plaintiff and decedent. Thus, injuries in the future to the Plaintiffs' property and/or business would have stopped occurring for which ABC, Inc. is now liable for.**

**Consequently, ABC, Inc. is not only vicariously liable to the Plaintiff and decedent under the Respondeat Superior Doctrine, but owes the Plaintiffs for any future injuries sustained after 6-21-18 from the same types of racketeering activities committed in their court cases by any additional racketeers. Willow Bay as one of the owners of ABC, Inc., went out of her way to participate in having the Plaintiff continue to be damaged in his court cases when she, through Tanya Menton, illegally stopped the Plaintiff from disclosing local government**

118

**racketeering news to the public while doing business with USC, thus aiding and abetting Florida's state judicial enterprise under Title 18, Chapter 96, Section 1962(c). Consequently, as the Plaintiff continues to be defrauded and deprived in his business and property interests by the Florida's state judicial enterprise for profit or gain (something of value), ABC, Inc. will continue to be liable to the Plaintiff and any other parties who join him in filing future lawsuits while sustaining racketeering damages from this same enterprise!**

**ABC, Inc. is liable for any future court case injuries sustained by the Plaintiffs under Title 18, Chapter 96, Section 1962(c), the same as the principles because its employees' who participated in this matter, caused future foreseeable harm to the Plaintiff.**

For either a § 1962(d) conspiracy claim or a racketeering activity in violation of § 1962(c), the defendant need not agree to operate or manage the enterprise. ***Salinas v. United States***, 522 U.S. 52, 63 (1997) (holding that "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."). Rather, the defendant may be liable if it knowingly agrees to facilitate others who operate or manage the enterprise.

**The court rejected the notion that business or property interests harmed by a defendant's acts must actually be the**

**target of the predicate act, and remanded the case to determine if the plaintiff could satisfy the remaining aspects of his claim.** Diaz v. Gates, 420 F. 3d 897 (9th Cir. 2005), Id. at 900-03. The Defendant is: **ABC, Inc. for being vicariously liable under the Respondeat Superior Doctrine in conjunction with Section § 1962(a, b & c) violations** and **for being as liable to the Plaintiffs as the principles within Florida's state judicial enterprise under Title 18, Chapter 96, Section 1962(c).** The accomplices are: **Willow Bay** and **Tanya Menton,** for the above cited reasons.

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 16:**

They say money is the root of all evil. And conspiracy theories are usually right on the money accurate at who is at fault because the plot in each one of them always centers on predictable, human nature bringing out the worst in corruptible, soulless, descendants of apes. This predictability is inherent in everyone without a moral conscience, and given the opportunity for many unconscionable, rotten to the core vermin achieving their dreams, aspirations and desires at the expense of the poor, ignorant and gullible, they gladly participate in real life conspiracies. **Willow Bay did!**

120

On 6-21-18, Willow Bay benefit herself and her company ABC, Inc. when she had Tanya Menton act as her RICO agent to help defraud the Plaintiff under Title 18, Chapter 63, U.S. Codes § 1341, right out of posting a legitimate ad at USC (tortious interference with expectancy). When Willow Bay did this, she also **aided and abetted** the local judges (secondary enterprise or state judicial enterprise) in defrauding and depriving the Plaintiff under: 1) (Title 18, Chapter 96, Codes § 1961-1968), 2) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 3) (Title 18, U.S. Code § 3), 4) (Title 42, Chapter 21, Section 1983), 5) Title 18, Chapter 13, U.S. Codes § 241 & 242, 6) Title 18, Chapter 95, Section 1956 and 7) Fraud on the Court. Thus, foreseeably injuring the Plaintiff, and anyone who was a joint plaintiff with him, in pursuing their property and/or business interests during future court case proceedings.

**Willow Bay benefited as one of the principals (owners) of ABC, Inc. (no distinction requirement under RICO between an owner and a company, Petro-Tech, Inc., 824 F. 2d at 1361) under Title 18, Chapter 96, Section 1962(a), by not having been humiliated by the U.S. Department of State (DOS), U.S. Department of Public Affairs (DOPA), U.S. Department of Press Relations (DOPR) and her family members, for allowing the Plaintiff to release information about a government scandal that included Donald Trump, Rudolf Giuliani and Kellyanne Conway to the public right**

**under Willow Bay's nose** that her broadcasting company was **obligated to cover-up!** ABC, Inc. is most definitely affiliated with all of these government agencies. **For the security of officials within the U.S. government, not for American citizens' security, but for government officials' security, television broadcasting stations (major outreach broadcasting companies) have to continually get permission from the DOS as to what they can air on television, so that restricted information that changes daily is not aired to the public. The U.S. government absolutely, positively, controls the release of any and all televised information to the public, especially any information about a government scandal, unless approved by the DOS as either retaliatory, distractionary or disinformation**!

On 6-12-18, the Plaintiff sent Willow Bay a copy of a letter he had sent to Kellyanne Conway who oversees all U.S. government agencies within the Trump Administration which includes the U.S. State Department (DOS), explaining to Kellyanne Conway that the decedent's murder was being covered up by Florida state government officials, but she ignored Section 3 of Article 2 of the U.S. Constitution by turning a blind eye to the Plaintiff's complaints. **This was the reason Willow Bay recklessly instructed Tanya Menton to: 1) violate the Plaintiff's U.S. civil rights on 6-21-18 by both denying him the ability to follow up with her on his business dealings with USC and by also**

122

2) **threatening him with ABC's security, if he did not cease exercising his U.S. civil rights to post a murder story advertisement at USC's department of journalism, when ABC, Inc. was not affiliated with USC.** <u>**Just how many murders a year does ABC, Inc. and other media conglomerates help state and federal governments cover-up?**</u> <u>**Every single one that the state and federal government wants covered up!**</u> **And that is a lot of murders**! <u>**The Plaintiff is still going to have the decedent's murder cover-up disclosed to the public, and Willow Bay is now justifiably part of this complaint**</u>! If it is at all possible to shame Willow bay, she should be feeling a little bit humiliated, if only because of her ignorance of applicable federal laws.

**It will be interesting to see how ABC, Inc. decides to handle this newsworthy lawsuit, hopefully by finally taking the high road as one honest and brave, patriotic and trustworthy, broadcasting company working hard to inform the public of scandals committed by** <u>**their affiliates**</u> **in government and giving them all the bad publicity they deserve!** <u>**It is a RICO Act violation under Title 18, Chapter 96, Sections 1962(a or b) for any broadcasting station owner or company manager to facilitate under Title 18, Chapter 96, Section 1962(c), or conspire to facilitate, under Title 18, Chapter 96, Section 1962(d), any future racketeering activities committed for whatever reason**! **And** <u>**it is a RICO Act violation under Title 18, Chapter 96,**</u>

**Section 1962(c) for any broadcasting station employee or agent to facilitate, or conspire to facilitate, under Title 18, Chapter 96, Section 1962(d), any future racketeering activities committed for either the company's, or owner's, benefit!**

**If ABC, Inc. had only aired the Plaintiff's story given to them at their ABC, Inc. branch office in Tampa, Florida when Adam Waiser was contacted by the Plaintiff, there would have been no need for this complaint to have been written and filed in this court. Unfortunately broadcasting companies do not have a fiduciary duty to the public to report illegal acts committed on citizens, but if the acts are serious enough and continuous, they are required to act under the Duty to Act law. Florida and California are Duty to Act law states.** Duty to act refers to duty of a party to take necessary action to prevent future harm to another party or the **general public.** Breach of duty to act may make a party liable for damages, depending on the circumstances and relationship between the parties. Determining whether there was an injury requires meeting the injury element of the prima facie case, the injury must be one of two things: Bodily harm **or harm to property (can be personal property or real property).** Pure economic loss **(not property or emotional damages)** will usually not meet the injury requirement. Sometimes **emotional distress/harm** may meet the bodily harm requirement **(even if there is no accompanying physical harm).** Legal

Information Institute. **ABC, Inc. is not just being sued for maliciously causing the Plaintiffs foreseeable property damages as of 6-21-18, but for causing them unnerving distress type damages as well**.

**Section 17.** In 3/2012, by beyond reasonable doubt evidence, **Claudia Isom and James Previtera** participated in this matter under **(Fraud on the Court)** in conjunction with (Title 18, Chapter 95, U.S. Code 1962(d & c)), violations under **(Title 18, Chapter 96, Section 1961-1968)**, when they **defrauded** the Plaintiff in case 12-CP-249 out of his state and federal substantive due process rights (civil rights) by participating in honest services fraud, violations under **(Title 18, Chapter 63, Sections 1341, 1343 & 1346)**. **This prevented** him from his U.S. constitutional rights under **(Title 18, chapter 13, Section 241)** and both **defrauded and deprived** him of his U.S. constitutional rights respectively under **(Title 18, Chapter 13, Section 242)** and **(Title 42, Chapter 21, Section 1983)**. **Manuel Menendez, Claudia Isom, David Gee and James Previtera formed the initial alliance between HCSO and 13th Judicial Circuit in Tampa, Florida for monetarily injuring the Plaintiff in the future. The decedent's murder cover-up was implemented by HCSO due to a vendetta that David Gee and James Previtera had since 2/2012 against the Plaintiff. The decedent's murder cover-up was just**

125

**an angle used by HCSO to financially injure the Plaintiff due to his having had one of their own, Colonel James Previtera, asked to find employment elsewhere (technically terminated from HCSO) by FDLE**. Thus, the formation of the secondary corrupt enterprise against the Plaintiff was first orchestrated by David Gee at the HCSO and Manuel Menendez at the 13th Judicial Circuit, a violation under **(Title 18, Chapter 96, Section 1962(b & d))**. It was first implemented by Claudia Isom and James Previtera on 3-1-12, case 12-CP-249, a violation under **(Title 18, Chapter 96, U.S. Code 1962(d))**. And when the second RICO predicate act was committed against the **Plaintiff** during case 14-CA-10278 by Bernard Silver on 2-6-15, their actions were in violation of **(Title 18, Chapter 96, U.S. Code 1962(c))**. Robert Foster aided and abetted the primary enterprise in implementing an extrinsic fraud on the Plaintiff as a member of the secondary enterprise when he illegally signed a final order permanently dismissing court case 12-CP-1669 with **prejudice**, on 05-15-13. See Appendix A documents.

**Both James Previtera and Claudia Isom Wanted to Injure the Plaintiff Financially Anyway They Could out of Revenge:**

**1)** Claudia Isom was most likely transferred out of the circuit civil court division prior to 2012 due to the many complaints made about her to the authorities, two of which were made by the

126

Plaintiff to the 13th Judicial Circuit and the Judicial Qualification Commission (JQC) headed by the chief judge of the Florida Supreme Court during the Plaintiff's personal injury lawsuit, around 2002, case 01-CA-5911. And **2)** James Previtera wanted revenge on the Plaintiff for FDLE having strongly recommending to David Gee that he be removed from both his position and employment at HCSO due to the Plaintiff having rightfully complained about this diabolical government employee. **Claudia Isom and James Previtera initially formed the pattern and purpose behind the RICO predicate acts committed in this matter.** The pattern requirement under RICO, is how **related and continuous** the predicate acts are. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 233 (1989). The court noted that **"[r]etaliatory acts** are inherently connected to the underlying wrongdoing exposed by the **whistleblower** [; therefore,] **in most cases, retaliatory acts and the underlying scheme" will satisfy the relatedness requirement.** *DeGuelle v. Camilli*, 664 F. 3d 192 (7th Cir. 2011), Id. at 201. **Manuel Menendez (respondeat superior to Claudia Isom)** and **David Gee (respondeat superior to James Previtera)** can be sued under **Title 18, Chapter 96, Section 1962(b),** when they orchestrated the RICO plan around 2/2012 that was later implemented again on the Plaintiff starting around 8/2012 by the chief judges office within the 13th Judicial Circuit, instructing judges in this

127

district to injure the Plaintiff in his business and/or property during his court cases.  The accomplices are:  **Claudia Isom; Manuel Menendez under Sections § 1962(b) and the Respondeat Superior Doctrine; James Previtera; David Gee under Section § 1962(b) and the Respondeat Superior Doctrine,** for the above cited reasons.


**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 17:**

The Court held that the mail fraud statute protects traditional property rights, "but does not refer to the intangible right of the citizenry to good government." *McNally v. United States*, 483 U.S. 350 (1987), Id. at 356.  **In 1988, Congress voided the *McNally v. United States* "intangible rights" limitation by amending the mail fraud statute, Title 18, Chapter 63, Section 1341, to provide that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."**

*Skilling v. United States*, 561 U.S. 358 (2010), was a United States Supreme Court case interpreting the honest services fraud statute, 18 U.S.C. § 1346.  The court held, in the case involving former Enron CEO Jeffrey Skilling, that the honest services fraud statute, which prohibits **"a scheme or artifice to deprive another of the intangible right of honest services",**

128

**covers only bribes and kickback schemes (direct or indirect), where a public official was 1) paid in some way (not necessarily money) for a particular decision or action, or 2) failed to disclose a conflict of interest, resulting in personal gain (something of value, but not necessarily money).**

According to the American Bar Association, Volume 18, Number 3 January/February 2009, by *Razzano and Kristin H. Jones*, Since the enactment of 18 U.S.C. § 1346, federal courts have tried to step into this gap. They have divided the universe of honest services fraud into two spheres: public and private honest services fraud. Public honest services fraud is the instrument used by federal prosecutors to impose the federal government's view of good government on state and local officials. **Since the national government under our federal system cannot pass bribery or conflict of interest laws covering local and state officials, the honest services fraud statute has become its vehicle for enforcing its view of good government on state and local jurisdictions.** The theory is that when a local or state official **1) takes a bribe, or 2) is embroiled in a conflict of interest, he or she defrauds the people of the state or locality of their right to that public official's honest services.** The courts have widely recognized two theories of honest services fraud in public-sector honest services fraud prosecutions: **(1) bribery, where a public official was paid, with some type of**

**valued benefit (not necessarily money), for a particular decision or action, or (2) a failure to disclose a conflict of interest resulting in personal gain (something of value, but not necessarily money).**

**The 11th Circuit's position is that "[p]ublic officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest. 'If the official instead secretly makes his decision based on his own personal interests. . . the official has defrauded the public of his honest services.'"** *United States v. DeVegter*, 198 F. 3d 1324, 1328 (11th Cir. 1999) (quoting *United States v. Lopez-Lukis*, 102 F. 3d 1164, 1169 (11th Cir. 1997) (emphasis added) (internal citation omitted).

The First, Fourth, Ninth, and Eleventh Circuit Courts have all held that **the federal statute does not limit the meaning of "honest services" to violations of state law.**

**Ninth Circuit Joins Other Circuits in Ruling that Honest Services Fraud Conviction of a Public Official Does Not Require a Violation of State Law:**

As the Ninth Circuit decided in *United States v. Weyhrauch* in 2008: Because laws governing official conduct differ from state to state, conditioning mail fraud convictions on state law means that conduct in one state might violate the mail fraud statute, whereas identical conduct in a neighboring state would

not. **Congress has given no indication it intended the criminality of official conduct under federal law to depend on geography**. *United States v. Weyhrauch*, 548 F. 3d 1237 (9th Cir. 2008).

Courts are divided over how much knowledge a defendant must have of the criminal enterprise to be a conspirator under § 1962(d). The District of Columbia Circuit and the Second Circuit have held that **the plaintiff must allege that the defendant knew about and agreed to facilitate the scheme**. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F. 3d 1043, 1052 (D.C. Cir. 2012) (upholding dismissal of RICO conspiracy claim because "RSM failed to allege facts sufficient to support a plausible inference that *Freshfields* knew of and agreed to further the bribery-racketeering conspiracy") and *Baisch v. Gallina*, 346 F. 3d 366, 377 (2d Cir. 2003) (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)). Similarly, the Seventh Circuit has stated that the defendant must **"knowingly agree to facilitate the activities of those who operate or manage a criminal enterprise."** *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F. 3d 862, 869-70 (7th Cir. 2001). See also *Brouwer v. Raffensperger, Hughes & Co.*, 199F. 3d 961 (7th Cir. 2000) and *Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F. 3d 862, 869-70 (7th Cir. 2001). According to the Fourth and Fifth Circuits, **the plaintiff must prove only that the "defendant participated**

**in the conspiracy with knowledge of the <u>essential nature</u> of the plan."** *United States. v. Tillett*, 763 F. 2d 628, 632 (4th Cir. 1985) and *United States v. Elliott*, 571 F. 2d 880, 903-04 (5th Cir. 1978). **It is "not necessary to prove that the defendant knew all of the <u>details</u> of the unlawful enterprise <u>or the number or identities of all the co-conspirators</u>."** *Dale v. Frankel*, 131 F. Supp. 2d 852, 860 (S.D. Miss. 2001) (quoting *United States v. Posada-Rios*, 158 F. 3d 832, 858 (5th Cir. 1998)).

The accomplices cited in Section 17 denied both the Plaintiffs and the decedent their state and federal substantive due process rights under the 5th and 14th amendment to the U.S. Constitution. **At this point, the RICO predicate acts committed by Claudia Isom and James Previtera did not keep the Plaintiff from acquiring any money owed to him (no business or property damages), but the alliance formed at this time did so on 2-6-15 in case 14-CA-10278. <u>James Previtera and Claudia Isom initially help start all of the racketeering activities committed by the state judicial enterprise on the Plaintiffs and decedent in this matter</u>!** The agreement HCSO had with the 13th Judicial Circuit, approved, orchestrated and overseen by both Manuel Menendez at the 13th Judicial Circuit and David Gee at HCSO, was the beginning of Florida judges violating both the Plaintiff's and decedent's state and federal substantive due process rights under Title 18, Chapter 96, Section 1962(c) since 2/2012 because

of the following:  **The court emphasized that "one who opts into
or participates in a conspiracy is liable for the acts of his
[or her] co-conspirators which violate [S]ection 1962(c), even
if the defendant did not personally agree to do, or to conspire
with respect to, any particular element."** *Smith v. Berg*, 247 F.
3d 532, 534 (3d Cir. 2001), Id at 537.   See also *Connecticut
General Life Ins. Co. v. New Images of Beverly Hills*, 257 F.
App'x 49 (9th Cir. 2007).

The agreement between James Previtera, Claudia Isom, Manuel
Menendez and David Gee was a racketeering violation on 3-1-12,
during case 12-CP-249, under Title 18, Chapter 96, U.S. Code
1962(d), as the initial RICO plan and first RICO predicate act
committed to monetarily injuring the Plaintiff in the future.
**And on 2-6-15, during case 14-CA-10278,** under Title 18, Chapter
96, U.S. Code 1962(c), as participants under 1) (Title 18,
Chapter 96, Codes § 1961-1968), 2) (Title 18, Chapter 63, U.S.
Codes § 1341, 1343 & 1346), 3) (Title 18, U.S. Code § 3), 4)
(Title 42, Chapter 21, Section 1983), 5) Title 18, Chapter 13,
U.S. Codes § 241 & 242, 6) Title 18, Chapter 95, Section 1956
and 7) Fraud on the Court, **an injury to the Plaintiff's property
interest was first committed by the secondary enterprise.**
**Claudia Isom's RICO predicate act during case 12-CP-249 became
the first RICO predicate act committed in this matter, and when
Bernard Silver joined up with the secondary enterprise on 2-6-15**

(within four (4) years from 3-1-12 with the first injury committed) and violated the Plaintiff's state and federal substantive due process rights, by illegally dismissing case 14-CA-10278, he helped in covering up both the aggravated manslaughter (Florida statute 782.07) of the decedent and legally aided and abetted the defrauding of the Plaintiff by the primary enterprise on 5-15-13.

Thus, the second RICO predicate act was committed in this matter by the secondary enterprise, forming both the pattern and purpose of racketeering activities committed on the Plaintiff and decedent since 3-1-12, case 12-CP-249, in Hillsborough County, Florida, home of the proud and the brave, but not the free. In *United States v. Price*, 383 U.S. 787 (1966) and *United States v. ReBrook*, 837 F. Supp. 162, 171 (S.D.W.Va. 1993), rev. in part, 58 F. 3d 961 (4th Cir. 1995), cert. den. 516 U.S. 970 (1995), the Court reasoned as follows:  Concrete parameters outlining the duty of honest service should **not be necessary** in order for a person to be charged with violating this duty.  **The concept of the duty of honest service sufficiently conveys warning of the proscribed conduct when measured in terms of common understanding and practice.  The Constitution requires no more.**

**Section 18.     Craig Villanti, Daniel Sleet and Anthony Black** (secondary enterprise) can be sued under **(Title 18, Chapter 96, Codes § 1961-1968), (Title 18, Chapter 13, U.S. Codes § 241 & 242), (Fraud on the Court)** and **(Title 18, U.S. Code § 3)**, for participating under **(Title 18, Chapter 96, Section 1962(c))** when they failed to reverse Chet Thorpe's false order made on 11-27-18, case 18-CA-1537, that was appealed with the 2DCA, case 2D18-4761, as a Writ of Quo Warranto and affirmed by these same accomplices on 01-24-19 in the ever continuing RICO plan implemented now by Chad Chronister at HCSO and Ronald Ficarrotta at the 13th Judicial Circuit to defraud and injure the Plaintiff in his business or property interests under **(Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346)**. This bogus ruling by the state judicial enterprise was yet another RICO predicate act used for the purpose of **A)** further monetarily injuring the Plaintiff, but in **his business interest to the amount of $15,000,** by defrauding the Plaintiff out of his state and federal constitutional rights as racketeers in violation of the Civil RICO Act when they were legally required by law to act appropriately.

Once Manuel Menendez gave the word for Claudia Isom to defraud the Plaintiff during his guardianship case (12-CP-249) back in 2/2012, with the approval of upper management within the state judicial enterprise, Edward LaRose's obedient 2DCA judges in

turn accommodated the request made by their superior under Title 18, Chapter 96, 1962(c) as willing members of the secondary enterprise.   The accomplices are:   **Charles Canady, Rick Scott, Pamela Bondi (upper level management under Section § 1962(b)) within the secondary enterprise), Edward LaRose (Section § 1962(b)), Craig Villanti, Daniel Sleet, Anthony Black, Chet Thorpe, Ronald Ficarrotta (Section § 1962(b)) and Michael D'Lugo. And the Defendants are:   Chart Industries, Inc. for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations and ABC, Inc. for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(a, b & c) violations,** damaging the Plaintiff's business interests in Florida court cases as of 6-21-18.

**Further Analysis of the Ultimate Facts and Laws Supporting the Counts of Section 18:**

For either a § 1962(d) conspiracy or § 1962(c) activity claim, **the defendant need not agree to operate or manage the enterprise.**   Salinas v. United States, 522 U.S. 52, 63 (1997) (holding that **"[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense."**).   Rather, the defendant may be liable **if it knowingly agrees to facilitate others who operate or**

**manage the enterprise**. For example, in *Brouwer v. Raffensperger, Hughes & Co.*, the Seventh Circuit reconciled a perceived conflict between the Supreme Court's opinions in *Salinas* and *Reves* by holding that to be actionable, the agreement need not be to manage the enterprise, but to **"facilitate the activities of those who do."** *Brouwer v. Raffensperger, Hughes & Co.*, 199 F. 3d 961 (7th Cir. 2000). See also *MCM Partners, Inc.*, 62 F. 3d 967; *United States v. Quintanilla*, 2 F.3d 1469, 1485 (7th Cir. 1993); *United States v. Starrett*, 55 F. 3d 1525, 1547-48 (11th Cir. 1995); *Tonnemacher v. Sasak*, 859 F. Supp. 1273, 1277-78 (D. Ariz. 1994); *Fid. Fed. Sav. & Loan Ass'n*, 830 F. Supp. at 261 and *Jones v. Meridian Towers Apartments, Inc.*, 816 F. Supp. 762, 772-73 (D.D.C. 1993). The Seventh Circuit reconciled a perceived conflict between the Supreme Court's opinions in *Salinas and Reves* by holding that to be actionable, the agreement need not be to manage the enterprise, but to **"facilitate the activities of those who do."** *Brouwer*, 199 F. 3d at 967. The Third Circuit has similarly held that a **"defendant may be held liable for conspiracy to violate § 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."** *Smith v. Berg*, 247 F. 3d 532, 538 (3d Cir. 2001).

**Section 19.**   All of the Defendants and co-conspirators (owners, employees, insured agents, agents and other accomplices) either directly implemented, and/or assisted in (even by turning a blind eye to) under Title 18, U.S. Code § 3, the racketeering activities committed in violation of the Plaintiffs' and decedent's 5th and 14th U.S. constitutional amendment rights by their having participated in violation of the RICO Act, under Title 18, Chapter 96, Section 1962(a and/or b and/or c and d), for either profit or gain (something of value).   Something of value by definition is **1)** anything that is pecuniary (monetary) or compensatory (used to offset) in value to a person, or **2)** the primary significance of which is economic gain (income generated). USLegal.com.   **Since a favor given for a favor owed, is a compensatory service, there need not be any monetary payment or exchange under the Civil RICO Act for services rendered.**   And just satisfaction for a dirty job well done for the good of the enterprise is payment enough!   **No proof of economic motive is required under the Civil RICO Act.   _Nat'l Org. for Women, Inc. v. Scheidler_, 510 U.S. 249, 255-58 (1994).** RICO does not require proof that the RICO predicate acts committed due to racketeering in Section § 1962(c) were motivated by an economic purpose.   **The "enterprise" in subsection (c) of Title 18, chapter 96, Section 1962, connotes generally the vehicle through which the unlawful pattern of**

**racketeering activity is committed.  Since this vehicle is not being acquired (as an asset would be), it need not have a property interest that can be acquired nor an economic motive for engaging in illegal activity; it need only be an association in fact that engages in a pattern of racketeering activity.  Nor is an economic motive requirement supported by the congressional statement of findings that prefaces RICO and refers to activities that drain billions of dollars from America's economy.**  See *Sedima, S.P.R.L. v. Imrex Co.*, 473 U. S. 479, 499. pp. 256-262.

All of the Defendants and their co-conspirators (owners, companies, agencies, employees, insured agents, agents and other accomplices) have been a part of the systematic and continuous state and federal substantive due process right violations over the last seven (7) years or more, orchestrated and committed by the four (4) corrupt enterprises (primary, secondary, third and fourth) cited, in violation of the Racketeer Influenced and Corrupt Organization ("RICO") Act, all of which are still continuing in nature, and continuing against the Plaintiffs and the decedent.   As **grounds** therefore, Plaintiffs allege as follows:


**20.  Jurisdiction and Venue:**

First, Section 1965(b) of RICO provides that process **may be served** "in any judicial district of the United States" when required by the "ends of justice." **Being that the Plaintiffs would not, by beyond reasonable doubt evidence, receive a fair and equitable ruling in any Florida U.S. district court due to local political influences, as seen in the Plaintiff's federal case 8-17-CV-219-7-36MAP on 5-9-17, and being that ABC, Inc. (Disney) has offices, agents and affiliates in every major city in America, Title 18, Chapter 96, Section 1965(d) is applicable in that it allows process to be served "in any judicial district in which such person resides, is found, has an agent, or transacts his affairs."**

**Title 18 U.S. Code § 1965. Venue and process, U.S. Code Notes:**

**(a)** Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States in which such person resides, is found, **has an agent, or transacts his affairs.**

**WVNY, virtual channel 22 (VHF digital channel 13), is an ABC-affiliated television station licensed to Burlington, Vermont, United States, serving Northern Vermont's Champlain Valley and Upstate New York's North Country, including Plattsburgh. Owned by Mission Broadcasting, it is operated under a local marketing agreement (LMA) by Nexstar Media Group, making it a sister**

station to Fox affiliate WFFF-TV (channel 44, also licensed to Burlington).

WFFF-TV, virtual channel 44 (UHF digital channel 43), is a Fox affiliated television station licensed to Burlington, Vermont, United States, serving Northern Vermont's Champlain Valley and Upstate New York's North Country, including Plattsburgh. The station is owned by Nexstar Media Group, which also operates ABC affiliate WVNY (channel 22, also licensed to Burlington) under a local marketing agreement (LMA) with owner Mission Broadcasting. ABC, Inc. provides advertising from its customers, through its affiliated broadcasting stations, on signals transmitted from towers to end users in particular forums.


If a RICO plaintiff can show that at least **one defendant** "resides, is found, <u>has an agent, or transacts his affairs" in the forum</u>, then jurisdiction is proper as to <u>all other defendants</u> if "the ends of justice require." *Rolls-Royce*, 576 F. Supp. 2d at 779; *Paolino v. Argyll Equities, L.L.C.*, 401 F. Supp. 2d 712, 718 (W.D. Tex. 2005). Due process in such cases is satisfied if the nonresident defendant has sufficient minimum contacts with the United States. See Busch, 11 F. 3d at 1258; Rolls-Royce, 576 F. Supp. 2d at 782. Accordingly, courts have approved nationwide service of process under both § 1965(b) and § 1965(d). *ESAB Group, Inc. v. Centricut, Inc.*, 126 F. 3d 617,

626-27 (4th Cir. 1997), **holding that court had jurisdiction because defendant was served under nationwide service of process provision in Section 1965(d)**. And *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F. 3d 935, 942 (11th Cir. 1997), Section 1965(d) **"provides for . . . nationwide service of process."** And *PT United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F. 3d 65, 70-72 (2d Cir. 1998, finding that **Section 1965(b) provides for nationwide service of process**. And *Stauffacher v. Bennett*, 969 F. 2d 455, 460 (7th Cir. 1992), finding **nationwide service of process in Section 1965(b))**, superseded by *Central States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F. 3d 934 (7th Cir. 2000).

**21.**  The Plaintiffs claim a financial loss that is ascertainable and definable, **1)** Mr. Schneider's **property interest** loss amounts to **$1,060,000** ($700,000 cash, $225,000 home, $100,000 in coins and $35,000 in car & home furnishings) after being defrauded in case 12-CP-1669 and **2)** his **business interest** loss amounts to **$15,000** after being defrauded in case 18-CA-1537.  Ms. Kimball's property interest loss amounts to **$240,324** after being defrauded in case 17-CA-6219.  And Mr. Schneider's **property interest** loss amounts to **$6720** after being defrauded in case 17-CA-6219.

**22.**    The Plaintiffs claims standing to sue under Title 18, chapter 95, Section 1962(a), (b), (c) and (d). **1)** The plaintiffs are persons **2)** who sustained injuries **3)** to their **business and/or property interests 4)** by reason of the Defendants' violations under § 1962. The Court confirmed that a **"RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."** Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 493-99 (1985), Id. at 496.

**23.**    The Plaintiffs currently claim federal jurisdiction pursuant to the Civil RICO Act, Title 18, Chapter 96, Codes § 1961-1968; Title 42, Chapter 21, Subchapter 1, U.S. Code § 1985(3) & 1983; Civil RICO Act Title 18, Part 1, Chapter 95, Sections 1954, 1956(a) & 1959; Title 18, U.S. Codes § 2 & 3; Title 18, Chapter 1, U.S. Code § 4; Title 18, Chapter 41, Section 880; Title 18, Chapter 73, Section 1512; Title 42, Chapter 21, U.S. Code § 1988; Title 18, Chapter 216, Section 3333; Title 18, Chapter 42, Sections 891-894; Title 18, Chapter 13, U.S. Codes § 241 & 242; common law tort of tortious interference with diversity of citizenship and damages over $75,000; Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346; Title 18, U.S. Codes § 201(b)(3) & 201(b)(4); Fraud on the Court

and Title 42, Chapter 21, Section 1983, **all of which extends the jurisdiction to all federal courts.**

**24.** The Plaintiffs bring this suit for violations of certain protections guaranteed to them and the murdered decedent under the First (1), Fifth (5) and Fourteenth (14) Amendments to the Federal Constitution under color of law.

**25.** The Plaintiffs, Darryl Schneider and Sandra Kimball, are natural born citizens of the U.S. residing at 10406 N. 26th Street, Tampa, Hillsborough County, Florida 33612.

**26.** The Defendants who were working for any number of enterprises involved in this matter during their employment, aiding and abetting other racketeering members who were defrauding and depriving the Plaintiffs and decedent of their state and federal civil rights for either profit or gain (something of value), when they directly implemented and/or assisted (even turning a blind eye to) under Title 18, U.S. Code § 3, for the purpose of both **A)** covering up the prior racketeering activities committed by the three (3) local enterprises and **B)** monetarily damaging the Plaintiffs' business and/or property interests by soliciting the court to launder money owed to the Plaintiffs under Title 18, Chapter 95, Section

144

1956, when they were legally required by law to act appropriately. All of the government Defendants and their accomplices are still continuing to act as accessories after the fact by using their positions to do so either in the 13th Judicial Circuit, HCSO, 2DCA, Florida Governor's Office, Florida Attorney General's Office, Florida Supreme Court, Florida Department of State and Legislative Affairs, State Attorney's Office, Trump Administration, FBI, DOJ and Hillsborough County Coroner's Office, all co-conspirators in this matter under the Civil RICO Act, when they denied the Plaintiffs and decedent their state and federal substantive due process rights to respectively money owed and the decedent's murderers brought to justice.

**27.** This is a civil action for violations of Title 18, Chapter 96, U.S. Codes § 1961-1968 ("Racketeer Influenced and Corrupt Organizations Act" or "RICO") and other federal statutes cited. RICO addresses the corrupt abuse and misuse – **usually covertly** – of **organizations, entities, businesses, institutions** or even **governments or government agencies,** such that **superficially, legitimate entities actually operate for illegal purposes irrelevant to the entity's purpose.**

**28.** This Court has subject matter jurisdiction over this action pursuant to Title 28, Chapter 85, Codes § 1330, 1331 and 1332 and Title 28, Chapter 97, Section 1603. Jurisdiction is also proper pursuant to Title 18, Chapter 96, U.S. Code § 1965, which allows for **nationwide jurisdiction** pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Title 18, Chapter 96, U.S. Codes § 1961-1968 and racketeering activities under Title 18, Chapter 95.

**29.** This Court has subject matter jurisdiction over this action pursuant to Title 28, Chapter 85, U.S. Code § 1343 - **Civil rights** and elective franchise, specifically Title 42, U.S. Code § 1985(1) - Conspiracy to interfere with civil rights of subordinate trial judges by Manuel Menendez and Ronald Ficarrotta having made their judges injure the Plaintiffs and decedent fully and completely in the 13th Judicial Circuit, or be transferred to criminal court (Mark Wolfe and Elizabeth Rice were transferred to criminal court compliments of Ronald Ficarrotta).

**30.** Jurisdiction is also proper under **Davis v. Passman**, 442 U.S. 228 (1979), in so far as the **actions violated the Fifth (5) Amendment to the U.S. Constitution in violation of the equal protection component of this Amendment's due process clause.**

146

**31.** This Court has supplemental jurisdiction over this action pursuant to Title 28, Chapter 85, U.S. Code § 1367.

**32.** And this Court also has jurisdiction over this action pursuant to Title 28, U.S.C. § 1361, to order Clarence Thomas to perform the mandatory duty (writ of mandamus) of notifying the proper authority (DOJ) of a murder having been committed. **Under federal law, it is a felony for an officer, or employee, of the U.S. government, to fail to report (cover-up) the knowledge of a federal crime.**

**33.** A complaint must be sustained, if relief could be granted under any set of facts that could be proved consistent with the allegations. Federal Rule of Civil Procedure, Rule 8. *Hishon v. King & Spalding*, 467 U.S. 69 (1984) citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**34. Civil RICO Statute of Limitations:**

In a U.S. Supreme Court decision regarding the statute of limitations in civil RICO actions, the Court held in *Rotella v. Wood* 528 US 549, (2000), that the four-year statute of limitations period begins as soon as the plaintiff discovers his injury, **regardless** of when the fraud causing that injury is

147

discovered.  **This was an all-around wrong ruling since there was no second RICO predicate act committed in this case to call it a RICO case.  Did the U.S. Supreme Court use the *Rotella* case to wrongly limit the pattern requirement in RICO cases, or did they wrongly make a RICO ruling on a common law fraud case?  Both! Looking at the following facts of the *Rotella* case:**

**1) There were no RICO predicate acts committed under Title 18, Chapter 96, Section 1961(1).  Improper relationships and illegal agreements  without  more  details,  are  not  Section  § 1961(1) violations,  just  common  law  fraud  torts.    And  there  was  no indication  that  Mr.  Rotella  was  made  to  stay  at  a  medical facility  longer  than  he  should  have.    Was  Mr.  Rotella  in  a locked facility, or could he have just walked out?**

**2) If there was racketeering on Mr. Rotella, he was not within the terms of Section § 1961(5) which is a 10 year limit for having  filed  his  claim  between  the  first  and  second  RICO predicate acts committed.**

**3) Mr.  Rotella  did  not  have  any  stated  property  or  business injuries.**

**So *Rotella* was technically a fraud case, not a RICO case.  The U.S.  Supreme  Court  took  the  applicable  facts  of  a  common  law fraud case and falsely used them to illegally limit the use of the RICO Pattern Discovery Rule in 2000.  <u>Fraud</u>!  The crooked U.S.  government,  through  the  U.S.  Supreme  Court,  used  the**

*Rotella* case to illegally undermine the mandatory Pattern Discovery Rule requirement when this case did not have a pattern of RICO predicate acts to have been a RICO case. <u>Fraud</u>! The U.S. government was obviously trying to undermine the RICO rules and disenfranchise U.S. citizens of their legal right to sue under the Civil RICO Act. The *Rotella* case was no different than a fraud case.

There is a RICO <u>Pattern</u> Discovery Rule requirement in place in Section § 1961(5), so you can prove that a racketeering tort, not a common law fraud tort, was committed. Under the RICO Act, the two (2) RICO predicate acts committed must "amount to or <u>pose a threat of continued criminal activity</u>." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 238-39 (1989). Also, if another victim besides you was defrauded by the same enterprise using their same RICO pattern for the same purpose and you knew it, how would you apply the Continuing Violation Rule (CVR) to your lawsuit when there was no second RICO predicate act committed on you within the four (4) year limitation period? CVR violation has to be committed on the same victim.


Now let us look at this court case and its applicable facts that fit right in with the RICO Act rules:

You can sue an opposing party in a court case under the RICO Act, if at least one (1) opposing party illegally benefited by having filed a clearly false pleading that was ruled favorably on, or if they subsequently acquiescing in after illegally benefiting from one (1) RICO injury committed on you during the case, 2) with the injuring enterprise consisting of at least one (1) judge, 3) that committing two (2) RICO predicate acts on you, thus forming the pattern requirement under the RICO Act, 4) when you were denied honest services.

So how do you tell if a judicial referee in a court case was acting as either 1) a member of a state judicial enterprise that was in on the plan to defraud you, 2) just erred or 3) personally and individually defrauded you one time for spite, not as a member of an enterprise?  By taking additional legal recourse in:   1) Filing for a rehearing and submitting correspondence to the judge, telling him or her that, if he or she commits a second (2) RICO predicate act on you by affirming their obviously false prior ruling, you will sue him or her and their co-conspiring benefactors for any injuries caused in state or federal court under the RICO Act and provide a copy to opposing parties.  2) Filing an appeal.  Or 3) filing a new complaint with new counts and claims for the same or different (any) property or business interest owed to see if one (1) more RICO predicate act is committed by the same or a different judge

**working for the same state judicial enterprise, resulting in a second (2) RICO predicate act committed on you, thus confirming a judicial conspiracy to defraud under the RICO Act.**   After a **second RICO predicate act** resulting in an 1) illegal dismissal, 2) permanent illegal suspension of some part of the discovery process or 3) an order stopping you from adding counts and claims to your complaint to conform with the evidence (all honest services frauds) in a A) related or B) new case, injuring the same victim or victims in any property or business interest, the victim or victims should **know absolutely** that state judicial racketeering was in play, not an error, or a personal onetime spite ruling by a judge (a Section § 1983 violation) who caused an injury, and can sue any one of their co-conspirators from any of their court cases who unjustly benefited (vicarious liability or subsequently acquiescing in) in violation of the RICO Act. **It is not the two (2) RICO predicate acts committed by opposing parties that starts the RICO accrual process, but after the second (2) RICO predicate act judicially committed within the ten (10) year limit under Section § 1961(5) and not more than four (4) years after the first injury (RICO predicate act) was committed (*Rotella* case), that resulted in at least one (1) injury during one (1) court case, to a party's or parties' property or business interest, and the victim or victims are**

still within the statute of limitations for filing a RICO complaint without tolling.

A RICO injury in a court case is usually the result of either 1) an illegal dismissal without further legal recourse taken, or the 2) illegal suspension of some part of the discovery process that stops you from moving the case forwards to trial with all of the evidence without further legal recourse taken.  Or 3) an illegal order that keeps you from adding counts and claims to conform with the evidence, illegally benefiting an opposing party or parties without further legal recourse taken.

In numbers 1 and 2 above, opposing parties would have to file false pleadings for the judge to deny honest services in these types of judicial order rendered, but in number 3, no false pleading would need to be filed by opposing parties. Consequently, an opposing party would have a reasonable amount of time to subsequently acquiescing in (30 days) by allowing the judge's illegal order to stand that wrongly benefited them, or you could sue them too.

Judges and their state judicial enterprises pose the real threat of continued RICO activity within the court system, not opposing parties.  WITHOUT JUDICIAL RACKETEERING IN COURT CASES, THERE WOULD BE VERY FEW RICO INJURIES COMMITTED DURING COURT CASES!

In any event, the Plaintiffs' RICO case has three (3) huge differences from the *Rotella* case in that due to the Plaintiff's tenacity (due diligence) in fighting multiple cabals (enterprises) during multiple court cases.

1) The RICO predicate acts committed, first starting on 3-1-12, during case 12-CP-249, that started all of the defrauding tactics used in injuring the Plaintiffs and decedent in nine (9) different court cases, out of four (4) different money amounts owed, have been continuous nonstop! Case 12-CP-1669 was a Florida Slayer Statute tort ($1,060,000); case 14-CA-10278 was a tortious interference with inheritance tort ($1,060,000); cases 14-CA-12557 and 16-CA-4693 were malpractice torts ($1,060,000); case 17-CA-902 was a slander tort ($1,060,000); case 8-17-CV-219-7-36MAP was a federal Title 42, Chapter 21, Section 1983 tort (reversal of order sought); case 17-CC-403 was a misrepresentation tort ($15,000) still on hold; case 17-CA-4051 was a fraud tort ($1,060,000) with appellate case 2D19-1384 just affirmed on 12-27-19; case 17-CA-6219 is a theft and dignitary tort ($6720 owed to Mr. Schneider and $239,724 owed to Ms. Kimball) still in litigation. There is a current tenth (10) court case, case 17-CA-8903, which is a personal injury tort case that the Plaintiff has not yet been injured in under the RICO Act, but opposing parties did committed wire fraud (Section § 1343) in this case by filing clearly false solicitation

pleadings, a violation under Title 18, Chapter 96, Section 1962(d).

Consequently, there is <u>no</u> statute of limitations problem under the <u>Last Predicate Act Rule</u> or the <u>Continuing Violation Rule</u> in tolling the statute of limitations in this matter because each RICO predicate act committed was within the four (4) year limitation period that resulted in a <u>new and independent injury</u>, or <u>new "discrete act"</u>, that followed the same RICO pattern of defrauding the Plaintiffs in their property or business interest. After a civil RICO claim has accrued (pattern of racketeering exists), there will frequently be additional, <u>independent injuries</u> that will result from the <u>same violation of § 1962</u>. *Bankers Trust Co. v. Rhoades*, 859 F. 2d 1096 (2d Cir. 1988).

As the Supreme Court made clear in *Sedima*, **RICO injuries flow from <u>individual predicate acts</u>**, not from the pattern itself. 473 U.S. at 495-97, 105 S. Ct. at 3284-85.

<u>The difference in these two accrual methods cited above is: 1) The Last Predicate Act Rule does not require another individual and separate injury to the pattern of RICO predicate acts committed to toll the statute of limitations an additional four (4) years, just another predicate act, but the Continuing Violation Rule does require another individual and separate</u>

injury committed on the same victim within four (4) years from the prior injury. But according to the *Rotella* Case, it does not matter if another injury was committed on a different victim, thus starting the accrual process, but it does if you are enacting the Continuing Violation Rule. When each additional RICO predicate act is committed with an injury on the same victim, as is the case in this matter, the statute of limitations is tolled for another four (4) years under CVR. Thus, both the Continuing Violation Rule and the Last Predicate Act Rule are applicable to this case.

Continuing Violation Doctrine is the principle that a tort continuing or repeating over time is treated as a whole such that the statute of limitations begins to run not when the tortious conduct begins, but when it ends. And the injuries occurring within the limitation period were not simply a continuation of the same injury that was sustained by the victim or victims. Each new RICO predicate act (clear abuse of discretion) committed on the Plaintiffs' as honest services frauds resulted in repeated injuries (new) implemented until the cases were damaged enough to end them! Whether they were committed in conjunction with a 1) revised complaint ordered during the same case, 2) a deposition denied during the same complaint or 3) an order by a judge that denied the Plaintiffs'

their state and federal substantive due process rights to keep or add claims and counts to their revised complaints to conform with the evidence during the same case, it newly injured them under the RICO Act.

In *Larson v. Ferrellgas Partners*, No. 15-2789 (8th Cir. 2016), The majority held that, in an antitrust conspiracy suit, a continuing violation tolls the statute of limitations as long as there were unlawful acts (e.g., sales to the plaintiff) within the limitations period, even if the alleged conspiracy was hatched outside the four-year statute of limitations period. The dissent, however, argued that to avoid dismissal plaintiffs are required to show a live, ongoing conspiracy within the limitations period. This is the case in this matter where the sale of honest services to consumers (the Plaintiffs) by the local courthouses were repeatedly denied (antitrust).

in *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), the majority held that, in an antitrust suit, each allegedly unlawful sale restarts the running of the statute of limitations regardless of whether the plaintiff had earlier knowledge of the allegedly illegal conduct. In doing so, the majority recognized several weaknesses in this argument—namely, that *Klehr was a RICO case* and that the relevant passage in that decision is dicta (did not apply). Nonetheless, it concluded that deference was owed to

*Klehr's* expression of the continuing violation doctrine, which it read as consistent with other Supreme Court antitrust decisions.

The Continuing Violation Rule is Applicable to All types of Tort Law Cases throughout America:

Delaware State Coll. v. Ricks, 449 U.S. 250, 261 n. 15, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980) ("Mere requests to reconsider ... cannot extend the limitations periods applicable to the civil rights laws."). However, it is apparent from the Supreme Court's discussions in *Morgan* and *Ledbetter* that an employee who renews his request for particular accommodations may bring suit based on a new "discrete act" of discrimination if the employer again denies his request. In *Morgan*, the Court explicitly stated that "[t]he existence of past acts and the employee's prior knowledge of their occurrence ... does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed (in RICO, 4 years)." 536 U.S. at 113, 122 S. Ct. 2061; see also *Ledbetter*, 127 S. Ct. at 2174 ("[A] freestanding violation may always be charged within its own charging period regardless of its connection to other violations."). All of the injuries committed on the Plaintiffs and decedent during their court cases were freestanding

157

(independent) violations, irregardless of their relationship to the same property interest, business interest or murder investigation because they were independent and separate from each other and <u>no res judicata or collateral estoppel rules were applicable to any of the Plaintiffs' cases</u>, but because the cases had to do with the same RICO pattern by the same enterprises, on the same victims, the Continuing Violation Rule is applicable in this matter.

Continuing Violation Rule espied its origins in <u>tort law</u>, e.g., *Dziura v. United States*, 168 F. 3d 581, 583 (1st Cir. 1999). The doctrine permits a plaintiff to recover for wrongdoing transpiring outside of the limitations period, which is saved from the limitations bar because of its connection to more recent misconduct. See *O'Rourke v. City of Providence*, 235 F. 3d 713, 730 (1st Cir. 2001). The Continuing Violations Doctrine has grown so closely associated with employment discrimination claims that some courts have <u>assumed</u> that the doctrine originated in cases interpreting Title VII. *Velazquez v. Chardon*, 736 F. 2d 831, 833 (1st Cir. 1984). A serial violation occurred when the defendant committed a series of discriminatory acts directed against a single plaintiff. Provided that an anchoring act of discrimination occurred within the limitations period preceding the filing of an administrative charge, the

plaintiff could recover for all related instances of discrimination, subject to certain additional requirements that varied from circuit to circuit. *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F. 2d 396,401 (1st Cir. 1990). In continuing violation scenarios the discovery rule may create a longer limitation period than would the continuing violation doctrine, where the harm becomes discoverable long after the unlawful conduct has ceased, or in cases the separate accrual version of the doctrine is applicable long after the particular segment of the conduct which caused the harm took place. *Rodriguez v. Banco Cent.*, 917 F. 2d 664, 666 (1st Cir. 1990). Where recurring conduct of a uniform nature is at issue, both its factual and its legal link with the future harm follow from the presumed presence of such links in the past. *Wessmann v. Gittens*, 160 F. 3d 790, 818 (1st Cir. 1998).

**Last Predicate Act Rule is Also Applicable to this Case:**

[F]rom the date the plaintiff knew or **should have known** that the elements of the civil RICO cause of action existed (four (4) years) **unless**, as a part of the same pattern of racketeering activity, there is **further injury** to the plaintiff **or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the**

**same pattern of racketeering activity**. *Keystone Ins. Co. v. Houghton*, 863 F. 2d 1125, 1130 (1988). "last predicate act" rule, allows a plaintiff to recover damages accumulated since the first injury as long as the last RICO violation ("last predicate act") happened **within four years** of the lawsuit. "[If], as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, . . . **the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff, but must be part of the same pattern**." *Keystone Ins. Co. v. Houghton*, 863 F. 2d 1125, 1130 (1988). And,


**Since courthouses are commerce based government businesses that offer honest services to the public in need of fair and equitable legal relief, and all of the racketeering in this matter occurred during the Plaintiffs' court cases in the form of honest services frauds, the Continuing Violation Rule is applicable to the Plaintiffs' type of antitrust matter**. *Klehr v. A.O. Smith Corp.*, U.S. Supreme Court, 521 U.S. 179 (1997) and In re *Pre-Filled Propane Tank Antitrust Litigation*, 860 F. 3d 1059 (8th Cir. 2017). Antitrust law provides that, in the case

of a "continuing violation," say a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, **"each overt act that is part of the violation and that injures the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times**." 2 *Areeda*, ¶ 338b, at 145 (footnote omitted); see also *Zenith*, supra, at 338; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 502, n. 15 (1968); *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F. 3d 462, 467 (CA6 1996). **But the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period -- outside of the 4 year limit period after the second (2) RICO predicate act was committed on you, without tolling the statute of limitations.   And within 10 years between the first and second act.   And,**

2) **The Plaintiff is Not in Violation of the Injury Discovery Rule using equitable tolling methods, specifically due to concealment fraud, case 12-CP-1669 and in being misled, case 14-CA-10278:**

**Keep in mind that the ruling in the *Rotella* case only applies to the Injury Discovery Rule without using equitable tolling methods.   Normally you have to litigate a RICO complaint within**

the guidelines of both Section § 1961(5), 10 years between the first and second act committed.   And from the *Rotella* case, within 4 years after the second (2) act was committed, unless you should have known there was racketeering committed on you after the first act.

You have to litigate a RICO complaint within four (4) years after either:  1) one (1) RICO predicate act was committed on you that you should have known was by an enterprise, 2) after a second RICO act was committed on you and within four (4) years after this second act, not exceeding 10 years between the first and second act, committed by the same enterprise, or after a 3) second RICO act was committed on someone else and within four (4) years after the second RICO act was committed on another victim by the same enterprise that you had knowledge of and within 10 years between your first and their second act, without tolling.

<u>There were over forty (40) RICO predicate acts committed by Florida's state judicial enterprise to defraud the Plaintiffs in their property and/or business interests that were continuous</u>. A "pattern of racketeering activity" requires at least two (2) acts of racketeering activity (RICO predicate acts), one of which occurred after the effective date of this chapter and the <u>last of which occurred within ten years</u> (excluding any period of

imprisonment) after the commission of a prior act of racketeering activity.   Section § 1961(5).

3) For this law, the statute of limitations is tolled in any U.S. circuit court indefinitely:   The statute of limitations on an heir suing a co-conspirator for an injury that they caused when they were an accessory (aided and abetted in) after the fact (AATF) in a murder, is tolled indefinitely.   In order for the Defendants, FLMIC, CNA and AI, not to have been required under their contracts with their clients to pay the Plaintiff his inheritance money owed under the Florida Slayer Statute 732.802, they have been continuously co-conspiring, from case 14-CA-10278 to case 2D19-1384, and will be co-conspiring forevermore to cover-up the decedent's murder.

In addition, . . . murder is a RICO predicate act, and it would certainly be anomalous if a cause of action based on death did not survive the death of the would-be plaintiff (decedent).   We cannot conclude that Congress ignored the brutal history of organized crime by providing a defense to criminals who have the foresight to kill their victims.   We hold that civil RICO claims do not abate upon the death of the injured party.").   We falsify legal history, when, as we often do, read modern distinctions back into legal history.   That said, in Roman law, which did not reflect from its earliest times, our modern distinctions, hardly

an eternal verity, between "crime" and "tort," civil actions, brought ex delicto, for multiple damages (e.g., theft, robbery with violence, outrage, and wrongful damage to property) did not survive against the offending party, but they did for an heir of the offended party. G. INST. 4.112-13 (F. de Zulueta trans., 1946) (addressing survival); id. at 6.189-215 (discussing the scope of delicts for multiple damages). Volume 88 | Issue 4, Article 1, 4-1-2013, Time-Bars: Rico-Criminal and Civil Federal and State, G. Robert Blakey, University of Notre Dame, g.r.blakey.1@nd.edu. As long as any co-conspirators continue to cover-up the decedent's murder during court cases, they will continue to owe the Plaintiff for injuries to his property inheritance interest including interest at a nominal rate. Actus reas is a Latin term which means guilty act. In order to be convicted of this crime, a crime must have taken place and you must have done something to help (aid or abet) the person who committed the crime to escape arrest and/or punishment. The statute of limitations for committing, or aiding and/or abetting in, after the fact in a murder is tolled indefinitely. For murder in aid of racketeering under 18 U.S.C. § 1959 (2006) implicates the death penalty, for which Title 18 provides that murder is "without limitation." Id. § 3281; see also *United States v. Payne*, 591 F. 3d 46, 57-59 (2d Cir. 2010) (following *Smith v. United States*, 360 U.S. 1, 8 (1959), which

held that charging the **statute** rather than facts warranting **death invokes the unlimited period of limitations**). Volume 88 | Issue 4, Article 1, 4-1-2013, Time-Bars: Rico-Criminal and Civil Federal and State, G. Robert Blakey, University of Notre Dame, g.r.blakey.1@nd.edu. **As for being an accessory after the fact (AATF) in a murder, the penalties are less, but the statute of limitations is also unlimited.**

**Outside of a fraud on the court or a AATF in a murder,** courts that have permitted equitable tolling of the four-year limitations period in civil RICO cases after two (2) RICO predicate acts have been committed, based on one of three grounds: **1) fraudulent concealment, 2) continuing tort or conspiracy, or 3) pendency of another court action. Courts in several circuits have held under A) a Continuing Violation Rule tort or B) a conspiracy, may serve as grounds for equitable tolling in civil RICO cases.** In this matter, the statute of limitation started to run when the Plaintiff filed his RICO complaint, **giving up on litigating** his remaining Florida court cases because of the expression, **"It's a rigged system."**, stated by Donald Trump in 2016, and he would have known as well as anyone after years of courting the **upper echelons** of the political system in America before his name was allowed to be placed on any ballot.

The Continuing Violation Rule and the Last Predicate Act Rule are applicable in this matter because of the following:

Mr. Schneider's most resent court case injuries were on **12-27-19** for Mr. Schneider's **$1,060,000** from respectively appellate case **2D19-1384** from 17-CA-4051; on **1-24-19,** appellate case **2D18-4761,** from case **18-CA-1537** for Mr. Schneider's **$15,000** and on **10-28-19** for both Mr. Schneider's **$6720,** and for Ms. Kimball's **$239,724** in case **17-CA-6219.**  All of these cases are either respectively just affirmed on appeal, illegally stopped or still in litigation.

**35.  A More General Analogy of the Applicable Rules in this Matter for Determining Whether a Party is Within the Statute of Limitations under the Civil RICO Act, Outside of a 1) Murder or 2) a Fraud on the Court:**

**A.**  A VICTIM HAS FOUR YEARS TO FILE SUIT FROM THE TIME OF AN INJURY TO ONE'S BUSINESS OR PROPERTY THAT SHOULD HAVE BEEN KNOWN WAS FROM AN ENTERPRISE'S RACKETEERING.

**B.**  AND AN ENTERPRISE IS DEFINED AS HAVING AT LEAST THREE STRUCTURAL FEATURES:  1) A PURPOSE, 2) LONGEVITY SUFFICIENT TO PERMIT ITS ENTITIES TO PURSUE THE PURPOSE OF THE ENTERPRISE AND 3) A STRUCTURE DISTINCT FROM THE RICO PREDICATE ACTS, SHOWING THAT THE INJURY WAS CAUSED BY AN ENTERPRISE.

**C.** THE STATUTE OF LIMITATION FOR FILING A COMPLAINT UNDER THE RICO ACT IS TOLLED WHEN AN ENTERPRISE OR ASSOCIATION INTENTIONALLY CONCEALS HAVING COMMITTED AN **EXTRINSIC FRAUD**, TO PREVENT THE KNOWLEDGE NEEDED FOR ONE TO LEGALLY SEEK COMPENSATION FOR DAMAGES UNDER THE RICO ACT.

**D.** **EQUITABLE TOLLING** IS GRANTED WHEN THE STATUTE OF LIMITATIONS ON THE CORRECT REMEDY HAS NOT BEEN PURSUED, IF ONE CAN SHOW REASONABLE GOOD FAITH CONDUCT OF HAVING ACTIVELY PURSUED A LEGAL REMEDY, BUT WAS **MISLED** (GIVEN SOMEONE THE WRONG IDEA OR IMPRESSION) BY A DEFENDANT OR CO-CONSPIRATOR ABOUT THE CAUSE OF ACTION NEEDED TO BE TAKEN WHICH PREVENTED ONE FROM RELIEF UNDER THE RICO ACT.  THE EQUITABLE TOLLING DOCTRINE, AS IT RELATES TO THE RICO ACT, **DOES NOT REQUIRE WRONGFUL CONDUCT ON THE PART OF A DEFENDANT OR CO-CONSPIRATOR SUCH AS FRAUD OR MISREPRESENTATION, BUT EQUITABLE ESTOPPEL DOES.** American Jurisprudence 2d Limitation of Actions § 174 (2007).

**E.** AND **EQUITABLE ESTOPPEL** IS GRANTED FOR TOLLING THE STATUTE OF LIMITATIONS WHEN:

1. THERE WAS REPRESENTATION OR CONCEALMENT OF A FACT OR FACTS,

2. THE FACT OR FACTS WERE KNOWN BY THE DEFENDANT AT THE TIME OF THE REPRESENTATION OR CONCEALMENT,

3. THE REPRESENTATION OR CONCEALMENT WAS MADE WITH THE INTENTION OR EXPECTATION THAT IT WAS GOING TO BE ACTED UPON,

4. THE REPRESENTATION OR CONCEALMENT WAS ACTED UPON,

5.  THE PLAINTIFF WAS INJURED.

**36.  Applicable Laws from Different Federal Circuits Regarding the Statute of Limitations under the Civil RICO Act:**

In *Rotella v. Wood* 528 US 549 – 2000, **the Supreme Court failed to decide "whether civil RICO allows for a cause of action when a second predicate act follows the injury," because such facts did not exist in that case**.  Under the traditional federal accrual principle, a statute of limitation period does not begin to run until the cause of action is **complete**. See, e.g., *Rawlings v. Ray*, 312 U.S. 96, 98 (1941) and *Clark v. Iowa City*, 87 U.S. 583, 589 (1874).  Some courts have incorporated this traditional principle into the injury discovery rule, **holding that a pattern of racketeering must exist, even if racketeering is believed, before the limitations period begins to run and avoiding the *Rotella* "quandary" altogether (the *Rotella* case did not have the required two (2) RICO predicate acts committed under Section § 1961(5), if there was even one committed**. See, e.g., *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F. 3d 797, 802 **(7th Cir. 2008)** and *Bygrave v. Van Reken*, 238 F. 3d 419 (6th Cir. 2000) (unpublished table decision) **(Avoiding the *Rotella* quandary because injury and two alleged predicate acts occurred over four years before plaintiff filed RICO claim)**; *Grimmett v. Brown*, 75 F. 3d 506, 512 (9th Cir. 1996) **("[b]ecause a RICO**

cause of action cannot accrue until all the elements exist, <u>no statute of limitations can begin to tick until a pattern exists")</u> (citation omitted); *McCool v. Strata* Oil Co., 972 F. 2d 1452, 1465 (7th Cir. 1992) **(though injury discovery rule applies, "[t]here must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury").** Agency Holding v. Malley-Duff, 483 U.S. 143 (1987). Since this case, **the federal courts have <u>uniformly upheld</u>** the **application of federal equitable tolling and equitable estoppel.**

37.  **How and When the Plaintiff Discovered that His Million Dollar Plus Property Injury was the Result of Racketeering:** In this complaint there were, <u>and still are, four (4) distinct enterprises that defrauded the Plaintiffs out of money owed.</u> Consequently all four enterprises' actions have to be examined separately in determining when, to a diligent person, their participation was done in violation of Title 18, Chapter 96, Section 1962(c).

38.  **The Defrauding Tactics Used by the <u>Primary Enterprise</u> With Regards to What the Plaintiff Should Have Known and When:** Cyrie Schneider was the murdered decedent's live in caretaker and accountant, who started to kill the decedent 7 months before

her death on 7-1-12 as a means of making her completely incompetent in order to extract signed inheritance instruments (contracts) out of her, which she did on 6-29-12. Instruments that were **not** standard form inheritance contracts, but extremely detailed, taking hours for Robert Welker to iron out **with Cyrie Schneider present, along with when the gift deed instrument was going to wrongly be delivered to the Plaintiff.** These were inheritance instruments that **Cyrie Schneider technically wrote** and authorized Robert Welker to compile and format by placing the decedent's forged signature on his retainer agreement and then paid him with one of the decedent's forged checks. This plan was used as a means to cut the Plaintiff out of $250,000 worth of inheritance property from the decedent's estate. When Cyrie Schneider had achieved what she wanted to accomplish, she was very much guilty of aggravated manslaughter under Florida Statute 782.07, and having violated Florida Slayer Statute 732.802. **Cyrie Schneider had killed the decedent to defraud the Plaintiff out of $250,000 worth of property under the Florida intestate laws!** Hindsight being 20/20, Cyrie Schneider's plan to abuse, neglect, exploit and murder the decedent, if need be for more profit, was known to the decedent's other two (2) greedy and coldblooded caretakers before the decedent's death. The Plaintiff had confirmation of this when he discovered in 6/2016 an extortionate credit transaction from one of the

decedent's bank accounts with Marcy McDermott name also on this account which was credited by Cyrie Schneider on 6-12-12 for $20,000. **It was important for Cyrie Schneider to move the decedent's bank account money around before the decedent's death, because all of the joint account holders anticipated inheriting the decedent's property after her death by way of a false will that stated in it that any of her joint bank account holders had the right to the remaining money, thus cutting the Plaintiff out of his inheritance.**

**If a another one of the decedent's caretakers had conspired to divided the decedent's property behind her back before she was dead due to being too sick and incompetent to have known or cared, more than one of the decedent's caretakers also knew that the decedent was being mentally and physically compromised in order to be taken advantage of by another, but could have cared less. So more than one of the decedent's caretakers decided to profit from the decedent being abused and neglected until she was dead. Undoubtedly, more than one of the decedent's caretakers also knew that the decedent was too incompetent to have signed any inheritance instruments 17 days later on 6-29-12, <u>two (2) days before she died from sepsis and/or septic shock</u>! So Sybil Murphy and Cyrie Schneider singed false affidavits for Thomas Rydberg's summary judgment motion, case**

**12-CP-1669, on 3-20-13, when they stated that the decedent was competent when she was out of her mind from sepsis.**

Around 6/2016, about a month after Mark Wolfe had granted in part an order on 5-18-16, from case 14-CA-12257, allowing the Plaintiff to subpoena bank account information on the decedent's banking records, but wrongly only allowing the Plaintiff to go back one year from her murder, he saw a fraudulent transaction made when the decedent was too sick and out of her mind to have been thinking about who to leave her property to when she wanted to die intestate. **The decedent assumed that her joint bank account holders would divide her property evenly amongst all of her heirs.** And quite possibly, the caretakers' intentions to fleece the decedent while they slowly killed her, was known to Robert Welker, the caretakers' attorney. **The confirmation of any information about the relationship between the decedent's caretakers and how they were involved in the decedent's murder, were unknown to the Plaintiff due to concealment fraud. Although the Plaintiff had diligently tried to get this information during Sybil Murphy's deposition on 4-19-13, case 12-CP-1669, taken by primary enterprise member Lee Pearlman, he was defrauded out of acquiring the information by Lee Pearlman.** So the Plaintiff did not believe that anyone else was involved in the murder of the decedent before 6/2016, but Cyrie Schneider. During case 12-CP-1669, all that the Plaintiff knew,

172

and could diligently find out, was that Cyrie Schneider had been killing the decedent for the last 7 months of her life alone and without any of the other caretakers' knowledge by giving the decedent critical/lethal amounts of potassium to stop her heart while substituting an antifungal for her pneumonia medication. And Cyrie Schneider cleverly refrained from taking the decedent to a doctor where these illegal acts might have been discovered and documented.   The Decedent died from severe sepsis and/or septic shock due to untreated pneumonia and critical levels of potassium, both of which stopped her heart from beating, as documented by Florida Hospital.   The decedent's cause of death from Florida Hospital was not affirmed by the Hillsborough County Coroner's Office in Tampa, Florida.   This coroner's office wrongly stated that the decedent died from natural causes, after being pressured from HCSO into doing so.   During case 12-CP-1669, the Plaintiff never thought that the decedent's murder was the work of an enterprise, but a poor, greedy and vindictive relative without a moral conscience.

As for Robert Welker being partners with Cyrie Schneider in an association in fact enterprise, depends on what Robert Welker knew before he indirectly helped kill the decedent by giving Cyrie Schneider two (2) false inheritance instruments around 3/2012 to cram down her throat for months before her death on 7-1-12, 9pm, and then used the instruments in 7/2012 to probate

173

her estate for more blood money! **Unfortunately, anyone in America can legally pay an attorney to draft a standard inheritance instrument for someone else, as long as they sign a retainer agreement and pay the attorney's drafting fee. It is illegal to 1) add to a standard inheritance instrument what it is <u>you want in it</u>, communicated verbally or in writing to the attorney drafting it, or to 2) forge someone else's name on a retainer agreement for services to be rendered.** A family procuring a **<u>standard</u>** will instrument from an attorney for one of their relative is currently not a racketeering activity under the Civil RICO Act, but it should be. Hindsight being 20/20, the Plaintiff believed in 6/2016 that the decedent's three (3) caretakers had already formed the primary enterprise before Cyrie Schneider had killed the decedent. **What the Plaintiff found out from 3/2016 to 6/2016, gave him an uneasy feeling that he had been fooled in case 12-CP-1669 by everyone in it, including his attorney. And that fraud had been committed under the Civil RICO Act by both a primary and a secondary enterprise. These were the Plaintiff's <u>storm warnings</u>.**

All of the RICO predicate acts in Section 7 of this complaint were committed by the primary enterprise. When Sybil Murphy became an agent for the primary enterprise in court case 12-CP-1669, she as well as cyrie Schneider and Robert Welker participated in it under Title 18, Chapter 96, Section 1962(d)

174

by filing knowingly false affidavits on 3-20-13. Thus, the primary enterprise also had its defrauding hand in case 12-CP-1669, but the Plaintiff had no way of knowing this until he could gather more information on what had happened to all of the decedent's money prior to her murder. **If you want to find out who else was involved in a money crime, you have to follow the money trail and the Plaintiff got lucky in 6/2016.**

When Robert Welker filed false documents to probate the decedent's estate, case 12-CP-1669, he became an agent for the primary enterprise under Title 18, Chapter 96, Section 1962(d). And when Robert Welker had his good friend Thomas Rydberg illegally litigate case 12-CP-1669 in the best interests of the primary enterprise, he too became an agent (facilitator) in it under Title 18, Chapter 96, Section 1962(d). A fraud on the court was committed twice when both Robert Welker and Thomas Rydberg filed false documents respectively for opening and litigating probate. Consequently, the primary enterprise intended for their false final order submitted to the court after a summary judgment motion filed on 3-20-13 and heard on 5-6-13 to be signed by Robert Foster on 5-15-13, case 12-CP-1669. This final order defrauded the decedent under Title 18, Chapter 96, Section 1961(1), specifically Title 18, Chapter 63, U.S. Codes § 1341 (mail), 1343 (wire) and 1346 (honest services fraud). At this point in time, no monetary injury to the

175

Plaintiff had yet occurred and no honest services were denied to either the decedent or the Plaintiff.    On 5-15-13, when Robert Foster signed the false final order, he was a participant in the secondary enterprise (state judicial enterprise) who had committed racketeering on the decedent.    The Plaintiff believed he had lost probate case 12-CP-1669 because of **1)** Lee Pearlman's negligence for not filing the Plaintiff's affidavit refuting the allegations in Thomas Rydberg's affidavits filed in support of his summary judgment motion and **2)** for not objecting to the false final order submitted to the court prior to its signing by Robert Foster.

When Thomas Rydberg came up with the plan to somehow coerce (bribe) the Plaintiff's attorney Lee Pearlman under Title 18, U.S. Code § 201(b)(3), and he accepted under Title 18, U.S. Code § 201(b)(4) right before Sybil Murphy's deposition on 4-19-13, case 12-CP-1669, they had both participated under Title 18, Chapter 96, Section 1962(d), but still no monetary injury to the Plaintiff's business or property had occurred.    And the Plaintiff believed he would be court awarded both his inheritance as well as 1/3 of Cyrie Schneider's inheritance under Florida's Slayer Statute 732.802 during case 12-CP-1669. This amount would have been around $333,000.

When opposing parties along with Lee Pearlman, Thomas Rydberg and Robert Welker during case 12-CP-1669, knew that the primary

176

enterprise's plan was **not** to talk about the decedent's murder in court and just have Lee Pearlman **not** file a rebuttal pleading (affidavit) to refute the summary judgment motion's allegations (affidavits) during the hearings on 5-6-13 and 7-29-13, with Thomas Rydberg drafting and filing the bogus final order, including in it a statement about the Plaintiff's murder count having been abandoned that Robert Foster would sign, **all opposing parties and their attorneys along with lee Pearlman were primary enterprise RICO participants under Title 18, Chapter 96, Section 1962(d).**

**When Robert Foster signed the final order in case 12-CP-1669 with prejudice on 5-15-13 and when the concealment fraud (extrinsic fraud) had finished on 7-29-13 (second summary judgment rehearing), all opposing parties and Robert Foster, were in violation of Title 18, Chapter 96, Section 1962(c) for respectively defrauding the Plaintiff as to where the decedent's property was going (committed by opposing parties and their counselors along with Lee Pearlman) and in defrauding the decedent out of an investigation into her murder under Florida statute 732.802 (committed by Robert Foster, opposing parties and their counselors along with Lee Pearlman). What ended case 12-CP-1669 was Lee Pearlman not objecting to allegations that opposing parties introduced as being factual. And the fact that**

the decedent was murdered only had monetary merit to the Plaintiff if case 12-CP-1669 was still open and in litigation. The Plaintiff had no way of knowing that he had been monetarily injured under the Civil RICO Act because the RICO plan was an extrinsic fraud that covered up the fact that Lee Pearlman was not negligent, but a member of the primary enterprise, whose job it was not to file a rebuttal affidavit, along with Robert Foster's job, as a secondary enterprise member, to make sure the Plaintiff's will contest (case 12-CP-1669) never made it to trial. Robert Foster did not have to end case 12-CP-1669 illegally as a member of the secondary enterprise when Lee Pearlman refused to adequately work the case. The Plaintiff had determined on 3-8-16 the real reason for his having lost case 12-CP-1669. The statute of limitations for filing a RICO complaint is tolled for concealment fraud which purposely stops a party from receiving information to correctly litigate a claim for damages.

Hindsight being 20/20, during case 12-CP-1669, Robert Foster knowingly aided and abetted in the Plaintiff being defrauded by the primary enterprise in his court under Title 18, U.S. Code § 3 as a member of the secondary enterprises by being in violation of Title 18, Chapter 96, Section 1962(d) (Pinkerton Liability Doctrine) up until 5-14-13. And Robert Foster was in violation of Section § 1962(d) for committing honest services fraud under

Code § 1346 by not ordering an investigation up until 5-14-13 into the murder of the decedent. On 5-15-13, Robert Foster did not have to investigate the decedent's murder because case 12-CP-1669 was legally dismissed under the umbrella of Lee Pearlman's negligence act. Despicable! By Lee Pealman (primary enterprise member) 1) never having filed a rebuttal affidavit during case 12-CP-1669 and 2) having failed to object to Thomas Rydberg's proposed final order before Robert Foster signed it on 5-15-13, the secondary enterprise (Robert Foster) legally dismissed this case because of Lee Pearlman's negligence act, but illegally dismissed the case because the final order was with prejudice that covered up the decedent's murder permanently in probate court. So Robert Foster and his state judicial enterprise did not need to defraud the Plaintiff, just dismiss case 12-CP-1669 legally and violate the decedent's civil rights by covering up her murder to keep the Plaintiff from coming back into his court to try the case later on by signing the false final order that both parties agreed to with prejudice. It did not matter to Robert Foster that the decedent was murdered, when he had a legitimate reason for dismissing case 12-CP-1669 and shunning his responsibility to her. The racketeering on the Plaintiff was committed under Title 18, Chapter 96, Section 1962(c) by Lee Pearlman and the primary enterprise. The Plaintiff's attorney was at fault for not wanting to litigate

case 12-CP-1669.    In the transcript from the 7-29-13 rehearing on the summary judgment motion, case 12-CP-1669, page 4, line 25, Lee Pearlman states "Now, I'm not saying it's not right for a judgment of acquittal"; page 14, line 23, the judge acts like he does not remember the three counts from this case and says "is he claiming undue influence?".    Then he implies that the Plaintiff has to wave his undue influence claim in order to proceed to trial, saying "So he doesn't want to do that.  Isn't that a condition to proceeding?".    <u>Both Robert Foster and Lee Pearlman knew how to play it dumb when defraud a victim</u>!    It was not enough for Lee Pearlman <u>not</u> to have filed a rebuttal affidavit in response to Thomas Rydberg's summary judgment motion <u>allegations</u> (no factual statements), Lee Pearlman had to agree with the allegations as being factual to insure that Robert Foster would dismiss the case regardless of the allegations <u>not</u> having been based on any material facts!    At this point, Robert Foster should have 1) dismissed the motion or 2) simply suspended the case and told the Plaintiff to find another attorney within 60 days, but he was required to dismiss this case permanently with <u>prejudice</u> any way he could per his orders from Manuel Menendez.    If you read the transcripts from 5-6-13 and 7-29-13, no judge, not even Robert Foster, could have been this negligently, but perhaps he was.    Who can say that Robert Foster committed a clear abuse of discretion in

dismissing case 12-CP-1669 when Lee Pearlman failed to adequately work the case? No one.

**39.   The Formation of the <u>Secondary and Third Enterprises</u> in this Matter With What the Plaintiff Should Have Known and When:** Right after case 12-CP-1669 had ended, the Plaintiff filed case 14-CA-10278 which was a tortious interference with inheritance case, not a continuation of probate case 12-CP-1669.  Where the decedent's property was going had already been decided (in rem) in case 12-CP-1669.  Case 14-CA-10278 was against Robert Welker and the decedent's personal representative Sybil Murphy from case 12-CP-1669.  Thomas Rydberg was hired by Robert Welker, and paid by CNA Insurance Company (third enterprise) as their agent to file false documents, claiming a violation of the collateral estoppel rule (count preclusion) had occurred, with the Plaintiff already having had his bite at the apple for acquiring the decedent's property in case 12-CP-1669.

Opposing parties with their attorney Thomas Rydberg, as well as Manuel Menendez and Kimberly Cash from the 13th Judicial Circuit, all solicited Bernard Silver with fraudulent statements to commit a fraud on the court.  And he did so, illegally dismissing case 14-CA-10278 once (1) with prejudice on 2-6-15 under Title 18, Chapter 96, Section 1962(c) as a member of the secondary enterprise for the Plaintiff supposedly violating

Florida Statute §733.103(2), **when Robert Welker was clearly not party to probate case 12-CP-1669** and **the Plaintiff was clearly not suing Sybil Murphy again for where the decedent's property was going.** The Plaintiff had no way of knowing that Bernard Silver was working for the secondary enterprise when he defrauded him, monetarily injuring him in his property interest on 2-6-15.

On 2-6-15, Bernard Silver committed violations under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346, but since this fraud on the court could have also been implemented by Manuel Menendez and Kimberly Cash when they slandered the Plaintiff with Bernard Silver per quod around 1-6-15, **the Plaintiff could not discern the nature (underlining purpose) behind Bernard Silver having illegally dismissed case 14-CA-10278 on 2-6-15 other than it was for spite sake.** Either the Plaintiff illegally lost case 14-CA-10278 on 2-6-15 because Bernard Silver wanted to spite him (more likely), or because Manuel Menendez's office instructed Bernard Silver to do so as a member of their enterprise out to defraud the Plaintiff in his property interest as a favor to HCSO. **There was no way for the Plaintiff to have suspected a racketeering activity had been committed during court case 14-CA-10278 by an enterprise out to injure him until a second (2) RICO predicate act was committed on him by either Bernard Silver or another judge within the secondary enterprise (state judicial**

enterprise). At this point in time, the Plaintiff knew nothing about a conspiracy between HCSO and the 13th Judicial Circuit in which HCSO wanted all of the Plaintiff's cases damage out of revenge (something of value). The Plaintiff only knew that on 1-6-15, the local courthouse had slandered him with Bernard Silver and the Plaintiff was being asked by Bernard Silver in court on this day to admit to having made derogatory remarks to the chief judge's office concerning his religion. **There was no way for the Plaintiff to have known that heavy handed Bernard Silver had violated the Plaintiff's civil rights on 2-6-15 as a member of the secondary enterprise other than he wanted to damage the Plaintiff monetarily in case 14-CA-10278 for supposedly insulting his nationality behind his back.** **Hindsight being 20/20, Bernard Silver's having yelled in anger at the Plaintiff on 1-6-15, was a ruse to make the Plaintiff believe that when he illegally dismissed case 14-CA-10278 on 2-6-15, it was done for spite sake and not because the chief judge's office had instructed him to do so.** Even though Lee Pearlman was to blame for the Plaintiff having lost case 12-CP-1669, the Plaintiff did not trust the 2DCA for affirming the **entire** ruling made on 5-15-13, from case 12-CP-1669, case 2D13-4571, filed by Lee Pearlman, and affirmed on 6-6-14, when a murder had occurred.

And since the Plaintiff did not want to waste his time questioning Bernard Silver in his court to try and get to the bottom of why he had illegally dismissed case 14-CA-10278 in the hopes of somehow having his final order correctly voided, he chose to try having Bernard Silver's ruling made on 2-6-15 reversed in federal court, case 8-17-CV-219-7-36MAP, U.S. Middle District of Florida, under Title 42, Chapter 21, Section 1983 for depriving him of his right to sue Robert Welker and Sybil Murphy for tortious interference with inheritance in case 14-CA-10278.   If the Plaintiff could have been court awarded his property interest during case 14-CA-10278, he would not have written this complaint. **Even though the Plaintiff thought that Bernard Silver's false ruling made on 2-6-15 was due to Kimberly Cash and Manuel Menendez having spited him themselves using Bernard Silver, his only option was to sue Bernard Silver in federal court, under Title 42, Chapter 21, Section 1983 for a reversal of his ruling. A couple of people making a false allegation to a judge about a party to spite him or her one time for the pleasure of injuring the party in their property or business, is not racketeering under the RICO Act.** At this point in time, the Plaintiff was going to sustain a monetarily injured in his property by the one (1) clearly illegal ruling made by Bernard Silver on 2-6-15, if he did not take further legal recourse, but the plaintiff did not know that the cause of this

clear abuse of discretion was other than for spite sake due to the Plaintiff having made complaints starting in 12/2014 to the chief judge of the 13th Judicial Circuit (Manuel Menendez) about no one at Bernard Silver's office answering the telephone for weeks, which had nothing to do with Bernard Silver's nationality.

**The RICO predicate act committed in conjunction with Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346, case 14-CA-10278, is tolled under the equitable tolling doctrine due to the Plaintiff having been diligent in the pursuit of justice while being misled into believing that the false ruling on 2-6-15 by Bernard Silver, court case 14-CA-10278, was due to spite.**

Then in case 8-17-CV-219-7-36MAP, when Charlene Honeywell illegally dismissed the Plaintiff's complaint on 5-9-17 against Bernard Silver (a Section § 1983 case), she participated as a member of the secondary enterprise under Title 18, Chapter 96, Section 1962(c) by defrauding the Plaintiff out of his property interest from case 14-CA-10278, when she violated Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346.

**When Charlene Honeywell had also monetarily injured the Plaintiff in his property on 5-9-17, it was the second (2) known RICO predicate act committed by a judge (secondary enterprise) on the Plaintiff which continued to injury him in his property interest from case 14-CA-10278. The Plaintiff already knew on**

185

3-8-16 that there was one (1) injury to his property interests that had been committed on him by the primary enterprise, injuring him on 5-15-13 in probate court, case 12-CP-1669. Hindsight being 20/20, Bernard Silver did in fact defraud the Plaintiff out of property owed to him in case 14-CA-10278 under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346 as a participant in the secondary enterprise under Title 18, Chapter 96, Section 1962(c), **but concealed this fact well by yelling at the Plaintiff on 1-6-15 for supposedly disliking his religion.**

**For simplicity sake in analyzing how the statute of limitations under the Civil RICO Act relates to this matter even though it is tolled indefinitely under both 1) fraud on the court and 2) AATF in a murder under U.S. Code § 1959, on both 3-8-16 and 5-18-16 the Plaintiff figuring that he had, and still was, being defrauded out of his property interest by two different enterprises, respectively by the decedent's caretakers (primary enterprise) and by Florida state judges (secondary enterprise) for two (2) different reasons.**

**40.   The Details of How the Plaintiff Concluded on 3-8-16 and 5-18-16 that He had been Defrauded under the Civil RICO Act Respectively in Cases 12-CP-1669 and 14-CA-10278:**

The Plaintiff filed suit on Lee Pearlman, case 14-CA-12257, for committing malpractice during case 12-CA-1669 and Florida Lawyers Mutual Insurance Company was his malpractice insurance carrier during cases 12-CP-1669 and 14-CA-12257. In the beginning of 3/2016, case 14-CA-12257, the Plaintiff started filing subpoenas on Lee Pearlman, Thomas Rydberg and the decedent's former banking institutions to acquire detailed banking records from each, **but on 3-8-16, Thomas Rydberg made the huge mistake of not only representing his law firm and Sybil Murphy, but unofficially representing Lee Pearlman's interests without Lee Pearlman showing up for court! This was a slap in the Plaintiff face (wakeup call!) and he quickly reevaluated the reason for his having lost case 12-CP-1669 and concluded that Thomas Rydberg had somehow coerced (bribed) Lee Pearlman into throwing case 12-CP-1669.** Thomas Rydberg not only wanted to keep his banking records on the decedent confidential from the Plaintiff, but also wanted to help the one (1) person who had helped him illegally win case 12-CP-1669. **This was a kind of reckless oversight that most attorneys make when they feel that their illegal actions committed during court cases are above the law. And the Plaintiff had his suspicions about what Thomas Rydberg illegally did in case 12-CP-1669 to win it when he started representing Lee Pearlman's interests in case 14-CA-12257 without a notice of appearance filed.**

Hindsight being 20/20, the primary enterprise had gotten away with defrauding the Plaintiff out of his inheritance during case 12-CP-1669 when the decedent's three (3) caretakers made rich Sybil Murphy the personal representative to the decedent's estate to fight the Plaintiff, and she in turn paid agent Thomas Rydberg to win for the primary enterprise. He did this by soliciting Lee Pearlman to throw case 12-CP-1669. This was accomplished when **1)** Lee Pearlman failed miserably to ask Sybil Murphy **any relevant questions** during her deposition, taken on 4-19-13, case 12-CP-1669 when Cyrie Schneider was the one who had murdered the decedent. And **2)** by not filing the Plaintiff's affidavit refuting Thomas Rydberg's summary judgment motion affidavits during case 12-CP-1669. The Plaintiff lost case 12-CP-1669 with prejudice and believed that Lee Pearlman was to blame for being negligent and sued him in case 14-CA-12257 for malpractice. **There was no way for the Plaintiff to have known that Lee Pearlman was working for the primary enterprise by not deposing Cyrie Schneider and failing to file a rebuttal affidavit at least 48 hours before the two (2) summary judgment motion hearings, who planned on defrauding the Plaintiff twice (2) in court to keep him from acquiring his stolen inheritance property.** In the probate final order dated 5-15-13, case 12-CP-1669, written by Thomas Rydberg and signed by Robert Foster, it states that the petitioner's (Plaintiff's) third claim (Florida

slayer statute 732.802) was abandoned. **Abandoned means to castoff or discontinue for a time.** When the Plaintiff read this in the final order, he did not know why he was reading it or what it meant. **Lee Pearlman in court on 7-29-13, page 15 of the filed transcript, case 14-CP-12257, summary judgment rehearing, states "we're only going forwards on the two counts.", after taking about the Plaintiff withdrawing his undue influence count and agreeing to wave this count. Again, the Plaintiff did not know why he was hearing this or what this statement meant since both his incompetency and undue influence counts had supposedly ended on 5-15-13 (hearing on 5-6-13). This was a <u>ruse</u> by Lee Pearlman to make the Plaintiff believe that on 7-29-13, his slayer statute count was <u>not</u> permanently over with so he would not make a scene in court with a court reporter present. <u>No one ever stated in court on 5-6-13 anything about the slayer statute count prior to the signing of the final order on 5-15-13! And there had to be an affidavit filed by opposing parties detailing any reason for this count being dismissed during the summary judgment motion or its dismissal was in violation of the Four Corners rule</u>!**

**<u>The Plaintiff contends that Robert Foster should have never agreed to hear Thomas Rydberg's summary Judgment motion because of the following:</u>**

A motion for summary judgment should be granted when there is **no genuine issue of material fact** (relevancy) and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In other words, Robert Foster thought that there was **1)** no real relevancy in the decedent dying from septic shock when she was being negligently cared for, **2)** the decedent's signature having been forged on Robert Welker's retainer agreement to draft the false inheritance instruments, **3)** the decedent's pneumonia medicine not found in her system, **4)** only $1,200 in the decedent's estate and **5)** no explanation given by opposing parties to any of these facts stated in the Plaintiff's petition. **Was there something in the water Robert Foster was drinking or was he just racketeering? Most Florida trial judges illegally allow summary judgment motions before discovery has finished to defraud parties out of their day in court, basing their illegal dismissals only on unproven allegations!**

**The beauty of Thomas Rydberg's plan of introducing a summary judgment motion before discovery had really started, was to 1) stop the Plaintiff from proving absolutely to the court that the decedent was murdered. And to 2) stop Robert Foster from having to order an investigation into the decedent's murder using law enforcement (HCSO), which both Robert Foster and the primary**

**enterprise did not want to accommodate**. So Robert Foster heard the summary judgment motion before discovery had really started by Lee Pearlman having failed to depose Cyrie Schneider to ask her why she committed aggravated manslaughter on the decedent. **Lee Pearlman was worse that a negligent attorney.   Who needs enemies when you have Lee Pearlman representing you!** Anything Lee Pearlman did as part of a negotiated arrangement he had with Thomas Rydberg (defense counsel) behind the Plaintiff's back that dismissed any part of the Plaintiff's petition in probate case 12-CP-1669 without the Plaintiff knowing or permitting it, injuring him in his property interest, is considered an extrinsic fraud.   **By Lee Pearlman not having argued this issue after reading the proposed final order, he was undeniably part of the extrinsic fraud, if he was not just plain negligent.** Thomas Rydberg having represented Lee Pearlman's interests in court, case 14-CA-12257, on 3-8-16, **without Lee Pearlman present,** resulted in the Plaintiff filing "Amended Complaint 4-15-17" in case 14-CA-12257.   **By beyond reasonable doubt evidence, Thomas Rydberg and Lee Pearlman were members of the primary enterprise during case 12-CP-1669.   The jig was up on 4-15-17, so Thomas Rydberg stopped representing Lee Pearlman interests in case 14-CA-12257.**

Because of the **extrinsic fraud** committed during case 12-CP-1669 by opposing parties, which also included Robert Welker, Thomas

Rydberg and Lee Pearlman, the Plaintiff could not determine until 3-8-16 during case 14-CA-12257, that he had been defrauded by at least one (1) enterprise, but all he could do then was amended his complaint on 4-15-17, case 14-CA-12257, to include fraud counts. The Plaintiff also file a separate fraud complaint around 4-15-17 against Thomas Rydberg, Lee Pearlman, Robert Welker and Sybil Murphy, case 17-CA-4051, but in congruence with the statute of limitations, excluding a fraud on the court or an AATF in a murder, he had to file a RICO complaint before 3-8-20.

**The Plaintiff knew after 3-8-16 that if there was one more RICO predicate act committed by the secondary enterprise to defraud him in any of his property or business interests within the unlucky 13, 13th Judicial Circuit after Bernard Silver did so in case 14-CA-10278, Bernard Silver absolutely did not defraud the Plaintiff for spite sake, but because the chief judge's office at the 13th Judicial Circuit asked him to do so as a secondary enterprise member!** The Plaintiff knew that this was the case when William Levens defrauded him on 4-6-16, case 14-CA-12257. Both judge William Levens and Thomas Rydberg were co-conspirators out to defraud the Plaintiff and did so when they stopped the Plaintiff from obtaining all of the decedent's banking documents, case 14-CA-12257. The Plaintiff felt the storm warnings on **1) 3-8-16** by Thomas Rydberg representing Lee

Pearlman in case 14-CA-12257; **2)** on 4-6-16 by William Levens' false order in case 14-CA-12257; **3)** on 5-18-16 by Mark Wolfe's false order in case 14-CA-12257 and **4)** on 6/2016 by Marcy McDermott being paid off for her part in the decedent's neglect, exploitation and murder cover-up. These were the storm warnings that convinced the Plaintiff that Lee Pearlman was coerced by Thomas Rydberg into **not** filing an affidavit refuting the allegations made in the summary judgment motion affidavits during case 12-CP-1669 to benefit at least one (1) enterprise. Hindsight being 20/20, the Plaintiff had confirmation of local courthouse judges defrauding him as part of a secondary enterprise when both William Levens and Mark Wolfe also signed false orders respectively on 4-6-16 and 5-18-16, defrauding the Plaintiff as two more judges from the 13th Judicial Circuit with Thomas Rydberg once again providing the **government function** of assisting with the needed bogus motions filed for two more presiding 13th Judicial Circuit judges to make two more clearly false ruling on! The Plaintiff knew by 6/2016 that he had until around 3-8-20 to prove on paper what he needed to in order to file a RICO complaint under the Civil RICO Act against the primary, secondary and third enterprises seeking compensation for damages from cases 12-CP-1669 and 14-CA-10278 due to racketeering and not respectively negligence or a onetime spiting as first thought. The reason for the pro-se Plaintiff

not having filed under the RICO Act sooner is because he had **other legal recourse available** since the clear abuse of discretions used to injure him under the RICO Act, were still rectifiable, if he chose to litigate any further.  The Plaintiff also had to educate himself on the current Civil RICO Act rules which took time.  And the Plaintiff wanted to play along with the clearly obvious and pathetic enterprises already involved to see how many more crooked judges, attorneys and insurance agents would look into the Plaintiff's case files to see what the score was, talk to the agents involved who had already injured the Plaintiff, and decide to gladly jump on the band wagon (participate) in defrauding the Plaintiff some more.  Thus, numerous new RICO predicate act were committed **validating** the pattern and purpose of the prior RICO activities that defrauded the Plaintiff out of his business and property interests.  **And the Plaintiff also wanted to find out if there was at least one honest American judge with enough moral conviction not to participate in defrauding him.  If the Plaintiff had found one, you would not be reading this complaint!**

**Damn the crooked American judicial system scam and the bar franchisor, Four Inns of Court at Crown Templar, that first introduced its bar scheme to the world centuries ago.  This organized enterprise knew how to maximize long term profits by putting their corrupted gang members into high level government**

positions while taking over countries.  From positions of power, they have been able to control media conglomerates, keeping their criminal activities from being aired to the public while spewing out disinformation.  What a racket!  Consequently, modern day Templars (banking syndicates and affiliates) have their bought and paid for American presidents, governors, attorney generals and chief supreme court judges, act as pawnbrokers in their vast and varied scams to defraud citizens out of their property which grows the economy while the public grows ever poorer.  The fact of the matter is, some of whatever the American government costs the public, eventually winds up in the Templars' packets.  The more wrong judicial rulings trial judges make (antitrust), the more loot gets laundered by affiliates using commerce based schemes to wind up in the Templars' pockets.  Consequently, the State of Florida allows its citizens to be defrauded by its state judges for increased profits and gains going to he Templars.  Whether property is stolen, converted and then spent, or just spent, the Templars get a percentage due to the economics of the scheme growing the economy.  And depressing the public enough to spend more also grows the economy.  The more citizens get ripped off, the more the economy grows, and the more profits go into the Templars' pockets.  Bastards!  A song that comes to the Plaintiff's mind reflecting what the Templars have given the world when citizens

**need a loaf of bread to eat or some clean water to drink is "Welcome To The Jungle" by Guns N' Roses.**

The Plaintiff sued Bernard Silver within two years (you have 4 years in Florida under Section § 1983) of his 2-15-15 signed ruling during case 14-CA-10278 in federal court, case 8-17-CV-219-7-36MAP, under Title 42, Chapter 21, Section 1983 for deliberately depriving him of his state and federal substantive due process rights (civil rights) when he maliciously applied the wrong case law to his ruling. Charlene Honeywell's ruling on 5-9-17 stated that Bernard Silver had not violated the Plaintiff's civil rights, **and did so without a jury trial.** **Fraud!** Charlene Honeywell implied in her ruling that Bernard Silver did not commit a clear abuse of discretion, but had only erred on 2-6-15 and then illegally dismissed case 8-17-CV-219-7-36MAP! The Plaintiff was once again misled into believing that perhaps he should have pursued another avenue.

The misled Plaintiff had already thought to file under Florida Rules of Civil Procedure (FRCP) 1.540(b)(1) to reverse Bernard Silver's 2-6-15 ruling, this time for supposedly being made in error during case 14-CA-10278, filed on 1-26-16, after Bernard Silver had retired and within a year from his final ruling (2-6-15).

On 5-9-17, the Plaintiff **new absolutely** that he had been injured monetarily in case 14-CA-10278 by a secondary enterprise

196

consisting of Florida statewide judges.  And Charlene Honeywell was one of them, **but the Plaintiff still did not know who the organizers of the secondary enterprise were who had made the Plaintiff their patsy until around 1-1-18.**

After the 4-6-16 and 5-18-16 rulings, case 14-CA-12257, the Plaintiff went back to the beginning of his court battles with unfriendly and unethical judges at the 13th Judicial Circuit and read the transcripts from cases 12-CP-1669, 14-CA-10278 and 14-CA-12257, and knowing what he already knew, saw a sneaky and underhanded pattern of fraud committed on him by district area judges and determined that every judge who had presided on one of the Plaintiff's court cases had ruled favorably on clearly fraudulent pleadings filed by opposing parties, but dismissed every clearly correct pleading with merit submitted to the court by the Plaintiff due to a **genuine conspiracy.**

**The doctrine of inquiry notice is said to trigger the limitations period once there are "storm warnings" sufficient to alert a reasonable investor of possible fraud committed after an injury occurs.** *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.*, 328 F. App'x 695 (2d Cir. 2009) and Mathews, 260 F. 3d 239; *Isaak v. Trumbull Sav. & Loan Co.*, 169 F. 3d 390, 399 (6th Cir. 1999).

The 4 years to file under RICO depends on the plaintiff's ability to discover the injury rather than the predicate acts of

fraud.  *Love v. Nat'l Med. Enters.*, 230 F. 3d 765, 777 (5th Cir. 2000) **(emphasizing that the statute of limitations runs when the plaintiff has reasonable notice of his injury, not the fraud)**; *Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243, 1249 (D. Haw. 2000) (stating that under the injury discovery doctrine, the focus is on the plaintiff's constructive notice of his injury, not on his awareness of the fraud.  **Focusing on the plaintiff's knowledge of the <u>RICO fraud</u> is actually a form of the pattern discovery rule, which the Supreme Court rejected in *Rotella*.**  Tanaka v. First Hawaiian Bank, 104 F. Supp. 2d 1243 (D. Haw. 2000).  **<u>If you do not know that a member of an enterprise has defrauded you in your business or property, you have no reason to suspect that the fraud was due to racketeering committed on you by an enterprise, unless you are told or have a sixth sense.</u>**  **<u>And writing and filing a RICO complaint is extremely more difficult than a common law fraud complaint</u>.**

From cases:  14-CA-10278, on 2-6-15 (final order); 14-CA-12257, on 3-8-16; 16-CA-4693, on 5-2-17 (final order) and 8-17-CV-219-7-36MAP, on 5-9-17 (final order), the Plaintiff **knew absolutely** that the local district area judges were against his winning in any court case **as part of one large diabolically and unconscionable gang of monsters, but he still did not know who was ordering the travesty of false rulings or why.**

Sometime around 1-1-18, the Plaintiff **knew** who all of the crooks were involved in the secondary enterprise and why they were against him being awarded money owed by any court that they could influence.

**41.  Some Older, but Still Applicable RICO Case Laws Cited:**

Bernard Silver discriminated against the Plaintiff under (Title 42, Chapter 21, Section 1985(3), **in the context of this civil RICO matter.**  See *United States v. Beggerly*, 524 U.S. 38, 49 (1998) (Stevens, J., concurring); *accord Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) **(holding that timely filing of discrimination claims is "a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.").**

In *Klehr* 521 U.S. at 194, the Supreme Court resolved the issue by holding that for the purposes of civil RICO, "'reasonable diligence' does matter, and a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" **The *Klehr* court was silent as to whether a plaintiff must also establish due diligence when asserting equitable estoppel on the grounds of non-fraudulent acts, (e.g., murder and accessory after the fact (AATF) in a murder, both of which do not have a statute of limitations).**  Plaintiffs arguing fraudulent concealment must establish that **"(1) the defendant wrongfully concealed material**

facts relating to the defendant's wrongdoing; [and] (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period." Civil RICO claims are subject to a four-year statute of limitations that begins to run <u>"when the plaintiff discovers or should have discovered the RICO injury</u>." See *Merrill Lynch Ltd. Partnerships Litig.*, 154 F. 3d 56, 58 (2d Cir. 1998). *Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F. 3d 23, 36 (2d Cir. 2002) states,

**Misrepresentation of Applicable Laws in Pleadings that Result in a Clear Abuse of Discretion Twice (2) by the Same Enterprise, is Racketeering:**

**Abuse of Discretion:**

<u>A finding</u> is `clearly erroneous' when although there is evidence to support <u>it</u>, "the reviewing court on the entire evidence is left with the definite and firm conviction <u>that a mistake has been committed</u>." *United States v. United States Gypsum Co.,* 333 U.S. 364, 394 -395. A district court **"abuses" or "exceeds" the discretion** accorded to it **when (1) its decision rests on an error of law (such as** <u>application of the wrong legal principle</u>**) or a clearly erroneous factual finding, or (2) its decision —** though <u>not necessarily the product of a legal error</u>, or a clearly erroneous factual finding — <u>cannot be located within the</u>

**range of permissible decisions**. *United States v. United States Gypsum Co.*, 333 U.S. 364, 394 –395.

Discretion is said to be **"abused"** ("exceeded" would be both a more felicitous and correct term) **when the decision reached is not within the range of decision-making authority a reviewing court determines is acceptable for a given set of facts**. This determination that **the range of acceptable decision-making has been exceeded in a particular case is assuredly one of law**, but **it is analytically distinct from a determination that a legal standard applicable to a generality of fact situations has been ignored**, incorrectly applied, or inadequately applied in a **particular case**. *Zervos v. Verizon New York, Inc.*, 252 F. 3d 163, 168 (2d Cir. 2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948)).

**A RICO plaintiff facing a statute of limitations problem should consider arguing that the limitations period should be equitably tolled until it could determine, exercising reasonable diligence, that its injury stems from conduct that was part of a pattern of racketeering**. See, e.g., *McCool v. Strata Oil Co.*, 972 F. 2d 1452, 1465 (7th Cir. 1992) **(noting that equitable tolling may delay the running of the statute of limitations**

**"while a victim diligently investigates the possible existence and extent of a pattern of racketeering")**.

Most courts use the phrases **"affirmative acts" or "active misleading" to require the plaintiff to show that the defendant took affirmative steps to conceal the claim through fraud.** See, e.g., *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F. 3d 226, 237-38 (3d Cir. 2001); *Detrick v. Panalpina, Inc.*, 108 F. 3d 529, 542-43 (4th Cir. 1991); *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n,* 377 F. 3d 682, 689 (7th Cir. 2004); *Pincay v. Andrews*, 238 F. 3d 1106, 1110 (9th Cir. 2001) and *Grimmett v. Brown*, 75 F. 3d 506, 514 (9th Cir. 1996) **(alternating use of "actively misled" with "affirmative conduct" in describing elements of fraudulent concealment).**

The Plaintiff was, and still is, being defrauded by Florida's state judicial enterprise in his property and business interests in 1) appellate case 2D19-1384 (affirmed on 12-27-19) from trial case 17-CA-4051 and 2) in appellate cases 18-CA-1537 from trial case 17-CA-403 and in 3) case 17-CA-6219.

**42.   The Masterminds behind the RICO Predicate Acts in this Matter:**

It was on 3-8-16, during case 14-CA-12257, that the Plaintiff started adding up the pieces of the shim sham puzzle of what

really went wrong to have ended case 12-CP-1669 in favor of opposing parties, when Lee Pearlman who had a Doctor of Jurisprudence Degree (J.D.) and supposedly graduated law school with honors, should have known better than not to have filed a rebuttal pleading twice (2) with an affidavit for the Plaintiff in refuting the allegations in the summary judgment motion filed in case 12-CP-1669, on 3-20-13. **And if Lee Pearlman did not believe that the Plaintiff was entitled to his share of the decedent's property, then he should not have taken the case or withdrawn as the Plaintiff's counselor.** The Plaintiff filed "Amended Complaint 04-15-17" on Lee Pearlman in case 14-CA-12257 on about 04-15-17, and then filed a similar complaint on Thomas Rydberg and his three accomplices from probate case 12-CP-1669 around 04-15-17, case 17-CA-4051.

During the months spent writing "Amended Complaint 4-15-17" (case 14-CA-12257) and thinking about how all of the Plaintiff's judges were **so way off base** in their rulings that **someone more powerful than a circuit court trial judge**, working from outside the 13th Judicial Circuit had to have been calling the **shots** in defrauding the Plaintiff, **but who had enough authority over the 13th Judicial Circuit's chief judge's office and enough hatred for the Plaintiff to have done so?**

**The Plaintiff then remembered the incident during his guardian advocate court proceeding, case 12-CP-249, having to do with his**

**mentally compromised friend, Ms. Kimball, back in 2/2012.** In 2/2012, **HCSO had snapped it fingers and got an emergency hearing with Claudia Isom, probate and guardianship judge, to have the Plaintiff's guardianship illegally revoked and she obeyed.** In 2/2012, HCSO ignored the Plaintiff's letters of guardianship and continued to injure Ms. Kimball by giving her bad medications until her face was scared while she was in their custody. And when the Plaintiff complained to the detention commander, Colonel James Previtera at HCSO, he had two (2) of his HCSO goons at the Plaintiff's house with their guns drawn looking for a reason to **shoot him**! Tampa Police Department (TPD) and Florida Department of Law enforcement (FDLE) had to be called into the matter by the Plaintiff in order for the death threats and harassment to stop, but in the end, Claudia isom illegally revoked the Plaintiffs letters of guardianship.

**What happened here is absolute confirmation of the power given to HCSO by the governor's office to damage the public at will and the very special relationship that HCSO has with its courthouse judges that it protects and controls for profit and gain (something of value)! Even with the Plaintiff's many complaints to Chief Judge Manuel Menendez's office through his secretary Kimberly Cash around 3-1-12, nothing was done about the illegal activities involving Claudia Isom and HCSO at the 13th Judicial Circuit during case 12-CP-249, on 3-1-12.** After

the Plaintiff remembered having gotten nowhere with Manuel Menendez and Kimberly Cash, he also figured out before 4/2017 that the denial of his state and federal substantive due process rights in case 14-CA-10278 by accomplice Bernard Silver on 2-6-15, and in case 14-CA-12257 by both accomplice William levens and Mark Wolfe having defrauded the Plaintiff respectively on 4-6-16 and 5-18-16, were from Ronald Ficarrotta instructing them to do so as the chief judge of the 13th Judicial Circuit, from 2015 to present. **HCSO did not want to conduct an investigation into the decedent's murder for the Plaintiff having fingered James Previtera's illegal operational procedures at HCSO in 2/2012 with FDLE, so Sheriff David Gee had the chief judge's office instruct the trial judges to dismiss the Plaintiff's court cases slowly and illegally, monetarily injuring him.**

David Gee had blacklisted the Plaintiff at both HCSO and at the 13th Judicial circuit for having gotten Colonel James Previtera immediately reassigned and then terminated through FDLE beginning in 3/2012. Around 4/2017, there were way too many judges clearly defrauding the Plaintiff without there being a common purpose and a single source of instructions for so many of them in the local circuit to have made so many blatantly false rulings without fear of being made to see a psychiatrist and then terminated.

The only people who had **full control** over all of the judges in the circuit for racketeering purposes were Manuel Menendez and Ronald Ficarrotta. **These two crooks had been calling the shots as the ringleaders in a corrupt enterprise of racketeers, indorsed and approved by the acting chief judge of the Florida Supreme Court, Rick Scott and Pamela Bondi, all out to deprive the Plaintiff of his state and federal substantive due process rights for an all too obvious and childish reason, which was to help HCSO get even with the Plaintiff for mere satisfaction purposes (something of value).**

The term racketeers used in this complaint is not to be confused with musketeers, mouseketeers or rocketeers.  These are the good guys.  The Plaintiff finally figured out on 3-8-15 that Sybil Murphy, with her attorneys Thomas Rydberg and Robert Welker from probate case 12-CP-1669, including the Plaintiff's attorney Lee Pearlman, were by beyond reasonable doubt evidence, **all part of the same primary enterprise.**  Unknown to the Plaintiff until 5-18-16, Robert Foster was informed of the RICO plan to defraud the Plaintiff by Manuel Menendez (secondary enterprise) in court case 12-CP-1669.   Robert Foster knew he had illegally helped cover-up the decedent's murder when he ended the probate case **with prejudice** after turning a blind eye to the extrinsic fraud that was committed on the Plaintiff by the primary enterprise before discovery into the decedent's murder had really started,

**so he would not be obligated to look at the evidence and order an investigation into her murder.** Opposing parties and their attorneys winning case 12-CP-1669 was accomplished **not** by way of negligence as first thought by the Plaintiff, but by way of an extrinsic fraud in which the Florida Slayer Statute (732.802) count was dismissed in the final order without the Plaintiff knowledge or consent. **The Plaintiff never gave written permission to the clerk of the court, dismissing the slayer statute count in case 12-CP-1669 and neither did his attorney Lee Pearlman! And Robert Foster had no legal authority to have ordered the Plaintiff's murder count dismissed, unless opposing parties had filed an affidavit to this effect and a hearing discussing at least one (1) good reason for dismissing the murder count resulted in a ruling by Robert Foster to do so! So Robert Foster also wanted case 12-CP-1669 illegally dismissed, but as a member of the secondary enterprise. Robert Foster let the primary enterprise defraud the Plaintiff using his attorney because he did not have a fiduciary duty to the Plaintiff to intervene.**

Leading up to 4/2017, in case 14-CA-12257, both accomplices William Levens and Mark Wolfe helped illegally limit what evidence the Plaintiff could subpoena. With William Levens, it was **stopping the Plaintiff from obtaining both medical and banking records on the decedent to prove she was not taken to a**

**doctor while she was being killed and her estate devalued by $1,058,800. The Plaintiff also filed a motion in case 14-CA-12257 to compel Robert Welker to divulge his case file records in order to prove that his retainer contract with the decedent was forged by Cyrie Schneider.** A hearing on this motion was never given by William Levens, who also refused to order Defendant Lee Pearlman to provide the Plaintiff with his complete case file records. **This allowed Lee Pearlman to hold out on providing the Plaintiff with a copy of the $160,000 bank account, given to him by Thomas Rydberg, as proof of the decedent's devalued inventory and stolen assets.**

With Mark Wolfe, it was the decedent's banking records. **Mark Wolfe issued an order disallowing the decedent's banks to provide the Plaintiff with any of her banking records that went back any further than one (1) year from her death, when the Plaintiff was next of kin to the decedent and needed at least 20 years worth of the decedent's banking information to begin trying to find out where her missing $350,000 went. <u>Fraud</u>!** In committing these violations, accomplices William Levens, Mark Wolfe, Lee Pearlman with Florida Lawyers Mutual Insurance Company (FLMIC) and Thomas Rydberg continued to violate both the Plaintiff's and decedent's state and federal substantive due process rights in the **<u>tradition of excellence</u>** first committed on the Plaintiff by Bernard Silver and Claudia Isom, respectively

tortious interference case 14-CA-10278 and guardianship case 12-CP-249. **Mark Wolfe, William Levens, Thomas Rydberg (with possibly CNA, if he was still working for them), Lee Pearlman and FLMIC, up to this point, committed spoliation of the decedent's banking record evidence.**

The Plaintiff figured out around 4/2017 that there was a bonafide conspiracy to defraud the Plaintiff by every elected official, colleague, attorney, affiliate and insurance company that came out of the woodwork to help Florida's state judicial enterprise (secondary enterprise) ruin all of the Plaintiff's cases, until there were no more legal actions left for him to take in acquiring the stolen property owed to him, **but during this time, he could not figure out who initially wanted him monetarily injured and for what reason.**

### 43.  Hindsight is always 20/20 to the Diligent:

In the beginning of 2018, the Plaintiff received confirmation as to why HCSO had refused to do an investigation into the murder of the decedent, notably starting in mid. 2015 when the Plaintiff first thought to put some pressure on HCSO to finally investigate the decedent's murder by complaining to all of the state agencies affiliated with HCSO.

During a telephone conversation with ABC, Inc. (Disney) reporter Adam Waiser around 1/2018, he stated that an investigation into

why HCSO had refused to investigate the decedent's murder was conducted by another ABC, Inc. news reporter working at HCSO (crookedly suspicious), in which HCSO had solicited the 13th Judicial Circuit (offices of both Manuel Menendez and Ronald Ficarrotta) to circumvent any judicial inquiry going to HCSO to investigate the decedent's murder and to keep the Plaintiff from deposing any HCSO officer!  Adam Waiser also stated that there was a special relationship between HCSO and the 13th Judicial Circuit, so anything illegal that HCSO wanted covered up in the courthouse, would be implemented.  **Adam Waiser stated that Ronald Ficarrotta was 1) not about to let a pro se litigant prove a conspiracy against Sheriff David Gee, especially if he had been in bed with him.  And consequently, Ronald Ficarrotta was also 2) not going to allow any of his judges to allow Chad Chronister or any other HCSO employee to be deposed by the Plaintiff, so no one at HCSO could implicate either David Gee or himself (Ronald Ficarrotta) as an accessory after the fact in the murder of the decedent!**

By beyond reasonable doubt evidence, HCSO had asked Ronald Ficarrotta in early 2018, to have Richard Nielsen in case 14-CA-12257, along with Paul Huey, Elizabeth Rice, Catherine Catlin and the other judges from the local courthouse who were hearing the Plaintiff's court cases during 2018, illegally dismissed either the Plaintiff's motions or cases by ruling against him at

every hearing.   Even cases that had nothing to do with the decedent's murder, like cases 17-CC-403 (Joelle Ober) and 17-CA-6219 (Elizabeth Rice), were being illegally dismissed.   The Plaintiff could no longer take Sheriff Chad Chronister's deposition, or any other HCSO deputy's deposition, after HCSO contacted the 13th Judicial Circuit right before 1-24-18, during case 14-CA-12257, and before 4-8-18, during case 17-CA-4051. And HCSO indirectly had the 2DCA Chief Judge Edward LaRose, through the offices of Jorge Labarga, Florida Supreme Court Chief Judge and the chief judge at the 13th Judicial Circuit, Ronald Ficarrotta, illegally PCA the Plaintiff's 2DCA appealed cases filed in 2017 and 2018, which were:   Cases 2D17-2243, 2D17-2725, 2D18-694, 2D18-1889, 18-CA-1537, 2D18-4761 and 2D18-1538.

**Adam Waiser did not say why HCSO did not want to investigate the decedent's murder, but the Plaintiff knew why.   FDLE had embarrassed Sheriff David Gee when he was given a firm recommendation to terminate Colonel James Previtera from HCSO. And after David Gee had retired from HCSO in 9/2017, his friend Chad Chronister was just continuing to get even with the Plaintiff**.

In early 2012, both Claudia Isom and Paul Huey the presiding judge after the Plaintiff recused Claudia Isom, on 4-25-12, from case 12-CP-249, assisted HCSO in permanently revoking the

Plaintiff's letters of guardianship in case 12-CP-249.  When the decedent was murdered in 7/2012, Claudia Isom was the probate judge who was first informed of the decedent's murder by way of the Plaintiff recusing her from case 12-CP-1669 on 8-6-12. Claudia Isom in turn told her contacts within the chief judge's office of the money owed to the Plaintiff by way of Florida slayer statute 732.802.

**HCSO asked the courthouse sometime after 2/2012, through the chief judge's office, to damage the Plaintiff's cases at both the 13th Judicial Circuit and the 2DCA, <u>depriving him of money owed, just like the Plaintiff had deprived Colonel James Previtera of money earned.</u>**

**<u>"An eye for an eye, and a tooth for a tooth", along with "What goes around, will come back around" were stated to the Plaintiff by one of the two HCSO goons, who in 2/2012, was looking to shoot him at his address.  The same two HCSO gang members who wanted to shoot the Plaintiff in 2/2012, went out to meet him in the courthouse caught on camera during case 10-CF-012263-A, on 4-5-12, when they knew he would be there, just to let him know that HCSO was going to get even with him</u>**.  At this point in time, the Plaintiff did not know James Previtera had been removed from his detention position and was eventually going to be terminated from his employment at HCSO, or when his friends there were going to injure him, but he knew they would, if given

the opportunity. The Plaintiff recused Claudia Isom as the presiding judge on case 12-CP-1669, but since the cat was out of the bag on the Plaintiff being entitled to **slayer statute amounts of money in his petition,** by beyond reasonable doubt evidence, David Gee had the 13th Judicial Circuit through Manuel Menendez, told Robert Foster to illegally dismiss case 12-CP-1669, **but he did not have to, Lee Pearlman and Thomas Rydberg from the primary enterprise had already beaten him to the punch!** All of the judicial accomplices have been part of the same childish and illegal snitch niche against the Plaintiff since 2012, when Colonel James Previtera was unwillingly asked by Sheriff David Gee to find other employment. **The last time the Plaintiff talked with Adam Waiser, he stated that he would lose his job and career, if he pushed any further for the decedent's story to air and then disconnected the telephone call. Consequently, around the beginning of 2018 the Plaintiff knew why the endless pattern of RICO predicate acts had been committed and would be continuing forever, compliments of the governor's office! If State of Florida employees David Gee and Manuel Menendez, had been committing obvious illegal acts, they were absolutely approved by the governor and seconded by the flunky attorney general! The Plaintiff confirmed this to be true when he sent Rick Scott and Pamela Bondi all the proof they needed by USPS certified mail, and they turned a blind eye to**

their fiduciary duty to act appropriately. Respectively on 11-19-18 (USPS 70182290000075887042) and 8-9-18 (USPS 70173380000052003137).

Under the traditional federal accrual principle, a statute of limitation period does not begin to run until the cause of action is **complete**, when the final fraudulent act monetarily injuring the plaintiff has been committed **(when the victim in a court case either stops litigating the claims, or has reached the end of their legal remedies)**. See, e.g., *Rawlings v. Ray*, 312 U.S. 96, 98 (1941); *Clark v. Iowa City*, 87 U.S. 583, 589 (1874). *Isaak v. Trumbull Sav. & Loan Co.*, 169 F. 3d 390, 396-97 (6th Cir. 1999) **(concluding that plaintiffs had standing to bring RICO action when camping resorts filed for bankruptcy, because "bust-out" scheme to defraud buyers was complete by the final fraudulent act of placing the property into bankruptcy)**.

**And in any case, fraudulent concealment tolls the statute of limitations in a RICO cases. Under Rule 9(b), the Plaintiff was defrauded right out of case 12-CP-1669 by the accomplices committing an extrinsic fraud on him, found out on 3-8-16 and documented around 4-15-17, cases 14-CA-12257 and 17-CA-4051. And then again the Plaintiff was defrauded out of reopening case 12-CP-1669 with new evidence on 5-16-16 and again on 5-4-17 by both the local courthouse probate judges respectively Robert Bauman and Catherine Catlin. And in 2DCA case 2D17-2725, by the**

**three judge panel having affirmed Catherine Catlin's order on 6-8-18 not to reopen case 12-CP-1669, complements of Edward LaRose (Title 18, Chapter 96, Sections 1962(b & c)), Marva Crenshaw and Susan Rothstein-Youakim.**

**Plaintiffs have been allowed to bring RICO actions for acts of** <u>**public corruption**</u> **that resulted in pecuniary (monetary) injury to them.** *Envtl. Tectonics v. W. S. Kirkpatrick, Inc.*, 847 F. 2d 1052, 1067 (3d Cir. 1988); **(business competitor had standing to challenge defendant's** <u>**alleged use of bribery**</u> **of foreign government officials to obtain contracts),** judgment aff'd, 493 U.S. 400 (1990); *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F. 2d 1263, 1268 (3d Cir. 1987) **(land developer allowed to bring RICO action for injuries sustained from defendants'** <u>**bribery of town officials**</u>**)** and *Bieter Co. v. Blomquist*, 987 F. 2d 1319, 1327 (8th Cir. 1993) **(permitting builder to pursue RICO claim** <u>**where alleged bribery of public officials**</u> **raised issue of fact concerning proximate cause of builder's injury from failure to obtain rezoning).**

Together, all of the Defendants and their accomplices were part of the scheme to deprive the Plaintiffs from obtaining money owed to them, damaging them in their property and business interests, by illegally denying them and the decedent their state and federal substantive due process rights. **<u>The court rejected the notion that business or property interests harmed</u>**

215

**by a defendant's acts must actually be the target of the predicate act, and remanded the case to determine if the plaintiff could satisfy the remaining aspects of his claim**. *Diaz v. Gates*, 420 F. 3d 897 (9th Cir. 2005), Id. at 900-03. **A RICO action may be maintained even if the "injury to business or property" is not the predominant injury alleged.** *Northeast Women's Ctr., Inc. v. McMonagle,* 868 F. 2d 1342 (3d Cir. 1989), Id. at 1349.

Hindsight being 20/20, James Previtera and David Gee, acted respectively through Claudia Isom and Manuel Menendez in 2012 as co-conspirators under Title 18, Chapter 96, Section 1962(d) to all of the counts stated in Sections 1 and 4. And by beyond reasonable doubt evidence, David Gee had instructed the secondary enterprise (state judicial enterprise) to defraud the Plaintiff and decedent in violation of Title 18, Chapter 96, Section 1962(d) after 2/2012.

On 10-9-18, Chet Tharpe came up with a uniquely clever fraud tactic not used before by Florida's state judicial enterprise when he tried to extort money out of the indigent Plaintiff in case 18-CA-1537 by demanding that he start paying off a $108.50 transcript fee for a copy of the lower court's case record, **or he would not hear the case. Derekiction of duty and extortion**! The Plaintiff received permission by the courthouse under Florida Statutes 57.081(1) to be exempt from any upfront

appellate fee when it indexed (transcribed) the lower case file (17-CC-403) as part of the appellate process.   Case 18-CA-1537, from case 17-**CC**-403, was the plaintiff's product liability appeal, which had nothing to do with the decedent's murder, but was illegally stopped by Chet Tharpe to continue the pattern of RICO predicate acts, in the **tradition of excellence**, committed under Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346 (honest services fraud) by the Florida's state judicial enterprise, to monetarily damaging the Plaintiff in his business interest into 2020.

The new angle that Florida's state judicial enterprise is currently using to defraud the Plaintiffs with in their court cases, has courthouse confederates (judges and lawyers) make up a reason having nothing to do **specifically with the actual merits of the cases in order to illegally stop the court cases from progressing.**   This is what happened in case 17-CA-4051, where Elizabeth Rice dragged this case out 1.5 years and then illegally dismissed it on 3-19-19 **for the Plaintiff not rewriting the complaint the way she wanted it rewritten. Twistedly demonic!**   And Elizabeth Rice implemented the same method of injuring both Plaintiffs in case 17-CA-6219 until she was removed from the division by the state judicial enterprise around 12-19-19 for being too obvious in her defrauding tactics.

**44.  Economic Motive:**

In *National Organization for Women, Inc. v. Scheidler*, 510 U.S.
249 (1994), the Supreme Court resolved an ongoing dispute among
the federal courts of appeals by holding that neither a RICO
enterprise nor the predicate acts of racketeering must have an
economic motivation. Prior to the Supreme Court's decision,
three circuits, including the Seventh Circuit in *Scheidler v.
National Organization for Women, Inc.*, had concluded that the
RICO enterprise (or at least the predicate acts) must have an
economic motive.   In a unanimous decision, the Supreme Court
reversed the Seventh Circuit and held that **no proof of economic
motive is required.**  The Court concluded that the plain language
of § 1962(c) and the definition of "pattern of racketeering
activity" in § 1961(1) provide **no indication that an economic
motive is required.**  The Court rejected the Seventh Circuit's
conclusion that because the use of the term "enterprise" in §
1962(a) and (b) is tied to economic motivation, the same term
should be applied to restrict the breadth of § 1962(c).   The
Court reasoned that because the "enterprise" in § 1962(c) is not
being acquired and instead is the vehicle for the commission of
the racketeering activity, "it need not have a property interest
that can be acquired nor an economic motive for engaging in
illegal activity; **it need only be an association in fact that
engages in a pattern of racketeering activity.**"

**45.  18 U.S. Code § 1964 - Civil Remedies:**

**(a)** The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter **by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise;** imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, **making due provision for the rights of innocent persons.**

**(b)** The Attorney General may institute proceedings under this section.  Pending final determination thereof, the court may at any time **enter such restraining orders or prohibitions,** or take such other actions, including the acceptance of satisfactory performance bonds, **as it shall deem proper.**

**(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees,** except that no person

may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

**(d)** A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States. (Added Pub. L. 91-452, title IX, §901(a), Oct. 15, 1970, 84 Stat. 943; amended Pub. L. 98-620, title IV, §402(24)(A), Nov. 8, 1984, 98 Stat. 3359; Pub. L. 104-67, title I, §107, Dec. 22, 1995, 109 Stat. 758.)

**46.** RICO requires "a person" who violated or conspired to violate under **§ 1962(a) to be the principle** of the company or enterprise, and to violate under **§ 1962(b) to manage the company** or enterprise and to violate under **§ 1962(c) to be an associate or affiliate** of the company or enterprise.

**47.**   The Senate Report regarding Section 1959 states that any person who **aids and abets a violation** of the listed underlying **crimes of violence is also liable for a Section 1959 violation** "**under 18 U.S.C. § 2**" **(the acts of the perpetrator become the acts of the aider and abettor) in** addition to "**the person who actually commits or attempts the offense.**"   S.   Rep.   No.   98-225 at 307.   Thus, Congress manifested its intent that federal law of aiding and abetting applies to Section 1959.   In accordance with this legislative history, all of the courts that have decided the issue have held that **a person may be liable for a Section 1959 violation on the ground of aiding or abetting**. Therefore, a defendant may be liable under Section 1959 for the commission of a **crime of violence** for having **aided and abetted another person's efforts to gain entrance to, or maintain or increase that person's position in an enterprise, even though the defendant does not seek to gain entrance to, or maintain or increase his own position in, an enterprise (§ 1962(c)).**   See, e.g., *Frampton*, 382 F. 3d at 222-23.   This principle not only flows from the law on aiding and abetting, but also **stems** from the well settled principal that **a defendant may be liable for a conspiracy to violate (§ 1962(d)) a law even if he may not be liable for a substantive violation of the law because he does not fall within the category of persons who could commit the substantive offense directly.**   See, e.g., *Salinas v. United*

*States*, 522 U.S. 52, 64 (1977) ("[A] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense.") (citing *United States v. Rabinovich*, 238 U.S. 78, 86 (1915)). See, e.g., *Frampton*, 382 F. 3d at 222-23 (applying 18 U.S.C. § 2); *Khalil*, 279 F. 3d at 109 367-370; (same); Diaz, 176 F. 3d at 96-97; *Houlihan*, 92 F. 3d at 1293; *Matta-Ballesteros*, 71 F. 3d at 765 n. 8, 771; *Hoyte*, 51 F. 3d at 1245; *Locascio*, 6 F. 3d at 941; *Concepcion*, 983 F. 2d at 383-84 (applying 18 U.S.C. § 2) and Cf., *Marino*, 277 F. 3d at 29-32 (suggesting, but not holding, that state law applies).

**48.   "To be found guilty of the crime of aiding and abetting a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed."**   *Khalil*, 279 F. 3d at 369, quoting *United States v. Martin*, 920 F. 2d 345, 348 (6 Cir. 1990). See also *Concepcion*, 983 F. 2d at 383 ("To secure a conviction on a theory of aiding and abetting in violation of [18 U.S. Code § 2(a)), **the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required the defendant to act, with the specific purpose of bringing about the underlying crime . . . . Under 18 U.S. Code § 2(a), an aider and abettor**

must share in the principal's essential criminal **intent**, [and] the principal must be shown to have **had the essential** criminal **intent**.") (internal quotations and citations omitted). This requirement that the defendant **must share** the same criminal **intent** as the principal is especially significant as it applies to aiding and abetting a Section 1959 violation **because "[t]he intent necessary to support a conviction for aiding and abetting goes beyond the mere knowledge that the defendant's action would tend to advance some nefarious purpose of the principal. Rather, the defendant must act with the specific intent of facilitating or advancing the principal's commission of the underlying crime**." *Frampton*, 382 F. 3d at 223. **The defendant knew that the principal he was aiding and abetting was seeking to gain entrance to, or maintain or increase his position in, the enterprise and "acted toward that end**." *Frampton*, 382 F. 3d at 223.112.


49. *Pinkerton* Liability Doctrine:

Under the Pinkerton Liability Doctrine, **a defendant is a principal when he consciously shares in any criminal act, whether or not there is a conspiracy**. In *Pinkerton v. United States, 328 U.S.* 640 (1946), defendant Daniel Pinkerton and his brother were charged with conspiracy to violate the tax laws and with two substantive tax violations. Although no evidence was

introduced showing that Daniel Pinkerton participated directly in the commission of the substantive offenses, the district court instructed the jury that each defendant could be found guilty of the **other's** substantive offenses, if they were **both part of the same criminal conspiracy** and "the acts referred to in the substantive counts **were acts in furtherance** of the unlawful **conspiracy or object** of the unlawful conspiracy." Id. at 645 and n. 6.  **The Supreme Court upheld Daniel Pinkerton's conviction under a theory of co-conspirator liability, but cautioned that the case would be different "if the substantive offense committed by one of the conspirators was not in fact done in <u>furtherance of the conspiracy</u>, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be <u>reasonably foreseen</u> as a necessary or natural <u>consequence of the unlawful agreement</u>." Id. at 647-648.**  The instruction upheld in Pinkerton did not explicitly state that a defendant is liable under the Pinkerton doctrine for the substantive acts of his co-conspirators, only if those acts were **"reasonably foreseeable."** Some circuits, however, have indicated that a Pinkerton instruction must explicitly include "reasonable foreseeability" language even though that language did not, in fact, appear in the jury instruction in Pinkerton itself.  **In any event, the common and better practice is to include such 113 "reasonable**

foreseeability" language in a **Pinkerton** instruction. Moreover, the government may not rely on the Pinkerton doctrine unless the jury is "instructed in terms of that theory." *Pereira v. United States*, 347 U.S. 1, fn. at 10 (1954) and *Accord Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949). **Applying these principles, courts have held in Section 1959 prosecutions, that a defendant may be convicted of an underlying crime of violence (murder) in violation of state law under the federal Pinkerton doctrine.** <u>**All of the Defendants cited in Section 7 are guilty of having violated Section § 1959**</u>. See, e.g., *Diaz*, 176 F. 3d at 99-100; *Tse*, 135 F. 3d at 206-07; *United States v. Katona*, 204 F. Supp. 2d 410, 412 (E.D.N.Y. 2002) and Cf., *United States v. Carrozza*, 55 F. Supp. 2d 84, 87-89 (D. Mass. 1999).

**49.5  Respondeat Superior Doctrine:**

Respondeat superior (Latin: **"let the master answer"** is a doctrine that a party is responsible for (has vicarious liability for) the acts of their agents. Criminal Law - Cases and Materials, 7th ed. 2012, Wolters Kluwer Law & Business; John Kaplan, Robert Weisberg, Guyora Binder, ISBN 978-1-4548-0698-1. For Example, in the United States, there are circumstances when an **employer is liable for the acts of employees performed within the course of their employment.** Harger, Lloyd. "Workers' Compensation, A Brief History". Florida Department of Financial

Services.   Retrieved 22 June 2010.   This rule is also called the master-servant rule, recognized in both common law and civil law jurisdictions.   Owen, Ralph Dornfeld.   "Tort Liability in German School Law".   Law and Contemporary Problems.   Duke University School of Law.   20 (1):   72-79. JSTOR 1190275.

**Respondeat superior is a legal doctrine, most commonly used in tort, that holds an employer or principal (company, owner or even a supervisor) legally responsible for the wrongful acts of an employee or agent, if such acts occur within the scope of their employment or agency.**   Typically when respondeat superior is invoked, a plaintiff will look to hold both the employer and the employee liable.   As such, a court will generally look to the **doctrine of joint and several liability** when assigning damages.

**Joint and Several Liability:**

Joint and several liability is a rule followed in **all federal courts** (Federal Rule 19) and some states, in which two or more parties can be held **independently liable** for the full amount of a personal injury plaintiff's damages, **regardless of their respective degrees of fault (federal Rule 19).**   The parties that are found responsible for the accident are known as tortfeasors. Under the joint and several liability rule, a single tortfeasor can be held responsible for the total amount of damages **even if**

**he or she is only responsible for the plaintiff's injuries to a small degree.** If the plaintiff collects from only one jointly and severally liable defendant, that defendant can pursue the other responsible parties for contribution. Usually, the defendants' liability for damages is reduced to the extent that the plaintiff was negligent. Not all states follow the rule of joint and several liability, and many follow a hybrid rule.

**50. Accessory after the Fact under Title 18, U.S. Code 3: Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.** Courts have held that under this provision, **a defendant may be convicted as an accessory after the fact to a violation of Section § 1959,** provided the government proves: **(1) the commission of an underlying offense against the United States [i.e., § 1959] by [another person], (2) the defendant's knowledge of that offense, and (3) assistance by the defendant, in order to prevent the apprehension, trial, or punishment of the offender (Title 18, U.S. Code § 3).** *Cuong Gia Le*, 310 F. Supp. 2d at 779. *Accord United States v. Malpeso*, 115 F. 3d 155, 163-64 (2d Cir, 1997).

**51.   RICO "is a unique cause of action that is concerned with
eradicating organized, long-term, habitual criminal activity."**
*Crest Constr. II, Inc. v. Doe*, 660 F. 3d 346, 353 (8th Cir.
2011) (quoting *Gamboa v. Velez*, 457 F. 3d 703, 705 (7th Cir.
2006)).    A properly stated RICO claim in the Eighth Circuit
must allege the following four elements:   **"(1)** conduct **(2)** of an
enterprise **(3)** through a pattern **(4)** of racketeering activity."
*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).


**52.   Conduct:**

The first element of RICO is conduct.   This element is extremely
straightforward   and   rarely   litigated   in   court.   It   simply
requires the defendants who **participated** in the enterprise to
**carry out the directions of the enterprise.**


**53.   Enterprise:**

An 'enterprise' is defined in 18 U.S.C Section 1961 (4) to
include "any individual, partnership, **corporation, association,**
or other **legal entity,** and **any union or group of individuals
associated in fact although not a legal entity"**. The Eighth
Circuit requires **"an ascertainable structure distinct from the
conduct of a pattern of racketeering."** *Crest Constr. II, Inc.*,
660 F. 3d at 354 (quoting *United States v. Lee*, 374 F. 3d 637,
647 (8th Cir. 2004)).   Further, **"an enterprise cannot simply be**

the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." Id. (quoting *United States v. Bledsoe*, 674 F. 2d 647, 664 (8th Cir.), cert. denied, 459 U.S. 1040 (1982)). **An enterprise must still exist without the illegal conduct.** This does not mean that simply the members must exist, but rather **the enterprise itself exists and maintains structure.** In *United States v. Bledsoe*, the Eighth Circuit held that an association-in-fact enterprise must exhibit three characteristics: (1) **a common or shared purpose among its members;** (2) **some continuity of structure** and personnel; and (3) **an ascertainable structure distinct from that inherent in the pattern of racketeering.**


54. **Pattern:**

**A 'pattern of racketeering activity' requires at least two acts of racketeering activity. 18 U.S.C. § 1961(5).** However, the Eighth Circuit has held that **multiple acts of racketeering may not be enough.** See *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989). **The acts must "amount to or pose a threat of continued criminal activity."** *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-39 (1989). This continuity requirement can be established by showing either closed-ended or **open-ended continuity (the continual defrauding of the Plaintiff in his cases forever more by the Florida's**

**state judicial enterprise)**.   At minimum, the predicate acts for close-ended continuity must span a period of "at least one year." **Open-ended continuity**, however, does not require that the acts span for a certain period of time.   Rather, the racketeering acts must **"include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business**."   See *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 242 (1989).

55. **Racketeering Activity:**

The element of 'racketeering activity' is extremely broad.   The statute includes **murder**, kidnapping, gambling, arson, robbery, **bribery, extortion**, or a list of many other criminal statutes. The more common statutes include **fraud**, obstruction of law enforcement, forgery, and trafficking statutes.   It is impossible to have a racketeering claim without finding the defendant guilty of another criminal violation.   Heightened civil and criminal penalties of RICO are reserved for **schemes whose scope and persistence** set them above the routine.

56. **Association-in-Fact Enterprise:**

**Any group of entities or individuals that is "associated in fact" may be a RICO enterprise.**   Historically, many courts required the association-in-fact enterprise to have some

structure or hierarchy and an ongoing legitimate purpose that was different from a group that is joined solely to violate RICO.   In *United States v. Bledsoe*, the Eighth Circuit held that **an association-in-fact enterprise must exhibit three characteristics:   (1)** a common or shared purpose among its members; **(2)** some continuity of structure and personnel; and **(3)** an ascertainable structure distinct from that inherent in the pattern of racketeering.

**57.   Evidentiary Facts and Actionable Claims in Support of the Counts with Evidence in Appendices:**

**A Brief Introduction:**

What the co-conspirators in the primary and secondary enterprises, along with the CNA Insurance Company did not foresee when they respectively defrauded the Plaintiff on 5-15-13, 7-29-13 and 6-6-14, case 12-CP-1669 and on 2-6-15, case 14-CA-10278, was the **diligent and relentless Plaintiff** filing new complaints with different counts and claims that addressed both the same underlying inheritance money stolen from him and the decedent's murder cover-up that unfortunately for them, reiterated over and over again **what they illegally participated in!   The more accomplices who were suckered into helping the existing crooked participants fight the Plaintiff in ending his**

231

**new cases as 1) accessories to both honest services frauds and 2) covering up the prior racketeering activities committed by the state judicial enterprise and their co-conspirators or lose their standing as affiliates in multiple enterprises, the more RICO predicate acts that were committed by the ever growing number of enterprise members from each enterprise, who by participating in defrauding the Plaintiff, would in turn make themselves, their supervisors and their companies liable for the Plaintiff's damage amounts and <u>undeniably</u> prove the Plaintiff's racketeering counts and claims.** This allowed for over forty (40) RICO predicate acts to be committed and documented as the state judicial enterprise continued implementing their scheme to defraud the Plaintiffs **using officers of the court,** while covering up their prior racketeering activities, again and again.

Ronald Ficarrotta had Joelle Ober ended case 17-CC-403 on 2-7-18, a case that had nothing to do with the decedent's murder, in order to both monetarily injure and tire the Plaintiff into giving up all of his legal causes for justice. **Florida's state judicial enterprise's scheme of defrauding the Plaintiff in <u>all</u> of his court cases resulted in multiple series of related RICO predicate acts committed with the same pattern and purpose of stopping the Plaintiff, along with his co-plaintiff, from together obtaining four (4) different money amounts.** These acts

were judicial orders filed in violation of the Plaintiffs'
and/or decedent's state and federal substantive due process
rights (civil rights violations), committed under Title 18,
Chapter 96, Section 1341, 1343 and 1346 which have been going on
now for seven (7) years! Dozens of Civil RICO Act violations
were committed using some of the following shim sham, scam
rulings by judges when knew better: **1) Extrinsic fraud** was used
to dismiss a very obvious murder count as a cause of action in a
case 12-CP-1669. **2) Collateral Estoppel** from Florida statute
733.103(2), was used when it was not applicable to the
actionable claims cited in the complaints, resulting in the
dismissal of cases 14-CA-10278 and 16-CA-4693. **3) Res Judicata**
was used when it was not applicable to the actionable claims
cited in the complaint, resulting in the dismissal of case 17-
CC-403. **4)** Having to **divest a gifted deed instrument that was
never legally delivered before contesting a separate will
instrument** was used to dismiss cases 16-CA-4693 and 12-CA-12257.
**5) Not having the right to sue your attorney for lack of privity
with him** was used to dismiss case 16-CA-4693. **6) Illegally
having the Plaintiff's complaints dismissed and rewritten twice
in cases 17-CA-4051 and three times in case 17-CA-6219 and then
dismissing case 17-CA-4051 with prejudice on 3-19-19 because the
revised complaints were not written the way the court wanted.
And 7) not paying a courthouse waved transcription fee, or the**

case would not be heard, was ordered on 10-9-19 and 11-27-18, case 18-CA-1537.

The evidentiary facts and relevant laws cited in all of the Plaintiff's complaints, clearly outlined the merits of each court case, substantiating both the counts and claims

The verdict is still out in case 17-CA-6219 in which Elizabeth Rice ordered the complaint to be rewritten on 8-22-18, 5-22-19 and 10-10-19 in violation of the Four Corners Rule, **stating on 5-22-19 that she did not see why Julie Holt, local public defender, one of the ringleaders and co-conspirators in case 17-CA-6219, was a defendant being sued**, and would be dismissing the case with prejudice, if the complaint was not <u>correctly written</u> after giving the Plaintiff just <u>one more</u> chance to rewrite the complaint (leave to amend) the <u>way she wanted it rewritten</u>. Elizabeth Rice heavily implied that Julie Holt's name had to be taken out of the complaint when it was refiled on 6-11-19, case 17-CA-6219! <u>This was once again, Florida's state judicial enterprise illegally flexing its muscles in the 13th Judicial Circuit, by using the best crooked judges they could find to illegally stop consumers from acquiring justice in Florida courts</u>! A court reporter was present, if a transcript is needed. And Elizabeth Rice also stated on 5-22-19 that she did not want the revised complaint to be <u>any longer with any more</u>

**defendants listed after giving leave to amend.** **Truly an unethical tyrant on a mission to tire and defraud!**

**Several court of appeals and district courts have ruled that respondeat superior is appropriate under Section § 1962(c) when the party to be held vicariously liable is not the alleged enterprise (not the company, but a group of bad actors within a company or agency), and also was not the central figure or aggressor in the alleged scheme (not the facilitator or principle under Section 1962(c)).** See, e.g., *Davis v. Mutual Life Ins. Co. of New York*, 6 F. 3d 367, 378-80 (6th Cir. 1993); *Liquid Air Corp. v. Rogers*, 834 F. 2d 1297, 1306 (7th Cir. 1987); *Brady v. Dairy Fresh Products Co.*, 974 F. 2d 1149, 1154-55 (9th Cir. 1992) and *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F. 3d 1386, 1406-1407 (11th Cir. 1994) **(holding that respondeat superior liability may be assessed under Section § 1962(c) where corporate employers (companies and/or owners) benefit from the acts of its employees and the acts were:** **(1)** related to, and committed within, the course of employment; **(2)** committed in furtherance of the corporations' business; and **(3)** authorized, or acquiesced in, by the corporations, opinion modified on other grounds on reh'g, 30 F. 3d 1347 (11th Cir. 1994). The *Bloch* court relied upon a footnote from *Petro-Tech* which stated that **"there could be circumstances in which the common law of respondeat superior would hold an employer (company) liable even**

when the employer did not benefit from the employee's conduct (where the employees are the owners of a company who were the only ones who benefited, not their company)." *Bloch*, 707 F. Supp. at 193, quoting *Petro-Tech, Inc.*, 824 F. 2d at 1359 n. 11.


Respondeat Superior Doctrine in conjunction with a RICO violation, would also hold a supervisor liable for triple remedial damages even if the supervisor did not benefit from the employee's conduct, as long as the subordinate employee was working within the scope of employment and 1) the supervisor was "guilty of negligence in the appointment of such sub-agent." (Hilton v. Oliver (1928) 204 Cal. 535, 539.).  And 2) the supervisor knew what illegal acts had been performed by the sub-agent, but instead of acting appropriately, turned a blind eye to the wrong committed.  The negligent hiring done by the supervisor goes beyond the scope of the agency relationship, and, as such, beyond the scope of any immunity that they would have as an agent of the employer.  With such immunity no longer applicable, plaintiff's counsel can establish a negligence claim showing a supervisor's knowledge of an employee's propensity for committing the torts at issue.

Below are both case and Defendant specific chronological listings of the frauds committed in violation of the Civil RICO

Act by the Defendants and their accomplices when all of them at least consciously shared in covering up the prior RICO predicate acts committed by the principles with new ones foreseeable continuing in the future, costing the Plaintiffs in their business and/or property interests, by depriving them of their 5th and 14th constitutional amendment rights in **every one** of their court cases listed in this complaint, except court case 17-CA-8903.

Keep in mind there is no **statute of limitations** on **1)** being an accessory after the fact in a murder, or on any state or federal judge having **2)** aided and abetted a fraud on the court to be perpetrated on a party in a court case. **The Florida Governor's Office and former governor Rick Scott, were informed of most of the illegal acts committed in the paragraphs below by USPS certified mail, as were Pamela Bondi and the Florida Attorney General's Office, but these accomplices did nothing, but ignore the Plaintiff's request for help in fighting affiliate gang members in their Florida government cabal!** Consequently, anyone who holds a position where one of their require duties is to assist in the enforcement of federal statutes when probable cause has been established, either refuses to do so, or takes action to prevent the enforcement of the penalties, is considered an accessory after the fact under Title 18, U.S. Code

§ 3. And when future racketeering was foreseeably committed, is also in violation of Title 18, Chapter 96, Section 1962(c).

State municipalities can be sued in state court outside of RICO for one of their employees having breached state government policy either negligently or deliberately (punitive damages allowed) that caused damages during the scope of their employment, but this is not the case with Rick Scott and Pamela Bondi who acted outside the scope of their employment.

**Both Rick Scott and Pamela Bondi can be sued for every illegal act committed on the Plaintiffs and decedent under the RICO Act as individuals because they were informed of the wrong that was being committed when they had a fiduciary duty to their citizens as government employees (official capacities) to stop Florida's state judicial enterprise from continuing to defraud citizens seeking justice in Florida courts, but failed to act appropriately, choosing to turn a blind eye to foreseeable future racketeering as part of their <u>subjective policy</u> of treating all of their citizens <u>differently while protecting their affiliates</u>!**

**58A.** In the decedent's will contest, case 12-CP-1669, both the illegal probating of false inheritance instruments by Robert Welker for where the decedent's property was going (in rem) and

238

the litigation of a false summary judgment motion filed by Thomas Rydberg containing false affidavits from Sybil Murphy, Robert Welker and Cyrie Schneider, resulted in the decedent's caretakers fraudulently inheriting the decedent's entire million dollar estate.   Together, all three (3) of these accomplices along with the Plaintiff's own attorney, Lee Pearlman, committed:   **I** Fiduciary & Common Law Frauds; **II** Gross Negligence;   **III** Concealment Fraud;   **IV** Fraudulent Misrepresentation; **V** Extrinsic Fraud; **VI** Abuse and Neglect under Florida Statutes 415.1111 & 732.802 (Slayer Statute); **VII** Bad Faith Breach of Legal Representation Under Contract; **VIII** Constructive Fraud and **IX** Aiding and Abetting During and After a Murder, respectively under Title 18, Chapter 1, Sections 2 & 3. Yet Robert Foster did nothing but dismissed the case with **prejudice.   Fraud!** Sybil Murphy and her three (3) lawyers, including Lee Pearlman, not only knew of the others' illegal acts beforehand (scienter under state and federal Rule 9(b)), but purposely aided each other in planning, commit and cover-up all of the frauds cited above as **accessories after the fact in the decedent's murder under Title 18, Chapter 1, Code § 3.** And all three (3) of these lawyers violated The **Florida Bar's Code of Conduct Rules from 4-3.3 to 4-8.4.** In Supreme Court of Florida, *The Florida Bar v. Whitney*, 132 So. 3d 1095, No. SC11-

1135 (2013) **cites when an attorney is in violation of the Florida Bar's code of conduct.**

Lee Pearlman helped opposing parties illegally win in probate by deliberately failing twice (2) to file the Plaintiff's affidavit for refuting the false affidavits filed by opposing counsel Thomas Rydberg at least 48 hours before the summary judgment hearing (5-6-13), and rehearing (7-29-13). This resulted in the dismissal of case 12-CP-1669, but with the slayer statute count (Florida Statute 732.802) also having been dismissed with prejudice without the Plaintiff's knowledge or permission (extrinsic fraud). The slayer statute count was never argued during the summary judgment hearings by any party and no affidavit by opposing parties was ever filed refuting the decedent's murder in violation of the Four Corners Rule. If case 12-CP-1669 was not dismissed, Robert Foster would have been required to have ordered an investigation into the decedent's death and her murder corroborated. Robert Foster read the complaint and knew of the Plaintiff's murder allegation count before illegally dismissing it **with prejudice** on 5-15-13 because of Lee Pearlman's failure to adequately work the case. The transcripts from these two (2) hearings (5-6-13 and 7-29-13) are in the case file (12-CP-1669) only because the Petitioner alone hired a court reporter and filed copies with the clerk of the court. The accomplices are: **Ricky Polston, Rick Scott and**

**Pamela Bondi as the principle leadership of the secondary enterprise (Section § 1962(b)), Claudia Isom, James Previtera, David Gee (Section § 1962(b)), Manuel Menendez (Section § 1962(b)), Lee Pearlman, Thomas Rydberg, Thomas Rydberg P.A., Robert Welker Sybil Murphy and Robert Foster,** for the above reasons.  See Appendix A documents.


**58B.**  On 6-6-14, the 2DCA in appellate case 2D13-4571, legally in part affirmed the final order in probate case 12-CP-1669 due to the Plaintiff's attorney, Lee Pearlman, **never** having filed a summary judgment rebuttal affidavit (required), but because of the severity of the Florida Slayer Statute count violation, the case warranted the 2DCA reversing the order with prejudice and sending the case back to the trial judge for an investigation into the decedent's murder, as stated in the Plaintiff's murder count, but the 2DCA, specifically Edward LaRose, was already in on the RICO plan to cover-up the decedent's murder by way of both the chief judge's office at the 13th Judicial Circuit (Manuel Menendez) and the chief judge's office at the Florida Supreme Court, Ricky Polston.    Consequently, the 2DCA deliberately failed to notify anyone of the decedent's murder or the Florida Bar for a disciplinary action to be taken on Lee Pearlman for his negligence during the probate farce, case 12-

241

CP-1669.    The  Florida  2DCA  judges  played  their  part  as
accessories after the fact in the decedent's **murder cover-up** by
turning  a  blind  eye  to  the  decedent's  state  and  federal
substantive  due  process  rights  by  committing  more  patterned
racketeering activities throughout the years (2012 – present) in
covering  up  the  prior  racketeering  activities  committed  by  the
three  (3)  local  enterprises  that  illegally  participated  in  this
matter.    The  accomplices  are:    **Ricky  Polston,  Rick  Scott  and
Pamela  Bondi  as  organizers  of  the  secondary  enterprise  (Section
§  1962(b)),  Manuel  Menendez  (Section  §  1962(b)),  Edward  LaRose
(Sections  §  1962(b  &  c)),  Patricia  Kelly  and  Nelly  Khouzam** for
the above reasons.  See Appendix B documents.

**58C.**   Then the Plaintiff filed a separate complaint for tortious
interference with inheritance on both Sybil Murphy and Robert
Welker,  case  14-CA-10278.    Bernard  Silver  presided.    This
resulted in Bernard Silver making a deliberately false ruling to
dismiss case 14-CA-10278 based on the Plaintiff supposedly suing
the beneficiaries again for where the decedent's property should
have  gone.    **Fraud!**   The  basis  for  the  dismissal  was  Florida
Statute 733.103(2).  This statute comes into effect only if one
is  suing  parties  a  second  time  for  where  property  has  gone
(collateral estoppel), not in suing a beneficiary of an estate

for having committed an intentional tort. In rem is having the jurisdiction of the probate court decide where the location of a deceased person's property will go. Florida statute 733.103 only has relevance when suing again as to where (location) legally probated property should have gone, not for suing a person who has illegally interfered with someone inheriting property. Looking back at this case, By beyond reasonable doubt evidence, Bernard Silver's arbitrary, capricious and pretextual ruling on 2-6-15 did **not** have anything to do with Manuel Menendez authorizing his secretary, Kimberly Cash, to slander the Plaintiff per quod with him. And an affidavit from Kimberly Cash, stating that she slandered the Plaintiff with Bernard Silver around 1-6-15, placed in case file 17-CA-902, was a **ruse** to fool the Plaintiff into believing that the courthouse having slandered him with Bernard Silver, was the reason for his having lost case 14-CA-10278. During case 14-CA-10278, Thomas Rydberg, both a CNA Insurance Company counselor for Robert Welker and a private attorney for Sybil Murphy, filed bogus documents, committing multiple mail and/or wire fraud solicitations to Bernard Silver to dismiss this case, one based on Florida Statute 733.103 which Bernard Silver illegally used, dismissing this case when all of these accomplices knew better. This is called having committed **a fraud on the court**. Before the Plaintiff was slandered per quod with Bernard Silver by Manuel

243

Menendez's office, case 14-CA-10278, Bernard Silver violated the Plaintiff's first 1st amendment rights by having given an order on 12-18-14 for just the Plaintiff to never contact his office by telephone again, or be held in contempt of court (order is in appendices).   The Plaintiff made a complaint to Manuel Menendez's office before 12-18-14 about having never received a returned telephone call in over 30 days from Bernard Silver's office and was wondering if he and his judicial assistant were still in business.   All of this built up biasness by Bernard Silver, and yet he refused to recuse himself from case 14-CA-10278, remaining on it to commit prejudicial treatment of the Plaintiff, violations under Title 42, Chapter 21, U.S. Code § 1985(3) by reversely discriminating against him on 12-18-14, 1-6-15 and 2-6-15.   Bernard Silver had an axe to grind, but was also being required by his superior, Manuel Menendez, to continue presiding on case 14-CA-10278 to monetarily damage the Plaintiff.   The accomplices are: **Chief Judge of the Florida Supreme Court during this time with Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Kimberly Cash, Bernard Silver, Manuel Menendez (Section § 1962(b)), Sybil Murphy (Section § 1962(b)), Robert Welker, Thomas Rydberg and CNA Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with**

**Section § 1962(b & c) violations, Defendant,** for the above reasons. See Appendix C documents.


**58D.** The Petitioner then filed suit on his former probate attorney, Lee Pearlman, in case 14-CA-12257, for negligently representing him in probate court. The original judge on this case, William Levens, was about to retire, so he allowed himself to be recused by the Plaintiff on 4-6-16 rather than illegally violate any more of his state and federal substantive due process rights by illegally dismissing case 14-CA-12257 at the request of Chief Judge Ronald Ficarrotta. The second judge on this case, Mark Wolfe, was removed and sent to criminal court, compliments of Ronald Ficarrotta after refusing to **fully** grant opposing party's false motion to stop the Plaintiff from acquiring any banking records on the decedent, as seen in court order 5-18-16. **And for his unwillingness on 4-25-16 to agree to hear Thomas Rydberg's verbal request (solicitation) for a summary judgment motion to be heard , case 14-CA-12257, in order to have this case illegally dismissed when he, and whoever else he was representing, were not party to the case! Mark Wolfe might make a good witness for law enforcement against Ronald Ficarrotta and the secondary enterprise consisting of local**

district judges and attorneys and should be given immunity from prosecution.

Attorney Lee Pearlman, the defendant in case 14-CA-12257, was unofficially (no notice of appearance) represented on 3-8-16 until shortly after 4-25-16 by his legal opponent, Thomas Rydberg, from the Plaintiff's probate case (12-CP-1669)!  Thomas Rydberg was trying to stop the Plaintiff from obtaining banking information on the decedent, but when he failed, he stopped representing Lee Pearlman in court case 14-CA-12257.  The Plaintiff then decided to depose Sheriff Chad Chronister from HCSO during this case to find out why for the past three (3) years the HCSO gang of officers had refused to investigate the decedent's murder.  Jason Gordillo at HCSO filed a bogus motion to quash the sheriff's subpoena, but Richard Nielsen, the third judge on case 14-CA-12257, was not going to commit a fraud on the court unless made to by the Chief Judge Ronald Ficarrotta. Chad Chronister was ordered by Richard Nielsen on 1-10-18 to come to court on 1-25-18 with his calendar.  **And the Plaintiff back then, had Adam Wieser from ABC, Inc. (Disney) ready to film at the court hearing.**  When push came to shove, Chad Chronister contact Ronald Ficarrotta to stop this hearing and Robert Nielsen illegally dismiss case 14-CA-12257 on 1-24-18, one day before the motion to quash Chad Chronister's deposition was scheduled to be heard (1-25-18), with perhaps a salary increase,

or the ability to stay in his cushy civil division indefinitely as a bonafide member of the secondary enterprise in good standing. **Adam Wieser's commentary to the Plaintiff as to why the case had been illegally dismissed was based on information from an ABC, Inc. employee working at HCSO around 1/2018.** The illegal final order dismissing case 14-CA-12257 stated that the case was dismissed because **1)** the Plaintiff did not have any damages to sue Lee Pearlman for. **Fraud!** Consequently, the Plaintiff did not have a right to sue his extremely negligent attorney for failing to file an affidavit to refute opposing party's summary judgment affidavits, costing him the probate case. And the Plaintiff lost the probate case because **2)** he should have divested the benefits of the gift deed instrument that the Plaintiff never officially received from the caretakers, as part of their estate plans for the decedent, before contesting the decedent's will instrument. **Total fraud! If the Plaintiff did not have any damages from his mother being murdered and a voided gift deed given to him by the caretakers as a joke, why should he of had to divest anything before contesting the false will instrument which allowed the caretakers to make claim to over a million dollars' worth of his mother's property? Hysterical! The property given to the Plaintiff as a gift deed was not delivered to him before the decedent died, voiding the gift deed benefit. Fraud!**

Consequently, the Plaintiff was not going to be given his day in court by Richard Nielsen, HCSO and Ronald Ficarrotta to prove in case 14-CA-12257 before a jury of his peers that **1)** the decedent was murdered and her will instrument was worthless and **2)** the Plaintiff would have won case 12-CP-1669, if not for the intentional defrauding of the Plaintiff by Lee Pearlman. Richard Nielsen knew before he signed the final order with prejudice in case 14-CA-12257 that under Florida law, a gift deed has to be delivered to the intended recipient by the person gifting the property before their death. He also knew that an inheritance gift only needs to be divested, if the inheritance instrument through which the gift is made is being contested and the will instrument was being contested in case 12-CP-1669, not the deed instrument. Robert Nielsen knew these facts because the Plaintiff told him during the summary judgment hearing on 1-17-18 with a court reporter present and the transcript from this hearing was filed on 3-7-18 into the case file (14-CA-12257). The appeal for this case was illegally affirmed by the 2DCA on 12-5-18, case 2D18-694, a violation of the Plaintiff's state and federal substantive due process rights, once again by the secondary enterprise. The accomplices are: **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Edward LaRose (Section § 1962(b)), Patricia Kelly, Samuel Salario, Matthew Lucas, Ronald Ficarrotta (Section**

§ 1962(b)), **Chad Chronister (Section § 1962(b)), Richard Nielsen, Mark Wolfe, Lee Pearlman, William Levens, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC and Florida's Lawyer's Mutual Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant,** for the above reasons.  See Appendix D documents.

**58E.**  At the very first hearing on 9-6-17 with Robert Nielsen presiding on case 14-CA-12257, additional objections were heard along with the Plaintiff amending his complaint with a verbal motion to dismiss the case, made by Thomas Rydberg's attorney, Michael McGirney, working for the firm of Spector Gadon & Rosen, P.C., who was being paid by Axis Insurance.  A notice of appearance and joinder to Michael McGirney's motion was also filed by CNA Insurance Company representing Robert Welker, **all of whom were not party to the case, or representing anyone officially who was party to the case.**  On 9-6-17, Michael McGirney stated to Richard Nielsen that the Plaintiff was a threat to all parties (enterprises), having freely filed complaints on attorneys and judges, was quite a litigator.  **He then asked Richard Nielsen to take caution of this and then verbally soliciting him to illegally dismiss case 14-CA-12257.**

Richard Nielsen stated that he had never had anyone ask him to dismiss a case based on the reasons presented, but by beyond reasonable doubt evidence, Richard Nielsen dismiss the case illegally when he was asked to by his boss Ronald Ficarrotta. By beyond reasonable doubt evidence, case 14-CA-12257 was illegally dismissed on 1-24-18 compliments of Chad Chronister having solicited Ronald Ficarrotta to make Richard Nielsen do so.  This was not Ronald Ficarrotta and Richard Nielsen just having committed a fraud on the court, **but was racketeering!**  A transcript can be ordered by the Plaintiff, if desired.   The Defendants are:  **CNA Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with a Section § 1962(d) violation** and **Axis Insurance for vicarious liability under the Respondeat Superior Doctrine in conjunction with a Section § 1962(d) violation,** See documents in appendix D.


**58F.**   During the beginning of 2017, the Plaintiff filed a complaint in federal court, Middle District of Florida, case 8-17-CV-219-7-36MAP,  for Bernard Silver having violating the Plaintiff's state and federal substantive due process rights and liberties under the **1st, 5th and 14th amendments to the U.S. Constitution,** when he violated (**Title 42, Chapter 21, Subchapter 1, U.S. Code § 1983)** during case 14-CA-10278, but Charlene

Honeywell, the federal judge on this case, illegally dismissed it on 5-9-17, violating the Plaintiff's federal substantive due process rights before he was even allowed to have federal marshals serve Bernard Silver (defendant) with the complaint! In *Hishon v. King & Spalding*, 467 U.S. 69 (1984), the petitioner's complaint states a claim cognizable under Title VII, and she was therefore **entitled to her day in court to prove her allegations.** Pp. 73-79. Charlene Honeywell wrongly stated in her order that the Plaintiff had no right to sue Bernard Silver under Title 42, Chapter 21, U.S. Code § 1983 because he had judicial immunity from having erred. **Fraud! This case was not to be decided by the presiding judge before discovery had even started, but by a jury under amend. VII to the U.S. Constitution, as stated in the Plaintiff's complaint!** Accomplice Bernard Silver used a phony reason, probate statute 733.103, to carry out an improper motive against the Plaintiff in order to illegally dismiss case 14-CA-10278, a tortious interference with inheritance case against accomplices Sybil Murphy and Robert Welker **and all that the Plaintiff wanted was for Bernard Silver's order made on 2-6-15 to be reversed by a jury. <u>Fraud</u>!**

The Plaintiff's federal substantive due process rights and liberties were violated **again** by Charlene Honeywell when she illegally stopped him from appealing her false ruling for not

having paid the $500 filing fee for Charlene Honeywell to have heard this case which was waived by the clerk of the U.S. Florida Middle District Court, since the Plaintiff was a U.S. citizen out of work and certifiably indigent.   Consequently, Charlene Honeywell should **not** have heard case 8-17-CV-219-7-36MAP, if the filing fee was not waved, but then Charlene Honeywell would not have been able to defraud the Plaintiff herself as a member in good standing with Florida's state judicial enterprise! **In order to appeal a U.S. district court's ruling and not have to pay a $500 filing fee first, you need the U.S. district court judge that defrauded you during your court case, to honestly confirm that you are indigent in order to have the case file submitted to the regional U.S. appellate court. Charlene Honeywell deliberately failed to honestly confirm the Plaintiff indigent, so he could not appeal her bogus ruling, but wrongly heard the court case herself when a jury trial was demanded, so the Plaintiff could not have her illegal ruling looked at by a U.S. district appellate court judge. Underhandedly fraudulent and evil!** By beyond reasonable doubt evidence as to Bernard Silver and Charlene Honeywell having known what both the primary and secondary enterprises' RICO plan was respectively during cases 12-CP-1669 and 14-CA-10278, they were in violation of the Plaintiff's 1st, 5th and 14th U.S. amendment rights, as well as violations under the Civil RICO

Act, specifically under **1)** Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346, **2)** Title 42, Chapter 21, Section 1983, **3)** Title 18, Chapter 96, Section 1962(c), **4)** Title 18, Chapter 13, U.S. Codes § 241 & 242, **5)** Title 18, U.S. Code § 3, **6)** Title 18, Chapter 95, Section 1956 and **7)** Fraud on the Court.   The accomplices are:   **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b), Charlene Honeywell and Ronald Ficarrotta (Section § 1962(b)),** for the above reasons.  See appendix F documents.

**58G.**  After Bernard Silver had illegally dismissed case 14-CA-10278, the Petitioner filed another lawsuit, case 16-CA-4693, on 5-18-16, with different counts and claims against Robert Welker for negligence (legal malpractice).  Keep in mind Robert Welker never met with the murdered decedent, and one of her caretakers forged her signature on Robert Welker's retainer agreement.  The Plaintiff overcame the privity requirement for suing Robert Welker when he drafted a gift deed for the decedent's caretakers as part of their false estate plans for the decedent.  But the caretakers failed to deliver her gift deed to the Plaintiff while the decedent was alive in order to fool him into thinking that he inherited something from the decedent.  This would have made Robert Welker the decedent's escrow agent since the

delivery of the gift deed to the Plaintiff was by Robert Welker after the decedent's death, but Robert Welker had no contract with the decedent to act as her escrow agent, and no one else did either. **So the gifted property delivered to the Plaintiff by Robert Welker, currently belongs to the caretakers, beneficiaries of all the decedent's property under the decedent's will!** The judge on case 16-CA-4693, accomplice Paul Huey, carried out orders from Ronald Ficarrotta violating the Plaintiff's 5th and 14th U.S. constitutional amendment rights by having illegally dismissed case 16-CA-469, on 5-2-17, **before discovery had even taken place** by stating that the Plaintiff was in violation of Florida Statute 733.103 in his final order from the summary judgment motion hearing, heard on 4-26-17. **This has been an irrelevant Florida probate statute used frequently by local members of the state judicial enterprise to dismiss the Plaintiff's tort cases for some time. <u>Fraud</u>!** Paul Huey stated in his final order on 5-2-17, and the 2DCA affirmed on 3-23-18, case 2D17-2243, that the Plaintiff had no privity with Robert Welker, **and even if this were true**, because of Florida Statute 733.103, the Plaintiff would not be allowed to prove that he would have won probate case 12-CP-1669, if not for Robert Welker's negligence, by proving up the underlying counts and claims from case 12-CP-1669, during case 16-CA-4693. **<u>No way in Hell was the state judicial enterprise going to allow this to</u>**

**happen after David Gee, Manuel Menendez, Robert Foster, Bernard Silver and Ronald Ficarrotta had acted as accessories after the fact in covering up a murder!** But Robert Welker was not even a **beneficiary in the probate case and the Plaintiff was not suing anyone in case 16-CA-4693 for where the decedent's property had illegally gone (in rem).** So because the Plaintiff had lost probate case 12-CP-1669, Florida Statute 733.103 supposedly applied. **Fraud!** The basis for the permanent dismissal of case 16-CA-4693 was Florida Statute 733.103. **This statute comes into effect only if one is suing again for where property has gone (collateral estoppel), not in suing a person, or a beneficiary of an estate, for committing an intentional tort. In rem is having the jurisdiction of a probate court decide where the location of property will be. Florida statute 733.103 only has relevance in suing again as to where (location) legally probated property has already gone, not for suing a person who has illegally interfered with someone inheriting property.** So because this irrelevant statute was deliberately used by the state judicial enterprise to defraud the Plaintiff in case 14-CA-10278, Paul Huey also used it to disallow the Plaintiff to prove in case 16-CA-4693 that he would have won probate case 12-CP-1669, if not for Robert Welker's negligence who was not even a beneficiary of the decedent's estate plans. **Total fraud and corruption!** The accomplices are: **Jorge Labarga, Rick Scott and**

**Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), CNA Insurance Company for vicarious liability under Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant, Ronald Ficarrotta (Section § 1962(b)), starting from 2015 when he took office until present, Paul Huey, Robert Welker and his attorney Thomas Rydberg** for the above reasons. See Appendix G documents.


**58H.** The Plaintiff also sued the 13th Judicial Circuit (the courthouse) in case 17-CA-902, on 1-30-17, for slandering him with Bernard Silver per quod during case 14-CA-10278. Both the new chief judge as of 2015, Ronald Ficarrotta, and the chief judge of the Florida Supreme Court, Jorge Labarga, illegally had case 17-CA-902 transferred to Jack St. Arnold a state judicial enterprise colleague of theirs on 2-15-17. Ringer Judge Jack St. Arnold, another one of America's crooked judges living off the tax dollars of Florida citizens and Bay News 9's notorious judge from the 6th Judicial Circuit, who enjoyed screwing the elderly out of their civil rights, **received this case without either party to it having requested, or having given permission to the presiding judge, Richard Nielsen, to transfer the case to another judicial circuit under FRCP 47.101.** Jack St. Arnold illegally dismissed case 17-CA-902 (8-7-17) after the first

hearing (7-14-17) and based his ruling on **1)** the Plaintiff supposedly not having filed the complaint within the 2 year statute of limitations period.  And **2)** all opposing parties had judicial immunity from suit, as if there were supposedly no ministerial operational decisions made by Kimberly Cash and Manuel Menendez as to how policies governing slandering customers (antitrust) in their courthouse were to be implemented.  **Supposedly only basic state government decisions from Florida's capital, giving when and how (authorization) state courthouses employees were to be allowed to slander courthouse customers when warranted were made!  <u>Fraud</u>!**  The defense counselor was David McClain working for Pamela Bondi at the local Attorney General's Office.  David McClain achieved committing a fraud on the court when he solicited Jack St. Arnold to accept his clearly bogus motion to dismiss and verbal lies as to the local courthouse confederates Manuel Menendez and Kimberly Cash having sovereign immunity from suit for damages when they purposely breached state policy in slandering the Plaintiff with Bernard Silver per quod during the scope of their employment.  Right?  Wrong!  They went outside the scope of their employment when they racketeered figured out by the Plaintiff sometime after he filed the complaint on 1-30-17, but they still did not have sovereign immunity for either tortiously interfering, slandering or racketeering against the Plaintiff.

**Case 17-CA-902 was filed on** <u>1-30-17</u> and the Plaintiff was damaged on <u>**2-6-15**</u>, in case 14-CA-10278, from violations of **1)** Title 42, Chapter 21, Section 1985(3), **2)** Title 18, Chapter 13, U.S. Codes § 241 & 242) and **3)** Title 42, Chapter 21, Code § 1983, due to **Kimberly Cash's slander per quod remarks that caused** <u>**actual monetary damages of $1,060,000**</u>**, not for slander causing** <u>**presumed damages or dignitary tort damages from emotional distress**</u>. The Plaintiff <u>**did**</u> file suit within two (2) years from the date he was **monetarily injured**. <u>**When the Plaintiff was damaged (2-6-15), started the statute of limitations period for the Plaintiff filing the slander per quod complaint, case 17-CA-902**</u>. In the end jack St. Arnold illegally dismissed case 17-CA-902 using arbitrary, capricious and pretextual laws not applicable to the merits of the case as a favor to Ronald Ficarrotta, Jorge Labarga, Rick Scott and Pamela Bondi and as an **affirmed tax dollar paid member of Florida's state judicial enterprise (secondary enterprise) in good standing. At the time case 17-CA-902 was dismissed (8-7-17), the Plaintiff already knew that Jorge Labarga, Rick Scott and Pamela Bondi, were all managers of the racketeering activities committed on the Plaintiff in case 17-CA-902 because Ronald Ficarrotta had Jorge Labarga illegally transferred this case to Jack St. Arnold, who during the last court hearing on 7-14-17, smiled and then snarled at the Plaintiff! If verminous Jack St.**

**Arnold was so emboldened to taunt the Plaintiff, as if this mere public servant had full control to do whatever illegal acts he wished, it was by beyond reasonable doubt evidence indorsed by Jorge Labarga, Rick Scott and Pamela Bondi.** By Kimberly Cash having admitted to committing a fraud on the court (no statute of limitations) during case 14-CA-10278, this case could be filed with either the appellate court or the local federal court at any time to void the final order, but would be respectively illegally affirmed or dismissed.   The accomplices are:   **Jorge Labarga (Sections § 1962(b & c)) with Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Manuel Menendez (Section § 1962(b)), Kimberly Cash, Ronald Ficarrotta (Sections § 1962(b & c)), David McClain and Jack St. Arnold** for the above reasons.   See Appendix H documents.


**58I.**   These classic illegal courthouse maneuvers by seasoned judges using inapplicable case laws and statutes to give **comically wrong rulings** on purpose to deny the Plaintiffs and decedent their state and federal constitutional rights **while sheepishly smiling at the Plaintiff, have been obvious, demoralizing and pathetic!**   These actions have been the routine shim sham, scam scheme, under the Civil RICO Act, performed on

the average of twice (2) in at least every court case that the Plaintiffs have been in since 3-1-12.

In this matter, the lying lawyers, most of them, working for insurance carriers after case 12-CP-1669 had ended, deliberately pled irrelevant facts and case laws, soliciting the judges to deny the Plaintiffs the right to have their day in court! **Then some of the lords of implementing justice (corrupted state judicial enterprise members) would bold faced <u>until they could not hold back smiling or laughing hysterically (Elizabeth Rice) at the Plaintiff</u>, while they illegally approved the irrelevant case laws and statutes cited that opposing parties submitted as being relevant to the merits of the case in order to illegally damage or dismiss the Plaintiffs' cases! And afterwards, officers of the court would laugh it up in festive jubilation as proud state judicial enterprise affiliated participants excited at having been a part of the winning team of crooks, believing they had finally drawn the Plaintiff's blood with their last licks! This patterned process of having defrauded the Plaintiffs is not only called having committed a fraud on the court, but by having been implemented for the benefit of multiple enterprises in dozens of hearings, <u>all completely documented for the record</u> as having had everything to do with covering up the prior racketeering activities committed on the Plaintiffs and decedent along with having done them out of both**

property owed and justice served, <u>their actions fall under the Civil RICO Act as having participated in racketeering activities</u>. It is not legal for judges to take public tax dollars in the form of salaries while setting up, and work with, monopolistic type enterprises that illegally profit from denying honest services to citizens (antitrust) for whatever valued reasons in Jerkwater, USA (Florida), home of the proud and the brave!

Florida Statutes Title XLVI. Crimes § 876.05., Public Employees' Oath:

**(1)** All persons who now or hereafter are employed by or who now or hereafter are on the **payroll of the state**, or any of its departments and agencies, subdivisions, counties, cities, school boards and districts of the free public school system of the state or counties, or institutions of higher learning, except candidates for federal office, are required to **take an oath** before any person duly authorized to take acknowledgments of instruments for public record in the state in the following form:

I, _____, a citizen of the State of Florida and of the <u>United States of America</u>, and being employed by, or an officer of _____, and <u>a recipient of public funds as such employee or officer</u>, do hereby solemnly swear or affirm that <u>I will support</u>

**the Constitution of the United States and of the State of Florida**.

**(2) Said oath shall be filed with the records of the governing official or employing governmental agency prior to the approval of any voucher for the payment of salary, expenses, or other compensation.**

**All Florida government Defendants and accomplices in this matter violated this oath!**

**58J.** The Plaintiff appealed Paul Huey's false final order in case 16-CA-4693 with the 2DCA, case 2D17-2243, and accomplice Morris Silberman, lead judge on the panel, heard the Plaintiff's oral arguments on or around 3-13-18. During the Plaintiff's presentation, Matthew Lucas, another judge on this three judge panel, was leaning back in his chair staring up at the ceiling daydreaming like he did not have to pay attention to the facts stated. And Daniel Sleet was shaking his head humoring the Plaintiff, as if in agreement with the Plaintiff's every recollection of relevant facts (evidentiary and ultimate), and Morris Silberman was staring at the Plaintiff with daggers in his eyes.

Some of the completely corrupted feel that the world owes them a good living. **These are the miserable ones who hate their lives**

**and mankind.   Consequently, they find satisfaction in defrauding good people for just taking up their time.**   Hindsight being 20/20, all of the judges cited above knew that they were going to illegally dismiss the Plaintiff's appeal **before** oral arguments were heard.   Case 2D17-2243 was affirmed by the 2DCA on 3-23-18.   The Plaintiff had his court reporter present, so a transcript of the proceeding can be ordered at any time.

The reason for Florida state DCA judges making false rulings in this matter has been due to **political influences overseen by the offices of the 1) governor, 2) attorney general and the 3) chief judge of the Supreme Court.**   DCA rulings that are never given an opinion are mainly done to defraud a parties out of appealing their false rulings with the Florida Supreme Court due to the *Wells v. State*, 132 So. 3d 1110 (Fla. 2014) case, where illegal changes to Florida's constitutional requirements were made in violation to U.S. constitutional amendment rights, limiting this Florida court's review of writs under Article V, Section 3(b)3 to just elaborated per curiam decisions by DCA courts.   The Florida Supreme Court now refuses to stop both state and federal substantive due process rights from being upheld at the appellate court level, a violation under Title 42, Chapter 21, U.S. Code § 1983, but restorable under Title 42, Chapter 21, U.S. Code § 1988.   This change in the constitution was made by the treasonous teamwork efforts of **accomplices Jorge Labarga,**

**Pamela Bondi and Rick Scott along with both the Florida Department of State and Legislative Affairs that assisted in Rick Scott's illegal legislative agendas while governor.** So on 03-23-18, the 2DCA affirmed the final ruling from case 16-CA-4693 without any explanation.   The accomplices are: **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Ronald Ficarrotta (Section § 1962(b)), Paul Huey, Morris Silberman, Edward LaRose (Section § 1962(b)), Daniel Sleet, Matthew Lucas, Robert Welker, CNA Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant, Robin Black and Thomas Rydberg** for the above reasons.   See Appendix J documents.

**58K.**   The Plaintiff then filed a writ of certiorari with the Florida Supreme Court, case SC18-590, but it was illegally dismissed on 4-18-18 due to the illegal Florida amendment to the state constitution baring this type of appeal (writ of certiorari) from a Florida district court that does not have an opinion rendered.

**But the Florida Supreme Court may review by conflict certiorari, a per curiam judgment of affirmance without an opinion, if an appellate court ruling creates a conflict with a decision of the**

**Florida Supreme Court, or another Florida District Court of Appeal.** *Foley v. Weaver Drugs, Inc.*, Florida Supreme Court No. 32357, (1965). **The Plaintiff met this requirement, but was still illegally denied his right to an appeal by the Florida Supreme Court.**

When Florida Supreme Court Judge Jorge Labarga and Attorney General Pamela Bondi, in *Wells v. State,* 132 So. 3d 1110 (Fla. 2014), aided and abetted the illegal changing of Florida's constitutional requirements, limiting its review under Article V, Section 3(b)3 to just elaborated per curiam decisions, they opened the door to state and federal substantive due process rights being violated at the appellate court level, a violation of under Title 42, Chapter 21, U.S. Code § 1983, but restorable under Title 42, Chapter 21, U.S. Code § 1988. The Defendants are: **the Florida Department of State and Legislative Affairs** for the above reasons. Consequently, future affirmed rulings from all Florida DCA courts **without** an opinion given (PCA), will continue to be denied review by the Florida Supreme Court. See document in Appendix J.


**58L.** The Plaintiff then filed a writ of certiorari with the U.S. Supreme Court in 2017, case U.S. 17-9268, for the Florida Supreme Court having denied the Plaintiff's writ in case SC18-

590. Defendant Clarence Thomas was **not** required to hear this U.S. Supreme Court writ, **but his office staff had to read it and inform Clarence Thomas of the facts surrounding the lower court case (16-CA-4693) as summarized in the Plaintiff's questions presented in the writ before he had the case dismissed.** **Consequently, it was Clarence Thomas's fiduciary duty and obligation as the presiding federal judge on case U.S. 17-9268, who was being paid federal tax dollars** to understand the merits of the Plaintiff's case, **to forward the murder information in it to the Department of Justice (DOJ) for an investigation!** Under Title 18, Chapter 1, U.S. Code § 4 – Misprision of felony: Whoever, having knowledge of the actual commission of a felony cognizable (perceptible) by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both. (June 25, 1948, Ch. 645, 62 Stat. 684; Pub. L. 103-322, title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147.). **This never happened. Treasonous!**

**A U.S. Ninth Circuit panel** recently issued a decision in *United States v. Olson*, affirming the conviction of the former Alaska executive director of the U.S. Department of Agriculture's ("USDA") Farm Service Agency for misprision of felony under 18 U.S.C. § 4. Specifically, **the panel held that the former**

**director was correctly convicted of misprision of felony "for concealing and failing to notify authorities of her business partner's submission of false statements" to the USDA's Rural Development Program in connection with a federal grant application.**

**A cognizable claim or controversy (murder), is one that <u>meets the basic criteria of viability</u> for being tried or adjudicated before a particular tribunal. The term cognizable means that the claim or controversy is <u>within the power or jurisdiction of a particular court (U.S. court) to adjudicate</u>.** The Defendant is:  **Clarence Thomas** for non-criminal misconduct under Title 18, Chapter 216, Section 3333, and as an accomplice in having participated on 10-1-18, in covering up the decedent's murder under both Title 18, U.S. Code § 3 and Title 18, Chapter 96, Section 1962(c).  See Appendix L documents.

**58M.**   On 1-5-17, the Plaintiff filed case 17-CC-403 against Chart Industries, Inc. for the misrepresentation of a ten (10) year warranty on one of its products purchased by the Plaintiff when it had failed only after 6 years in use, damaging the Plaintiff in his business, and this company failed to compensate the Plaintiff.   Chart Industries, Inc., **1)** misrepresented how long its dewar MVC SC type liquid nitrogen storage tanks would

actually work for under normal use and **2)** concealed what the exact procedures were for both filling and emptying this tank under normal use, to even have a related liability disclaimer in its warranty coverage section. And had it not been for these deliberate acts by Chart Industries, Inc., the Plaintiff would not have been damaged, losing the complete contents of his tank. This was a straight forward misrepresentation tort lawsuit, but Joelle Ober wanted to entertain opposing parties illegally interjecting the res judicata rule as an applicable defense when the prior case against Chart Industries Inc. (case 16-CC-18569) was for their tank being defective in design (negligence), not for having inadequate instructions or labeling to warn against what customers are inclined to do with the product that will likely cause damage, and are considered to be defects in marketing (misrepresentation). These were two (2) different causes of action with different actionable claims in which the Plaintiff's knowledge pertaining to the misrepresentation count could not be timely added to the prior small claims court complaint, case 16-CC-18569, after it was filed. And in any case, this older case (16-CC-18569) was dismissed **without prejudice** which makes any argument for res judicata or collateral estoppel mute. **Without prejudice means that the Plaintiff <u>can</u> file for further relief, or even <u>similar</u> relief, if such circumstances warrant. When a court case is dismissed**

**without prejudice**, it means that a new case may be brought on the **same basis** as the dismissed case within the statute of limitations.   The Plaintiff filed case 17-CC-403 on 1-5-17 and the damages occurred in 3/2013.   You have four (4) years to file a misrepresentation claim after an injury in civil court.

http://www.businessdictionary.com/definition/without-prejudice.html

**A dismissal without prejudice makes it unnecessary for the court in which the subsequent action is brought to determine whether or not an action is based on the same cause as the original action, or whether the identical parties are involved in the two actions.**   The Free Dictionary by Farlex.

On 3-28-17, there was a motion filed by opposing parties for the dismissal of case 17-CC-403 to be heard and it was correctly denied verbally on 8-9-17, but during this hearing, Joelle Ober told Janice Pickett, one of the agents working for Chart Industries Inc., that a motion to dismiss was not the correct motion to use for ending case 17-CC-403, stating that under the Four Corners Rule she could not dismiss this case for violating the Res Judicata Rule, but that a summary judgment motion was the more appropriate type of motion to use in ending this case (hint, hint).   **Joelle Ober implied to Janice Pickett that she should file for a summary judgment motion on res judicata to**

**have the case dismissed!   Fraud!**   Janice Pickett filed a motion for summary judgment on 9-7-18 based on res judicata (same topic as the dismissal motion) a month after her motion to dismiss was denied.   Then she requested a hearing date for this motion on 9-26-18, to be heard on 1-9-18!   **Why not?**   Joelle Ober as much as told Janice Pickett on 8-9-17 to file a summary judgment motion so she could illegally dismiss case 17-CC-403!   **After committing this type of corrupt act, to be able to have any respect for yourself as a judge who went seven (7) years to profession school, with 20 years' experience, you would have to be some sort of insane sociopath dealing from half a deck of cards!   A big thank you to Joelle Ober, who by seeking out an easier occupation for a few dollars more in pay, has helped make America a hollowed out egg shell of what it once was, and its crooked government, one of the most hated on the planet!**

The dismissal of case 17-CC-403 was not granted on 8-9-17 because Joelle Ober did not want to violate the Four Corners Rule by improperly considering res judicata documents filed that were outside the scope of the complaint in determining its sufficiency to state a cause of action, yet she did not hesitate to dismiss the complaint based on the same topic of res judicata in a summary judgment motion.   **Hair splitting fraud!**   Any type of order that dismissed case 17-CC-403, required a clear abuse of discretion, but Joelle Ober figured that a res judicata type

of fraud committed during a summary judgment motion, was not as obvious as a Four Corners Rule violation and most importantly this motion was used to waste more of the Plaintiff's time, money, and energy before dismissing case 17-CC-403 as a favor to Ronald Ficarrotta.

In the 2-7-18 order, from the 1-9-18 hearing, case 17-CC-403, Joelle Ober illegally dismisses case 17-CC-403 with prejudice using the res judicata rule due to the Plaintiff having already sued Chart Industries Inc. before, period! **Judicial corruption and fraud!** Absolutely no explanation was given as to how Joelle Ober came to this obviously wrong conclusion except by beyond reasonable doubt evidence, Ronald Ficarrotta had everything to do with the false order being written and filed with the clerk of the court. Case 17-CC-403 was appealed to the circuit civil division within the 13th Judicial Circuit, case 18-CA-1537. The accomplices are: **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Ronald Ficarrotta (Section § 1962(b), Chart Industries Inc. for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant, Janice Pickett, Wicker, Smith, O'Hara, McCoy & Ford, P.A. and Joelle Ober, for the above reasons.** See Appendix M documents.

**58N.** On 5-2-17, the Petitioner filed lawsuit 17-CA-4051 on accomplices Sybil Murphy, Lee Pearlman, Robert Welker and Thomas Rydberg for injuring him during cases 12-CP-1669, 14-CA-10278 and 14-CA-12257 by fraud. All four (4) accomplices in this case (17-CA-4051) were sued for having committed a half dozen or more different types of intentional fraud torts when they defrauded the Plaintiff out of property owed to him during the three (3) cited cases above. Robert Welker and Thomas Rydberg were also grossly negligence in their duty to the personal representative (Sybil Murphy) of the decedent's estate during case 12-CP-1669, for instructing her on how to defraud the Plaintiff out of stolen money owed to him **by having it laundered at the courthouse!**

On 03-29-18, Elizabeth Rice heard opposing counsel's motion to illegally quash the Plaintiff's courthouse approved and issued subpoena that was allowing him to take Sheriff Chad Chronister's deposition again. The Plaintiff did not have any knowledge of the court hearing date because he never received notice of one due to Elizabeth Rice, but attended telephonically. The Plaintiff had filed another subpoena to take Chad Chronister's deposition again, but in this court case (17-CA-4051), not case 14-CA-12257. Elizabeth Rice wrongly stated in her order on 4-8-18, from the hearing on 03-29-18, that the Plaintiff could not take **anyone's** deposition from the local sheriff's office (HCSO)

due to the public duty doctrine.   **Fraud!**   The public duty
doctrine has nothing to do with deposing Chad Chronister, or
another officer from HCSO.   HCSO was **not** being held responsible
for the murder of the decedent, but was responsible for her
murder not having been investigated as an individual, not as an
obligation owed to the public.   This ruling on 4-8-18, case 17-
CA-4051, violated both the decedent's and the Plaintiff's state
and federal substantive due process rights and liberties under
the 5th and 14th Amendments to the U.S. Constitution by **1)**
**stopping discovery** (technically ending the case) to acquire more
evidence in support of the actionable claims (liability issues)
cited in the complaint (17-CA-4051) having to do with the
planning, committing and aiding and abetting of RICO predicate
acts committed on the Plaintiff that caused him to be injured in
his property interest before, during and after case 12-CP-1669.
And by **2) preventing evidence as to Manuel Menendez and Ronald**
**Ficarrotta (13th Judicial Circuit managers) having corroborated**
**with David Gee, James Previtera and himself (Chad Chronister) at**
**HCSO in orchestrating the decedent's murder cover-up with their**
**other state judicial enterprise members like Elizabeth Rice, a**
**crooked tax dollar paid, judicial enterprise member who**
**facilitated the defrauding of the Plaintiff in multiple court**
**cases (17-CA-4051 and 17-CA-6219) and helped the greedy and well**
**connected ruin the American judicial system for money, power and**

control over poor, beaten down Americans! In Elizabeth Rice's memorandum dated 4-25-18, from the 4-24-18 hearing, she also failed to grant the Plaintiff's motion to ask certified questions of Marcy McDermott in her court, but gave no reason for doing so other than documenting that the motion filed concerned a different court case. The injuries sustained by the Plaintiff and decedent during case 12-CP-1669 resulted in different actionable claims and counts being filed in cases 14-CA-12257 and 17-CA-4051. Case 14-CA-12257 was illegally dismissed on 1-24-18 by Richard Nielsen, but Elizabeth Rice still had jurisdiction to hear any motion for obtaining more evidentiary evidence surrounding probate case 12-CP-1669 in support the counts and claims filed in case 17-CA-4051.

Then on 4-25-18, in the filed memorandum, case 17-CA-4051, from the hearing on 4-24-18, Elizabeth Rice denies the Plaintiff's motion for contempt of court fine money, which the Plaintiff had a right to, for Steven Hearn and Andrew Mallory wrongly walking out of Marcy McDermott's deposition with Marcy McDermott on 12-5-17, case 14-CA-12257.

The Plaintiff filed a writ of certiorari, case 2D18-1538, asking the 2DCA to reverse the 4-8-18 order from case 17-CA-4051, which was illegally affirmed by the 2DCA on 12-20-18. After the Plaintiff had objected to Chad Chronister's legal counselor,

Christopher Brown, filing documents with the 2DCA in case 2D18-1538, Chad Chronister was permitted to have his say as a friend of the court, **just to make sure that Edward LaRose and the state judicial enterprise members at the 2DCA knew that he objected to being asked some hard questions under oath (deposed) about 1) his relationship with the local chief judge's office, 2) his personal involvement in covering up the decedents murder and 3) his instructions for Ronald Ficarrotta to have Richard Neilsen illegally dismiss case 14-CA-12257 to stop his deposition in the beginning of 2018.** Sheriff Chad Chronister is supposed to investigate murders, not cover them up, **but according to a local ABC, Inc. News reporter working at HCSO, as stated to the Plaintiff by Adam Waiser around 1-1-18, solicited the courthouse (Ronald Ficarrotta) right before Richard Nielsen illegally dismissed case 14-CA-12257 to stop his deposition from being taken during this court case.** Bad events in history always repeat themselves due to the same types of morally weak government employees fleecing the public after becoming appointed or elected! Thus, the crooked, only hire the crooked in need of crooked acts committed. Ronald Ficarrotta, by beyond reasonable doubt evidence, had Elizabeth Rice stop the Plaintiff on 4-8-18, from deposing anyone from HCSO a second time. The judicial accomplices involved in defrauding the Plaintiff during case 17-CA-4051, participated with all three (3) local

enterprises in defrauding both the Plaintiff and decedent out their state and federal substantive due process rights!  The accomplices are:  **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Chad Chronister (Section § 1962(b), Christopher Brown, Elizabeth Rice, Ronald Ficarrotta (Section § 1962(b)), Edward LaRose (Sections § 1962(b & c)), Daniel Sleet and Matthew Lucas** for the above reasons.  See Appendix N documents.

**580.** Elizabeth Rice, the presiding judge on case 17-CA-4051, with the help of the 2DCA, committed another state and federal substantive due process right violation on the Plaintiff.  In a writ of certiorari, case 2D18-1889, the 2DCA illegally stopped the Plaintiff on 05-31-18, from collecting contempt of court fine money in case 17-CA-4051, that Elizabeth Rice illegally denied him on 4-25-18, from both defense counselors Steven Hearn (Marcy McDermott's attorney), working for Steven Hearn P.A. and Andrew Mallory (Lee Pearlman's attorney), working for Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, when they both wrongly stopped witness Marcy McDermott on 12-05-17 from answering the Plaintiff's legitimate probate (12-CP-1669) related questions in case 14-CA-12257 and then walked out of the deposition with Marcy McDermott.  **Andrew Mallory had no**

**right to object to any question asked of Marcy McDermott during the meeting because he was not her attorney!** Steven Hearn did not properly preserve his objections when he told Marcy McDermott not to answer the Plaintiff's questions and then walked out of the meeting room with her, wrongfully ending the Plaintiff's scheduled deposition, so **Marcy McDermott forfeited her right to preserve any legal objections to the Plaintiff's line of questioning in the future.**

During the hearing on 3-29-18, case 17-CA-4051, Elizabeth Rice verbally gave the Plaintiff a **no reply** for allowing certified questions from Marcy McDermott's deposition, taken during case 14-CA-12257, to be asked in her court without any explanation. Marcy McDermott's deposition was not scheduled in case 17-CA-4051, but in case 14-CA-12257. The same questions from Marcy McDermott's deposition during case 14-CA-12257, held on 12-05-17, needed to be asked of Marcy McDermott again and were time sensitive with the same line of questioning that involved exactly the same parties from probate case 12-CP-1669, in which Lee Pearlman, Robert Welker and Thomas Rydberg were compensated to ruin case 12-CP-1669 for the Plaintiff, and Marcy McDermott knew this along with other important case related information. The accomplices are: **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b)), Ronald Ficarrotta (Section 1962(b)), Elizabeth Rice, Andrew**

**Mallory, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, Florida Lawyer's Mutual Insurance Company for vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(b & c) violations, Defendant, Steven Hearn, Steven Hearn P.A., Edward LaRose (Section § 1962(b)), Morris Silberman, Robert Morris, John Badalamenti, Sybil Murphy (Section § 1962(b)) and Marcy McDermott** for the above reasons.  See Appendix O documents.


**58P.**  Case 17-CA-4051 was illegally dismissed a third time with prejudice on 3-19-19 by Elizabeth Rice **1)** to defraud the Plaintiff out of property owed, **2)** to cover-up the facts surrounding the decedent's murder and who aided and abetted it before and after and **3)** to cover-up what the accomplices did illegally in this matter since 2012 that caused the Plaintiff to be defrauded and deprived.  The appeal of the 3-19-19 order in case 17-CA-4051 was illegally affirmed on 12-27-12, case 2D19-1384.

The Plaintiff is suing all of the insurance companies who were involved in the Plaintiff being defrauded and deprived out of money owed during case 17-CA-4051.  And the Plaintiff is also suing ABC, Inc. for being responsible, as of 6-21-18, for committing an illegal act that resulted in foreseeable future

injuries to the Plaintiff from racketeering when it **1)** tortiously interfered with his posting an advertisement at USC on 6-21-18 as a Florida state judicial enterprise participant in violation of **1)** (Title 18, Chapter 96, Codes § 1961-1968), **2)** (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), **3)** (Title 18, U.S. Code § 3), **4)** (Title 42, Chapter 21, Section 1983), **5)** Title 18, Chapter 13, U.S. Codes § 241 & 242, **6)** Title 18, Chapter 95, Section 1956 and **7)** Fraud on the Court. And also having **8)** benefited from having been vicariously liable under the Respondeat Superior Doctrine on 6-21-18, by tortuously interfering with the Plaintiff posting his advertisement.

Thus after 6-21-18, ABC, Inc. was just as culpable under Title 18, Chapter 96, Section 1962(c) to the wrong committed by Florida's state judicial enterprise and their co-conspirators, as if it were one of the local principles involved in planning and committing the illegal RICO activities on the Plaintiffs and decedent. As stated in Section 16, ABC, Inc. was responsible for injuries after 6-21-18 to the Plaintiffs from the dismissal of cases: **1)** 17-CA-4051 on 3-19-19, **2)** 17-CA-6219 on 10-28-19 and **3)** from case 18-CA-1537 having been permanently stalled on 11-27-18, with at least two (2) RICO predicate acts having been committed in each of these cases before they were respectively **1)** illegally dismissed, **2)** illegally dismissed and **3)** illegally stopped.

279

NO PARTY OR PARTIES ARE REQUIRED TO LITIGATE A COURT CASE ANY FURTHER AFTER TWO (2) RICO PREDICATE ACT HAVE BEEN COMMITTED ON THEM BY AN ENTERPRISE, RESULTING IN THEIR BEING INJURIED, BEFORE THEY CAN SUE UNDER THE RICO ACT.   **A RICO COURT CASE INJURY (INJURY TO PROPERTY OR BUSINESS FROM TWO (2) RACKETEERING ACTIVITIES UNDER SECTION § 1961(1)) RESULTS WHEN:**

**1) A COURT CASE IS EITHER ILLEGALLY DISMISSED, WITH OR WITHOUT PREJUDICE, BENEFITING OPPOSINT PARITES OR,**

**2) SOME PART OF THE DISCOVERY PROCESS HAS BEEN ILLEGALLY STOPPED INDEFINITELY, BENEFITING OPPOSING PARTIES OR,**

**3) AN ILLEGAL ORDER ISSUED THAT STOPS ANY NEW COUNTS AND CLAIMS FROM CONFORMING WITH THE EVIDENCE FROM BEING ADDED TO THE COMPLAINT (IN FLORIDA, UNDER FRCP 1.190(b)), BENEFITING OPPOSING PARTIES.**

**THESE TYPES OF COURT CASE RICO FRAUDS, REQUIRE A VICTIM TO TAKE FURTHER LEGAL RECOURSE IN A FUTILE ATTEMPT TO UNDUE THE EFFECT OF THE ABUSE OF DISCRETION (HOSEST SERVICES FRAUD) COMMITTED BY A STATE JUDICIAL ENTERPRISE, OR SUSTAIN THE INJURY TO THE CASE.**

See Appendix P for P, Q, R, S and T section documents.


**58Q.** Discovery is an important and essential tool in civil litigation. "Depositions can save the time, effort and money of litigants and help expedite trials." *Hub v. Sun Valley Co.*, 682

F.2d 776, 778 (9th Cir. 1982). Admitting deposition testimony from prior proceedings can help facilitate these goals. Moreover, the point of admitting deposition testimony from prior proceedings is to increase efficiency at trial, without jeopardizing accurate fact finding. Id at 776-778.

**58R.  Statutes for Determining a Fair Discovery Ruling under Both State and Federal Laws:**

A party will be permitted to enter into evidence, deposition testimony from a prior court proceeding. **Rule 32(a)(8) of the Federal Rules of Civil Procedure governs admission of deposition testimony in federal or state court proceedings.** Fed. R. Civ. P. 32. Rule 32(a)(8) of the Federal Rules of Civil Procedure and Rule 804(b)(1) of the Federal Rules of Evidence set forth the conditions under which prior deposition testimony may be admitted into evidence in a subsequent action. Id.  Fed. R. Evid. 804(b)(1).

**Fed. R. Civ. P. 32(a)(8)** addresses when deposition testimony from a prior proceeding will be admissible in **either state or federal court cases.** It states as follows:  "**[a] deposition lawfully taken, and if required, filed in any federal - or state - court action, may be used in a later action involving the 1) same subject matter between the 2) same parties, or their**

**representatives or successors in interest**, to the **3) same extent (same purpose) as if taken in the later action.** A deposition previously taken may also be used as allowed by the Federal Rules of Evidence (804(b)(1)). Id. **Under a literal interpretation of the rule, the actions must involve the 1) same subject matter and be between the 2) same parties. See id. However, not all courts have resolved to interpret the rule so strictly.** What the rule requires has been a subject of much discussion. The "same subject matter" and "same parties" requirements have been subject to both narrow and expansive constructions by the courts.

**Under Fed. R. Civ. P. 32(a)(8) and (804(b)(1)):**

**A) If questions and answers from a previous deposition are admissible in a related state court case because the 1) parties are the same in both cases, 2) the subject matter (line of questioning) is the same in both cases and 3) the prior deposition will be used for the same purpose of proving the same evidentiary facts (evidence) surrounding the injury or injuries in both cases and,**

**B) If any of the questions were illegally objected to being answered in the prior case then,**

**C) the presiding judge in the latter case has to make arrangements to referee the witness's deposition that was not**

obtainable, to allow the same deposing party, or his or her representative, to <u>substantiate the latter case's counts and claims concluded from the same evidentiary facts</u>!

It is the present judge's obligation and duty in the pursuit of justice when asked by a party or parties to remedy any foreseeable contempt of court antics that were committed before, to <u>oversee</u> a repeat deposition of the same witness in his or her court, with the same parties involved, about same subject matter, for the same purpose of proving the same evidentiary facts in order to substantiate the current case's counts and claims.

For Elizabeth Rice to have objected to her employment requirements without good cause to 1) assist with a witness's certified deposition questions being answered, where the deponent's attorney is prone to committing contempt of court antics, and then to 2) blatantly dismiss the current court case with prejudice in violation of the Four Corners Rule for supposedly failing to substantiate the counts, she not only committed a clear abuse of discretion, but racketeered. <u>A state court judge has a fiduciary duty to all parties to foster justice prevailing in their court by rectifying any prior injustice committed that will foreseeably repeat themselves in</u>

<u>their court due to fraud, injuring the same party or parties</u>
<u>again</u>.

"Florida Rule of Civil Procedure 1.330(d)(3)(B) requires the attorney to state the basis for the objection.  In Weyant v. Rawlings, 389 So. 2d 710, the attorney failed to state the basis of his objection in the deposition and the appellate court ruled that he waived his right to object to the form of the question later in the proceedings.  Steven Hearn having stated to Marcy McDermott, on 12-5-17, court case 14-CA-12257, not to answer the Plaintiff's evidentiary fact related line of questioning having to do with the probating of the decedent's estate, case 12-CP-1699 because it did not have anything to do with case 14-CA-12257, was <u>clearly a bogus statement</u> because the counts and claims in this malpractice case (14-CA-12257) had <u>everything</u> to do with the Plaintiff having been injured during probate case 12-CP-1669 by the defendant Lee Pearlman!  <u>The evidentiary facts</u> <u>(evidence) surrounding the Plaintiff having been injured during</u> <u>case 12-CP-1669 was the basis for the counts and claims filed in</u> <u>both court cases 14-CA-12257 and 17-CA-4051</u>!


Federal Rules of Civil Procedure:

There is no express provision in the Federal Rules of Civil Procedure for instructing a witness not to answer questions

posed in a deposition.  To the contrary, Rule 30(c) of the Federal Rules of Civil Procedure states:  "Evidence objected to shall be taken subject to the objections."  (Emphasis added.)

**Instructing a Deponent Not to Answer:**

An attorney may not instruct a witness not to answer a question during a deposition.  The Florida Rules of Civil Procedure provide no basis for an attorney to instruct a witness not to answer a question during a deposition.  Comparatively, an attorney has the right to instruct a client not to answer questions which, if answered, would violate some type of privilege.  The following case law deals strictly with unprotected witnesses.

In Jones v. Seaboard Coast Line Railroad Company, 297 So. 2d 861 (Fla. 2d DCA 1974), and Smith v. Gardy, 569 So. 2d 504 (Fla. 4th DCA 1990), the courts held that it was improper for an attorney to instruct a witness not to answer questions asked during a deposition.  In Jones, objections were raised during the deposition as to the specific form of questions being asked of the witness.  The questions were leading and therefore improper.  Opposing counsel instructed the witness not to answer the leading questions, and the questioning attorney terminated the deposition and moved for a court order requiring answers to his

questions.   The trial court denied the motion to compel and
agreed that the deponent should not be required to answer
improper leading questions asked during a deposition.

**The appellate court overruled the trial court and held that it
was _improper_ for the attorney to instruct the witness not to
answer the leading questions.   The court stated that correct
procedure was for the objecting attorney to make the proper
objection on the record and request a ruling from the court
concerning the admissibility of the objectionable question at a
later date.**

**Smith also held that an attorney may not instruct a witness not
to answer questions at a deposition.   The court concluded that
an attorney instructing a witness not to answer questions during
a deposition will find no legal support in the Florida Rules of
Civil Procedure.**

**In Smith, the defense counsel instructed the deponent doctor not
to answer questions that pertained to standards of care because
they were outside the scope of expert interrogatories previously
propounded to the doctor.   The court of appeal stated that the
doctor should have answered the questions posed during the
deposition stating, "the arrogance of the defense attorney in
instructing the witness not to answer is without legal
justification.   Nowhere in the Florida Rules of Civil Procedure**

**is there any provision that states that an attorney may instruct a witness not to answer a question**." **Smith, 569 So. 2d at 507.**

There are certain circumstances when an attorney may terminate a deposition.  Florida Rule of Civil Procedure 1.310(d) states: "At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass, or oppress the deponent or party. . . the court may limit the scope and manner of the deposition under Rule 1.280(c)."

Florida Rule of Civil Procedure 1.280(c) allows for the suspension of the deposition and the filing of a motion for protective order if an attorney believes that the information sought from the witness would be irreparable if revealed by the witness.  **Although the attorney may not instruct a witness not to answer a question, the attorney may suspend the deposition and have the court determine if the witness should be required to answer the question.**  Rule 1.280(c) states in relevant part that, "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense that justice requires."

58S.   Marcy McDermott's certified deposition questions taken on 12-5-17 from case 14-CA-12257 (<u>state court</u>) should have been allowed to be asked again in case 17-CA-4051 during a repeat deposition of Marcy McDermott with Elizabeth Rice present because they were about the 1) <u>same subject matter</u> (same line of questioning concerning the evidentiary facts surrounding the injuries sustained by the Plaintiff in probate case 12-CP-1669), for the 2) <u>same purpose</u> of proving (concluding) actionable claims in both cases 14-CA-12257 and 17-CA-4051 were correct and with merit, detailing what fraudulent acts committed before, during and after probate case 12-CP-1669, and by whom, that resulted in the Plaintiff's injuries during case 12-CP-1669, caused by 3) <u>exactly the same parties</u> in both cases 14-CA-12257 and 17-CA-4051.   The answers to the Plaintiff's questions asked of Marcy McDermott on 12-5-17 were needed in order for the Plaintiff to have further substantiated the stated conclusions of law (counts) that he cited in case 17-CA-4051.

The 2DCA judges in appellate case 2D18-1889 should have reversed Elizabeth Rice's false ruling for **1)** not allowing certified deposition questions to be asked of Marcy McDermott from case 14-CA-12257 in case 17-CA-4051.   And for **2)** not sanctioning Marcy McDermott's attorney, Steven Hearn, and Lee Pearlman's

attorney, Andrew Mallory, both from case 14-CA-12257, **during case 17-CA-4051**, for wrongly instructing Marcy McDermott not to answer questions relevant to the evidentiary facts of the underlying case (12-CP-1669) and then walking out of the deposition with Marcy McDermott.

The 2DCA panel instead tampered with Marcy McDermott answering certified questions during case 17-CA-4051, having to do with the same subject matter as in case 14-CA-12257, which were the fraudulent actions that the same parties in both cases 14-CA-12257 and 17-CA-4051 committed to illegally end probate case 12-CP-1669. **Whether or not all of the same parties in case 17-CA-4051 were officially asked to attend and present during Marcy McDermott's deposition during case 14-CA-12257 on 12-5-17 is irrelevant, since all of same parties would have been allowed to attend during the continuation of her deposition during case 17-CA-4051. What is relevant is Marcy McDermott's next attorney, in either state or federal court, cannot object to any questions put to her having to do with the fraudulent acts committed before, during and after case 12-CP-1669, that were not previously objected to correctly. The reason for the slayer statute count being extrinsically voided from the probate complaint during case 12-CP-1669 by the primary enterprise, was to also keep questions and answers surrounding the defrauding of**

**the Plaintiff and who was involved in the decedent's murder from**
**being testified to**.

All of the Defendants from **all four (4) enterprises did an**
**excellent job of circumvented any evidence surrounding case 12-**
**CP-1669 from being brought to light, <u>in or outside of any</u>**
**<u>courtroom</u>!** The Defendants and their co-conspirators were
accessories after the fact under Title 18, U.S. Code § 3 in
covering up the RICO predicate acts committed on the Plaintiffs
and decedent in order to stop justice from prevailing during
case 17-CA-4951. **If discovery is illegally and permanently**
**stopped during a court case (the depositions of all HCSO**
**employees along with Marcy McDermott's were illegally and**
**permanently stopped in both cases 14-CA-12257 and 17-CA-4051),**
**<u>the case is technically over</u>! Key witnesses' depositions in**
**case 17-CA-4051 were illegally and permanently stopped with some**
**of the murder evidence spoiled by Florida's state judicial**
**enterprise, along with it having committed <u>bad faith</u> through**
**Elizabeth Rice and her co-conspirators during their racketeering**
**scams on the Plaintiff during this case (14-CA-4051).**

**(a) Florida State Court Standards:**

Florida state courts have ruled that the issue of **"bad faith"** is
irrelevant if the evidence was so essential to the party's case
that it could not proceed without it. In *DePuy*, for example,

the court noted: "Whether the prothesis was destroyed in **bad faith** or accidentally, is irrelevant in the present case. **The evidence is unavailable for the plaintiff's use and they have demonstrated an inability to proceed without it . . . Having lost the prothesis, [defendants] are now accountable for the ramifications of their act."** Fla. 427 So. 2d at 308.

**(b) Federal Court Standards:**

**Bad faith is generally a prerequisite to the imposition of sanctions in federal court.** In *Stanton v. National R.R. Passenger Corp.*, 849 F. Supp. 1524 (M.D. Ala. 1994), the plaintiff sought denial of the defendant railroad company's motion for summary judgment, arguing that because the defendant lost its "speed or computer tape" an adverse inference of speeding should be imposed. In denying the motion for summary judgment, the court agreed that issues of fact remained in view of the lost tape, but instructed the plaintiff that it must prove the defendant exercised **bad faith** before adverse inferences can be drawn against the defendant.

**By just the shear preponderance of beyond clear and convincing evidence from both cases 14-CA-12257 and 17-CA-4051, accomplices Richard Nielsen, Elizabeth Rice, Steven Hearn, Chad Chronister, Manuel Menendez, Ronald Ficarrotta, Lee Pearlman, Sybil Murphy, Andrew Mallory, CNA Insurance Company, Florida Lawyer's Mutual**

**Insurance Company, Edward LaRose, Daniel Sleet and Matthew Lucas
(2D18-1538), Morris Silberman, Robert Morris, John Badalamenti
(2D18-1889), Axis Insurance and ABC, Inc., <u>conspired to stop the
Plaintiff from obtaining any evidence about anything having to
do with probate case 12-CP-1669</u>! At this point in time, it is
unknown how valuable any spoliated evidence will be that was not
able to be obtained.**

**58T.** In case 17-CA-4051, Elizabeth Rice illegally stalled her
final dismissal order for 1.5 years that she knew from the
beginning of this case she was going to illegally dismiss, per
her instruction from Ronald Ficarrotta. Elizabeth Rice gave her
first illegal dismissal of case 17-CA-4051 without prejudice on
1-16-18, so that the Plaintiff would have to waste his time
needlessly rewriting the complaint in order to tire him. After
this complaint was rewritten once, all of the parties to case
17-CA-4051 failed to answer it once again (second (2) set of
fraud solicitations to Elizabeth Rice by opposing parties),
continuing to cite inapplicable rules for dismissing the
complaint along with the revised complaint not having been
rewritten the way Elizabeth Rice stated that she wanted it
rewritten. So Elizabeth Rice dismissed the Plaintiff's first
revision of this complaint on 6-19-18. And once again, all of

the parties to case 17-CA-4051 cited the same irrelevant and inapplicable rules for not answering the Plaintiff's second revision (third (3) set of wire frauds committed by opposing parties) of the complaint along with it not having been rewritten the way Elizabeth Rice wanted it rewritten and it was dismissed on 3-19-19 in a final order with prejudice for the Plaintiff not having rewritten the complaint the way that it was ordered to be rewritten before discovery had taken place.  All three (3) dismissals of case 17-CA-4051 by Elizabeth Rice were **violations of the Four Corners Rule.  <u>They were also violations of both state and federal substantive due process rights and clear abuses of discretion</u>**!

In *Fontainebleau Hotel Corp., a Florida Corporation*, Petitioner, v. *David Walters and Arthur Courshon*, Respondents.  No. 39504.  Supreme Court of Florida, March 24, 1971, **it states that a motion to dismiss a complaint for failure to state a cause of action does not reach the defects of vague and ambiguous pleading.**  Also cited in *Calhoun v. Epstein* (Fla. App. 1960) 121 So. 2d 828; *Smith v. Platt Motors Inc.* (Fla. App. 1962) 137 So. 2d 239; *Frisch v. Kelly* (Fla. App. 1962) 137 So. 2d 252 and *Plowden & Roberts, Inc. v. Conway* (Fla. App. 1966) 192 So. 2d 528.

In 736 So. 2d 1243 (Mem), District Court of Appeal of Florida, Fourth District. *Virginia Snyder and Virginia Snyder, Inc.*, Appellants, *v. The City of Delray Beach, a municipal corporation, et al.*, Appellees. No. 98-2409. June 30, 1999. **It states that it is now rudimentary that complaints may not be dismissed for failure to state a cause of action unless the moving party can establish beyond any doubt that the claimant could prove no set of facts whatever in support of his claim.** *Greenfield v. Manor Care Inc.*, 705 So. 2d 926 (Fla. 4th DCA 1997) **("it is important to remember that, at this point in the proceedings, we do not consider the ultimate merits of appellant's claim, but merely whether she can plead it. Complaints should not be dismissed for failure to state a cause of action unless the movant can establish beyond any doubt that the claimant could prove no set of facts whatever in support of his claim.");** *Hillman Constr. Corp. v. *1246 Wainer*, 636 So. 2d 576, 577 (Fla. 4th DCA 1994) (same); *Orlovsky v. Solid Surf Inc.*, 405 So. 2d 1363 (Fla. 4th DCA 1981), **(motion to dismiss should not be granted if pleader sets forth facts upon which relief can be granted on any theory);** *Martin v. Highway Equipment Supply Co.*, 172 So. 2d 246, 248 (Fla. 2d DCA 1965) ("a claim should not be dismissed for insufficiency unless it appears to a certainty that the plaintiff is entitled to no

relief under any state of facts which could be proved in support of the claim.").

In *Warner v. Florida Jai Alai, Inc.*, 235 So. 2d 294 (1970) Betty M. Warner, Petitioner, *v. Florida Jai Alai Inc.*, Respondent. No. 38722, Supreme Court of Florida, May 6, 1970, **conclusions of law may be drawn from these pleadings to determine whether a cause of action has been stated.** It is **not proper** to dismiss a complaint on grounds the allegations are only **"conclusions of the pleader".** **If a pleading includes evidentiary facts from which ultimate facts or conclusions of fact may be fairly inferred, the pleading has stated a cause of action.** Citing *Martin v. Highway Equipment Supply Co.*, 172 So. 2d 246 (Fla. App. 2d 1965) holding that a claim should not be dismissed for insufficiency unless it is certain the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.

By the 1930s legal commentators agreed that **the need to plead ultimate facts was hindering the cause of justice.** The Federal Rules of Civil Procedure, which were adopted in 1938, eliminated the ultimate fact requirement and changed the philosophy behind the plaintiff's complaint and the defendant's answer. The Free Dictionary by Farlex. **In place of ultimate facts, Federal Rule 8(a) provides that the complaint shall contain "a short and**

plain statement of the claim showing that the pleader is entitled to relief." Likewise, the defendant "shall state in short and plain terms" the defenses to the plaintiff's complaint. <u>The rules do not require that only facts be alleged</u>. Most states have adopted the federal rules in whole or in part, and <u>the need to state ultimate facts in a pleading is no longer of great importance</u>.

http://law.jrank.org/pages/10963/Ultimate-Facts.html

The accomplices are: **Jorge Labarga, Charles Canady, Rick Scott and Pamela Bondi** as organizers of the secondary enterprise (Section § 1962(b)), **Elizabeth Rice, Ronald Ficarrotta** (Section § 1962(b)), **Lee Pearlman, Sybil Murphy** (Section § 1962(b)), **Robert Welker, Thomas Rydberg, Thomas Rydberg P.A., CNA Insurance Company** for vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(b & c) violations, Defendant, **Florida Lawyers Mutual Insurance Company** for vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(b & c), violations, Defendant, **Denmon & Pearlman P.A.**, a subcontracted agent for Lee Pearlman and FLMIC, **Steven Hearn, Steven Hearn P.A., Michael McGirney, Spector Gadon & Rosen, P.C., Axis Insurance** for vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(b & c) violations, Defendant and **ABC, Inc.** for vicarious liability under the Respondeat Superior

**Doctrine after 6-21-18, in conjunction with Section § 1962(a, b & c) violations, Defendant,** for the above reasons.


**58U.**   In mid. 2015, the Plaintiff was told by Colonel Chad Chronister over the telephone that he would not authorize HCSO to conduct an investigation into the decedent's death until the coroner's office reported that it was the result of a homicide, even though the Plaintiff told this HCSO employee that he had proof that the decedent was in fact murdered.  Chad Chronister then sent the Plaintiff on a wild-goose chase to Mary Mainland, Hillsborough County Coroner, who verbally agreed with the Plaintiff on 6-24-15 that the decedent's death was **not** from natural causes, but from aggravated manslaughter (Florida Statute 782.07) for having been fooled into thinking she was taking her pneumonia medication when in fact she was being given an antifungal which resulted in her having developed sepsis and/or septic shock from not having been treated for a bacterial infection (as documented by Florida Hospital) while being overdosed to death on potassium, as yet **another secondary enterprise ruse.**  Mary Mainland notes taken on 6-24-15 failed to state how the decedent really died and that she was going to order the decedent's medical records to conduct an investigation into her murder.  The Plaintiff found this out by ordering Mary

Mainland's notes taken on 6-24-15 from the Hillsborough County Coroner's Office (HCCO) in 4/2019.   Mary Mainland failed to order any of the decedent's medical records to find out for HCCO or HCSO, if the decedent was abused and neglected to death.   The caretakers had taken away the decedent's pneumonia medication, refused to take her to the doctor and gave her critical/lethal doses of potassium to stop her heart which Florida Hospital, now Advent Health, confirmed and documented.

**1)** HCSO can be sued for violating the decedent's civil rights in order to monetarily injure the Plaintiff in his court cases with their **illegal county government policy** of passing the buck off to their coroner anytime they do not wish to conduct an investigate into a murder and then illegally instruct their coroner **not** to correct their false cause of death on any death certificate.

**2)** Chad Chronister from his illegal actions from mid. 2015 to present, can be sued for aiding and abetting the plan between David Gee and Florida's state judicial enterprise to defraud the Plaintiff and decedent during cases 14-CA-12257, 17-CA-4051 and 2D18-1538.   And,

**3)** David Gee from his illegal actions from 2/2012 to 9/2017, can be sued for concocting and implementing the RICO plan with Florida's state judicial enterprise to defraud the Plaintiff and

decedent during cases 12-CA-1669, 14-CA-10278, 14-CA-12257 and 16-CA-4693.

**4)** HCSO, David Gee from mid. 2015 to 9/2017 and Chad Chronister from mid. 2015 to present, can be sued for **violating** state and federal statutory requirement to investigate the decedent's murder and provide the local state attorney with their findings. The accomplices are: **Jorge Labarga, Rick Scott** and **Pamela Bondi** as organizers of the secondary enterprise (Section § 1962(b)); **Hillsborough County Coroner's Office; Mary Mainland; HCSO** for their policy of denying state and U.S. civil rights; **David Gee** (Section § 1962(b)), respondeat superior to Chad Chronister, from 2/2012 up until 9/2017; **Chad Chronister** from mid. 2015 to present (Section § 1962(b)); **Christopher Brown; Jason Gordillo; Manuel Menendez** (Section § 1962(b)), from 2012 to 2015 and **Ronald Ficarrotta** (Section § 1962(b)), from 2015 to present.


58V. On 4-9-19, the Plaintiff appealed the 3-19-19 final ruling in case 17-CA-4051 with the 2DCA, case 2D19-1384, in which he waved his right to rebut the appellees' answer briefs on 7-18-19 due to the time constraints in filing this RICO complaint. On 12-27-19, the 2DCA illegally affirmed the 3-19-19 final ruling rendered without an opinion. They came up with their ruling based on it being good for Florida's state judicial enterprise

and in keeping their jobs, bar licenses and future retirement perks.  See Appendix V documents.


**58W.**  On 5-16-16, the Plaintiff filed a motion to reopen probate case 12-CP-1669 with new evidence on the decedent's inventory having been devalued by Sybil Murphy, Robert Welker and Thomas Rydberg.  There was $160,000 of the decedent's money supposedly jointly owned with Sybil Murphy on record at a banking institution.  This was stated by Sybil Murphy during her deposition taken on 4-19-13, during case 12-CP-1669, but Thomas Rydberg refused to disclose this banking record with anyone except Lee Pearlman, both of whom refused to disclose it to the Plaintiff.  The Plaintiff filed the pleading to be appointed the new personal representative (PR) in case 12-CP-1669, on 5-16-16, in order to both **1)** acquire any missing banking information on the decedent, and **2)** to sue the former personal representative, Sybil Murphy, in case 17-CA-4051, under Florida Statute 415.1111, for her involvement in the decedent having been abused, neglected, exploited and murdered.  Accomplice Robert Bauman was the probate judge who was assigned the Plaintiff's 5-16-16 pleading.  Robert Bauman should have reassigned the motion to the division that heard probate case 12-CP-1669, division B, Robert Foster's court.  This was the requirement under the

current administrative order written by Ronald Ficarrotta **to keep defrauded victims having to go back to the same crooked judge who defrauded them! This is the rule since it takes more time for another judge within this circuit to talk to Ronald Ficarrotta in order to find out why a party was defrauded by the state judicial enterprise before making another false ruling. A trial judge will never make an obviously false ruling unless it is for the good of the state judicial enterprise and it has to be confirmed by one of their managers or accomplices first or a demotion in position is a given.**

The decedent's probated inventory was devalued by about $1,058,800 due to her caretakers coercing (extorting) the decedent into allowing their names to be on her banking accounts, but Robert Bauman illegally dismissed the Plaintiff's motion to reopen probate case 12-CP-1669! **Fraud!** Robert Bauman stated irrelevant Florida Probate Statute 5030(a) in his 6-9-16 ruling for not reopen probate case 12-CP-1669. **Fraud!** It was irrelevant because the Plaintiff was not the former personal representative who needed an attorney to reopen this case. *Silveira v. Quiroga*, So. 3d, 40 Fla. L. Weekly D287 (Fla 3d DCA January 28, 2015). In this cited case, when the ward's sister sought to be substituted for the public guardian, the trial court ruled that she had to appear through counsel, and the sister appealed. The appellate court treated the appeal as a

petition for writ of certiorari and granted the petition.  **Fla. Prob. R. 5.030(a), which requires a guardian to be represented by counsel, was inapplicable because the sister was not a guardian,** and the sister, although persistent, had not risen to the level of a vexatious Litigant.  **The court stated that "pro se litigants are not held to a lesser standard than a reasonably competent attorney."**  The accomplices are:  **Jorge Labarga, Rick Scott and Pamela Bondi as organizers of the secondary enterprise (Section § 1962(b), Ronald Ficarrotta (Section § 1962(b), and Robert Bauman** for the above reasons.  See Appendix W documents.

**58X.**  Almost a year later on 5-4-17, the Plaintiff submitted another pleading to reopen probate case 12-CP-1669 under Florida Rule of Civil Procedure 1.540(b)(1).  And this motion was submitted to Catherine Catlin, the new probate judge for the 13th Judicial Circuit who did not transfer the motion to Robert Foster's division B either, but illegally dismissed it on 5-15-17 herself, stating that the motion was supposedly insufficient, period.  **Fraud!**  She did so without having the required evidentiary hearing under FRCP 1.540(b).  See *Cottrell v. Taylor, Bean & Whitaker Mortg. Corp.*, 198 So. 3d 688, 691 (Fla. 2d DCA 2016) **(holding that where rule 1.540(b) motion sets forth colorable claim for relief, trial court should conduct**

**evidentiary hearing to determine whether relief should be granted)** (citing *Chancey v. Chancey*, 880 So. 2d 1281, 1282 (Fla. 2d DCA 2004)). The Plaintiff's pleading was to reopen probate case 12-CP-1669 due to Robert Bauman having erred in case 12-CP-1669. The reality was, Robert Bauman deliberately defrauded the Plaintiff and decedent out of their state and federal substantive due process rights thanks to Manuel Menendez having asked Robert Foster to throw the case. **What one judge illegally does for the good of Florida's state judicial enterprise, always has to be repeated by another judge right next door <u>(operation broken gavel)</u>.** It is highly probable that Robert Bauman asked both Robert Foster and Ronald Ficarrotta for clarification on the matter before making the illegal ruling as did Catherine Catlin. And any judges can quickly look into a case file and see if a clear abuse of discretion was committed. **And they will absolutely, positively determine the real reason for why it was committed before making their ruling! It is the custom among Florida's judicial confederates, to continue the <u>tradition of excellence</u> in defrauding a disliked party without the poor bastard knowing that the axe is coming as long as possible for increased gratification as the superior man by implementing a well-played plan, not readily recognized as forthcoming (highly valued). And one with a dreadful ending is much more effective in demoralizing a person when they think they are going to be**

given a fair shake before lowering the boom, knocking the air out of them.  A similar scenario happened to the Jews during WWII when they thought they were going to be allowed to take a nice, hot shower at the Auschwitz Concentration Camp, but had the air knocked out of them too when they were gassed to death. <u>There is absolutely no difference in scenarios as to what real power does to the corruptible</u>!  Ultimate power ultimately corrupts the ones in positions of power to do the <u>most evil</u> they can think of getting away with in achieving their goals.  Very few, if any, elected officials today have any moral conscience, integrity or honor, if they did, they would not be able to stomach being flunkies committing illegal high dollar injuries on the innocent for the powers that be.  Consequently, the type of person who becomes a judge is a weak minded, dishonest, struggling attorney, looking for a judicial appointment to save his or her career and to help with making a new car or house payment.  You never see successful, competent and honest attorneys becoming judges.  When deranged losers become high powered judges, given immense power by dishonest men in high places, instilling in them a sense of invincibility and arrogance to do whatever immoral acts they wish to commit in court cases for both the good of the enterprise and their self-esteem, citizens are injured and <u>the country goes to pot</u>!  <u>When American judges make defrauding the innocent legal by putting</u>

**their signatures on blatantly false orders so that the guilty
can profit or gain, they not only injure their own citizens, but
the country they live in**! The accomplices are: **Jorge Labarga,
Rick Scott and Pamela Bondi as organizers of the secondary
enterprise (Section § 1962(b)), Ronald Ficarrotta (Section §
1962(b)), Steven Hearn, Steven Hearn P.A., Sybil Murphy (Section
§ 1962(b)) and Catherine Catlin** for the above reasons. See
Appendix X documents.

**58Y.** The Plaintiff filed a writ of mandamus to the last order
rendered in case 12-CP-1669, appellate case 2D17-2725, in
response to being illegally denied his right to reopen case 12-
CP-1669 after his second attempt on 5-4-17 failed on 5-15-17.
The 2DCA illegally affirmed Catherine Catlin's illegal ruling
without an opinion on 6-8-18. The accomplices are: **Jorge
Labarga, Rick Scott and Pamela Bondi as organizers of the
secondary enterprise (Section § 1962(b)), Ronald Ficarrotta
(Section § 1962(b)), Edward LaRose (Sections § 1962(b & c)),
Marva Crenshaw, Susan Rothstein-Youakim, Steven Hearn, Steven
Hearn P.A. and Sybil Murphy (Section § 1962(b)),** for the above
reasons. See Appendix Y documents.

**58Z.** The Plaintiff filed a dignitary tort case on 6-30—17 and willingly amended it on 10-31-18, as illegally ordered by Elizabeth Rice on 8-22-18, court case 17-CA-6219. The counts consisted of: 1. Slander, 2. Impact, 3. Defamation, 4. Abuse of Process, 5. False Imprisonment, 6. Breach of Fiduciary Duty, 7. Tortious Interference, 8. Breach of Duty of Care, 9. Civil Conspiracy to Commit abuse of process, 10. Culpable Participation in Fiduciary Breaches, 11. Civil Theft and Conversion and 12. Premise Liability.

Case 17-CA-6219 was first illegally dismissed by Elizabeth Rice on 8-22-18, but unknown to her, the Plaintiff welcomed it because he needed to file a more accurate and inclusive revised complaint, which he did on 10-31-18 that included Ms. Kimball as a party to the case. Ms. Kimball has been deemed mentally incompetent by the courts and Mr. Schneider is her POA.

**Federal Rule 17:**

Plaintiff and Defendant; Capacity; Public Officers (a) Real Party in Interest:

(1) Designation in General. An action must be prosecuted in the name of the real party in interest. The following may sue in their own names without joining the person for whose benefit the action is brought:

(A) an executor;

(B) an administrator;

(C) a guardian;

(D) a bailee;

(E) a trustee of an express trust;

(F) a party with whom or in whose name a contract has been made for another's benefit; and

(G) a party authorized by statute.

(2) Action in the Name of the United States for Another's Use or Benefit. When a federal statute so provides, an action for another's use or benefit must be brought in the name of the United States.

(3) Joinder of the Real Party in Interest. The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

(b) Capacity to Sue or Be Sued. Capacity to sue or be sued is determined as follows:

(1) For an individual who is not acting in a representative capacity, by the law of the individual's domicile;

307

(2) For a corporation, by the law under which it was organized; and

(3) For all other parties, by the law of the state where the court is located, except that:

(A) a partnership or other unincorporated association with no such capacity under that state's law may sue or be sued in its common name to enforce a substantive right existing under the United States Constitution or laws; and

(B) 28 U.S.C. §§754 and 959(a) govern the capacity of a receiver appointed by a United States court to sue or be sued in a United States court.

(c) Minor or Incompetent Person.

(1) With a Representative.  The following representatives may sue or defend on behalf of a minor or an incompetent person:

(A) a general guardian;

(B) a committee;

(C) a conservator; or

(D) a like fiduciary.

**(2) Without a Representative.  A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem.**  The court must appoint a

308

guardian ad litem or issue another appropriate order to protect a minor or incompetent person who is unrepresented in an action.

(d) Public Officer's Title and Name.  A public officer who sues or is sued in an official capacity may be designated by official title rather than by name, but the court may order that the officer's name be added.

On 1-12-18, the Plaintiff purposely filed a letter into the case files of both cases 17-CA-4051 and 17-CA-6219.  This pleading unequivocally informed anyone reading through the case files that racketeering had been committed by Elizabeth Rice during case 17-CA-4051 to both **1)** defraud the Plaintiff out of property owed to him and to **2)** cover-up the prior RICO predicate acts committed on the Plaintiff and decedent by the state judicial enterprise.  The Plaintiff also submitted correspondence to Jena Justice, Court Administrator and copied Elizabeth Rice on the 1-18-18 by way of the case file (17-CA-6219), stating that Elizabeth Rice defrauded him in case 17-CA-4051.

**After this, there were two (2) hearings, and importantly two (2) RICO predicate acts committed by Elizabeth Rice, <u>who before this case ever started, was a well-known secondary enterprise member from case 17-CA-4051, who had already committed five (5) RICO predicate acts on the Plaintiff during this case (five injuries sustained by the Plaintiff)</u>.  These two (2) hearings held during**

case 17-CA-6219 resulted in this case being illegally dismissing in violation of the Four Corners Rule on both 5-25-19 and 10-28-19 with the aid of all opposing parties.   Thus, the Plaintiffs were injured during this case with a visible pattern of racketeering by Florida's state judicial enterprise.

It is important to note that Florida's statewide judicial enterprise, like others throughout America, could not continue to operate without the 1) chief judge of the state supreme court, 2) the state governor and 3) state attorney general, managing and approving its daily racketeering operations.   And these types of cabals throughout America in turn could not continue to operate without the President of the United States overseeing and permitting their scam operations on the public. When major world banking corporations, the Vatican and the Bilderbergers talk, Donald Trump listens and does what he is told.   When the creators of currencies, faith based religions and major goods & services first teamed up to acquire riches centuries ago at the public's expense, they not only teamed up to defraud citizens for increased power and control over mankind, but to operate their businesses as world totalitarianists with the purpose of violating citizens' civil rights.   So it only follows their pattern of progression in total world domination that along with deciding how we live and die, they should also be allowed to control who takes possession

of our property before we are dead!  **THIS IS WHERE THE PLAINTIFF DREW HIS LINE IN THE SAND AND WILL BE MOVING OUT OF AMERICA!** Either ill-gotten profits exploited out of Americans by the Templars decrease to a minimum, or America turns into a third world country.  Vive la revolution, but the only revolution the poor, confused, unorganized and beaten down American citizens will ever have is to just die on the bastards.  Then there will be no one around for them to defraud.

Consequently, Donald Trump is nothing more than a puppet looking after his masters' interests in America, not the interests of Americans.  By Donald Trump allowing all of his subordinate employees within the American government to declare a free-for-all on U.S. citizens whenever it suits their needs, he has turned hundreds of millions of corrupted government grunts into dictators, making America one of the worst places on Earth to live!  And any national government that exploits the use of red marrow mutating vaccinations on newborns, video cameras with cell phone monitors on most street corners, and gets away with more than this by completely suppressing the freedom of the press, is where totalitarianism rules and reins, and where you do not ever want to live, if you want to live life to its full potential, but the Plaintiff digresses.

On 8-22-18, Elizabeth Rice wanted all parties to file false pleadings for the next hearing on 5-22-19, case 17-CA-6219. This is indicated in the transcript of this hearing, starting on page 13, line 2, that was placed into the case file. In this transcript (8-22-18) Elizabeth Rice indicates the fraudulent reasons she used to dismiss court case 17-CA-4051, and would be using again to dismiss court case 17-CA-6219, which she did on 5-25-19. **In this transcript are the only stated reasons Elisabeth Rice gives for illegally dismissing case 17-CA-6219 three times.** No explanations were given in her dismissal orders on 11-19-18, 5-25-19 and 10-28-19, only verbally in front of opposing parties stating on 8-22-18 that:

1) She did not like the way the Plaintiff structured and formed his complaints in cases 17-CA-6219 and case 17-CA-4051. **Fraud!**

2) She could not tell which counts were for which Defendants. **Fraud!**

3) She disagreed with the Plaintiff having stating that if the evidentiary facts stated in a complaint support the counts, ultimate facts (actionable claims) were stated. She implied that no set of evidentiary facts could be used to establish ultimate facts (acceptable claims), even if they supported the counts. So Elizabeth Rice illegally and deliberately stated for the record that the Plaintiff did not state any ultimate facts

312

(actionable claims) in his complaints. **Illogically fraudulent! If the evidentiary facts (evidence) cited in a complaint support the counts, then actionable claims were stated. Thus, ultimate facts were stated.**

4) She states that the Plaintiff cannot sue for having been impacted when acquiring the manifestation of physical ailments due to his close friend, Ms. Kimball, having been injured under modern day Florida impact laws. And then states that she is not going to let a jury decide if the Plaintiff is entitled to compensation for distress related injuries as if the Plaintiff asked for a bench trial. **Fraud!**

5) She also indicated that the Plaintiff **cannot** put any statutes and common laws into his complaints. **Extremely obvious ulterior motive with abuse of discretion eminent!**

6) She indicated that she did not like the way the Plaintiff presented the evidence used to support the counts. **Opinionatedly biased and fraudulent!**

7) She indicated that the Plaintiff's complaints are unacceptable, and susceptible to being dismiss for having cited statutes and laws in them. **Totally illogical since you need laws to substantiate the claims as being actionable on! When are laws stated in court case complaints ever grounds for a dismissal of the case? When Ronald Ficarrotta working for the**

**state judicial enterprise says they are and wants no statutes or common laws cited in the Plaintiff's complaints as evidence to there being clear abuse of discretions committed by his state judicial enterprise.**

8) She tells the Plaintiff to look at the reasons for her having dismissing case 17-CA-4051 and use them as a reference guide for revising his 17-CA-6219 court case complaint. **Elizabeth Rice laughed hysterically after stating this on 8-22-18, with her mouth opening wide enough for the Plaintiff to see her wisdom teeth and her eyes rolling back into her head as though a shark during a kill, while digressing to her prior frauds committed during case 17-CA-4051 for the good of Florida's state judicial enterprise.   One rotten to the core judge on a RICO mission!**

9) She made obvious her illegal plan to dismiss the Plaintiff's 17-CA-6219 case again for false reasons, hinting to opposing parties to file dismissal motions based on not being able to understanding the Plaintiff's complaint by his not having stated any ultimate facts (actionable claims) in support of the counts (cause of action), after his next revision of the complaint. **Pure fraud!   Supposedly none of the 18 counts in the revised complaints filed by the Plaintiff on 10-31-18 and the 13 counts filed on 6-11-19 by his 22 year veteran attorney, were supported with any applicable facts and dates that supported any counts,**

**so respectively on 5-25-19 and 10-28-19 Elizabeth Rice dismissed all of them!**

**When a state judicial enterprise starts soliciting officers of the court to commit the government function of defrauding a disliked party in open court (very obvious) with a court reporter present, by filing false pleadings (wire and/or mail fraud), so it can continue defrauding the same disliked patsy in another court case, injuring them in a different property or business interest, by deliberately misconstruing fair and equitable pleading requirements (laws) with false (made up) legal constructs to mean whatever the judge wants them to mean in accomplishing the plan (monetary loss for the Plaintiffs), aside from all of the smoke and mirrors, the results accomplished are most definitely and absolutely without a doubt from racketeering, authorized by management within the state judicial enterprise.**

When Elizabeth Rice committed honest services fraud, also known as a fraud on the court, racketeering and a violation of Section § 1983 (committed in an action at law), by deliberately **signing false orders on 5-25-19 and 10-28-19,** case 17-CA-6219, benefiting opposing parties, she could not circumvent herself and other officers of the court and their employers being liable for the Plaintiffs' damages by giving the Plaintiffs' the

challenge of rewriting the supposedly unacceptable complaint.
Elizabeth Rice **verbally** dismissed case 17-CA-6219 on 8-22-18
(first time), and then on 5-22-19 with the Plaintiffs' attorney
present (a second time), and then on 10-10-19 with the
Plaintiffs' attorney present (a third time), dismissing all of
counts in each one of the complaints with the ultimatum of
rewriting another one or lose! **Idiotic!** A similar scenario
would be a guilty woman who stole property numerous times, but
returned the property each time to give the owner the challenge
of making sure she did not do so again, so that criminal court
proceedings against her for theft and depreciation of property
could not be initiated. **One wickedly crafty, but very obviously
deranged and unscrupulous judge on a RICO mission!**

A judge who has participated with opposing parties in committing
a violation under the RICO Act by signing three (3) false
dismissal orders (17-CA-4051), **the same judge who already
committed racketeering on the same party or parties in another
court case, with two writs (appeals) filed during the case which
were illegally affirmed by his or her co-conspiring allies at
the appellate court (17-CA-4051, cases 2D18-1889 and 2D18-1538),**
who benefited all opposing parties in the later case with false
dismissal orders twice, injuring the intended victims (17-CA-
6219 on 5-25-19 and 10-28-19), **cannot circumvent being sued**

under RICO Act for damages for so kindly allowing multiple revisions of the complaint to be filed, with or without illegal restrictions (no new claims or counts allowed, stated in the 5-25-19 and 10-28-19 orders, case 17-CA-6219).

Keeping in line with the RICO rules:

After two (2) RICO predicate acts are committed by one or more judicial members of the same enterprise, illegally working against the same party or parties during any court case, resulting in at least one (1) injury to the same party or parties property or business interest, by either committing 1) an illegal dismissal of the case or 2) a permanent illegal suspension of some part of the discovery process or 3) an illegal order disallowing counts and claims to conform with the evidence (FRCP 1.190(b)) (all honest services frauds resulting in an injury), the same party or parties can file suit on any one of the participating judges and/or their co-conspiring benefactors who either filed false pleadings and/or subsequently acquiesced in under the RICO Act. Elizabeth Rice illegally and permanently suspended discovery of two (2) very important deponents during case 17-CA-4051 with the 2DCA illegally affirming these rulings (18-1889 McDermott and 18-1538 Chronister) which injured the Plaintiff's property interest. And Elizabeth Rice also illegally dismissed case 17-CA-4051 a

third time with prejudice, committing a total of five (5) RICO predicate acts during this court case (17-CA-4051), all honest services frauds. Case 17-CA-6219 was illegally dismissed by Elizabeth Rice three times (8-22-18, 5-22-19 and 10-10-19), and the last two times she did so, she was aided and abetted by ACTS and FMCNA, both of which intended to, and participating in, violations of respectively Title 18, Chapter 96, Section 1962(d and c). So after the 8-22-18 hearing, and after the 10-31-19 complaint was filed, when all opposing parties had committed wire fraud solicitations to Elizabeth Rice to illegally injure the Plaintiff by dismissing case 17-CA-6219 on 5-25-19, just the Plaintiff was legally allowed to sue any co-conspirator for any and all injuries to his property or business interest sought after in this case, as stated in his 10-31-18 amended complaint (dismissed on 5-25-19). Then when court case 17-CA-6219 was illegally dismissed on both 5-25-19 and 10-28-19, two (2) RICO predicate acts were committed on Ms. Kimball, not party to case 17-CA-4051. By Elizabeth Rice having illegally dismissing all of Ms. Kimball counts twice she was also allowed to sue any co-conspirator for any and all injuries to her property interest sought after, as stated in both her 10-31-18 and 6-11-19 amended complaints, illegally dismissed respectively on 5-25-19 and 10-28-19.

The Rotella case makes it easier for a victim or victims to sue for racketeering after one (1) RICO predicate act was committed on them, but the Plaintiff feels that two (2) committed are more in line with showing the pattern of racketeering on a particular party in the courtroom setting.

**The Four (4) Corners Rule:**

To survive a motion to dismiss, a complaint must be plausible on its face.  A complaint contains **"facial plausibility"** if the allegations allow the court to **draw a reasonable inference** that the defendant is liable for the alleged misconduct.  **So there was clearly no reason for** all of the counts (causes of action) **in case 17-CA-6219 to have been verbally dismissed on 8-22-18 (once) and a revision of the complaint ordered by Elizabeth Rice on this day.  The Plaintiff filed a revised complaint on 10-31-18 with bogus dismissal pleadings filed afterwards by all opposing parties and all of the counts were verbally dismissed on 5-22-19 (twice) by Elizabeth Rice.  Then a revised complaint was filed by the Plaintiffs' attorney on 6-11-19 with bogus dismissal pleadings filed afterwards by all opposing parties and all of the counts were verbally dismissed on 10-10-19 (a third time).  The second and third illegal dismissal orders filed with the clerk of the court were with leave to amend (5-25-19 and 10-**

28-19), but there were illegal statements made in these orders stating that the Plaintiffs SHALL NOT add any new counts or claims to the complaint (abuse of discretion)! Leave to amend means that a plaintiff can add or delete any counts and claims to conform with the evidence, period. If Elizabeth Rice did not want to allow the Plaintiffs to add any new counts or claims to their complaints, she should not have dismissed all of the counts in them and ordered leave to amend each time.

FRCP 1.190(b) Amended and Supplemental Pleadings:

Amendments to Conform with the Evidence. When issues not raised by the pleadings are tried by express or implied consent (assumption of permission) of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure to amend shall not affect the result of the trial of these issues. If the evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended to conform with the evidence and shall do so freely when the merits of the cause are more effectually presented thereby and the objecting party fails to satisfy the court that the admission of

such evidence will prejudice the objecting party in maintaining an action or defense upon the merits. But Elizabeth Rice already illegally voided the Plaintiffs' right to conform the revised complaints with the evidence that was stated in their 10-31-19 complaint, without any opposing party having objected and before any discovery had occurred! In fact, she wanted some Defendants (Julie Holt and Susan Brown) taken out of the complaint! This was not Elizabeth Rice using the state judicial system to get down and out right grubby in her court, but having racketeered!

FRCP 1.190(c) Relation Back of Amendments: When the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment shall relate back to the date of the original pleading (the plaintiffs get to amend the complaint and keep the date of the original filing).

On 10-28-19, Elizabeth Rice illegally stopped two (2) additional claims that were already stated in the 10-31-18 amended complaint for 1) theft and conversion committed by FMCNA in the amount of $720 owed to Mr. Schneider, with service to FMCNA and ACTS documented in the case file, that was accidently not stated in the revised complaint filed on 6-11-19. Along with 2) clarification on Ms. Kimball's incarceration dates, also

accidently not stated in the 6-11-19 amended complaint, but forbidden to be added to the revised complaints. These incarceration dates are from 2-4-17 until 6-17-21, in which money is currently owed to Ms. Kimball for any jail time served during this time frame by FMCNA along with their affiliates, those being the Florida Department of Corrections (DOC), Hillsborough County, State Attorney's Office (SAO) and Hillsborough County, Public Defender's Office (PDO), for all of them tortuously breaching Ms. Kimball's contract with the State of Florida (judgment and sentence). The purpose of Ms. Kimball's community control and aftercare, was to keep her off the streets and protected from having to do any further jail time up until 6-17-21. Elizabeth Rice stated in both of her 5-25-19 and 10-28-19 orders, case 17-CA-6219, that any new counts and claims SHALL NOT be added to the amended complaint, as just another one of her clear abuse of discretions used in committing honest services fraud to injure the Plaintiffs by keeping them from legally adding any left out details to their complaints in order to continue injuring them in their property interests.

Once a party or parties in a current court case determines that there was racketeering committed against them by the same enterprise involved in a prior court case, that has now committed another RICO predicate act on them during a different court case, the victim or victims can file a lawsuit against any

**co-conspirators who participated in, or subsequently acquiesced in after benefiting from, either court case without the need to take alternative legal action to show due diligence in procuring compensation for one's injury, prior to filing a RICO complaint**.

On 11-20-18, Joseph Riopelle electronically (#81079237) committed wire fraud on behalf of ACTS by submitting an illegal dismissal motion to the clerk of the court in which he struggles to come up with some good false reasons for Elizabeth Rice to dismiss the Plaintiff's revised complaint filed on 10-31-18, citing reasons that a 10 year old punk could have come up with. Fraud!   Joseph Riopelle states the following as reasons for dismissing case 17-CA-6219 with prejudice:

1) The Plaintiff's second amended complaint is a fifth one and as a fifth one, needs to be dismissed. **Fraudulently hysterical!**

2) The Plaintiff is representing Ms. Kimball and this is not allowed. **Fraud!**

3) The complaint does not state an identifiable cause of action, citing inapplicable case law as proof of this. **Fraud!**

4) The complaint does not allege sufficient ultimate facts, citing inapplicable case law as proof of this. **Fraud!**

5) Implies that the complaint is a notice pleading and not a fact pleading, citing inapplicable case law as proof of this. **Fraud!**

**6)** Says that all five complaints filed by the Plaintiff were vague and ambiguous. **Fraud!**

**7)** Says that there is no indication as to any abuse of process committed on Ms. Kimball. **Fraud!**

**8)** Implies that a signed court imposed judgment and sentence agreement with Ms. Kimball is not a contract with her. **Fraud!**

**9)** Says that keeping Ms. Kimball out of Hillsborough County does not constitute as a conspiracy, and unless given an exact date of the conspiracy with a copy of the illegal agreement in writing, there is no support for a count of conspiracy, citing inapplicable case law as proof of this. **Total fraud!**

**10)** Says that the Plaintiff did not state a cause of action for civil theft and conversion for failure to itemize all stolen items in the complaint, citing inapplicable case law as proof of this. **Fraud!**

**11)** Says that the Plaintiff's 10-31-18 complaint did not even establish a prima facie case for any property kept and converted by his employer. **Fraud!**

ACTS filed this type of bogus pleading (wire fraud) twice for the hearings on 5-22-19 and 10-10-19 to help Elizabeth Rice illegally dismiss case 17-CA-6219.

**A big thank you to Elizabeth Rice for educating gullible and accommodating opposing parties on 8-22-18 in the use of, not one**

**(1) specific misrepresentation, but a half dozen that were used to illegally dismiss the Plaintiffs' 17-CA-6219 case twice (5-25-19 and 10-28-19).  Quite an obvious abuse of discretion by a determined state judicial enterprise on a RICO mission!**

**Then on 12-6-18, Cory Person, working for FMCNA, does not only misrepresent what relevant statements and facts the Plaintiffs wrote in their 10-31-18 revised complaint, he blatantly lies about why a case should be dismissed:**

**1.** The complaint is in manuscript form.

**2.** Fails to state recognizable claims.

**3.** Fails to state factual assertions.

**4.** The Plaintiff pled opinions, theories, legal conclusions.

**5.** Fails to state one claim upon which relief can be granted, citing inapplicable case law as proof of this.

**6.** States that by the Plaintiff citing applicable rules of law, it is impossible to answer the Plaintiff's claims.

**7.** Says that the complaint is not clear enough to respond to, citing inapplicable case law as proof of this.

**8.** Says that the facts are not definitive enough in the complaint and consequently the complaint should be dismissed.

**On 10-17-19, both ACTS and FMCNA were put on notice by the Plaintiff that their agents committed wire fraud in soliciting**

Elizabeth Rice to defraud the Plaintiffs out of property owed to them on behalf of their companies, respectively by USPS certified mail 70191120000099242043 (ACTS) and 70191120000099242036 (FMCNA), and then again by USPS priority mail 9505515441349296508339 (FMCNA), on 10-23-19, due to FMCNA's accommodating postman just happening to have misplaced USPS certified mail parcel 70191120000099242036, sent out on 10-17-19.

Then on 11-5-19, FMCNA had their agent Butler, Weihmuller, Katz and Craig LLP, commit another wire fraud solicitation to Elizabeth Rice to 1) sanction Mr. Schneider for exercising his first (1) amendment rights and to 2) once again dismiss case 17-CA-6219 a fourth (4) time, claiming irrelevant and inapplicable case law for doing both. <u>Note that in this 11-5-19 pleading filed by agent Butler, Weihmuller, Katz and Craig LLP, case 17-CA-6219, it 1) does not deny either FMCNA or ACTS having permitted their agents to racketeer with Elizabeth Rice, but 2) confirms what their intent was, and still is, which is to continue defrauding the Plaintiffs, this time by soliciting Elizabeth Rice to A) illegally sanction Mr. Schneider for exercising his first (1) U.S. constitutional amendment rights and to once again B) illegally dismiss case 17-C A-6219.</u>

**On 11-12-19, the Plaintiffs' attorney filed a very comprehensive revised complaint with evidentiary facts and actionable claims (ultimate facts) cited as to what the co-conspirators did wrong in case 17-CA-6219 that in turn definitely supported the counts cited (conclusions of law).**

**Then on 12-2-19, ACTS filed another clearly false solicitation motion for Elizabeth Rice to grant which states the following:**

1.  It asked for the dismissal of the case due to the 11-12-19 revised complaint not having state a cause of action. **Hysterical**!

2.  The revised complaint makes convoluted statements and assertions in support of a cause of action, but does not give one (1) example. **Fraud**!

3.  The revised complaint does not plead any facts and ultimate facts to support the counts against ACTS, citing inapplicable case law as proof of this. **Completely fraudulent statement**!

4.  The revised complaint does not plead any facts, but was pled only as a notice pleading, citing inapplicable case law as proof of this. **Insanely fraudulent**!

5.  The revised complaint was vague and ambiguous, citing an inapplicable rule as proof of this. **Fraud**!

6.  The revised complaint's breach of fiduciary duty count is for negligence. **Fraud**! **The facts in case 17-CA-6219 clearly**

state that all of Ms. Kimball's injuries were from deliberate acts committed with <u>malice</u>. <u>Ms. Kimball at this point, did not need to state anything other than this count was for breaching a fiduciary duty, by whom and when it was breached, not what exactly the motives were for the Defendants breaching the count until after discovery</u>.

7.    Tortious interference requires a contract, citing inapplicable case law as proof of this. **<u>Completely fraudulent</u>**!

8.    Ms. Kimball did not identify any wrongful act or acts undertaken by ACTS to have stated a count of conspiracy. **<u>Total Fraud</u>**! Conspiracies allow for derivative liability where conspirators can also be punished for the illegal acts carried out by other members, but ACTS was directly involved in Ms. Kimball's court cases since mid. 2015 when she enrolled in their HEART Program. Joseph Riopelle, Jessica Welsh who wrote this dismissal motion filed on 12-2-19 and ACTS, all understood the definition of conspiracy under Section § 1962(d) and the Pinkerton Liability Doctrine, after they were constructively notified on respectively 11-16-19 and 11-17-19 of this RICO complaint being filed on ACTS. On 12-2-19 Boyd Richards Parker & Colonnelli, P.L. committed wire fraud for ACTS' benefit by providing Elizabeth Rice with another false pleading to rule favorable on during the upcoming 2-27-20 hearing. ACTS and

FMCNA were both given constructive notice on respectively 10-17-19 and 10-23-19 of being sued in this lawsuit, if they did not stop their agents from defrauding the Plaintiffs as participants in a RICO conspiracy with Elizabeth Rice during case 17-CA-6219.

9.    ACTS is exempt from having committed civil theft by providing health care or residential care under the Florida statute 772.11(3).   **Pure Fraud**!   **This statute relates to liability during the provision of health care and residential care, not liability during the theft of property.   And if the Plaintiff read this statute wrong, the State of Florida should be sued for concocting another bogus state law that is in violation of U.S. constitutional rights to sue for stolen property while being an invitee.   In any case, the Plaintiffs did not claim that a theft had occurred during Ms. Kimball's stay at the ACTS drug treatment program, but on 10-13-15, during Ms. Kimball's stay at the HUD funded HEART Program implemented by ACTS.**

10.   Mr. Schneider is not Ms. Kimball's representative, as the court (Elizabeth Rice) has ruled on prior occasions.   **Fraud**!   **Elizabeth Rice never made, nor needed to make, a ruling as to Mr. Schneider being, or not being, Ms. Kimball's representative in court because Mr. Schneider never represented Ms. Kimball in case 17-CA-6219.   Mr. Schneider has been Ms. Kimball's POA for**

many years as documented in this complaint, see Appendix Z documents.

11. Mr. Schneider did not give any details as to how ACTS stole his property at 13145 20th St. N., Apt. 209, Tampa, FL 33612, on 10-13-15, after ACTS had Ms. Kimball beaten and arrested by HCSO. **Fraud**! **All actionable claims can be referenced in the case file (17-CA-6219). To say that there are missing details needed to be plead to support the counts cited in this case for it to continue into the discovery phase, is a complete lie.**

**These statements made above were a flagrant disregard for civil rights routinely committed in America by officers of the court for profit or gain! And this illegal practice shamelessly confirms the norm among American attorneys is to solicit judges to defraud parties for profit or gain whenever they are hired to represent!**

**If being a good defense attorney representing guilty clients best interests means submitting wire and/or mail fraud solicitations to judges in hopes of persuaded them to defraud an intended court case victim, then any 10 year old punk feeling lucky enough to submit a false and inaccurate pleading in violation of the bar rules could win a court cases and no one has their bar license suspended. Wow! And this is what most American attorneys are, deceitful punks who need their bar**

licenses pulled and a few years stay in a federal prison!   So why make American citizens believe that American law schools instructing on, and American bar association govern, the honest practice of law?   **To implement the American government's false façade of justice (disinformation) used in covering up their affiliates' illegal acts committed on the public while everyone but the honest and innocent profit or gain because the rule is that in America, one dirty hand washes the other!   80 years worth of the powers that be, putting corrupt individuals into key American government positions, has resulted in every organization, public and private, doing whatever corrupt act the American government wants or be put out of business, a worse fate than operating one's business legitimately out of a third world country**.

Almost any business that allegedly engages in common law fraud can theoretically be sued under the RICO Act.   One may violate the mail or wire fraud statutes even if there is no affirmative misrepresentation **(just deception used)**.   American Jurisprudence 2d Limitation of Actions § 174 (2007).   **As a general rule, a scheme to defraud must relate to past or presently existing facts**.   *American Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1292 (11th Cir. 2010) **("a plaintiff must allege that some kind of deceptive conduct occurred in order to plead a RICO violation predicated on mail fraud")**.

**Misleading or Deceptive Conduct:**

**Knowingly making a false statement; intentionally omitting information from a statement** and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement; **with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false,** forged, altered, or otherwise lacking in authenticity; **with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect;** or knowingly using a trick, scheme, or device with intent to mislead.

**And in the future, making an clearly obvious false statement in a federal court pleading is a violation under 18 USC, § 1001.**

**It is illegal for a business to engage in conduct that misleads or deceives or is likely to mislead or deceive consumers or other businesses. This law applies even if you did not intend to mislead or deceive anyone or no one has suffered any loss or damage as a result of your conduct.**

When a state judicial enterprise wants to illegally monopolize the **commercially** used court system they work for, in their official capacity, to profit or gain in a particular lawsuit, opposing parties are subtly solicited by their judicial co-

conspirator participant into facilitating the illegal plan as government facilitators in defrauding a party or parties by filing knowingly false pleadings for the judge to rule favorably on (honest services fraud).

**Elizabeth Rice wanted the dismissal pleadings filed by opposing parties in cases 17-CA-6219 and 17-CA-4051 to be <u>chuck-full, from beginning to end, of erroneous rebuttal statements based on the Plaintiff's complaints not having stated a cause of action. And they were, for a slow, long and aggravating illegal dismissal of his cases to show the Plaintiff that judges rule and reign, even if they are in the wrong (might makes right)</u>! When a judge has previously participated with other co-conspirators in defrauding a particular party or parties, in violation of the RICO Act five (5) times (case 17-CA-4051), then participates in three (3) more illegal dismissals (three RICO predicate acts) in another court case (case 17-CA-6219), the judge has not only committed honest services fraud (abuse of discretion) over a half a dozen times on the same party, but has exhibited the <u>definite pattern requirement</u> for his or her victim or victims to file suit against them, or any of their co-conspirators, under Title 18, Chapter 96, Section 1962(a, b or c).**

**In schedule 2 of the Competition and Consumer Act 2010:**

**The doctrine aims primarily to provide <u>consumer protection</u> by preventing businesses from misleading their customers. However, it extends to all situations in the course of trade or <u>commerce</u>. <u>And the judicial system is most definitely a commerce based business</u>, where business owners and judges routinely monopolize government court systems for fraudulent purposes when needed with the help of each other. Business owners profit or gain from agents' (paid by one owner, but could be working for multiple owners), fraudulent actions when their false pleadings are illegally ruled on favorably by racketeering judges.**

The RICO Act is almost single-handedly responsible for the small print disclaimers that appear on every newspaper and T.V. advertisement. All of the disclaimers essentially say that the statements made in an advertisement are opinions that may or may not apply to the circumstances of any individual consumer.

**On 12-19-19, the Plaintiff's found out that Elizabeth Rice was being transferred to criminal court for the <u>staggeringly obvious</u> number of RICO predicate acts committed on a victim by one judge. <u>She made the same obvious violations of Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346 eight (8) times as a member of Florida's state judicial enterprise on one (1) victim</u>! When a circuit civil judge is transferred to criminal court by the same management team within the state judicial enterprise**

334

that ordered him or her to racketeer, it is a clear indication that they either 1) refused to do so, or 2) their sloppy defrauding technique embarrassed management.  A chief judge only gets embarrassed enough to enact damage control by transferring a trial judge to a less demanding court when:  1) a few hundred or so complains are made by attorneys as to a trial judge being incompetent, or 2) the failure of a trial judge to completely defraud a disliked party or parties without leaving any more than one (1) loose end laying around (just one clear abuse of discretion made) on behalf of the state judicial enterprise. After 1) Ronald Ficarrotta was informed of the evidence that the Plaintiff submitted to the 2DCA in case 2D19-1384, lower case 17-CA-4051, by Nelly Khouzam, the new chief judge of the 2DCA, and 2) once the evidence of what was in the Plaintiffs' documents sent to ACTS and FMCNA on 10-17-19, were submitted to the clerk of the court by FMCNA on 11-5-19 looking for another illegal judicial favor from Elizabeth Rice during case 17-CA-6219 (sanction motion), which she intended to hear by having granted FMCNA a hearing date on 3-5-20, <u>Elizabeth Rice was on her way out the door without any recourse</u>!

Ronald Ficarrotta and Jorge Labarga were obviously involved in racketeering on the Plaintiff during case 17-CA-902 when they illegally transferring case 17-CA-902 to Jack St. Arnold.  And if both of these crooks were involved in racketeering to defraud

the Plaintiff out of his property interest from case 17-CA-902, they were also involved in defrauding the Plaintiff out of his property interest during cases 14-CA-10278, 16-CA-4693, 17-CC-403, 17-CA-4051 and 17-CA-6219, especially after the Plaintiff informed them that he knew of their fraudulent plan.  And by these facts being absolutely true, all of the judicial racketeering in this matter was sanctioned by Rick Scott and Pamela Bondi.

If Elizabeth Rice was removed from her position in 12/2019 by the current management within the state judicial enterprise, consisting of Charles Canady, Ron DeSantis and Ashley Moody, for using an inferior defrauding technique that embarrassed them, she had absolutely no recourse for staying in her division and left as quietly as she came.  In any case, both Agency for Community Services (ACTS) and the Free Methodist Church of North America (FMCNA) are vicariously liable under the Respondeat Superior Doctrine in conjunction with Section § 1962(b and c) violations and are now being sued for racketeering under the RICO Act.  Mr. Schneider is owed a regular damages from FLMIC, CNA, and AI, in the amount of 1,060,000.  Mr. Schneider's regular injury amount owed to him by ACTS is $6,000.  And FMCNA owes Mr. Schneider $720 as a regular damage amount.  Both of these companies owe Mr. Schneider his attorney's fees for services rendered in case 17-CA-6219, from 1-25-19 up until 11-

12-19.   Ms. Kimball's regular damage amount owed, as the secondary plaintiff in this case (17-CA-6219), is $117,900 by FMCNA and $122,424 by ACTS.   And ABC, Inc. is also liable for the Plaintiffs' damage amounts for it having tortuously interfered in this matter when it committed the following:   **1)** participated in this matter on 6-21-18 with Florida's state judicial enterprise, violations of Title 18, Chapter 96, Section 1962(c).   **2)** Became vicarious liable, also on 6-21-18, under the Respondeat Superior Doctrine in conjunction with Section § 1962(a, b & c) violations, Defendant.   And since ABC, Inc. knew everything about the crimes committed on the Plaintiff as of 6-21-18, it is liable for damages for emotional pain and suffering under the Duty to Act law in California where Willow Bay was located when she injured the Plaintiff.   See Appendix Z documents.


**58ZA.**   For at least three years (mid 2015 to the end of 2018) the Plaintiff was in contact with Pamela Bondi by email, telephone and USPS certified mail, 7017-3380-0000-5200-3137 (8-9-18) and 7018-1130-0001-3829-4635 (8-20-18) on **1)** respectively the decedent's murder cover-up and **2)** case 17-CA-6219 which is a current dignitary tort case in which the local Public Defender Julie Holt helped falsely imprison Ms. Kimball for two (2)

years, who was then owed regular damage amounts, but is now owed triple remedial damage amounts under the RICO Act due to her having been defrauded during case 17-CA-6219, on 5-25-19 and 10-28-19, causing two (2) injuries to her property interest.     In 2017, the Plaintiff telephoned Pamela Bondi's senior assistant attorney general, Chesterfield Smith and customer service supervisor, Jack Hagadorn, asking for their help in yet again finding out why HCSO and the 13th Judicial Circuit had violated both state and federal statutes by allowing citizens in their district to be murdered and their rightful heirs defrauded out of their property interests.

On numerous occasions, the last time was on 4-30-19, Jack Hagadorn, still the customer service manager to the Attorney General's Office, told the Plaintiff over the telephone that his 04-06-15 and 06-28-17 emailed complaints sent to the Florida Attorney General's Office by way of their website correspondence page, that asked for help in making either local or state law enforcement investigate the decedent's murder, were not able to be investigated by Pamela Bondi's office because both Florida state statutes and constitutional laws prohibited her from doing so.    **Total fraud! Pamela Bondi supposedly could not conduct an investigation into Florida government agencies' (HCSO) ongoing criminal activities, or refer them to another Florida agency, like the Florida's Governor's Office for an investigation,**

leading to grand jury indictments of culprits because the current Florida state laws supposedly prohibited this! If this is true, **then the State of Florida has committed tens of thousands (10,000) of U.S. constitutional law violations!** Jack Hagadorn also told the Plaintiff at this time (4-30-19) that Pamela Bondi did not receive the Plaintiff's certified mailed documents because the Plaintiff had only copied Pamela Bondi on the documents that were sent to her, even though the envelope that contained these documents was addressed to Pamela Bondi by USPS certified mail, 70173380000052003137. **Illogically fraudulent! Constructive notice was given to Pamela Bondi on the decedent's murder and racketeering committed by government agencies, no matter who's name was on the documents inside the envelope that were sent to her.** Jack Hagadorn also told the Plaintiff on 4-30-19 that he would **not** be forwarding any of his prior correspondence to the new Florida Attorney General, Ashley Moody, or to the new Florida Governor, Ron DeSantis, because the documents contained in the envelope addressed specifically to Pamela bondi, did not have either of their names on them as well. **Double talking malarkey! If Pamela Bondi, Rick Scott, Ashley Moody and Ron DeSantis (Section § 1962(b) members), were having the Florida Legislature keep them from being required to step on any affiliates' toes by either investigating or referring murder cover-ups by local governments to a more**

appropriate agency, <u>then their policy of turned a blind eye to</u>
<u>state and federal crimes</u>, as well as those of any accomplices
for having implementing any illegal state laws or policies
allowing them to do so, <u>have truly amounted to numerous state</u>
<u>employees being accessories in thousands of crimes, whose</u>
<u>fraudulent actions over the years have been in violation of</u>
<u>their fiduciary duty to treat their citizens appropriately under</u>
<u>federal constitutional laws, violations under the RICO statutes</u>!

Former Florida Deputy Attorney General Chesterfield Smith Junior
told the Plaintiff over the telephone in 2017 to contact the law
firm of Wilkes & McHugh for help in having the decedent's abuse,
neglect, exploitation and murder investigated. **<u>Dereliction of</u>**
**<u>duty to protect one's job</u>**! Consequently, during this ten (10)
minute conversation between Chesterfield Smith Junior and the
Plaintiff, who verbally detailed the events of the decedent's
murder, **Chesterfield Smith Junior participated under Title 18,**
**Chapter 96, Section 1962(d) as a member of the secondary**
**enterprise by turning a blind eye to his employment requirements**
**to act appropriately**! On 5-2-19, the Plaintiff contacted
Chesterfield Smith Junior's office and talked with his secretary
Cori at telephone number 850-414-3623, who would only give out
her first name, to **1)** find out how to provide service on Pamela
Bondi, whose Florida Bar mailing address still listed her
address at the capital **(a crook in hiding), 2)** to find out if

340

Pamela Bondi did in fact read the Plaintiff's complaints sent to her by constructive notice and **3)** to tell Chesterfield Smith Junior that he was now in violation of Title 18, Chapter 96, Section 1962(c) for having aided and abetted Florida's state judicial enterprise, from 2017 to present, in defrauding the Plaintiffs.

The Plaintiff made two (2) formal complaints to The Florida Bar on Pamela Bondi. One on 5-6-19 and another on 5-13-19 by USPS certified mail 70182290000075894385, stating that their mailing address on Pamela Bondi was in error and that they needed to suspend her bar license until they were given a correct mailing address on her. **What the Plaintiff found out is that the chief judge of the Florida Supreme Court reigns as God Almighty over lower divisions of the Florida Supreme Court, one of which is The Florida Bar. <u>Jorge Labarga gave standing orders not to provide the right time of day to the Plaintiff, who was blacklisted when he complained to the Florida Bar about Lee Pearlman around the end of 2014 for being negligence during case 12-CP-1669</u>. The Florida Bar illegally refrains from giving out any mailing information on former elected officials to stop any process of service to be performed on their litigable and/or prosecutable, former enterprise members.** Consequently, due to the Respondeat Superior Doctrine, the chief judge of the Florida Supreme Court, through William Wilhelm working at The Florida

Bar, concealed Pamela Bondi's whereabouts and misrepresented to the Plaintiff that Pamela Bondi's mailing address was at the Florida capital where she was still working as the attorney general.  **Fruad!**  Thus, the statute of limitations for serving her this complaint, if need be, is tolled under concealment fraud (an equitable estoppel tolling method).

On 5-2-19, The Plaintiff gave Cori a message to give to Chesterfield Smith Junior, "Either come clean before being sued, or be sued with the rest of the Defendants anyway." Naturally the Plaintiff never heard back from anyone at the Florida Attorney General's office. **A den of iniquity!**

On 01-26-18 Pamela Bondi was sent documentation by certified mail about the decedent's murder cover-up due to local corruption at both HCSO and the 13th Judicial Circuit in Tampa, Florida by way of her home address in Tallahassee, Florida by USPS certified mail, 70172400000075179259.  These same documents were also sent in care of her mother, Patsy Bondi, by USPS priority mail (tracking number can be obtained, if needed) at her address in Temple Terrace, Florida, on 02-26-18.  The Plaintiff had USPS verify that the documents were delivered to Patsy Bondi the next day.  All that the Plaintiff ever received from Pamela Bondi were the documents that he sent to her at 4420 Argyle Ln., Tallahassee, FL  32309 on 01-26-18, with the words

"address unknown", "not the address of the attorney general" written on the envelope in a woman's handwriting.  It is more likely than not (probable cause established) that her mother Patsy Bondi gave Pamela Bondi the contents of what was sent to her in care of her at 207 Bannockburn Ave., Temple Terrace, FL 33617 on 02-26-18, **especially after the Plaintiff had gone to her house in 1/2018, knocked on her front door and talked with her briefly about her daughter's involvement in the decedent's murder cover-up before she jumped into her SUV and sped off with her down syndrome child, leaving the Plaintiff still standing on her front porch with her neighbors outside listening and the Plaintiff's dash car camera left on.  <u>PATSY BONDI APPEARED TO BE SEVERELY SUFFERING FROM SHAME DUE TO DECADES OF FAMILY CORRUPTION AND THE GUILT ATTACHED, BUT LIKE HER DAUGHTER PAMELA BONDI, HAD THE INTELLIGENCE, COURAGE AND STRENGTH TO RUN LIKE HELL AND HIDE WHEN CONFRONTED WITH A MAJOR PROBLEM THAT HER FAMILY WAS RESPONSIBLE FOR CAUSING</u>.  <u>Verminous</u>!**

Multiple times the Plaintiff constructively noticed Pamela Bondi enough documents for her to have had law enforcement arrest and charge everyone involved in both the decedent's murder and murder cover-up, but she naturally turned a blind eye to the racketeering, because she was part of the enterprise!  Pamela Bondi was allowed to have her name placed on the ballot for attorney general by Florida's government cabal starting in 2011

because she could be trusted to look after their best interests and take orders without question, as one of their own. Righteous people with honor and integrity are not trusted to manage the operations within higher levels of Florida's government. **Consequently, honest citizens without any crooked friends in high places are always illegally stopped from having their names placed on Florida ballots.** The accomplices are: **Jorge Labarga, from 2014 to 2018 (Section § 1962(b)), both Rick Scott and Pamela Bondi from mid. 2015 to 2019 all of whom were informed of the fraud committed in this matter, but continued to organize, control and manage the secondary enterprise (Section § 1962(b)); Chesterfield Smith Junior and Jack Hagadorn from mid. 2015 to present; Ashley Moody and Ron DeSantis (Section § 1962(b)) from around the beginning of 5/2019 to present, when their departments were contacted and notified through Jack Hagadorn, on 4-30-19, of this matter as the newest members of the secondary enterprise, who have continued in the <u>tradition of excellence</u> as organizers, controllers and managers of all racketeering policies implemented in the State of Florida through their state judges who deliberately breach state and federal constitutional laws for their enterprise's benefit.** See Appendix ZA documents.

**58ZB.**  In 6/2017, The Plaintiff filed a complaint online with the Department of Justice (DOJ) in Tampa, Florida, through their website complaint form.  All of the documents having to do with the decedent's murder were sent to the DOJ by way of their email address at the local DOJ office in Tampa, Florida, which were then reviewed by Eric Johnson.  Then these same documents were sent by the Plaintiff to Stephen Muldrow's secretary, Denise Woods, in Tampa, Florida by email on 6-15-17 at denife.woods@usdoj.gov.  A false email address was given to the Plaintiff on purpose by Denise Woods so there would not be any documentation of the Plaintiff having sent Stephen Muldrow any information on a murder cover-up by HCSO.  These same documents were then sent to the correct email address for Denise Woods on 6-16-17 at dwoods@usa.doj.gov, given to the Plaintiff by the operator at the local Tampa DOJ office.  These documents included the decedent's autopsy report and cause of death by Florida Hospital, with some other documents as evidence of the decedent having been murdered and that HCSO was covering it up. What was also included in these documents was a brief summary of what had happened to the decedent that the Plaintiff had sent to Senator Marco Rubio, explaining that HCSO had violated Title 18, Chapter 13, U.S. Codes § 241 & 242.  These same documents were also sent by emailed to Cynthia Medina on 6-16-17, at cynthia.medina@usdoj.gov, who was another employee at the local

345

DOJ office in Tampa, Florida.  About two (2) weeks before this, still in 6/2017, **the Plaintiff was told by Eric Johnson over the telephone that he had contacted HCSO in the Plaintiff's behalf, <u>not on behalf of the local DOJ office conducting an official DOJ inquiry</u>**, and was told that HCSO never received a complaint from anyone about the decedent having been murdered.  **<u>Naturally</u>! Eric Johnson then told the Plaintiff that <u>he did not submit the Plaintiff's murder documents to HCSO and failed to state a reason for not having done so, and then he disconnected the call</u>!  The local DOJ office had refused to even embarrass HCSO for not having conducted an investigation into the decedent's murder.  <u>One dirty, filthy, American government hand washing the other</u>!  <u>Crooked Stephen Muldrow and his crooked DOJ office staff, performed their illegal government tasks well and probably received pay raises for treasonously covering up another American murder for affiliated government cabal members</u>! All of the local DOJ employees cited above told the Plaintiff that their DOJ office was not going to investigate HCSO under Title 18, Chapter 13, U.S. Codes § 241 & 242, and then told him never to call back like they owned the DOJ!**  Stephen Muldrow, former manager of the local DOJ office in Tampa, Florida, by beyond reasonable doubt evidence, knew that HCSO deprived the decedent from her murder being investigated and the guilty charged with the offence, but had everyone in his office turn a

blind eye, a violation of their fiduciary duties to the decedent as one of their citizens. Thus, Stephen Muldrow was an accomplice in this matter starting on 6/2017 for having violated the U.S. Statutes cited in Section 4 of this complaint, two of which were Title 18, Chapter 96, Section 1962(b) and Title 18, U.S. Code § 3 when he covered up the prior racketeering activities of David Gee and Chad Chronister both HCSO employees in violation of Title 18, Chapter 96, Section 1962(b) and Title 18, Chapter 13, U.S. Codes § 241 & 242, during court cases 14-CA-12257 and 17-CA-4051. The Defendant is: **Stephen Muldrow,** under Title 18, Chapter 216, Section 3333. See Appendix ZB documents.

**58ZC.** On 6-12-18, the Plaintiff contacted Willow Bay's office at the University of Southern California (USC) College of Journalism only because she was the dean of this college, not because the Plaintiff knew her family owned ABC, Inc. The Plaintiff needed to get permission from Willow Bay's office to post a USC job offering for one of its patrons to write and publish a story on what happened to the decedent within the categories of elder abuse and government corruption, with or without pay. The Plaintiff believed that with USC being a large public educational institution that employed liberal law and

347

communications instructors, he had found a good place to look for an interested patron to write and publish his story, or at least give him a good referral.   The Plaintiff spoke to Ms. Stroud on 6-12-18, secretary to Dean Willow Bay, who was emailed the details of the Plaintiff's subject matter on this day to show her that his posting would be a legitimate one.   The Plaintiff asked Ms. Stroud if his job posting, along with some of the contents of the matter, could be displayed for USC patrons to view and was given a **yes reply**.   **All that the Plaintiff received back from having sent Ms. Stroud a copy of his U.S. Supreme Court petition and letters that he had sent to accomplice Kellyanne Conway and his correspondence with Donald Trump's advisor, Rudolph Giuliani, was a piece of threating hate mail from ABC, Inc., dated on 6-21-18, in violation of both the Plaintiff's first (1st) amendment rights to communicate with Dean Willow Bay's office in her official capacity at USC.   And 2) the Plaintiff's business expectancy with Willow Bay's office through Ms. Stroud.   Ultimate power, ultimately corrupts!**

**The verminous saboteurs at ABC, Inc. had illegally hindered the Plaintiff facilitating an investigation into the government cover-up of the decedent's murder by having tortiously interfered (wrongful inducement) with the Plaintiff's business expectancy with USC to post a journalism job about the decedent's murder cover-up storyline along with who was**

348

**responsible.**  And since ABC, Inc. had **A)** detailed knowledge of the decedent's murder, **B)** knew exactly which state and federal government racketeers were involved in the decedent's murder cover-up and **C)** were affiliated with the **U.S. Department of State (DOS)**, ABC, Inc. decided to act as a third party against the Plaintiff's expectancy with USC.  **This means that ABC, Inc. did not have an absolute right to have hindered the Plaintiff from his expectancy with USC.**

A third party's lawful termination of a business expectancy with a plaintiff will not, of itself, bar a claim that the defendant tortiously interfered with that expectancy.  **The focus of a claim for tortious interference with a business expectancy is upon the defendant's wrongful inducement of a business expectancy being terminated, not upon whether the termination itself was legally justified.**  In this context, Delaware courts have consistently followed the Restatement (Second) of Torts, which recognizes a claim for tortious interference with business relations where the defendant utilizes **"wrongful means"** to induce a third party to terminate the business relationship. *ASDI, INC. v. Beard Research, Inc.*, 11 A. 3d at 751 **(holding conversely that "the case law reflects that a defendant's tortious conduct that induces a third party to terminate a contract with the plaintiff, unlawfully, will suffice to establish a claim of tortious interference with contractual**

relations"). **There is no difference between a contractual or an expectational relationship when tortious conduct induces a third party to end the relationship. Tanya Menton and Willow Bay, both of whom were working for ABC, Inc. at the time they intended to, and participated in, injuring the Plaintiff's expectancy, did not have an absolute right to breach his expectancy with USC. Not even a USC employee had this right because the Plaintiff's business expectancy with USC was a legitimate one, the type which USC allowed.**

**Although the reason for the interference is not needed,** Willow Bay had a **bonafide personal conflict of interest with the Plaintiff's agenda,** so she aided and abetted the Defendants and their co-conspirators in the plan to defraud the Plaintiff through her family's broadcasting company, ABC, Inc., a separate and distinct company from USC, and had the Plaintiff **threatened not to contact her at the USC College of Journalism to follow up on posting a job, or suffer the consequences at the hands of ABC's security, when the Plaintiff had a business expectancy with this USC department to post a job offering on their bulletin board system.** And anyone can post a job offering at USC, or any other public educational institution for their patrons to view, if the job posting is an appropriate advertisement for a legitimate purpose. **<u>Willow Bay's actions in this matter defines the problem with implementing justice</u>**

**throughout the world when totalitarians control what is aired over media broadcasting stations (another type of newsworthy story).**

**The meaning of the expression, "If a tree falls in the forest and no one sees or hears it fall, did it fall?", Is why criminals in one huge government enterprise keep getting away with murder!** The real headline news that the public needs to hear about, such as how government corruption injures the public on a worldwide scale, is covered up by the media as favors to government affiliates in order to reciprocally profit and gain at the public's expense. Another expression that comes to the Plaintiff's mind is, **"If you can't beat them, join them."** And this is exactly what the media throughout the world has done, or be sued, fined, jailed or murdered right out of business for reporting the truth, but where is the profit in honorably telling the truth when the corrupted control the world? When government agencies fleece the public, the media suppress the scandalous news and both profits and gains at the expense of the public. **The media playing politics with governments to profit and gain at the expense of the public, has sadly made having quality characteristics like true talent and intelligence needed for one to be successful in the world today, take second place to marrying into families with money. Darwin's law of evolution**

**is still applicable, but Darwin himself has rolled over in his grave thanks to scheming and opportunistic vermin!**

It was not USC, but ABC, Inc. that: **1)** became **vicariously liable under Respondeat Superior Doctrine** in conjunction with **Section § 1962(a & b & c) violations, 2)** became an accessory after the fact under **(Title 18, U.S. Code § 3)** in covering up racketeering activities under **(Title 18, Chapter 95, Section 1961(1)) cited in Section 16, 3)** tortiously breached the Plaintiff's expectancy with USC **(tortious interference), 4)** violated the Plaintiff's U.S. **constitutional 1st amendment rights** to communicate **(free speech)** with USC, **5)** mail fraud on the Plaintiff under **Title 18, Chapter 63, Section 1341, 6) assisted the judicial accomplices** in defrauding and depriving the Plaintiffs and decedent out their civil rights **under 1) (Title 18, Chapter 96, Codes § 1961-1968), 2) (Title 18, Chapter 63, U.S. Codes § 1341, 1343 & 1346), 3) (Title 18, U.S. Code § 3), 4) (Title 42, Chapter 21, Section 1983), 5) Title 18, Chapter 13, U.S. Codes § 241 & 242, 6) Title 18, Chapter 95, Section 1956 and 7) Fraud on the Court, all of which monetarily damaged the Plaintiffs in their property and/or business interests.**

The Plaintiff had every right to contact the USC Department of Journalism until told not to by USC.  USC never told the Plaintiff to stop contacting anyone at USC, **ABC, Inc. did!**

352

Consequently, Willow Bay acted as a third party (outsider) to USC, when her actions were to benefit ABC, Inc. as one of its owners and managers by vicarious liability under the Respondeat Superior Doctrine, in conjunction with Section § 1962(a, b & c) violations.

**(a). Under the Civil Rico Act:**

A defendant may be liable for a conspiracy to violate a law even if he or she may not be liable for a substantive violation of the law because they do not fall within the category of persons who could commit the substantive offense directly.  See, e.g., *Salinas v. United States*, 522 U.S. 52, 64 (1977) ("[A] person . . . may be liable for a conspiracy under the RICO Act even though he or she was incapable of committing the substantive offense.

**"To be found guilty of being part of a criminal venture, a defendant must associate himself with the venture in a manner whereby he participates in it as something that he wishes to bring about and seeks by his acts to make succeed."** *Khalil*, 279 F. 3d at 369, quoting *United States v. Martin*, 920 F. 2d 345, 348 (6 Cir. 1990).

**Or failed to act in a way that the law required** the defendant to act, with the specific purpose of bringing about the underlying crime . . . . **Under Title 18 U.S. Code § 3.   (1) the commission**

353

of an underlying offense against the United States [i.e., §
1959] by [another person], (2) the defendant's knowledge of that
offense, and (3) assistance by the defendant, in order to
**prevent the apprehension, trial, or punishment of the offender**.
*Cuong Gia Le*, 310 F. Supp. 2d at 779.  *United States v. Malpeso*,
115 F. 3d 155, 163-64 (2d Cir, 1997).

**(b). Tortious Interference with a Business Expectancy:**

It is well established that an action will lie for the
intentional interference by a third person with a contractual
relationship **either by unlawful means or by** means otherwise
lawful when there is a **lack of sufficient justification for such
interference**. (*Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 35
[112 P. 2d 631]; *Herron v. State Farm Mutual Ins. Co.*, 56 [39
Cal. App. 3d 608] Cal. 2d 202, 205 [14 Cal. Rptr. 294, 363 P. 2d
310].) [3].

Both Tanya Menton and Willow Bay became accessories after the
fact in this RICO matter under Title 18 U.S. Code § 3, in order
to cover-up government racketeering activities against the
Plaintiff and decedent when they tortiously interfering with the
Plaintiff receiving publicity through USC as a means to help end
his fight against state and federal government corruption, at
least in this matter.

**As the senior advisor within the Trump Administration, Kellyanne Conway oversees the operations of all U.S. departments under the DOS.** **<u>A recommendation from the Trump Administration to the Office of the Assistant Attorney General who oversees the U.S. Antitrust Division within the DOJ to reevaluate permitting trouble making and untrustworthy ABC, Inc. to purchase 21st Century Fox in 3/2019, would have absolutely, positively, been made after the Plaintiff obtained good publicity through Willow Bay's USC office, embarrassing the Trump Administration</u>.**

**(c) Intentional Torts:**

Joint and several liability among multiple tortfeasors exists when the tortfeasors, acting in concert or through independent acts, produce a single injury.  This principle is set forth in Section § 875 of the Restatement (Second) of Torts (1979), which provides:

**Section § 875.   Contributing Tortfeasors-General Rule:**

**Each of <u>two or more</u> persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability to the injured party for the entire harm.** Additionally, section 876 provides further:    Section § 876. Persons Acting in Concert:  For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

355

**(1)** Does a tortious act in concert with the other or pursuant to a common design with him, or

**(2)** Knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

**(3)** Gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

**(d). Intentional Interference by Inducing or Causing the Termination of an Expectancy:**

Anyone who intentionally and improperly interferes with another's prospective business relation, is subject to liability to the other (plaintiff) for the pecuniary harm resulting from loss of the benefits of the relations (a good employee for the Plaintiff, and a good job for a USC patron), whether the interference consists of: **a) inducing or otherwise causing a third person not to enter into or continue the prospective relation (USC) or b) preventing the other (Plaintiff) from acquiring or continuing the prospective relation.** *Harbor Broadcasting, Inc. v. Boundary Waters Broadcasters, Inc.*, 636 NW 2nd 560, 569 (Minn. App. 2001).

**(e). Damages:**

The damages associated with a finding of liability for intentional interference are those that are directly or proximately caused by the actions of the defendants.

A claim of tortious interference with business relations does **not** require the existence of an enforceable contract. See *McKesson Med.-Surgical Inc.*, 266 F. Supp. 2d at 597.

"The five elements for intentional interference with prospective business relations or business expectancy are:

1. A valid business relationship or business expectancy existed between the parties;

2. The defendant had knowledge of the relationship or expectancy;

3. The defendant intentionally coerced one of the parties to terminate the business relationship, breach a contract, or withhold a valid business expectancy;

4. The defendant was not authorized to interfere with the parties' dealings;

5. The defendant's interference resulted in damages to the plaintiff.

"The question is whether a plaintiff must plead and prove that the defendant engaged in wrongful acts with the specific intent of interfering with the plaintiff's business expectancy. **We**

357

conclude that specific intent is not a required element of the tort of interference with prospective economic advantage. While a plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage, **a plaintiff may alternately plead that the defendant knew that the interference was certain, or substantially certain, to occur as a result of its action."** (*Korea Supply Co.*, supra, 29 Cal. 4th at p. 1154, original italics.). "<u>[A] plaintiff need not allege the interference and a second act independent of the interference</u>.

"[O]ur focus for determining the wrongfulness of those intentional acts should be on the defendant's <u>objective conduct</u>, and evidence of <u>motive</u> or other subjective states of mind is <u>relevant only to illuminating the nature of that conduct."</u> (*Arntz Contracting Co.*, supra, 47 Cal. App. 4th at p. 477.)

(f).   If the Plaintiff had just one USC patron help in publishing his story in 2018, this complaint may not have needed to be filed.  <u>It will be interesting to see if ABC covers this extremely newsworthy lawsuit about how the American government, with the media's help, cover-up murders all day long</u>!  <u>At least two homeless people are murder every month in Florida without the media covering the crime or law enforcement conducting an</u>

**investigating.   The same is true within the Florida prison system, but the most new worth segment you will ever see on American television is one (1) hyped up murder committed by a madman that the American government made psychotic.** There are no longer any published news articles or aired segments by the American media on corruption within the American government like there were in the 1970's, but the American government has gotten **much more** corrupted.  So where are all the current news reports about the America government turning American into a third world country?  They have all been covered up just like the decedent's murder.  With the aid of the media, national governments keep their defrauding techniques hidden from their poor, dumb citizens.  Just like the processing of poor, dumb cattle before being sold at market, the American government sees its citizens as the largest and most valued commodity on the planet to be fully exploited.  **Consequently, the lions are never far from the zebras**!

Judges should enjoy their job perks while they last and realize that their right to certain inhalable freedoms will not pass on to their heirs because these freedoms are only continual blue blood privileges.  **Also, what ABC's Adam Weiss did after finding out that HCSO had the 13th Judicial Circuit illegally cover-up the decedent's murder and then left the Plaintiff to the judicial wolves, is unconscionable and quite possibly illegal**

**due to the Duty to Act law in Florida**! The Defendant is:   **ABC,
Inc. for vicarious liability under the Respondeat Superior
Doctrine in conjunction with Section § 1962(a, b & c)
violations,** for the above reasons.   See Appendix ZC documents.


**58ZD.**   In 5/2018, the Plaintiff constructively notified both
Donald Trump and Kellyanne Conway along with at least six (6)
top White House executives by both emails and/or certified mail
messages with the decedent's medical records attached, informing
the Trump Administration that there was elder abuse, neglect,
exploitation and aggravated manslaughter committed on at least
one of their citizens.   Donald Trump was notified by email at
whops@eop.gov and USPS certified mail, 7018-3090-0000-2529-6800;
Kellyanne   E.   Conway   was   notified   by   email   at
kellyanne.e.conway@who.eop.gov and USPS certified mail, 7017-
3380-0000-5200-3847; Justin R. Clark was notified by telephone,
202-456-3704 & email, Justin.r.clark@who.eop.gov and Douglas. L.
Hoe   was   notified   by   telephone,   202-456-4247   &   email,
Douglas.l.hoe@who.eop.gov.   These last two Trump Administration
executives were contacted by telephone and informed the
Plaintiff that Kellyanne Conway, Donald Trump's senior counselor
in his administration, was sent the Plaintiff's documents.   The
Plaintiff sent at least four (4) other high ranking Trump

administrative personnel the **same documents** by email and these employees stated over the telephone that they received the documents and in turn forwarded them to Kellyanne Conway, Senior Counselor for the White House who was also the White House's Legal Department Manager.    In 5/2018, the Plaintiff also telephoned Stephanie Grisham at 480-219-0683 & 602-926-5518. Stephanie Grisham, special assistant to the president and director of communications for the first lady, at mailing address 425 L Street, Apt. 1328, Washington D.C.    20001, was sent by USPS priority mail (USPS number can be provided, if needed) the same documents that were sent to everyone else working for the Trump Administration.

**By the preponderance of evidence** (imputation by Trump administrative executives), both Kellyanne Conway and Donald Trump were informed of the decedent's murder, **but did nothing**, then a violation under Title 18, Chapter 96, Section 1962(d) and now, a violation under Title 18, Chapter 96, Section 1962(c).

**1)** Anyone who holds a position where one of their require duties is to assist in the enforcement of U.S. criminal statutes when probable cause evidence establishes that there has been a violation, either refuses to do so, or takes action to prevent the enforcement of the penalties once notified, is considered an accessory after the fact in the crime under Title 18, U.S. Code

§ 3.   There is no statute of limitation on being an accessory after the fact in a murder.

**2)**  A defendant with a fiduciary duty (legal or ethical) to act appropriately once notified of a racketeering operation in an agency or company that was within their employment requirements to have acted on, with foreseeable racketeering activity **having continued** into the future because the appropriate action was not taken, is in violation of Title 18, Chapter 96, Section 1962(c),

**(a) Elements of Confidential Relationships in Business:**

A confidential relationship is created when trust is reposed by one party (Kellyanne Conway) in another (Donald Trump) with resulting superiority and influence exercised by the other. Such a fiduciary duty is implied by law and its existence, imposition and breach depends upon specific factual circumstances.   Confidential relationships are not per se fiduciary in nature, but arise in situations where one party exercised 'dominion and control over another.  *Kelley v. Johns*, 96 S.W. 3d 189, 197 (Tenn. Ct. App. 2002); *Matlock v. Simpson*, 902 S.W. 2d 384, 385-86 (Tenn. 1995) and *Kelly v. Allen*, 558 S.W. 2d at 848.  This relationship, often called a 'confidential relationship, "is not merely a relationship of mutual trust and confidence, but rather it is one where confidence is placed by one in the other and the recipient of that confidence is the

362

dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party." Kelley v. Johns, 96 S.W. 3d at 197 (citing *Iacometti v. Frassinelli*, 494 S.W. 2d 496, 499 (Tenn. Ct. App. 1973)). **The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship**. *McRedmond v. Estate of Marianelli*, 46 S.W. 3d 730, 738 (Tenn. Ct. App. 2000); [Restatement (Second) of Torts] § 874 cmt. a (1979).

Kellyanne Conway breached her duty to both the Plaintiff and decedent when she knew there was a murder that both state and federal government agencies had covered up along with racketeering, but failed to take the appropriate steps to see that the federal constitutional law violations pertaining to a murder and the RICO Act, were enforced. **Kellyanne Conway's breach of duty to the Plaintiff and decedent was carried over to Donald Trump not for just being liable under the Respondeat Superior Doctrine for having wrongly hired her as his senior counselor, but because of the confidential relationship as to what Donald Trump wanted Kellyanne Conway to do in this type of matter along with the other top White House executives. Donald Trump dictated exactly what he wanted Kellyanne Conway to do when informed of government agencies covering up crimes like**

**murders in violation of U.S. constitutional law as a <u>benefit to</u>**
**<u>the Trump Administration by not making enemies with crooked</u>**
**<u>government agencies and their affiliates, that profit and gain</u>**
**<u>with Donald Trump in office</u>**.  Consequently, Donald Trump could
only keep on benefiting by <u>not</u> upholding Section 3 of Article 2
of the Constitution (Take Care Clause) that requires the U.S.
president and his administration to obey and enforce all federal
laws.  Donald Trump is liable for triple remedial damages
arising from this matter for violating:  **1)** Title 18, Chapter
96, Section 1962(c) (Pinkerton Liability Doctrine) once notified
of this matter, **2)** Respondeat Superior Doctrine, for having
wrongly hired Kellyanne Conway as his senior counselor in charge
of the White House.  And Donald Trump is liable in this matter
for violating:  **3)** Title 42, Chapter 21, Section 1983 as a co-
conspirator of Florida's state judicial enterprise that
defrauded the Plaintiffs in their court cases and **4)** Section 3
of Article 2 of the Constitution (Take Care Clause).
Consequently, Kellyanne Conway may have a civil remedy against
Donald Trump under confidential relationship law.  The statute
of limitations for Kellyanne Conway suing Donald Trump under
this type of law does not accrue until the misdeed becomes
apparent.  **And since Kellyanne Conway knew that she was breaking**
**the law the entire time in this matter, she has no recourse**
**against Donald Trump!**  The Defendant is:  **Kellyanne Conway** under

Title 18, Chapter 216, Section 3333. And the accomplice is **Donald Trump,** for the above stated reasons. See Appendix ZD documents.

**58ZE.** By far the most culpable from the list of accomplices is Ronald Ficarrotta, who personally had his courthouse judges defraud the Plaintiff and murdered decedent at the local Tampa, Florida state courthouse from 2015 to present. **"Without Ficarrotta as judge, there would have been justice for many"** was stated to the Plaintiff by numerous local attorneys! The Plaintiff both hand delivered letters to Ronald Ficarrotta through his secretary Gloria Scranton and sent letters to his email address at ficarrrn@fljud13.org since mid. 2015. These email dates include 6-16-17, 7-27-17, 1-31-18, 3-7-18 and 3-12-18, which concerned his 13th Judicial Circuit judges violating state and federal substantive due process rights. During the beginning of 2018, the Plaintiff contacted Jorge Labarga and the Florida Supreme Court through the Judicial Qualifications Commission (JQC), **a division of the Florida Supreme Court as is The Florida Bar.** Ronald Ficarrotta's name was mentioned throughout the Plaintiff's JQC complaint, Docket No. 18-057, as having had everything to do with both the Plaintiff and the decedent state and federal substantive due process rights having

been violated dozens of times by his local courthouse judges. Both Ronald Ficarrotta and Jorge Labarga were well informed for years about all of the Defendants and their co-conspirators having illegally denied both the Plaintiff and decedent their state and federal substantive due process rights. As the chief judge of the local 13th Judicial Circuit (courthouse), Ronald Ficarrotta knew that laws were being violated by his judges and injuries were being sustained by the plaintiffs, yet he did nothing to stop or rectify the injuries committed. **Why should he have? Ronald Ficarrotta has been the root cause of all the Plaintiff's courthouse problems since he took office in 2015!** Only fraud and racketeering were accomplished by Ronald Ficarrotta in this matter, not honesty and justice for anyone, especially if he had a monetary reason to turn a blind eye and look the other way. Ronald Ficarrotta was well informed by the Plaintiff of the illegal rulings being made by his racketeering judges, yet failed to take action to remedy the situation, just like a guilty member of a **gang of thieves** would have refrained from doing. **By beyond reasonable doubt evidence, Ronald Ficarrotta orchestrated and commissioned every illegal act committed on the Plaintiffs and decedent in this matter since 2015!** It is a mystery as to how Ronald Ficarrotta was nominated for chief judge when none of the local courthouse judges that the Plaintiff talked to admitted having voted for him. **Another**

**rigged election system!** We live a country no better than South America when it comes to both the election and appointment process of government officials. Consequently, America's pothole ridden roadways and the scowls on its citizens' faces have already resembled theirs! The accomplice is: **Ronald Ficarrotta** (Section 1962(b)) for the above reasons. See Appendix ZE documents.


**58ZF.** In case 18-CA-1537, the Plaintiff's appealed products liability case from the Hillsborough County Civil Division, case 17-CC-403, accomplice Chet Thorpe surreptitiously filed an order to show cause under Florida Rules of Appellate Procedure 9.410, or the case (18-CA-1537) would be dismissed. **1)** The Plaintiff was not notified by anyone of the order, and **2)** the indigent Plaintiff (out of work), according to Florida Indigence Statute 57.081, was exempt from having to pay a record fee (transcript fee) upfront, which was Chet Thorpe's fraudulent reason for illegally stalling this case on 10-09-18. Then on 11-25-18 the Plaintiff filed a motion under Florida Rules of Civil Procedure 1.540(b), relief from judgment, decrees, or orders, in response to Chet Tharpe's arbitrary, pretextual and capricious 10-09-18 order, but Chet Tharpe denied this motion in part on 11-27-18, requiring the Plaintiff to still pay the extortionate record fee

in installments, starting immediately. **Fraud and extortion**! The Plaintiff was qualified indigent under Florida Statute 57.081 by the 13th Judicial Circuit and the proof of this is in the case file (18-CA-1537), and by the clerk of the court having given the Plaintiff a case number (18-CA-1537) without requiring him to pay a penny first. The 2DCA affirmed Chet Tharpe's 11-27-18 ruling on 1-24-19, case 2D18-4761 (third RICO predicate act committed in case 18-CA-1537 by the state judicial enterprise). Michael D'Lugo's filed a clearly false rebuttal pleading (wire fraud), with the clerk of the court on 5-18-18 after the Plaintiff filled his complaint in case 18-CA-1537. The result was the Plaintiff being defrauded out of his $15,000 during case 18-CA-1537, on 11-27-18, from case 17-CC-403, a RICO business injury implemented by Chet Tharpe and affirmed on 1-24-19 by 2DCA judges Craig Villanti, Daniel Sleet and Anthony Black.

On 6-21-19, Chet Tharpe filed an **opinion**. He was the first out of 30 judges to do so, but he did so as an attachment to his 11-27-18 ruling, 7 months later on. The Plaintiff had submitted his appeal of the 11-27-18 order to the 2DCA, case 2D18-4761, not to Chet Tharpe's court. **Idiotic!** His opinion takes up one line, citing Livingston v. Frank, 150 So. 3d 239, 243-244 (Fla. 2d DCA 2014). This was just another clearly inapplicable case law used by the state judicial enterprise to once again defraud

368

the Plaintiff out of what was owed to him. **The cited case above clearly has absolutely nothing to do with anyone having to pay any type of court imposed fee before a judge could hear a complaint!** **If a judge is this off base, the victim or victims after two (2) RICO predicate acts are committed resulting in an injury, should not waste their time fighting city hall and just file a federal RICO lawsuit on opposing parties who either co-conspired and/or subsequently acquiesced in the RICO injury, as far away from the courthouse as they can**. The accomplices are: **Charles Canady from 2018 to present, Rick Scott from 2012 to 2019, Pamela Bondi from 2012 to 2019, Ashley Moody from 2019 to present and Ron DeSantis from 2019 to present as organizers of the secondary enterprise (Section § 1962(b)), Chet Tharpe, Ronald Ficarrotta (Section § 1962(b)), Edward LaRose (Section § 1962(b)), Anthony Black, Craig Villanti, Daniel Sleet, Chart Industries Inc. for being vicarious liable under the Respondeat Superior Doctrine in conjunction with Section 1962(b & c) violations during cases 17-CC-403 and 18-CA-1537, Defendant and ABC, Inc. for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(a, b & c) violations, Defendant,** for the above reasons. See Appendix ZE documents.

**58ZG.** Appellate case 2D18-694 from case 14-CA-12257 was illegally affirmed by the 2DCA on 12-05-18. This appeal was to have Robert Nielsen's final order that illegally dismissed case 14-CA-12257 reversed. The Plaintiff knows there is a standing order from Edward LaRose (Section § 1962(b)) to his judges, authorized by Jorge Labarga (Section § 1962(b)), to dismiss any and all of the Plaintiff's appeals without an opinion given. Ultimate power ultimately corrupts, making a spineless and gullible person, who is part of a large, powerful enterprise, rotten to the core and capable of making false rulings in their sleep!  The accomplices are: **Jorge Labarga from 2014 to 2018, Charles Canady from 2018 to present, Rick Scott from 2012 to 2019, Pamela Bondi from 2012 to 2019, Ashley Moody from 2019 to present and Ron DeSantis from 2019 to present as organizers of the secondary enterprise (Section § 1962(b)), Lee Pearlman, Denmon & Pearlman P.A., a subcontracted agent for Lee Pearlman and FLMIC, Florida's Lawyer's Mutual Insurance Company for vicarious liability under the Respondeat Superior Doctrine in conjunction with Section § 1962(b & c) violations, Defendant, Edward LaRose (Section § 1962(b)), Matthew Lucas, Samuel Salario, Patricia Kelly and Ronald Ficarrotta (Section § 1962(b)),** for the above reasons.  See Appendix ZG documents.

**58ZH.** Numerous association in fact team members (Defendants and co-conspirators), both past and present, using their standing as officers of the court to monopolize the Plaintiff's court cases in continuing the **tradition of excellence** in defrauding the Plaintiffs and decedent out of respectively money owed and justice served, is not only racketeering, **but the organized monetary theft and conversion under Florida Statute 772.11, which is what the Civil RICO Act was intended to stop and punish.** An enterprise using the court system to legally funnel another person's money to go, or to stay, where it wants (conversion), if only for the enterprise's satisfaction, is also racketeering under Title 18, Chapter 95, Section 1956 (money laundering).

**Relevant Case Law Cited as Rational for the Plaintiffs and Decedent to Receive Relief under the Civil RICO Act:**

**59.** With respect to **"relationship"** element of a RICO pattern, the term is no more constrained than that used in Title X of the Organized Crime Control Act, under which "criminal conduct forms a pattern, if it embraces criminal acts that have the same or **similar purposes, results, participants, victims, or methods of commission,** or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C.A. §§

371

1961(5), 1962 and 18 U.S.C. (1982 Ed.) § 3575(e).  109 S. Ct. 2893 *Supreme Court of the United States H.J. Inc., et al., etc.,* Petitioners v. *Northwestern Bell Telephone Company et al.*  No. 87-1252.  Argued Nov. 8, 1988.  Decided June 26, 1989. **The pattern that all four (4) enterprises embraced was in stopping the Plaintiff from exposing to a jury of his peers 1) his having been defrauded out of money owed by local enterprises and 2) to cover up the prior RICO predicate acts committed as accessories after the fact under Title 18, U.S. Code § 3.  This was accomplished by the Defendants and their accomplices when they participated either directly or indirectly in illegally having the Plaintiff's court cases dismissed.**

**60.**  A RICO pattern may be established if related predicates (predicate acts) themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit.  18 U.S.C.A. §§ 1961(5), 1962.  109 S. Ct. 2893 Supreme Court of the United States.  *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989). **The entire legal system in Florida is undoubtedly set up to allow racketeering activities by officers of the court to flourish forever, compliments of the chief judge of the Florida Supreme Court, Florida Attorney General and the Florida Governor.**

**61.**   Continuity element of a RICO pattern may be established by showing that predicate acts or offenses are part of an ongoing entity's regular way of doing business.   18 U.S.C.A. §§ 1961(5), 1962.   *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).   **Over forty (40) very obvious illegal court rulings committed for over seven (7) years against just one party, where a higher court repeatedly affirms a lower court's RICO predicate acts (honest services frauds) for the benefit of enterprise members, most definitely shows a pattern of illegal offenses that continued to be committed until there were no more practical legal actions left for the Plaintiffs to take for justice to prevail.**

**62.**   Proof that a RICO defendant has been involved in multiple criminal schemes would be highly relevant to an inquiry into continuity of racketeering activity.   Proof of multiple schemes is not the only way to show continuity.   18 U.S.C.A. §§ 1961(5), 1962.   109 S. Ct. 2893 Supreme Court of the United States.   *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).

**63.**   Continuity" is sufficiently established for purposes of a RICO pattern, where the predicates (predicate acts) can be

373

attributed to a defendant operating as part of a long-term association that exists for criminal purposes; such associations include, but extend well beyond, those traditionally grouped under the phrase "organized crime." 18 U.S.C.A. §§ 1961(5), 1962. 109 S. Ct. 2893 Supreme Court of the United States. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). **A few key state government officers, those being the governor, attorney general and supreme court judge, who monopolize a statewide (state and federal) public court system in violating of Title 18, Chapter 96, Section 1962(b), where these officers are allowed to get away with 1) defrauding citizens with illegally enacted policies (civil rights violations), 2) who use the illegal policies to enact illegal procedures to reallocate government funds into their pockets (embezzlement), along with 3) reallocating private citizens' stolen money (theft and conversion) into the pockets of crooks (money laundering), <u>fit the definitions of racketeering and antitrust better than any corrupt enterprise (mob) in U.S. history ever prosecuted under the RICO Act</u>!**

**64.** The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, which is Title IX of the Organized Crime Control Act of 1970 (OCCA), imposes criminal and civil liability upon persons who engage in certain "prohibited activities," each of which is defined to include, as a necessary

element, proof of a "pattern of racketeering activity," § 1962. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). *International Data Bank, Ltd. v. Zepkin*, 812 F. 2d 149, 154–155 (CA4 1987) (rejecting any mechanical test; single limited scheme insufficient, but a large continuous scheme should not escape RICO's enhanced penalties). 109 S. Ct. 2893 Supreme Court of the United States. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989). **There were over forty (40) very well documented RICO predicate acts committed by Florida's state judicial enterprise, defining and exemplifying the pattern requirement of racketeering activities against the Plaintiffs and decedent for the main purpose of defrauding the Plaintiff out of money owed.**

**65.** The text of 28 U.S.C. § 2676 does not cover these other legal theories, outside § 1346(b), and thus the § 2676 judgment bar should not apply to similar claims filed against the individual agents. *Pesnell v. Arsenault*, 543 F. 3d 1038 (2008). **Any state or federal employee can be sued individually in federal court for knowingly contributing to the enterprise's illegal purpose.**

**66.** Under the *Ex parte Young* doctrine, Eleventh Amendment immunity does not bar suit in federal court against a state officer accused of violating federal statutory or constitutional law; the doctrine is premised on the notion that states cannot authorize state officers to violate the constitution and laws of the United States.   U.S. Const. Amend. 11.   235 F. Supp. 3d 1132, United States District Court, E.D. California.   *Committee To Protect Our Agricultural Water, et al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et al*, Defendants.   No. 1: 15-cv-01323-DAD-JLT.   Signed 01/20/2017.   **Both state and federal employees can be sued for having violated federal constitutional laws under the Civil RICO Act as participants in an enterprise's plan.**

**67.** To invoke the *Ex parte Young* exception to Eleventh Amendment immunity, the state official sued must have some connection to the enforcement of the allegedly unconstitutional act; this connection must be fairly direct, as a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit. U.S. Const. Amend. 11. *Committee To Protect Our Agricultural Water, et al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et al*, Defendants.   **All**

**of the Defendants and their accomplices had a duty to act appropriately when given either constructive or actually notice of this matter, but failed to act appropriately.**

**68.** *Ex parte Young* exception to Eleventh Amendment immunity applied to official capacity claim for prospective injunctive relief by contravening First Amendment right to petition and Fifth Amendment Takings Clause, since director had direct role in approving well-drilling permit decisions.   U.S. Const. Amends. 1, 5, 11; 18 U.S.C.A. §§ 1962(c), 1962(d); Public Health Service Act § 1001, 42 U.S.C.A. § 300(f); 42 U.S.C.A. § 1983; Cal. Pub. Res. Code § 3013.   Under Article III, in the context of suits for monetary relief. U.S. Const. art. 1, § 8, cl. 3. Committee To Protect Our Agricultural Water, et al., Plaintiffs, v. Occidental Oil and Gas Corporation, et al, Defendants.   No. 1: 15-cv-01323-DAD-JLT.   Signed 01/20/2017.   **Injunctive relief can be implemented when 1st and 5th U.S. constitutional amendment rights have been violated.**

**69.   Absolute judicial and legislative immunity did not bar claims against** governor, **former** supervisor for California Division of Oil, Gas, and Geothermal Resources (DOGGR), director of California Department of Conservation (CDC), and county

official, for allegedly forming enterprise.  U.S. Const. Amends.
1, 5; 18 U.S.C.A. §§ 1962(c), 1962(d); 42 U.S.C.A. § 1983.
*Committee To Protect Our Agricultural Water, et al.*, Plaintiffs,
v. *Occidental Oil and Gas Corporation, et al*, Defendants.  No.
1: 15-cv-01323-DAD-JLT.  Signed 01/20/2017.  **For being a
participant, there is no judicial or legislative immunity from
suit under Title 18, Chapter 96, Sections 1961-1968 or Title 42,
Chapter 21, Section 1983.  And there is no immunity from suit
for having retired from one's official government capacity.**

**70.**  When determining whether qualified immunity applies, the
central questions are:  (1) whether the facts alleged, taken in
the light most favorable to the plaintiff, demonstrate that the
defendant's conduct violated a statutory or constitutional
right, and (2) whether the right at issue was clearly
established.  *Committee To Protect Our Agricultural Water, et
al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et al*,
Defendants.  No. 1: 15-cv-01323-DAD-JLT.  Signed 01/20/2017.
**All of the Defendants and their accomplices absolutely knew that
they had planned on, and committed, violations of the
Plaintiffs' and Decedent's U.S. constitutional rights under
either the 1st and/or 5th and/or 14th amendments.**

**71.** In determining whether qualified immunity applies, a government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right; in this regard, existing precedent must have placed the statutory or constitutional question beyond debate. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Jeffers v. Gomez*, 267 F. 3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)); see also *Bruce v. Ylst*, 351 F. 3d 1283, 1290 (9th Cir. 2003). When determining whether qualified immunity applies, the central questions are: (i) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (ii) whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); see also *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (holding that this two-part analysis is "often beneficial" but

not mandatory). *Committee To Protect Our Agricultural Water, et al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et al*, Defendants. No. 1: 15-cv-01323-DAD-JLT. Signed 01/20/2017. **All state and federal rights owed to the Plaintiffs and decedent by government officials with a fiduciary duty to act appropriately in safeguarding their citizens' rights, were clearly established and well known to all of the Defendants and their accomplices. Either there must have been something in the water that all of them were drinking that made them ignorant to their having participated in defrauding the Plaintiffs and decedent, or they knowingly planned on, and participated in, aiding and abetting Florida's state judicial enterprise by racketeering with judges and multiple enterprise members, violations under the RICO Act.**

**72.** To plead a conspiracy violation under Racketeer Influenced and Corrupt Organizations Act (RICO), while a defendant need not have personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy, the defendant must be aware of the essential nature and scope of the enterprise and intended to participate in it. 18 U.S.C.A. § 1962(d). The plaintiff must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or

**participated in,** a violation of two predicate offenses; the illegal agreement **need not be expressed** as long as its existence can be inferred from the words, **actions,** or **interdependence of activities** and persons involved. 18 U.S.C.A. § 1962(d). *Committee To Protect Our Agricultural Water, et al.,* Plaintiffs, v. *Occidental Oil and Gas Corporation, et al,* Defendants. No. 1: 15-cv-01323-DAD-JLT. Signed 01/20/2017. **All of the four (4) enterprises in this complaint worked together like one big team, achieving big team results. They did this after knowing that the basics of the RICO plan was to defraud the Plaintiff out of anything of value and to cover-up the prior RICO predicate acts committed by the three (3) local enterprises, as part of a team effort with hopefully big team rewards in the future as cooperative, enterprising participants in Florida's state judicial enterprise.**

**73.** To show an association-in-fact enterprise under the Racketeer Influenced and Corrupt Organizations Act (RICO), plaintiffs must plead three elements: **(1)** a common purpose, by alleging that the group engaged in enterprise conduct distinct from their own affairs, **(2)** an ongoing structure or organization to the enterprise, which may be either formal or informal, and some participation in the operation or management of the

enterprise by members, and **(3)** that the enterprise had the longevity necessary to accomplish its purpose and alleged associates in the enterprise, over time, functioned as a continuing unit. 18 U.S.C.A. §§ 1961(4), 1962(c). *Committee To Protect Our Agricultural Water, et al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et al*, Defendants.  No. 1: 15-cv-01323-DAD-JLT.  Signed 01/20/2017. **(1) The common purpose of the four (4) racketeering enterprises was to defraud the ignorant pro se Plaintiff in his business and/or property, first started by HCSO and the 13th Judicial Circuit.  (2) The structure was formal with the Plaintiffs, but informal with the members of the local enterprises who were allowed to make ministerial decisions on their own as to how and when to implement the RICO predicate acts committed.  (3) Judicial officials in Florida are assigned to their jobs for at least 6 years, but most them stay on the bench until retirement due to the media doing its part as good cooperative affiliates, <u>circumventing any bad publicity for its members</u>.**

**74.** The joint action test for determining whether a private party's actions amount to state action under § 1983 asks whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights;

this requirement can be satisfied by alleging facts
demonstrating the existence of a conspiracy between a private
party and the government.   42 U.S.C.A. § 1983.   Committee To
Protect Our Agricultural Water, et al., Plaintiffs, v.
Occidental Oil and Gas Corporation, et al, Defendants.   No. 1:
15-cv-01323-DAD-JLT.   Signed 01/20/2017.   **All of the judicial
accomplices illegally acted in concert with their attorney
accomplices, most of whom represented insurance companies, in
order to violate the Plaintiffs' and the decedent's state and
federal constitutional rights.**

**75.**   Immunity under *Noerr-Pennington* is not absolute, however.
In particular, immunity is withheld when the petitioning is a
"sham." *Kottle v. Northwest Kidney Ctrs.*, 146 F. 3d 1056, 1060
(9th Cir. 1998).   *Committee To Protect Our Agricultural Water,
et al.*, Plaintiffs, v. *Occidental Oil and Gas Corporation, et
al*, Defendants.   No. 1: 15-cv-01323-DAD-JLT.   Signed 01/20/2017.
**Any obvious arbitrary, capricious and pretextual actions (shams)
implemented by members of an enterprise that violate
constitutional rights, are not immune from suit.**

**76.**   To plead a conspiracy between a private party and the
government, as required to support a claim that the private

party's actions amount to state action under § 1983, plaintiff must **allege the existence of an agreement or meeting of the minds** with a state actor to violate his constitutional rights; the agreement **need not be overt,** and may be inferred on the basis of **circumstantial evidence,** such as if conspirators have committed acts that are **unlikely to have been undertaken** without an agreement, **and each of the defendants need not know the exact details of the plan, but every defendant must share the conspiracy's common objective.** 42 U.S.C.A. § 1983. *Committee To Protect Our Agricultural Water, et al.,* Plaintiffs, v. *Occidental Oil and Gas Corporation, et al,* Defendants. No. 1: 15-cv-01323-DAD-JLT. Signed 01/20/2017. **All of the Defendants and their accomplices were well informed enough on the RICO plan to be implemented, so there would be a meeting of the minds as to how the members of each enterprise, participating in each case (by filing pleadings and joinders), were to defraud and deprive the Plaintiffs and decedent out of their state and federal rights and liberties, most of which acts are documented in the case files.**

**An instance that comes to the Plaintiff's mind is when Elizabeth Rice, during the first motion to dismiss case 17-CA-6219 in violation of the Four Corners Rule, heard on 8-22-18, stated to opposing parties on page 13 of the hearing transcript, currently in the case file (and appendix Z), _that the Plaintiff was asked_**

**by the court to rewrite his complaint in another case (case 17-CA-4051), because it was not written correctly, (hint, hint)**. Opposing parties in case 17-CA-6219, during their first motion to dismiss this case (8-22-18), did _not_ state in their pleadings that the claims in the complaint were without merit based on the evidentiary facts or actionable claims stated in the complaint, just that they either did not commit the damages or had sovereign immunity from suit. Nor did opposing parties verbally state an objection to the claims in the complaint for being without merit based on the facts submitted during the dismissal hearing on 8-22-18, but Elizabeth Rice came up with the same lame, shim sham, scam scheme, of stating that ultimate facts (actionable claims) were not cited in the Plaintiffs' complaints. Thus, a cause of action was not stated. Elizabeth Rice liked using this method of defrauding the Plaintiff during case 17-CA-4051, and used it again in case 17-CA-6219 on both 5-22-19 and 10-10-19 (the second and third illegal dismissals of the case).


**77.** In _Pena_, 976 F. 2d at 473, (emphasizing that the Eleventh Amendment does not bar suits seeking damages against state officials sued in their individual capacities). **The civil RICO statutes allow individuals to file suit and recover treble**

**damages against individuals who, through a "pattern of racketeering activity", acquire an interest in, or conduct the business of, an enterprise engaged in interstate or foreign commerce.** 18 U.S.C. §§ 1962(b), 1962(c), 1964(d). In particular, § 1962(c) prohibits conducting the affairs of an enterprise engaged in interstate or foreign commerce through a pattern of racketeering activities. RICO also creates a private cause of action against individuals who conspire to engage in such prohibited activity. 18 U.S.C. § 1962(d). Committee To Protect Our Agricultural Water, et al., Plaintiffs, v. Occidental Oil and Gas Corporation, et al, Defendants. No. 1: 15-cv-01323-DAD-JLT. Signed 01/20/2017. **All of the Defendants and their judicial accomplices are still participating in multiple court case hearings to monetarily injure the Plaintiffs and decedent. Consequently, the need for out of state assistance in stopping the statewide pattern and policy of defrauding litigants and murder victims in Florida, at least in this matter, has also affected interstate commerce.**

**78.** If the relevant petitioning activity involves judicial processes, **the sham exception is broader.** **In judicial settings, misrepresentations to adjudicatory bodies (false laws and reasonings set forth by opposing parties in their pleadings) do**

invoke the sham exception to *Noerr–Pennington*.  See *Allied Tube & Conduit Corp.*, 486 U.S. at 499–500, 108 S. Ct. 1931 (observing that "in less political arenas, unethical and deceptive practices can constitute abuses of ... judicial processes"); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972) (finding that illegal or fraudulent lobbying activities normally immunized by *Noerr–Pennington* are not immunized if they occur in a judicial or quasi-judicial setting); *Kottle*, 146 F. 3d at 1061. *Committee To Protect Our Agricultural Water, et al., Plaintiffs, v. Occidental Oil and Gas Corporation, et al, Defendants*.  No. 1: 15-cv-01323-DAD-JLT.  Signed 01/20/2017.  **Courtrooms are only for pleading relevant facts based on the merits of a case and letting justice prevail, not for implementing dozens of monopolistic government shams with knowingly false pleadings filed by numerous officers of the court for blatant racketeering purposes.**

**79.   Section 1985(3), Claim [119], Title 42 U.S.C. § 1985(3) Provides:**

If two or more persons in any State or Territory conspire ..., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws,

or of equal privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators. To plead a deprivation of equal protection, the second element of a § 1985 claim, a plaintiff must allege **"a deprivation of [a] right motivated by some racial, or ... other[ ] class-based"** **animus**. *Sever*, 978 F. 2d at 1536. The Ninth Circuit has held that "Section 1985(3) is extended beyond race 'only when the class in question can show that there has been a governmental determination that its members require and warrant special federal assistance in protecting their civil rights.' " Id. at 1537. In particular, "the courts [must] have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that Congress has indicated through legislation that the class required special protection." Id. Finally, as recognized by the Supreme Court in *United Brotherhood of Carpenters and Joiners v. Scott*, 463 U.S. 825, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983), § 1985(3) does not "reach conspiracies motivated by economic or commercial animus." Id. at 838, 103 S. Ct. 3352. *Committee To Protect Our Agricultural Water, et al., Plaintiffs, v. Occidental Oil and*

*Gas Corporation, et al, Defendants.*   No. 1: 15-cv-01323-DAD-JLT. Signed 01/20/2017.   **By beyond reasonable doubt evidence, the illegal dismissal of case 14-CA-10278 was not only for continuing the racketeering activities on the Plaintiff by the three (3) local enterprises, but was also racially motivated by Bernard Silver for satisfaction purposes.**

**80.**   Although the Eleventh Amendment protects states from suits brought by citizens, the Supreme Court recognized an exception to that protection in Ex parte Young, 209 U.S. 123 (1908).   In that case, the Court held that **"[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."**   Id.   at   159-60. According to the Ex parte Young Court, the official whose actions would violate the constitution "may be enjoined by a Federal court of equity from such action" despite claims of sovereign immunity.   Id. at 155-56.   Nos. 06-5828/5829 *S&M Brands, Inc. et al. v. Cooper.*   **Any state laws or policies that were illegally concocted by the Florida legislatures as a ruse**

**for Pamela Bondi, Rick Scott, David Gee and Chad Chronister to deliberately use to neglect their responsibilities to U.S. citizens while they were being defrauded, are void of any authority and these accomplices can be personally sued for compensation on whatever injuries were sustained.**

**81.** Ex parte Young exception to Eleventh Amendment sovereign immunity for claims against state officials in their official capacities for **injunctive relief** on a prospective basis cannot operate as an exception to sovereign immunity where no defendant has any connection to the enforcement of the challenged law at issue; thus, before the exception applies, the state officer named as a defendant in his official capacity **must have the authority to enforce an unconstitutional act in the name of the state.** U.S. Const. Amend. 11. *Boglin v. Board of Trustees of Alabama Agricultural*, 290 F. Supp. 3d 1257. **All government employees, past and present, had a fiduciary duty to act appropriately when given either constructive or actual notice of the racketeering activities committed by the Defendants and their accomplices, with the racketeering foreseeably continuing if not stopped, but chose to participate, violations under Title 18, Chapter 96, Section 1962, Title 42, Chapter 21, Section 1983 and Title 18, U.S. Code § 3 by 1) effectuating the same**

continued pattern of racketeering activities into the future and 2) covering up the prior racketeering activities committed on the Plaintiffs and decedent.

82.     Former state university employee's request for reinstatement was cognizable under Ex parte Young exception to Eleventh Amendment as would allow employee to bring claims under § 1983 against school board trustees in their official capacities for **injunctive relief on a prospective basis; even though employee's termination occurred in the past, it continued to harm her by preventing her from obtaining the benefits of state employment.**   U.S. Const. Amend. 11; 42 U.S.C.A. § 1983. *Boglin v. Board of Trustees of Alabama Agricultural*, 290 F. Supp. 3d 1257.   **Florida Department of State and Legislative Affairs is being sued under Title 42, Chapter 21, Section 1988, but can also be sued under Title 42, Chapter 21, Section 1983, along with HCSO, Attorney General's Office and Florida Governor's Office for their illegal policies (laws) in violation of U.S. constitutional rights.**

83.   The required connection between the defendant and a challenged law under the Ex parte Young exception to sovereign immunity can be established when the law specifically grants the

defendant enforcement authority.   U.S. Const. Amend. 11.   *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301 (2015).   **All of the government accomplices under Sections § 1961-1968 and Section § 1983, when informed of this matter, had both a fiduciary duty and the authority to act appropriately, but deliberately failed to do so.**

**84.**   Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts, and reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken.   *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).   **All government accomplices in this matter had a fiduciary duty to act responsibly by not participating in clear violations of state and federal constitutional laws that damaged the Plaintiffs and the decedent as their constituents, but did so anyway as part of a large, untouchable enterprise.**

**85.**   When two agents of the same legal entity make an agreement in the course of their official duties, as a practical and legal matter, their acts are attributed to their principal; it then follows that there has not been an agreement between two or more separate people necessary to form a conspiracy.   *Ziglar v.*

*Abbasi*, 137 S. Ct. 1843 (2017). **The members of all four (4) enterprises, past and present, who intended to see the Plaintiff be continually defrauded and deprived out of his civil rights by Florida's state judicial enterprise, are now just as liable as the principal within this evil organization who committed the most resent RICO predicate act on him.**

86.  **In 1871, Congress passed a statute that was later codified at Rev. Stat. § 1979, 42 U.S.C. § 1983.  It entitles an injured person to money damages if <u>a state official</u> (one person, not an enterprise) violates his or her constitutional rights.** Congress did not create an analogous statute for federal officials. Indeed, in the 100 years leading up to Bivens, Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). **All past and present state and federal government defendants and their non-government accomplices, can be sued for money damages under either Title 42, Chapter 21, Section § 1983 or Title 18, Chapter 96, Sections 1961-1968, depending on whether or not there was racketeering committed under the RICO Act.**

**87.**  Davis v. Passman, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979), an administrative assistant sued a Congressman for firing her because she was a woman.  The Court held that the Fifth Amendment Due Process Clause gave her a damages remedy *1855 for gender discrimination.  Id., at 248-249, 99 S. Ct. 2264.  And in Carlson v. Green, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980), a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma.  The Court held that the Eighth (8th) Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment.  See id., at 19, 100 S. Ct. 1468.  In three cases, Bivens (4th), Davis (5th), and Carlson (8th), represent the only instances in which the Court has approved of an implied damages remedy (against the individual employee) under the U.S. Constitution itself.  *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017).  **All of the Defendants and their accomplices breached the Plaintiffs' and decedent's 5th U.S. constitutional amendment rights and liberties.  Consequently there is a damages remedy under either Title 18, Chapter 96, Sections 1961-1968 or title 42, Chapter 21, Section § 1983, depending on whether or not there was racketeering committed under the RICO Act.**

**88.**   The doctrine of "qualified immunity" protects government officials from liability for civil damages in a § 1983 action insofar as the officials' conduct does not violate clearly established U.S. statutory or constitutional rights of which a reasonable person would have known.   42 U.S.C.A. § 1983.   *Dodds v. Richardson*, 614 F. 3d 1185 (2010).   **All past and present state and federal government Defendants and their accomplices violated the Plaintiffs' and decedent's rights and liberties under state and federal laws, specifically the 5th and 14th amendments to the U.S. Constitution.   And they and their accomplices can be sued for damages under either Title 42, Chapter 21, Section § 1983 or Title 18, Chapter 96, Sections 1961-1968, depending on whether or not there was racketeering committed under the RICO Act.**

**89.**   Personal involvement in an alleged constitutional violation does not require direct participation, because under § 1983, **any official** who causes a citizen to be deprived of their constitutional rights can also be held liable.   42 U.S.C.A. § 1983.   *Dodds v. Richardson*, 614 F. 3d 1185 (2010).   **All of the government accomplices had a fiduciary duty to the Plaintiffs and decedent to act appropriately when notified of the RICO plan that was in effect, but willingly participated in future RICO**

**predicate acts by at least turning a blind eye to the prior ones committed, leaving the Plaintiffs and the murdered decedent to the judicial wolves.**

**90.** *Woodward*, 977 F. 2d at 1399–1400 & n. 11 (implying that personal direction or actual knowledge and acquiescence demonstrates deliberate indifference). At odds with the "set in motion" formulation, we also caution it is not enough to "merely show[ ] that a supervisor 'should have known' that a subordinate was violating someone's constitutional rights." *Woodward v. City of Worland*, 977 F. 2d 1392, 1399 (10th Cir.1992). **Instead, only a supervisor's <u>actual knowledge</u> of his subordinates' behavior will demonstrate the requisite "deliberate, intentional act by the supervisor to violate constitutional rights." Id. <u>Personal involvement</u>** in an alleged constitutional violation **does not require direct participation,** because under § 1983, any official who causes a citizen to be deprived of her constitutional rights can also be held liable. 42 U.S.C.A. § 1983. **A supervisor may cause violations when he or she has actual knowledge of past constitutional violations being carried out by a subordinate, and <u>does nothing</u> to stop future occurrences.** See *Hernandez*, 341 F. 3d at 145 **(supervisory liability can result from "failure to act on information**

indicating that <u>unconstitutional acts were occurring</u>"); *Chavez v. Ill.* State Police, 251 F. 3d 612, 651 (7th Cir. 2001) **(liability is appropriate for supervisors who "know about the conduct and facilitate it, approve it, condone it, <u>or turn a blind eye for fear of what they might see</u>");** *Hartley v. Parnell*, 193 F. 3d_1263, 1269 (11th Cir. 1999) **(widespread abuse that is "obvious, flagrant, rampant and of continued duration" can lead to supervisory liability if the supervisor does not act to correct these behaviors);** but see *Shehee v. Luttrell*, 199 F. 3d 295, 300 (6th Cir.1999) (even if supervisors know of unconstitutional behavior, "liability under § 1983 must be based on **active unconstitutional behavior (the <u>intent of</u>, or participating in, <u>by virtue of desiring that someone be deprived of their U.S. civil rights in the future after having knowledge of prior violations</u>)** and cannot be based upon a mere failure to act") (internal quotation marks omitted). Dodds v. Richardson, 614 F. 3d 1185 (2010). Thus, when a plaintiff sues an official under Bivens or § 1983 for conduct "arising from his or her superintendent responsibilities," the plaintiff must plausibly plead and eventually prove **not only that the official's subordinates violated the U.S. Constitution, but that the official by virtue of his own conduct and <u>state of mind</u> did so as well.** Id. at 1949. Dodds v. Richardson, 614 F. 3d 1185 (2010). **All of the Defendants and their accomplices had actual**

**knowledge (were well informed) of the Plaintiffs and decedent having had their U.S. constitutional rights denied to them for the good of multiple enterprises involved, but chose to participate by at least turning a blind eye to the prior RICO predicate acts committed, allowing future foreseeable ones to occur (Pinkerton Liability Doctrine used in Section § 1962(d)). Thus, all of the Defendants and their accomplices named in this complaint are as guilty and liable under the RICO Act as the principles under title 18, Chapter 96, Section 1962(c).**

**91.**   (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so **inadequate** as to show deliberate indifference to or **tacit authorization** (remaining silent) of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's **inaction** and the particular constitutional injury suffered by the plaintiff" (internal quotations omitted)); *Baker v. Monroe Twp.*, 50 F. 3d 1186, 1194 (3d Cir. 1995) (explaining that an individual may be liable under § 1983 if he participated in violating the plaintiff's rights, or he directed others to violate them, or as

a supervisor he had knowledge of and acquiesced in his subordinates' violations); *Jones v. City of Chicago*, 856 F. 2d 985, 992-93 (7th Cir.1988) (concluding that **to establish supervisory liability under § 1983 "[t]he supervisors must know about the conduct and <u>facilitate it</u>, approve it, condone it, <u>or turn a blind eye for fear of what they might see</u>. They must in other words act either knowingly or with deliberate, reckless indifference")**. *Dodds v. Richardson*, 614 F. 3d 1185 (2010). **All of the government Defendants and their accomplices under Sections § 1962(a, b or c) ignored their fiduciary duty to act appropriately, acting precisely and effectively as members within multiple enterprises in doing the Plaintiffs and decedent out of their U.S. constitutional rights and liberties that took the Plaintiff years to become wise to, but were undoubtedly the root cause of their injuries.**

**92.** In the decade that followed 1971, the Court recognized what has come to be called an implied cause of action in three cases involving other constitutional violations. **1)** *Davis v. Passman*, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979), an administrative assistant sued a Congressman for firing her because she was a woman. The Court held that the Fifth Amendment Due Process Clause gave her a damages remedy *1855 for

gender discrimination. Id., at 248-249, 99 S. Ct. 2264. **2)** In
*Carlson v. Green*, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15
(1980), a prisoner's estate sued federal jailers for failing to
treat the prisoner's asthma. The Court held that the Eighth
Amendment Cruel and Unusual Punishments Clause gave him a
damages remedy for failure to provide adequate medical
treatment. See id., at 19, 100 S. Ct. 1468. And **3)** in Bivens
v. Six Unknown Named Agents, 403 U.S. 388 (1971), Federal Bureau
of Narcotics (FBN) agents searched the Brooklyn home of the
plaintiff, Webster Bivens, and arrested him without a warrant.
Drug charges were filed but were later dismissed by a US
commissioner (now called magistrate judge). Bivens filed a
lawsuit alleging the violation of his Fourth Amendment freedom
from unreasonable search and seizure. The government claimed
that the violation allowed for only a state law claim for
invasion of privacy and that the Fourth Amendment provides no
cause of action, but only a rebuttable defense for the FBN
agents. ***Bivens, Davis, and Carlson* represent the only instances
in which the Court has approved of an implied damages remedy
under the Constitution itself, <u>irrelevant of officials no longer
working for an agency</u>**. *Ziglar v. Abbasi*, 137 S. Ct. 1843
(2017). **All government accomplices and their co-conspirators,
past or present employees, can be sued for violating the**

Plaintiffs' and decedent's 5th amendment rights and liberties under the U.S. Constitution.

**93.** I should think that the wisdom of permitting courts to consider Bivens actions, later granting monetary compensation to those wronged at the time, would follow a fortiori. With respect, I dissent. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). **Monetary compensation is allowed when suing state or federal government employees for deliberately violating U.S. civil rights.**

**94. When state and federal government officials monetarily damage their citizens and then quietly and comfortably collect fat salaries or retirement checks while the enterprises that they participated with are still injuring citizens in their business and property while the interest accrues on the debts owed. Officials who 1) had the authority to stop the unconstitutional acts from continuing while they were working in their official capacity and were 2) informed of the unconstitutional acts committed when they had a fiduciary duty to help their citizens while being paid in their official capacities. Yet informed officials who had the authority either 3) shunned their employment responsibilities by having done**

**absolutely nothing to stop the unconstitutional racketeering from foreseeably continuing into the future in violation of federal laws. Or worse, 4) lent a helping hand in damaging the victims, <u>they are not immune from suit in federal court under the Civil RICO Act</u>.**

**95.** Currently the amount owed to the Plaintiff in damages is $1,060,000 from case 12-CP-1669. Plus $15,000 from case 17-CC-403 (currently case 18-CA-1537 that is still in litigation), $6720 from case 17-CA-6219 and again $1,060,00 from cases 14-CA-12257 and 17-CA-4051 resulting in case 2D19-1384 having just ended in an illegal affirmance on 12-27-19. And Ms. Kimball is owed $240,324 from case 17-CA-6219 (still in litigation). All of which includes interest at a nominal rate starting from when the Plaintiffs were first owed their property. Ms. Kimball was owed $240,324 starting on 10-31-18 (case 17-CA-6219). And Mr. Schneider was owed $1,060,000 starting on 8-6-12 (case 12-CP-1669). And Mr. Schneider was owed the $15,000 starting on 1-5-17 (case 17-CC-403). And Mr. Schneider was owed the $6720 starting on 10-31-18 (case 17-CA-6219). And the Plaintiffs' attorney was owed his fees starting on 1-25-19 and ending on 11-12-19, case 17-CA-6219.

Since being an **accessory after the fact under Title 18, Chapter 1, Code § 3,** means that you knew what illegal act or acts occurred, and what damages were owed and when, before you aided and abetted the conspirators involved. And since FLMIC, CNA, AI and ABC knew the facts surrounding the first defrauding of the Plaintiff on 5-15-13 with injuries sustained before participating, but decided to aid and abet in covering them up anyway, they are on the hook for paying both the principle and interest at a nominal rate to the Plaintiff, starting on 8-6-12, on the $1,060,000. The same is true for the other Defendants as to when the injuries they were aiding and abetting covering up first occurred.

The money and interest are owed at a triple remedial damages rate plus attorney's fees for this case with a **high lodestar multiplier** for the case's complexity. *Faircloth v. Certified Finance Inc.*, No. 99-CV-3097, 2001 WL 527489, at *10-11 (E.D. La. May 16, 2001) (finding that various factors, including the "complexities of the RICO issues," weighed in favor of applying a multiplier to the lodestar). See also, *Hanrahan v. Britt*, 174 F.R.D. 356, 368-69 (E.D. Pa. 1997) (finding attorney's fees reasonable under either percentage of recovery or lodestar method and mentioning that multipliers of between **3 and 4.5 are common**). **This case deserves a multiplier of 20!** A plaintiff whose complaint includes both arbitrable RICO claims and other

nonarbitrable claims should consider whether to file suit asserting all claims and obtain a stay pending arbitration so as to ensure that the statute of limitations does not expire on its nonarbitrable claims while awaiting arbitration. See *Guyden v. Aetna, Inc.*, 544 F. 3d 376, 382 (2d Cir. 2008) (four-part test for courts to determine whether to stay proceedings pending arbitration) and *Bale v. Dean Witter Reynolds, Inc.*, 627 F. Supp. 650, 654-55 (D. Minn. 1986).

**96.   WHEREFORE**, the Plaintiffs in this suit asks for **1)** triple remedial compensation on the amounts that the Defendants' illegal acts stopped them from obtaining, which were: **A)** all of the decedent's property upon death under the Florida Slayer Statute; **B)** damages to the Plaintiff's business and property in respectively cases 17-CC-403 and 17-CA-6219 and **C)** Ms. Kimball's money for being incarcerated starting on 10-12-15 to 6-17-21 plus **D)** interest on all of the money owed to the Plaintiffs at a nominal rate from the dates referenced in paragraph 95 above; **E)** relief from all orders made in violation of the law by the judicial accomplices by voiding them starting from case 12-CP-1669 to present and **F)** due process of the law uphold justice for the murdered decedent with the **guilty parties prosecuted** and

issue further relief as the court deems appropriate, just and proper.

Respectfully submitted,


Darryl Schneider, Pro-se


_____

Signed By Darryl Schneider, Plaintiff

10406 N. 26th Street

Tampa, FL   33612

813-585-0552


**CERTIFICATE OF SERVICE:**

I hereby certify that a copy of the foregoing complaint, including three (3) motions, have been submitted to this court on 13 zip drives to be served to all parties by federal marshals.


**Parties:**

1.  ABC, Inc., Defendant
500 S. Buena Vista St.
Burbank, CA   91521
Or,
77 West 66th Street
Fifth Floor
New York, NY   10023

2.  C.N.A. Insurance Company, Defendant

4631 Woodland Corporate Blvd.
# 307
Tampa, FL   33614

3.  Axis Insurance, Defendant
300 Connell Dr.
Suite 8000
Berkeley Heights, NJ   07922

4.  Florida's Lawyer's Mutual Insurance Company, Defendant
541 E. Mitchell Hammock Rd.
#100
Oviedo, FL   32765

5.  Chart Industries, Inc., Defendant
3055 Torrington Drive
Ball Ground, GA   30107

66.  Free Methodist Church of North America (FMCNA), Defendant
770 North High School Road
Indianapolis, IN   46214

7.  Agency  for  Community  Treatment  Services,  Inc.  (ACTS),
Defendant
4612 N 56th St,
Tampa, FL   33610

8.  Florida Department of State, Legislative Affairs, Defendant
R. A. Gray Building
Suite 115
500 South Bronough Street
Tallahassee, FL   32399-0250
(850) 245-6500

9.  Stephen Muldrow, Defendant
c/o Department of Justice,
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL   33602

10. Clarence Thomas, Defendant
c/o The U.S. Supreme Court
1 First St. N.E.
Washington, D.C.   20543

11. David Bowdich, Defendant

Unit 1027
801 Pennsylvania Blvd.
Washington, D.C.  20004
Or,
935 Pennsylvania Avenue N.W.
Washington, D.C.  20535


12. Kellyanne Conway, Defendant
c/o The White House
1600 Pennsylvania Ave. N.W.
Washington, D.C.  20500

1.  Darryl Schneider, Plaintiff
10406 N. 26th Street
Tampa, FL  33612
813-585-0552


**Accomplices:**

1.  Rick Scott
801 North Florida Avenue
Suite 421,
Tampa FL  33602
Phone: (813) 225-7040

2.  Florida Governor's Office
400 S. Monroe St.
Tallahassee, FL  32399-0001
(850) 488-7146

3. David Gee
12729 Amber Ln
Lithia FL  33547-2030

4. James Previtera
3417 Dragon View Ct
Valrico FL  33594-3344

5. Chad Chronister
c/o HCSO
2008 E 8th Ave.
Tampa, FL  33605
813-247-8000

6. Christopher Brown

```
c/o HCSO
2008 E 8th Ave.
Tampa, FL  33605
813-247-8000

7. Jason Gordillo
c/o HCSO
2008 E 8th Ave.
Tampa, FL  33605
813-247-8000

8.  HCSO
2008 E 8th Ave.
Tampa, FL  33605
813-247-8000

9.  Manuel Menendez
3315 S Shamrock Rd
Tampa FL  33629

10. Ronald Ficarrotta
11. Mark Wolfe
12. Richard Nielsen
13. Paul Huey
14. Elizabeth Rice
15. Robert Foster
16. Catherine Catlin
17. Robert Bauman
18. Joelle Ober
19. Chet Tharpe
20. Kimberly Cash
21. Claudia Isom
c/o 13th Judicial Circuit
800 E. Twiggs Street
Tampa, FL  33602

22.  13th Judicial Circuit
800 E. Twiggs Street
Tampa, FL  33602
813-272-5894

23.  William Levens
3308 W San Miguel Street South
Tampa, FL  33629
bill@levensmediation.com

24.  Bernard Silver
```

14602 Village Glen Cir.
Tampa, FL   33618

25.   Jack St. Arnold
324 S. Ft Harrison Ave.
Clearwater, FL   33756

26.   Jorge Labarga
500 S. Duval St.
Tallahassee, FL   32399

27. Morris Silberman
28. John Badalamenti
29. Marva Crenshaw
30. Edward LaRose
31. Patricia Kelly
32. Matthew Lucas
33. Robert Morris
34. Susan Rothstein-Youakim
35. Samuel Salario
36. Anthony Black
37. Craig Villanti
38. Daniel Sleet
39. Nelly Khouzam
40. Stevan Northcutt
c/o Florida 2nd District Court of Appeals
P.O. Box 327
Lakeland, FL   33802

41. Charlene Honeywell
c/o Florida Middle U.S. District Court,
801 N. Florida Ave.
Tampa, FL   33602

42. Sybil Murphy
8954 S.W. 76th Lane
Gainesville, FL   32608

43. Thomas Rydberg
The Rydberg Law Firm, P.A.
#106-334
701 S. Howard Street Tampa, FL   33606
813-221-2800

44.   Thomas Rydberg, P.A.
The Rydberg Law Firm, P.A.
#106-334

701 S. Howard Street Tampa, FL   33606
813-221-2800

45. Robert Welker
Suite 303
9385 N 56th St
Temple Terrace, FL   33617
813-985-5517

46.  Lee Pearlman
Denmon & Pearlman, P.A.
520 2nd Ave. South
St. Petersburg, FL   33701
727-777-6548

47. Andrew Mallory
540 Fourth Street North
St. Petersburg, FL   33701
727-800-4792

48. Denmon & Pearlman, P.A.
520 2nd Ave. South
St. Petersburg, FL   33701
727-777-6548

49. Bowen Brown
50. Robin Black
c/o C.N.A. Insurance Company
4631 Woodland Corporate Blvd.
# 307
Tampa, FL   33614

50.  Michael McGirney
c/o Spector Gadon & Rosen, P.C.
360 Central Avenue North
# 1550
St. Petersburg, FL   33701

51. Spector Gadon & Rosen, P.C.
360 Central Avenue North
# 1550
St. Petersburg, FL   33701

52.  Mary Mainland
c/o Hillsborough County Medical Examiner's Office
11025 N. 46th St.
Tampa, FL   33617

53. Hillsborough County Medical Examiner's Office
11025 N. 46th St.
Tampa, FL   33617

54. Pamela Bondi
207 Bannockburn Ave.
Temple Terrace, FL   33617

55. Chesterfield H Smith Jr.
Associate Deputy Attorney General
107 West Gains Street
Tallahassee, FL   32399

56. David McClain
c/o  State of Florida, Office of the Attorney General
501 E. Kennedy Blvd.
Suite 1100
Tampa, FL   33602- 5258

57.  Florida Attorney General's Office
The Capitol PL-01
Tallahassee, FL   32399-1050

58.  Tanya Menton
c/o ABC, Inc.
500 S. Buena Vista St.
Burbank, CA   91521- 9722

59.  Marcy McDermott
5525 Dark Star Lp.
Wesley Chapel, FL   33544

60.  Cyrie Schneider
821 S.W. 60 Ter
Gainesville, FL   32607

61.  Donald Trump
c/o The White House
1600 Pennsylvania Ave. N.W.
Washington, D.C.   20500

62. Janice Pickett
63. Michael D'Lugo
c/o Wicker, Smith, O'Hara, McCoy & Ford, P.A.
390 North Orange Avenue
Suite 1000

Orlando, FL 32801

64. Wicker, Smith, O'Hara, McCoy & Ford, P.A.
390 North Orange Avenue
Suite 1000
Orlando, FL 32801

65. Frederick Hearn
66. Steven Hearn
c/o Steven Hearn P.A.
625 East Twiggs St
Suite 102
Tampa, FL 33602
813-222-0003

67. Steven Hearn P.A.
625 East Twiggs St
Suite 102
Tampa, FL 33602
813-222-0003

68. Christopher Wray
c/o Federal Bureau of Investigation
935 Pennsylvania Ave N.W.
Washington, D.C. 20535

69. Richard Smith
821 S.W. 60 Ter
Gainesville, FL 32607

70. Richard Murphy
8954 S.W. 76th Lane
Gainesville, FL 32608

71. Grower, Ketcham, Eide, Telan & Meltz, P.A
901 N Lake Destiny Rd
Maitland, FL 32751

72. Willow Bay
USC School of Journalism
3502 Watt Way
#304
Los Angeles, CA 90089
2rd mailing address:
P.O. Box 1119
Idyllwild, CA 92549-1119

73.  Butler, Weihmuller, Katz and Craig LLP
Suite 2300
400 N. Ashley Drive
Tampa, FL  33602

74.  Boyd, Richards, Parker and Colonnelli P.L.
Suite 1150
400 N Ashley Dr.
Tampa, FL  33602

75.  Ricky Polston
500 S. Duval St.
Tallahassee, FL  32399

76.  Charles Canady
500 S. Duval St.
Tallahassee, FL  32399

77.  Ashley Moody
The Capitol PL-01
Tallahassee, FL  32399

78.  Ron DeSantis
400 S Monroe St,
Tallahassee, FL  32399


**Affidavit of Verification:**

**STATE OF FLORIDA, COUNTY OF HILLSBOROUGH**

I, Darryl Schneider, being duly sworn, deposes and say:  I the

Plaintiff in the above entitled action, have read the foregoing

complaint and know the contents of it and say that the contents

are true and correct to the best of my personal knowledge and

belief and are made in good faith.

_____ Signature

Subscribed and sworn before me on _____2/1/2020_____

to certify which witness signed by my hand and official seal.

Driver License# _S·536·173·61·145·0_____

_____ Name

_____ Signature

JANET FONSECA
Notary Public – State of Florida
Commission # GG 189711
My Comm. Expires Feb 25, 2022

_____ Notary Public State of Florida Seal

I, Sandra Kimball, being duly sworn, deposes and say:  I the
Plaintiff in the above entitled action, told Mr. Schneider what
happened to me in this matter and exactly what l wanted to state
in this complaint and he wrote them down for me in this
complaint.  I have read the foregoing complaint and know the
contents of it and say that the contents are true and correct to
the best of my personal knowledge and belief and are made in
good faith.

_____ Signature

Subscribed and sworn before me on ____2/1/2020____

to certify which witness signed by my hand and official seal.

Driver License# _K514·796·81·913·0_____

_____ Name

_____ Signature

JANET FONSECA
Notary Public – State of Florida
Commission # GG 189711
My Comm. Expires Feb 25, 2022

_____ Notary Public State of Florida Seal

414